<pre>
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA        :
                                     :
 4   vs.                             : Case No. SA:19-CR-00063-DAE
                                     : San Antonio, Texas
 5   HAE YEONG SONG(1),              : July 21, 2021
     Defendant.                      :
 6   ********************************************************

 7             TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE DAVID A. EZRA
 8              SENIOR UNITED STATES DISTRICT JUDGE

 9   APPEARANCES:
     FOR THE GOVERNMENT:
10     Bettina Richardson, Esquire
       Eric Yuen, Esquire
11     Assistant U.S. Attorneys
       United States Attorney's Office
12     601 N.W. Loop 410, Suite 600
       San Antonio, Texas  78216
13     (210)384-7152

14

15   FOR THE DEFENDANT:
       John A. Convery, Esquire
16     Julie Hasdorff, Esquire
       Hasdorff & Convery, P.C.
17     1005 South Alamo Street
       San Antonio, Texas  78210
18     (210)738-9060

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     655 East Cesar E. Chavez Blvd., Third Floor
22   San Antonio, Texas  78206
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
</pre>

# I N D E X

**WITNESSES**                                                    **PAGE**

**Special Agent Joshua Findley**

By Mr. Yuen                                                       5


**Jeffrey Stetler**

By Mr. Yuen                                                      10

TRIAL PROCEEDINGS                    3

 1   *(Wednesday, July 21, 2021, 9:13 a.m.)*

 2                              *  *  *

 3            COURT SECURITY OFFICER:  All rise.

 4            COURTROOM DEPUTY CLERK:  SA:19-CR-00063, United States

 5   of America versus Hae Yeong Song.

 6            THE COURT:  Okay.  The Court would note the presence

 7   of the defendant and the presence of counsel for the continuing

 8   nonjury trial.  All right.  Does the government wish to call

 9   its next witness?

10            MR. YUEN:  Yes, Your Honor, but before we do so, there

11   are two points I'd like to address.  One is, Your Honor, for

12   the government witnesses who have already testified and who the

13   government does not intend to ask to testify, may they be

14   allowed to be excused from the rule and witness the rest of the

15   proceedings or come and sit in the audience?

16            THE COURT:  I don't have a problem with that.  We

17   don't have a jury.  Mr. Convery.

18            MR. CONVERY:  I would have to know who is staying to

19   testify and who is leaving.

20            THE COURT:  He said they're not intending to have them

21   testify, unless you intend to call some of them.

22            MR. CONVERY:  In order to make that decision, out of

23   the remaining people, who do you intend to call?

24            MR. YUEN:  We intend to call Special Agent Josh

25   Findley and Jeffrey Stetler.

1          MR. CONVERY:  Okay.  Then I have no concern with them

2   sitting in the courtroom.

3          THE COURT:  All right.  Yes.

4          MR. YUEN:  Thank you, Your Honor.  And then the second

5   thing is as a housekeeping matter, Government's Exhibits 10A

6   and 14A are excerpts of those Excel spreadsheets that are in

7   evidence as Exhibits 10 and 14 and we just want to make sure

8   that those excerpts are formally in evidence as well.

9          THE COURT:  Did you move them in?  I can't remember.

10         MS. RICHARDSON:  I offered -- I talked about them and

11  offered them.  I don't think I moved them to be asked to be

12  admitted.

13         THE COURT:  So you're doing that now?

14         MS. RICHARDSON:  Yes, please.

15         THE COURT:  Any objection?

16         MR. CONVERY:  Subject to my objection with respect

17  to --

18         THE COURT:  They'll be received.

19         MR. YUEN:  Thank you, Your Honor.  If it please the

20  court, the government calls Joshua Findley.

21         COURTROOM DEPUTY CLERK:  Please raise your right hand.

22                         *   *   *

23         *(JOSHUA FINDLEY, Government Witness, Sworn.)*

24                         *   *   *

25         THE WITNESS:  I do.

1        COURTROOM DEPUTY CLERK:  You can have a seat.

2                    DIRECT EXAMINATION

3    BY MR. YUEN:

4    Q.  Good morning, sir.  Would you please state your name and

5    spell your last name for the record?

6    A.  My name is Josh Findley, F-I-N-D-L-E-Y.

7    Q.  Who do you work for, sir?

8    A.  I'm employed by the Department of Homeland Security,

9    Homeland Security Investigations.

10   Q.  What's your title there?

11   A.  I'm a special agent.

12   Q.  How long have you been with Homeland Security?

13   A.  I've been with Homeland Security since 2004.

14   Q.  What are your duties and responsibilities as a special

15   agent?

16   A.  I'm a criminal investigator.  Currently I'm assigned to a

17   child sexual exploitation group.

18   Q.  How long have you been working on cases involving the

19   exploitation of children?

20   A.  This -- including this job and my previous law enforcement

21   experience, probably around 23 years.

22   Q.  What was your previous law enforcement experience?

23   A.  I worked for the Treasury Inspector General and Army CID.

24   Q.  Roughly how many child exploitation investigations have you

25   worked on?

Joshua Findley - Examination                    6

1   A.  I've been the primary case agent on probably over a hundred

2   cases and assisted on probably a thousand cases.

3   Q.  Have some of those investigations involved the production

4   and receipt and possession of child pornography?

5   A.  All of the above, sir.

6   Q.  As part of those investigations, do you have to attempt to

7   determine the age of the suspected children in those

8   depictions?

9   A.  Yes, sir.

10  Q.  Have you ever heard the term series in relation to child

11  pornography?

12  A.  Yes, sir.

13  Q.  What's a series?

14  A.  A series is a group of images or videos of a certain victim

15  or victims that have been traded on the Internet and sent to

16  the National Center for Missing and Exploited Children.  They

17  group those by offenders and each series is given a different

18  nondescript name to go by.

19  Q.  When you say a nondescript name, what do you mean?

20  A.  Sometimes, you know, it will describe something in the

21  background or a bedspread or something like that.  Sometimes it

22  will be a name that people on the Internet are calling it, but

23  they try to preclude using the suspect's name or the victim's

24  name in naming a series.

25  Q.  I'd like to direct your attention to 2005.  Were you

Joshua Findley - Examination                7

1   working child exploitation cases at that point?

2   A.  Yes, sir.

3   Q.  Are you familiar with a series of child pornography videos

4   and photographs that's known as the Vicki series?

5   A.  Yes, sir, I am.

6   Q.  How did you become familiar with that series?

7   A.  I was the case agent on that case.  There was a series of

8   videos that was being circulated on the Internet.

9   Investigators in Toronto, Canada had found clues in those

10  images and videos that led them to believe that the possible

11  victim in this case was located in the Pacific Northwest.  They

12  reached out to me and I initiated an investigation to try to

13  find this victim and get her out of an abusive situation.

14  Q.  Is it safe to assume that you were in the Pacific Northwest

15  at that time?

16  A.  Yes, sir.

17  Q.  You said that you were asked to identify that victim?

18  A.  Yes, sir.

19  Q.  Were you also asked to identify the -- well, let me back

20  up.  Can you describe generally what the photographs and videos

21  in the Vicki series depict?

22  A.  There's about 13 original videos that range in length from

23  ten to 20 minutes.  Those videos depict a minor female being

24  anally sodomized, vaginally sodomized and oral sex both as the

25  passive and active recipient.

1    Q.  And were you able to determine -- obviously you reviewed

2    those videos, correct?

3    A.  Yes, sir.

4    Q.  You said there was a child, female child in those videos?

5    A.  Yes, sir.

6    Q.  Who else was depicted in those videos?

7    A.  One male subject.

8    Q.  Were you asked to identify that male subject as well?

9    A.  Yes, sir.

10   Q.  Were you able to identify the child and the male?

11   A.  Ultimately, yes, sir, we identified the victim and the

12   suspect in the case.

13   Q.  Were you able to determine what, if any, relationship the

14   male had with the child?

15   A.  Yes, sir, it was her biological father who had abused her

16   on his bi-monthly visits.

17   Q.  Special Agent Findley, I'm going to show you -- I'm going

18   to ask you to look at what's in evidence as Government's

19   Exhibit 26A.

20          MR. YUEN:  Your Honor, may I approach?

21   BY MR. YUEN:

22   Q.  Special Agent Findley, do you recognize this?

23   A.  Yes, sir.

24   Q.  What do you recognize it to be?

25   A.  This is a series of still images taken from a video which

1  shows the victim in the Vicki series performing oral sex on an

2  adult male.

3  Q.  Based on your investigation, do you know how old the child

4  is in this video?

5  A.  Yes, based on my investigation, she was ten and eleven

6  during the entire abusive time in her life, so she would have

7  had to either been ten or eleven in these photographs.

8           MR. YUEN:  I'll pass the witness, Your Honor.

9           MR. CONVERY:  No questions.

10           THE COURT:  You can step down, sir.

11           THE WITNESS:  Thank you.

12           MR. YUEN:  Your Honor, the government calls Jeffrey

13  Stetler.

14           *(9:22 a.m.)*

15           COURTROOM DEPUTY CLERK:  Please raise your right hand.

16                         *   *   *

17           *(JEFFREY STETLER, Government Witness, Sworn.)*

18                         *   *   *

19           THE WITNESS:  I do.

20           COURTROOM DEPUTY CLERK:  You can have a seat.

21                    DIRECT EXAMINATION

22  BY MR. YUEN:

23  Q.  Good morning, sir.

24  A.  Good morning.

25  Q.  Please state your name and spell your last name for the

1  record?

2  A.  My name is Jeffrey Frederick Stetler.  Last name is spelled

3  S-T-E-T-L-E-R.

4  Q.  I understand that you're retired, sir?

5  A.  I am.  I retired June 30th.

6  Q.  Congratulations.

7  A.  Thank you.

8  Q.  Where did you retire from?

9  A.  I was a special agent with the FBI and retired out of the

10  Cleveland Division.

11  Q.  How long were you a special agent with FBI?

12  A.  Twenty-three years.

13  Q.  How many years did you work cases involving child

14  exploitation?

15  A.  My first child exploitation case was approximately 2007 and

16  I've worked them off and on from that time, mixed in with some

17  Indian country violations.

18  Q.  Roughly how many investigations involving child

19  exploitation did you work on?

20  A.  It's hard to quantify, I would say dozens.

21  Q.  I'd like to direct your attention to 2013.  Did you work

22  child exploitation cases during that timeframe?

23  A.  Yes, I did.

24  Q.  Are you familiar with a series of child pornography videos

25  and photographs known as the at-school series?

Jeffrey Stetler - Examination                11

1    A.  I am.

2    Q.  How did you become familiar with that series?

3    A.  That series or that case actually came to us as a lead from

4    some of our international partners from the Queensland Police

5    Department in Australia and the Dutch National Police.  The

6    Australians had downloaded six videos from the Internet which

7    contained images of a prepubescent Hispanic female.  In these

8    videos which were set in different locations, there were six of

9    them, in these videos set in different locations there was an

10   adult male, you could see his penis in hand, he was

11   masturbating, ultimately placing his penis in the child's mouth

12   and then ejaculating.

13       And then during the same time -- these were downloaded in

14   June and July of 2013.  At the same time, the Dutch National

15   Police had downloaded three videos which were three of the six

16   that the Australians had downloaded.  Both of these departments

17   had -- both sets of videos referenced a victim named Gina.  One

18   of the videos the Dutch National Police downloaded was called

19   Gina Sucking It At School.  Embedded in this video was GPS

20   coordinates that came back to the Belfair Elementary School in

21   Belfair, Washington, which was in our territory in the Olympia

22   resident agency of Seattle.

23       The Dutch National Police submitted that video and that

24   information to an Interpol working group which caused the

25   Australians to further analyze their videos.  They submitted

1   this information to Interpol on the 19th of August, 2013.  The

2   Australians looked at their images again to determine that two

3   of their six videos had GPS coordinates embedded.  One of these

4   Gina Sucking It At School came back to the Belfair Elementary

5   School and the second video came back to a residence in San

6   Diego, California.  This residence was determined to have been

7   the former residence of our subject, David Navarro.  Open

8   source research conducted by the Australians determined that

9   David Navarro was now more likely than not living in the

10  Belfair area.

11      The Australians also found an e-mail address associated

12  with David Navarro.  All of this information came to us, we

13  acted quickly, confirmed David Navarro's address in Belfair,

14  Washington.  A subpoena to Yahoo confirmed that this e-mail

15  address associated with David Navarro was, in fact, registering

16  at an IP address in Belfair, Washington.  Through DMV checks we

17  had confirmed his address.  We did some open source social

18  media checks and it confirmed that David Navarro did, in fact,

19  have a daughter that appeared to be Gina from the videos

20  provided.

21      We took a sanitized version, sanitized picture from the

22  Gina At School video and showed it to the Belfair Elementary

23  School guidance counselor who confirmed our victim's identity

24  and age and that the video had, in fact, been shot at the

25  Belfair Elementary School.  We were further advised that David

1  Navarro, our subject, was the president of the PTA and that the

2  video had more than likely than not been shot after a PTA

3  meeting.  Because we had information that we believed this girl

4  was being actively victimized, we moved very quickly and

5  obtained arrest warrant for David Navarro on the 23rd of

6  August, two days before our victim's 8th birthday.

7  Q.  I think you may have already answered my next question, but

8  were you able to determine the child's age?

9  A.  Yes, we were.  We know that our child victim was born on

10 August 25th, 2005 through, one, the guidance counselor, but

11 through birth records and through interviews of her mother.

12 And we arrested David Navarro two days before the 8th birthday.

13     *(Pause.)*

14 Q.  Mr. Stetler, I'm going to show you -- I'm going to ask you

15 to take a look at two exhibits one at a time.  The first is

16 going to be 22A.  Do you recognize what's depicted in

17 Government's Exhibit 22A?

18 A.  Yes, that is one of the six videos in the at-school series.

19 Q.  Can you just describe for the record what that exhibit

20 depicts?

21 A.  The actual video is Mr. Navarro masturbating, placing his

22 penis into the mouth of our victim and then ejaculating on her

23 face.

24 Q.  And again, based on your investigation, how old is the

25 victim in this video?

1   A.   This video I believe was either taken sometime between May

2   and June, possibly July of 2013, so she would have been no

3   older than seven years old.

4   Q.   And then I'd ask you to take a look at Government's 33A.

5   And I'll ask you the same questions.  Do you recognize this?

6   A.   I do.  This is another one of the at-school videos, one of

7   the six, and it depicts very much the same thing that I just

8   described in the previous video.

9   Q.   And is the child's age more or less the same?

10  A.   Yes.

11          MR. YUEN:  I'll pass the witness, Your Honor.

12          MR. CONVERY:  No questions.

13          THE COURT:  No questions?

14          MR. CONVERY:  No, sir.

15          THE COURT:  You may step down, sir.

16          THE WITNESS:  Thank you.

17          THE COURT:  Ms. Richardson, do you have any additional

18  witnesses?

19          MS. RICHARDSON:  We do not, Your Honor.  At this time,

20  the United States rests.

21          THE COURT:  All right.  We don't have a jury to send

22  out, so if you'd like to make your motion, counsel, you can do

23  that now.

24          MR. CONVERY:  Thank you, Your Honor.  Your Honor, we

25  would move for judgment of acquittal in terms of the

1   government's failure to prove its case.  I think the most

2   striking thing is the incomplete or lack of chain of custody.

3   I would point out to the Court that there are two exhibits in

4   question -- there was testimony that the Court will recall, but

5   3A and Six cannot be correct in the sense that 3A is the

6   envelope that the phone was put into.  It's signed for by the

7   person who identifies himself on the Army form as the evidence

8   custodian.  We learn through testimony that he attempted to

9   test the phone, that he used some device to test the phone, but

10  the Court knows nothing about that, nothing.  No paperwork, no

11  report from the device, nothing to indicate and nothing on the

12  envelope itself, most importantly, to indicate that the phone

13  was removed from that envelope or put back during the time

14  period 22 January to 25 January.

15           The government or the clean-up or clear-up tends to

16  indicate that perhaps it was done after the Military Magistrate

17  authorized the seizure and the search, keeping in mind that the

18  seizure was, if you look at the form in terms of the Military

19  Magistrate, the seizure was hidden from the Military

20  Magistrate.  The form itself on its face indicates that they

21  want to seize the phone.  How can that be, one would ask in

22  good faith, when you told the neutral and detached Magistrate

23  that these are your reasons and you want to take the phone?

24  Not that you took it days ago.  So going from there, you have

25  this search.

1          Now go to Mr. Cunningham, Agent Cunningham.  Doesn't

2    indicate he got any records for his forensic examination about

3    whatever happened to the phone in that evidence room back at

4    Fort Sam Houston.  We don't know and the Court doesn't know.

5    And it's critical because then when you go to Government's

6    Exhibit Number Six and you look at that chain of custody

7    document, just think of all the law that's gone before us in

8    terms of the importance of chain of custody, none of this is on

9    there.  And that's fundamentally wrong and it's the

10   government's burden and the government's obligation.

11         We would reurge the motion to suppress on that basis

12   that became clear only at trial and that the government,

13   therefore, has not proved its case.  Thank you.

14         THE COURT:  Ms. Richardson.

15         MS. RICHARDSON:  Your Honor, with regards -- first and

16   foremost, chain of custody goes to the weight of the evidence,

17   not the admissibility.  But secondly and more importantly, the

18   very thing that Mr. Convery speaks of was discussed from the

19   witness stand.  Special Agent Cerean talked about taking the

20   phone, putting it into the sealed envelope, he documented on

21   the form that he put it in the envelope, the testimony

22   discussed the fact that Kevin Strong on the installation

23   attempted an extraction of the phone, but was not successful.

24   Special Agent Cunningham discussed the fact that that's often

25   because of the level of licensing at the installation as

1    opposed to at a digital forensic examination location being

2    different and more successful there.

3          It is documented that Special Agent Cunningham took

4    the phone out of the envelope, did his work on that phone with

5    regards to the extraction and put the phone back into the

6    envelope.  The evidence before the Court was extracted from

7    that phone.  So the question with regards to custody is that

8    Where did the phone come from?  We had the testimony of Special

9    Agent Cerean who testified the phone came from the defendant.

10   And then, What happened to the phone and whether or not any of

11   the evidence that was put before the Court had been altered or

12   changed in any way.  And there is no evidence that anything was

13   changed.  There is evidence that the local installation

14   attempted an extraction, attempted to conduct the search at the

15   location, but were unsuccessful.  The phone was then

16   transferred to Fort Hood for a digital forensic examiner to

17   conduct the extraction and the analysis.

18          There's no evidence that would indicate that anything

19   happened to the phone that would change anything that was

20   within the phone.  And the testimony clearly establishes where

21   that phone went and who touched that phone.  There is, in fact,

22   extra documentation attached to the chain of custody and there

23   was witness -- there was testimony from the witness stand and,

24   in fact, Mr. Convery cross-examined the witnesses with regards

25   to the movement of the phone and the touching of the phone from

1    the time it was seized to the time that the examiner downloaded

2    it and began the analysis.

3              MR. CONVERY:  I forgot, Your Honor, with that the

4    defense, of course, would close and rest.

5              THE COURT:  Okay.  Thank you, Mr. Convery.

6              MR. CONVERY:  I didn't put that on the record.  I

7    apologize.

8              THE COURT:  Well, usually I do the defendant's motion

9    for judgment of acquittal before we hear from the defendant,

10   but I understand from your earlier pronouncements that you have

11   no witnesses.  Is that right?

12             MR. CONVERY:  Thank you, Your Honor.  The defendant --

13             THE COURT:  I have to query the defendant personally

14   about that before you close, actually.

15             MR. CONVERY:  I understand.

16             THE COURT:  So at this point, the Court of course must

17   look at the evidence in a light most favorable to the

18   government and the Court is absolutely satisfied with the chain

19   of custody with regard to the cell phone in this case.  There

20   is absolutely not one shred of doubt in the Court's mind, let

21   alone beyond a reasonable doubt, that this phone was kept in an

22   undisturbed and pristine condition from its inception into the

23   hands of the agent until it was formally examined.  I have no

24   concerns about that.  Let me say that, this is not something

25   that I take lightly.  I have in the past refused to allow

1  certain exhibits in evidence.  In one case, it resulted in the

2  dismissal of the criminal charges because it was the only

3  evidence the government had where I had -- where there was a

4  need for the government to establish the custody of the items

5  that were to go into evidence and there was some real, genuine

6  concern on my part from the evidence that the particular

7  evidence in question, which was drug evidence, had, in fact,

8  been tampered with.  And the government utterly failed to

9  provide me to any degree of certainty that that didn't occur.

10 And, in fact, there was very wishy-washy testimony about it

11 from one of the lab assistants and it later turned out that the

12 lab where they were tested had big problems.  So I had

13 suppressed that, wouldn't allow it in and that was the right

14 thing to do in that case.  So I'm not afraid to suppress

15 evidence and I've done it before in other instances.

16        In this case, there's no question about what

17 transpired with the phone, who had it, what was done with it.

18 It's all been clearly and well documented.  Otherwise, I should

19 say that the evidence submitted by the government at this

20 point, looking at it in a light most favorable to the

21 government has clearly been enough by which the Court could

22 find beyond a reasonable doubt the defendant guilty of each and

23 every element of the indictment.

24        Now, my understanding is that the defendant has

25 decided he does not wish to testify.  Am I right, Mr. Convery?

1          MR. CONVERY:  You are correct, sir.

2          THE COURT:  All right.  So I need to have Mr. Song

3     stand up.  And would you remove your mask for the purposes of

4     the reporter, Mr. Song?

5          You understand, Mr. Song, that you do have the right

6     to testify in your own defense?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Okay.  And you've been advised of that

9     both by the Court and by your attorneys, I am quite sure.

10          THE DEFENDANT:  Yes.

11          THE COURT:  All right.  But you've also discussed that

12    you have the constitutional right not to testify, is that

13    right?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Okay.  Now, you know that your deciding

16    not to testify cannot and will not be used against you in any

17    way and the burden always remains upon the government to

18    establish your guilt beyond a reasonable doubt.  You understand

19    that?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Okay.  Now, has anybody forced you,

22    coerced you or intimidated you into electing not to testify?

23          THE DEFENDANT:  No.

24          THE COURT:  Okay.  So this is your own decision?

25          THE DEFENDANT:  Yes.

1          THE COURT:  Okay.  Now, your lawyers can advise you,

2    but you have to remember that the decision ultimately to

3    testify or not to testify remains your decision.  You

4    understand that?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Okay.  And you still wish to exercise your

7    right not to testify?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Okay.  You can be seated.  Thank you.

10         THE DEFENDANT:  Thank you.

11         THE COURT:  All right.  Now, I must ask you, other

12   than your client who has decided not to testify, do you have

13   any additional witnesses or evidence you wish to put on?

14         MR. CONVERY:  No, Your Honor.  We would rest and

15   close.

16         THE COURT:  Okay.  And that means the government has

17   no rebuttal case, obviously.  All right.  Now, I didn't elect

18   to hear any opening statement because the Court absolutely

19   didn't need it.  The Court is well aware of all of the facts

20   and circumstances.  However, if counsel would like some closing

21   argument, I am more than happy to allow you to have closing

22   argument.

23         MS. RICHARDSON:  The government is prepared to do so,

24   Your Honor.

25         THE COURT:  All right.  And that's the same for you as

1    well, Mr. Convery.

2              MR. CONVERY:  Thank you, Your Honor.

3              THE COURT:  Okay.  You may proceed.

4              MS. RICHARDSON:  Thank you, Your Honor.  Your Honor,

5    you know that this case it starts, it rises and falls on

6    Government's Exhibit Three which was the cell phone that was

7    seized from the defendant as part of the ongoing investigation

8    that was already underway.  That cell phone represents one of

9    the primary elements in this case required both for counts one

10   and count two and that is a facility of interstate commerce.

11             We move from that cell phone to the forensic

12   examination that was conducted by Special Agent Jeffrey

13   Cunningham wherein a number of tools produced an enormous

14   amount of evidence.  First and foremost, that not only was that

15   beyond a reasonable doubt the defendant's phone because he had

16   it in his possession, it was his phone because he told the

17   agents, *I don't want you to take my phone.*  We know it was his

18   phone because he told the agents, *I know there's a video on*

19   *that phone and I can show it to you.*

20             We also know from Government's Exhibit 15 where the

21   user accounts were identified through the forensic analysis and

22   the important fact, one of the most critical facts that we find

23   from Government's Exhibit 15, is the identification of Hae

24   Yeong Song as the user of a variety of accounts.  Another very

25   important fact that we learned from the user accounts

1    identified in Government's Exhibit 15 is that the user is

2    identified as Soohyuk, S-O-O-H-Y-U-K.

3           We move from Government's Exhibit 15 to Government's

4    Exhibit 10.  Government's Exhibit 10 and 10A provide the Court

5    with a foundation of the defendant's intent to not only receive

6    child pornography, but to possess child pornography.  The web

7    history discussed in Government's Exhibit 10 and 10A show us

8    the variety of websites and searches conducted by the

9    defendant.  Of importance is the highlighted portion on that

10   page of 10A which identifies the web activity for

11   Hush18.Tumbler.com.

12          That takes us to Government's Exhibit 11A wherein

13   there's a conversation recorded that involves Hush18.Tumbler.

14   That conversation is originally, not just translated, but

15   originally in Korean and in English.  That conversation takes

16   place between 11/26/2017 and January 22nd, 2018.  The

17   conversation, while we don't know who is on the other side, we

18   know that the device, Government's Exhibit Three, is in

19   communication and that that communication involves conversation

20   regarding the desire for pictures via the Internet and

21   inquiring on how do you get them.

22          We then move to Government's Exhibit 12A which further

23   emphasizes the knowledge and the intent of the user of

24   Government's Exhibit Three.  In Government's Exhibit 12, we see

25   the translated conversation between Soohyuk, S-O-O-H-Y-U-K,

1    identified in the user accounts as the user for multiple

2    accounts having a conversation back and forth with Mr. Hush18.

3    That conversation begins on January the 19th, 2018 and goes

4    through January the 20th, 2018.

5              We move to Government's Exhibits 12B and 12C.  These

6    are the -- at first look when you put all of those various

7    screen shots together as the Court pointed out at the beginning

8    of our trial yesterday, they first appear unrelated and without

9    context, but when you put the conversation around them, it

10   becomes very clear what those various screen shots are.  They

11   are screen shots that are flowing in both directions between

12   the cell phone and Mr. Hush18.  Those screen shots show

13   receipt, they show knowledge, they show intent, they show the

14   use of a computer.  They show a facility of interstate

15   commerce.  Those screen shots represent the conversation

16   between those two individuals negotiating quality and quantity

17   and length and specific specifications as to the victims in the

18   sexual assault materials that the defendant was seeking.  He

19   was specific to race, he was specific to age and he was

20   specific in the quality that he wanted and the length of the

21   videos that he wanted.

22             At the end of that conversation, after the negotiation

23   goes back and forth -- and these screen shots represent the

24   ones coming from Mr. Hush18 represent Mr. Hush18's efforts to

25   show the defendant how to engage in business with him, how to

1    make payment by Paypal, Venmo, gift cards.  He then sends him

2    examples of the gift cards that he could use.  He also, at the

3    request of the defendant, sends a compilation of a variety of

4    samples of child pornography.  Finally, the defendant sends him

5    money in exchange for videos.  He receives the three zip files

6    within this conversation.  The defendant opens those zip files,

7    he unzips them, extracts the videos and he sends back to

8    Mr. Hush18 the menu list of the videos he opened and looked at.

9            That takes us to Government's Exhibit 12 which shows

10   within all of Government's Exhibits 20 through 35, including

11   Exhibits 22, 26 and 33 that we heard about this morning, when

12   those zip files were transferred that takes care of our

13   receipt.  When the defendant sends back the screen shot of all

14   of the videos that actually captured portions of those videos,

15   he was actually distributing back to Mr. Hush18 child

16   pornography.

17           When we go to --

18           MR. CONVERY:  I have to object to raising 404(b)

19   evidence in a closing argument.  I'm not exactly sure where we

20   go, but that's the reason for my objection.  Can't just sit

21   here as defense counsel --

22           THE COURT:  I thought she was referring to evidence

23   that's in.

24           MS. RICHARDSON:  I am.

25           THE COURT:  This isn't 404(b), this is actual evidence

1    that's in the record.

2          MR. CONVERY:  It's uncharged misconduct, there was no

3    balancing test, there was nothing to suggest that she's now

4    saying that that itself was a crime.  And I believe that's

5    inappropriate in closing.

6          THE COURT:  I'll disregard it.

7          MS. RICHARDSON:  When we look at Government's Exhibits

8    20 through 35, we know that there is knowledge of what he's

9    received because he's watched them.  And we know that because

10   Government's Exhibits Three and Four provided us with the fact

11   that he saved those unzipped videos and images in multiple

12   places, on the cell phone as well as on the SD card.  We also

13   have as evidence of his knowledge and of the possession the

14   evidence that was documented in Government's Exhibits 14 and

15   14A which are the VLC records showing which videos he used the

16   VLC media player to watch.  And the videos that he watched all

17   included prepubescent children which is evident just by

18   watching them, but has also been supported by the testimony

19   from the witness stand this morning by two agents who are

20   personally familiar with those children.  They all include

21   sexually explicit conduct involving all of the available forms

22   of sexually explicit conduct, sexual intercourse, anal

23   intercourse and oral, both as recipients and as being

24   perpetrated and being the perpetrator.  It includes bestiality

25   and includes bondage.  All of those videos were not just

TRIAL PROCEEDINGS                    27

1   watched, they were saved.

2           Probably, Your Honor, the most telling piece of

3   evidence can be found on page four of Government's Exhibit 12A

4   and that is the conversation wherein this is the incoming

5   portion of that conversation wherein Mr. Hush18 says,

6   *"Possessing these video footages in America?  Should be*

7   *prohibited."*

8           Soohyuk, outgoing message, *"As long as one doesn't get*

9   *caught with it."*

10          Mr. Hush 18, *"I'll be in trouble if you're caught."*

11          Soohyuk, *"How?  It's not connecting."*  Soohyuk to

12  Mr. Hush18, *"You're in Korea, you won't get caught."*

13          Mr. Hush18 to the defendant, *"Can you send it to a*

14  *bank account from there?"*

15          He knew exactly what he was doing because it was

16  exactly what he intended.

17          THE COURT:  What I'm interested in you focusing on for

18  a moment, Ms. Richardson, is the evidence in the record of him

19  actually distributing the child pornography.

20          MS. RICHARDSON:  So from his -- well, he hasn't been

21  charged with distribution.

22          THE COURT:  Well, he's been charged --

23          MS. RICHARDSON:  With receipt.

24          THE COURT:  Yes, I'm sorry, receipt.  That's right.

25          MS. RICHARDSON:  The receipt is fully documented by

1    the three zip files that are transferred from Mr. Hush18 on

2    that specific date, arriving to his phone and the knowledge of

3    what's in those zip files is documented when he opens those zip

4    files, he views the images.

5              THE COURT:  That's right, that's right.  I was looking

6    at count two and I in looking at count two, you're right,

7    that's just possession, that isn't distribution because I

8    didn't see much evidence here of distribution.

9              MS. RICHARDSON:  No, and the only reason I mentioned

10   it, and I obviously would not have mentioned it in front of a

11   jury, is to show his --

12             THE COURT:  Well, that was why I was asking you about

13   it because you were talking about him sending stuff back and

14   I'm looking here to see where is the distribution because it

15   isn't here and it isn't in the charges.

16             MS. RICHARDSON:  Correct.  No, he's not charged with

17   distribution, he's charged with receipt.  The screen shot back

18   to Mr. Hush18 was to confirm what he had received and opened.

19             THE COURT:  Well, he's actually charged with

20   possession in one count and receipt in the other.

21             MS. RICHARDSON:  That's correct.  That's correct, Your

22   Honor.  The government is confident they've proved each and

23   every element for both count one, receipt of child pornography,

24   as well as count two, possession for child pornography and we

25   would ask that the Court find the defendant guilty.

1          THE COURT:  Counsel, I've actually already heard a

2    good part, I think, of your closing argument.  If you wish to

3    give some more, I'm happy to have it.

4          MR. CONVERY:  You have heard my closing argument.  For

5    the defense, it's apparent to the Court, I think, that this

6    case revolves around the motion to suppress.

7          THE COURT:  That's right.

8          MR. CONVERY:  And now the issue of the chain of

9    custody.  In terms of the evidence, it's somewhat of a

10   circumstantial case in that it's based on it being his device.

11   There's not a wit of testimony from any friend, roommate,

12   anyone else that's ever seen --

13         THE COURT:  I would absolutely agree with you that

14   without -- because I don't believe that he confessed.  I don't

15   have -- we don't have any confession, so if there's no cell

16   phone, there's no case.

17         MR. CONVERY:  Correct.  And in terms of the possession

18   versus the receipt, that's the decision that the Court has to

19   wrestle with in any two-count case where the facts are somewhat

20   inextricably intertwined.  But with respect to where we're at,

21   the analysis of the Court in terms of the motion to suppress,

22   and with that I would have no additional closing argument.

23   Thank you.

24         THE COURT:  I think the parties are well aware that

25   the Court is quite knowledgeable on the background of this case

1  and the facts because we did essentially have a mini trial on

2  the issue of suppression.  And now, which was I think almost as

3  long as this one and that's all in the record.  And the Court,

4  of course, has heard the testimony today -- not today, but some

5  today, yesterday as well, in some greater detail and the Court

6  did verify for itself and there was no contention on the part

7  of the defense that these files did not constitute child

8  pornography under any definition of it, but in particular under

9  the definition which is outlined, which consists of any visual

10  depiction including any photograph, film, video, picture or

11  computer or computer-generated image or picture whether made or

12  produced by electronic, mechanical or other means of sexually

13  explicit conduct where, (A) the production of the visual

14  depiction involves the use of minor engaging in sexually

15  explicit conduct.  Such visual depiction is a digital image,

16  computer image or computer-generated image that is or is

17  indistinguishable from that of a minor engaging in sexually

18  explicit conduct.  Such visual depiction has been created,

19  adapted or modified to appear that the identifiable minor is

20  engaging in sexually explicit conduct.  That's from 18 U.S.C.

21  2556.

22       And a computer includes any electronic, magnetic,

23  optical, electromechanical or other high-speed data processing

24  device performing logical, arithmetic or storage functions and

25  includes any data storage facility or communications facility

1  directly related to or operating in conjunction with such

2  device, but such term does not include an automated typewriter

3  or typesetter or portable handheld calculator or other similar

4  device.  And that is 18 U.S.C. 1030(e)(1).

5          I don't know of any court that has not found that a

6  modern cell phone such as the one that's in evidence in this

7  case is anything other than a computer for purposes of the

8  statute.

9          Now, looking at count one, receipt of child

10 pornography, the elements are four, any person -- and of course

11 the defendant is a person -- who knowingly receives or

12 distributes.  And that's where the confusion was because this

13 statute does include "distributes", but you're not trying to

14 make a distribution case here.  Who knowingly receives -- and

15 the evidence establishes beyond a reasonable doubt that the

16 defendant did, in fact, receive knowingly child pornography --

17 any child pornography or any material that contains child

18 pornography.  This Court has received and has viewed the

19 material in evidence.  It does clearly and without question

20 contain images and videos of child pornography.  We often have

21 a problem because there are some -- and I've presided over I

22 can't even begin to think how many of these child pornography

23 cases.  Adult websites will occasionally have images of 19 and

24 20-year-olds dressed -- who are very young looking dressed as

25 children.  And of course, that does not constitute what we have

1   in this case.  And there's a big debate over whether that's

2   child pornography or it isn't and I believe that the latest

3   rulings are that it isn't.  And I've had some evidence

4   submitted to the Court by other government prosecutors where

5   you could not when you looked at the evidence because -- and I

6   don't know how to put this in an appropriate way in this day

7   and age, but I have to say it, these young women were, if I

8   could say this, quite well developed physically.  I don't know

9   of any less offensive way of putting it.  So that you could not

10  tell when you looked at those images.  And the government's

11  prosecutor actually agreed and withdrew those images because

12  she had not actually focused on those images, but you could not

13  tell whether that person was 15 or 22, to be honest with you.

14        That is not the case with these images.  These are in

15  many instances children that are clearly -- if they're 12 years

16  old, that would be a stretch.  Many of them are almost infants.

17  They're very, very young, two to three years old in the main.

18  The activities described in these videos are largely as

19  described by the prosecutor.  I am sorry to say that some of

20  these videos included, as she said, bestiality, a dog

21  interacting with a child, a farm animal interacting with a

22  child.  And these videos were absolutely, clearly and

23  unequivocally beyond any doubt at all child pornography.  There

24  is no doubt about it.  And anyone who views it will see within

25  the first few frames that this is child pornography.  So that

1    is covered.

2          And finally, number four, any means or facility of

3    interstate or foreign commerce or that has been mailed or

4    shipped or transported in or affecting interstate or foreign

5    commerce by any means including by computer.  There is clear

6    and unequivocal evidence that that occurred in this case.  So

7    the Court finds that the government has proven beyond a

8    reasonable doubt each and every element of count one and the

9    defendant is hereby found guilty of count one.

10          Moving to count two, possession of child pornography

11   pursuant to 18 U.S.C. 2252A(a)5(B), again we have any person,

12   and of course the defendant is a person, knowingly possesses or

13   knowingly accesses with intent to view -- and we have clear

14   evidence through the forensic examination of the cell phone

15   which was his, that that did occur -- any book, magazine,

16   periodical, film, video tape, computer disk or any other

17   material, (A) that contains an image of child pornography that

18   has been mailed or shipped or transported using any means or

19   facility of interstate or foreign commerce entered to affecting

20   interstate or foreign commerce by any means, including by

21   computer.  The evidence shows beyond a reasonable doubt that

22   3(a)(i) has been satisfied and that was produced using

23   materials that have been mailed or shipped or transported in or

24   affecting interstate or foreign commerce by any means including

25   a computer and that has also been satisfied beyond a reasonable

TRIAL PROCEEDINGS                    34

1   doubt.

2          So the Court finds the defendant guilty of count two

3   beyond a reasonable doubt.

4          Now, I agree with defense counsel, if a defendant

5   unconditionally pleads to an indictment, they have

6   unequivocally and irretrievably waived -- I mean assuming that

7   that plea stands, they weren't coerced into it -- unequivocally

8   and irretrievably waived any right to challenge evidence that

9   had been suppressed by the Court.  They've waived it.  In this

10  case, the defendant has not waived his right to appeal.  I'm

11  not going to give his appellate rights because he hasn't been

12  sentenced yet, I do that after sentencing.  But the defendant

13  has not waived his right to appeal.  That can be done -- a

14  person can plead guilty with a reservation of right to appeal,

15  we call that a conditional plea.  That did not happen in this

16  case.  Why?  I have no idea, but it didn't.  And I think both

17  counsel would agree that this Court has not in any way involved

18  itself in any plea negotiations or tried to attempt or coerce

19  anybody into pleading in this case.  Would you both agree with

20  that?

21          MS. RICHARDSON:  The government agrees, Your Honor.

22          MR. CONVERY:  The defense absolutely agrees with that.

23          THE COURT:  So if the defendant had his right to a

24  trial, he waived a jury trial, he did waive the right to a

25  findings of fact and conclusions of law, which in this case

1    would have been proforma and to be honest with you would have

2    just delayed things, and so the real issue in this case is

3    whether the Court made the correct judgment in denying the

4    motion to suppress.  I am quite sure that Mr. Convery and his

5    co-counsel will make a vigorous argument on behalf of the

6    defendant in that regard and that's their duty.  That's their

7    responsibility to their client.

8           As I've said many, many times, I've been very

9    privileged to have sat by designation on the Ninth Circuit

10   Court of Appeals for over 30 years.  I hold the record for the

11   most designated sittings and I'm very proud of that because it

12   means a bunch of judges asked me back and it's because they

13   know that I believe in the appellate process.  And we've got a

14   very good Appeals Court here in our Fifth Circuit.  They will

15   look at this dispassionately as I always try to do and they

16   will make a decision on these facts as to whether or not this

17   evidence should have been suppressed in whole or in part.  And

18   I will respect that decision regardless of what it is.  And

19   that's the way our system works, just like when I sit on the

20   Court of Appeals, and I'm right in the midst of almost ready to

21   file a published opinion in a very important case that I have

22   authored and that's the way it is.  I mean, that's the way the

23   system works and I wholly believe in it.

24          So I think that lawyers -- Mr. Convery and I and

25   Ms. Richardson and I have known each other and his co-counsel

1    long enough to know that I never hold it against a lawyer who

2    appeals anything that I do.  I understand that there is some

3    concern by some lawyers that judges do and there probably are

4    some judges who do hold it against them.  I don't.  I believe

5    in that process.

6            And in fact, one of my very best friends is a retired

7    Naval officer who was the Attorney General in Hawaii.  Now, I

8    was affirmed in the vast majority of cases he appealed, but he

9    was successful in getting me reversed in a case and I admired

10   him for his good work in that case and he and I are dear, dear

11   friends today.  And I joke about it all the time.  I tell him

12   he's the only -- he can hold it over me that he got me reversed

13   in this case.  He said, Yeah, but you forget the other cases.

14   Yeah, fine guy.  Author, actually wrote -- his name was Michael

15   Lilly and he wrote a book about Admiral Nimitz, who we both

16   know Admiral Nimitz grew up right up here in Fredericksburg and

17   we have his home here in Fredericksburg.  And Admiral Nimitz

18   during his time in the Pacific in World War II stayed with the

19   Lilly family and he wrote about that time.  It's called Nimitz

20   At Ease.  It's a very good book if you haven't had a chance to

21   read it.

22           So we need to set a date for the defendant's

23   sentencing.  Is he still in the United States Army?

24           MR. CONVERY:  No, sir.

25           THE COURT:  He's been discharged?

TRIAL PROCEEDINGS                    37

1           MR. CONVERY:  Yes, sir.

2           THE COURT:  Of his own volition or did they --

3           MR. CONVERY:  Through an administrative proceeding.

4           THE COURT:  And what kind of a discharge did they give

5    him?

6           MR. CONVERY:  I believe the UOTH, under other than

7    honorable.

8           THE COURT:  They didn't give him a dishonorable

9    discharge?

10          MR. CONVERY:  No, sir.

11          THE COURT:  Other than under honorable conditions.

12          MR. CONVERY:  He administrative discharged under other

13   than honorable.  Sorry to use the acronym.

14          THE COURT:  Well, you're closer in time to your active

15   service than I am.

16          Sentencing will be November 1st of 2021, at 9:00 a.m.

17   Now, where is he living?  Where is he residing now?

18          MS. RICHARDSON:  Your Honor, the government would ask

19   that he be taken into custody pursuant to 18 U.S.C. 3143, it's

20   statutorily mandatory.

21          THE COURT:  I think that's right, unfortunately.  I

22   don't think he's a flight risk, he hasn't gone anywhere.  He's

23   done everything he's supposed to do.  Are you sure it's

24   absolutely mandatory?

25          MS. RICHARDSON:  3143 says, *"The judicial officer*

1   *shall order that a person who has been found guilty of an*

2   *offense in a case described in sub paragraphs A, B or C of*

3   *subsection F(1) and is awaiting imposition or execution of*

4   *sentence be detained.*"

5            THE COURT:  Doesn't give me much leeway.

6            MR. CONVERY:  None at all, Your Honor.  And you know,

7   the defense will take a look at that, but that's been -- I

8   think she's actually --

9            THE COURT:  I have had these cases where government's

10  counsel just stood up and said we have no objection to their

11  remaining out.  And I guess we've never looked at it that

12  carefully.  I don't think he's either -- if he was going to be

13  a flight risk or try to run back to Korea or something -- where

14  was he born?

15           MR. CONVERY:  He was born in Korea.  He lives in

16  Columbia, Maryland.

17           THE COURT:  But I think that actually we have an

18  extradition treaty with Korea.

19           MR. CONVERY:  Throughout this time, I might add,

20  throughout the pandemic he's been at home under very

21  restrictive conditions which we can talk about more at

22  sentencing, but there's just been not a single problem.  He's

23  paid his way back and forth.  I agree with you that the

24  government -- it's been my experience also that at times they

25  have not exercised that statute.  I think in terms of this

1  prosecutor exercising it, well, that's their discretion.  I

2  can't do anything about it.

3          THE COURT:  I don't mean to suggest that I have any

4  sympathy for child pornography or anybody that's engaged in it.

5  My only concern is whether somebody is going to show up or

6  they're not going to show up and I have no doubt that he is

7  going to show up.  But that aside, since the government has

8  brought to the Court's attention their desire that he be held

9  in custody and the statute appears to require it, the fact that

10  other government prosecutors have not at times asked the Court

11  to enforce that doesn't mean that when it is being placed

12  before the Court that I can ignore my responsibility to enforce

13  the law and I won't.

14          So it is the judgment of the Court that the defendant

15  is hereby committed to the custody of the United States

16  Marshals for the Western District of Texas to be held pending

17  sentence at an appropriate facility, either a facility

18  contracted by the Marshals Service or a facility owned and

19  operated by the Bureau of Prisons.  Okay.  And you got that?

20  November 1st of '21, at 9:00 a.m.

21          MR. CONVERY:  November 1st at 9:00 a.m.

22          THE COURT:  Right.  We can move that if we have to for

23  some reason.  Sometimes people get involved in things or I

24  might be in Austin in the middle of a trial or something, but

25  we can move it a few days, but we'll try not to do that.

1          MR. CONVERY:  Your Honor, I don't think we have any
2   Marshals in the courtroom, which is not a problem at all --
3          THE COURT:  There is.
4          MR. CONVERY:  Okay, good.  I've got some clothing to
5   switch out and I'll make that administrative issue.
6          THE COURT:  Thank you.
7          COURT SECURITY OFFICER:  All rise.
8          THE COURT:  I thank you all very much.  If there's
9   anything that you need to talk to -- counsel needs to talk to
10  me about following this, just talk among yourselves and I'll be
11  happy to.  I don't see that there is or if there is an issue
12  later that you need to reach me and we need to discuss, just
13  get together and we can do a joint telephone call.
14         MS. RICHARDSON:  Thank you, Your Honor.
15         THE COURT:  Court stands in recess.
16         *(10:18 a.m.)*
17                         *   *   *
18
19
20
21
22
23
24
25

1                        *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  January 28, 2022

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   655 East Cesar E. Chavez Blvd., Third Floor
     San Antonio, Texas  78206
16   (210)244-5048

17

18

19

20

21

22

23

24

25