Writ Cause No.:
Court of Appeals Cause No.: 21-51229
Related Criminal Case: 5:19-cr-00063

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS,
# SAN ANTONIO DIVISION

---

# HAE YEONG SONG,

**Applicant-Defendant.**

**vs.**

# UNITED STATES OF AMERICA,

**Respondent-Plaintiff.**

---

# BRIEF IN SUPPORT OF MOTION TO VACATE, SET ASIDE OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY UNDER 28 U.S.C. § 2255.

---

NILES S. ILLICH
MIKAYLA J. LEWISON

PALMER PERLSTEIN
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Direct: (972) 204–5452
Fax: (214) 922–9900
Email: niles@palmerperlstein.com
Email: mikayla@palmerperlstein.com

ATTORNEYS FOR APPLICANT–DEFENDANT.

**Dated: October 28, 2024.**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ 4

INTRODUCTION .......................................................................................... 6

STATEMENT OF THE CASE ............................................................................ 7

REQUEST TO TAKE JUDICIAL NOTICE ........................................................... 9

STANDARD FOR CLAIMS OF INEFFECTIVE ASSISTANCE .................................. 10

EXHIBITS ................................................................................................. 10

BURDEN OF PROOF/PERSUASION ................................................................. 11

I. FIRST GROUND: TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR FAILING TO ARGUE THE FIRST WARRANT WAS OVERLY BROAD BECAUSE IT AUTHORIZED THE UNLIMITED SEARCH OF SONG'S PERSONAL CELLPHONE INCLUDING "ANY CONTACTS; CALL LOGS; TEXTS; SMS; MMS; VIDEOS; IMAGES; CALL AND APPLICATION DATA, INCLUDING CONTENTS FROM THE 'KAKAO TALK' APPLICATION." ......................................................................................... 12

    A.   Introduction ...................................................................................... 12

    B.   Law ................................................................................................. 15

        1.   *United States v. Winn* ............................................................... 18

    C.   Trial counsel was constitutionally ineffective because failing to argue the first warrant was overly broad since it authorized the unlimited search of "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application" was deficient. Had trial counsel made that argument the evidence would likely have been suppressed. ............................................................... 20

        1.   Trial counsel's failure to argue the warrant was overly broad because it authorized the unlimited search of categories of data was deficient. ............................................................................................. 20

        2.   Trial counsel's deficient performance prejudiced Applicant because had trial counsel argued the warrant was overly broad because it authorized the unlimited search "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application," the evidence likely would have been suppressed. ....................................................................................... 24

    D.   Conclusion ...................................................................................... 27

II. SECOND GROUND: APPELLATE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR FAILING TO ARGUE THE FIRST WARRANT WAS OVERLY BROAD BECAUSE IT AUTHORIZED THE UNLIMITED SEARCH OF "ANY CONTACTS; CALL LOGS; TEXTS; SMS; MMS; VIDEOS; IMAGES; CALL AND APPLICATION DATA, INCLUDING CONTENTS FROM THE 'KAKAO TALK' APPLICATION." .................. 27

    A.   Introduction ................................................................................................. 27

    B.   Law ............................................................................................................. 28

    C.   Appellate counsel was constitutionally ineffective because failing to argue the first warrant was overly broad since it authorized the unlimited search of "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application," was deficient. Had appellate counsel made that argument the evidence would likely have been suppressed. .......................................................... 29

        1.   Appellate counsel's failure to argue the warrant was overly broad because it authorized the unlimited search of categories of data was deficient. ...................................................... 29

        2.   Appellate counsel's deficient performance prejudiced Applicant because had appellate counsel argued the warrant was overly broad because it authorized the unlimited search of "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application," the evidence likely would have been suppressed. ...................................................................................... 31

    D.   Conclusion ................................................................................................. 32

III. REQUEST, IN THE ALTERNATIVE, FOR A CERTIFICATE OF APPEALABILITY OR OPPORTUNITY TO BRIEF MERITS OF A CERTIFICATE OF APPEALABILITY .................................................. 32

IV. CONCLUSION ................................................................................................ 33

CERTIFICATE OF SERVICE ............................................................................... 34

## TABLE OF AUTHORITIES

**Cases**

*Blanton v. Quarterman,*
 489 F. Supp. 2d 621, 699 (W.D. Tex. 2007), *aff'd,* 543 F.3d 230 (5th Cir. 2008) ........... passim

*Garza v. Idaho,*
 —— U.S. ——, 139 S. Ct. 738, 744, 203 L. Ed. 2d 77 (2019) ................................................. 10

*Groh v. Ramirez,*
 540 U.S. 551, 557 (2004) .................................................................................................... 15, 16

*Marron v United States,*
 275 U.S. 192, 196 (1927) .......................................................................................................... 15

*Platteville Area Apartment Ass'n v. City of Platteville,*
 179 F.3d 574, 579 (7th Cir. 1999) ............................................................................................ 20

*Riley v. California,*
 573 U.S. 373, 396–97 (2014) ........................................................................................ 17, 19, 22

*Smith v. Murray,*
 477 U.S. 527, 536 (1986) .......................................................................................................... 29

*Smith v. Robbins,*
 528 U.S. 259, 285 (2000) .................................................................................................... 10, 28

*Strickland v. Washington,*
 466 U.S. 668, 685–86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) .............................. 10, 24, 27

*United States v. Angelos,*
 433 F.3d 738, 744–46 (10th Cir. 2006) .................................................................................... 20

*United States v. Clay,*
 921 F.3d 550, 559 (5th Cir. 2019), *as revised* (Apr. 25, 2019) ................................................ 11

*United States v. Lazar,*
 604 F.3d 230, 238 (6th Cir. 2010) ...................................................................................... 19, 23

*United States v. Lora-Solano,*
 330 F.3d 1288, 1293 (10th Cir. 2003) ...................................................................................... 16

*United States v. Morales,*
 77 M.J. 567, 574 (A. Ct. Crim. App. 2017) ....................................................................... 16, 20

*United States v. Richards*,
76 M.J. 365, 369 (C.A.A.F. 2017) ........................................................................... 16

*United States v. Winn*,
79 F. Supp. 3d. 904, 920 (S.D. Ill. 2015) ...................................................... passim

*Wiggins v. Smith*,
539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) ............................. 10, 21, 25, 27

*Wright v. United States*,
624 F.2d 557, 558 (5th Cir. 1980) ...........................................................................11

## Rules

FED. R. EVID. 201 ......................................................................................................... 9

## Other Authorities

ADMIN. OFF. OF THE U.S. CT., RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES
DISTRICT COURTS AND RULES GOVERNING SECTION 2255 PROCEEDINGS FOR THE UNITED
STATES DISTRICT COURTS,
https://www.uscourts.gov/sites/default/files/rules_governing_section_2254_and_2255_cases_i
n_the_u.s._district_courts_-_dec_1_2019.pdf ......................................................... 33

Warlock, *File carving*, INFO. SEC. INST. (Feb. 4, 2018),
https://www.infosecinstitute.com/resources/digital-forensics/file-carving/ ............................. 13

# INTRODUCTION

The Government charged Hae Yeong Song ("Song"), Applicant, in a two-count indictment, with Receipt and Possession of Child Pornography in violation of 18 U.S.C. § 2552A(a)(2) and 18 U.S.C. § 2552A(a)(5)(B). The indictment originated from an investigation by the United States Army's Criminal Investigation Division ("CID") into an alleged sexual assault. During this investigation, special agents found an allegedly illicit image on Song's cellphone.[1] Song moved to suppress the image; Song argued CID agents violated his Fourth Amendment rights.[2] This Court denied Song's motion.[3] On July 21, 2021, after a bench trial, this Court found Song guilty on both counts.[4] On December 8, 2021, this Court sentenced Song under count one to one-hundred seventy months imprisonment and under count two to sixty months imprisonment.[5] The Court ordered the sentences to run concurrently.[6] The same day Song was sentenced, he filed a notice of appeal to the Fifth Circuit.[7] The Fifth Circuit affirmed on August 1, 2023.[8]

Applicant contends he received constitutionally ineffective assistance from trial counsel because trial counsel did not properly address the search warrant's overbreadth. Song also contends he received constitutionally ineffective assistance of counsel on appeal because appellate counsel did not adequately argue the search warrant was overly broad.

The signed search and seizure authorization allowed CID to search Song for the property described as "PFC Song's personal cell phone:"

---

[1] For the purposes of the case before this Court, Applicant was indicted on charged of receipt of and possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2), 2252A(a)(5)(B). Ex. 1. The investigation for an alleged sexual assault that was under investigation at the time the alleged child pornography was discovered was closed. Ex. 2, at 14–16.

[2] Ex. 3.

[3] Ex. 4.

[4] Ex. 5.

[5] Ex. 6.

[6] Ex. 6.

[7] Ex. 7.

[8] Ex. 8; Ex. 9; Ex. 10.

*As well as any* contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the "Kakao Talk" application; *as well as any deleted* messages, content, & application data between PFC Song & PFC Kim *related to the alleged offense* described in the affidavit submitted on 25 Jan. 18.[9]

This authorization had two parts:

1) *any* contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the "Kakao Talk" application; and

2) *as well as any deleted* messages, content, & application data between PFC Song & PFC Kim *related to the alleged offense* described in the affidavit submitted on 25 Jan. 18.

Had trial or appellate counsel adequately argued the first clause of the warrant allowed for an *unlimited* search of "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application,"[10] while the second clause restricted the search to "any deleted messages, content, & application data between PFC Song & PFC Kim *related to the alleged offense* described in the affidavit submitted on 25 Jan. 18,"[11] there is a reasonable probability the result of this case would have been different.

### STATEMENT OF THE CASE

Trial counsel filed a motion to suppress.[12] While trial counsel argued the warrant was overly broad, trial counsel did not recognize that the warrant authorized for the *unlimited* search of "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application,"[13] and the *limited* search of "any deleted messages, content, & application data between PFC Song & PFC Kim *related to the alleged offense* described in the affidavit submitted on 25 Jan. 18."[14] Trial counsel thus did not argue that the warrant was overly broad by allowing for the *unlimited* search of "any contacts; call logs; texts; SMS; MMS;

---

[9] Exs. 11, 11.2 (emphasis added).
[10] Exs. 11, 11.2.
[11] Exs. 11, 11.2 (emphasis added).
[12] Ex. 3.
[13] Exs. 11, 11.2.
[14] Exs. 11, 11.2 (emphasis added).

videos; images; call and Application data, including contents from the 'Kakao Talk' application."[15]

The Court held a hearing on the motion to suppress on November 26, 2019.[16] During the hearing, the Court asked for subsequent briefing on the inevitable-discovery rule and the good-faith exception.[17]

During a second hearing, the Government discussed why the warrant was not overly broad.[18] Applicant's trial counsel merely stated that the "[w]arrant attempts to be as broad as possible and the boilerplate language of what you can do just simply allows you to do whether it's by a program, a Cellebrite machine, Axiom, different things, you can do all those things which yielded the video."[19] Trial counsel did not argue that the warrant was overly broad because it authorized the *unlimited* search of: "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application."[20]

The Court denied Song's motion.[21] The Court concluded the warrant was not overly broad because "the first Warrant was intended to be narrowed to (1) information between [Song] and Complainant and (2) regarding the alleged sexual assault," and Special Agent ("SA") A. Cerean's "affidavit [was] attached to the back of the first Warrant."[22]

Song appealed.[23] On appeal, Song's appellate counsel re-urged the argument that the January 25, 2018 warrant was overly broad.[24] That said, like trial counsel, appellate counsel did

---

[15] Exs. 11, 11.2.
[16] Ex. 2.
[17] Ex. 2, at 52, 54, 57; The Court gave the Government until December 15, 2019 to file their brief on the good-faith exception, and gave the defense "seven days after that to file [the] reply." Ex. 2, at 57.
[18] Ex. 12, at 59–60.
[19] Ex. 12, at 59.
[20] Exs. 11, 11.2; *United States v. Winn*, 79 F. Supp. 3d. 904, 920 (S.D. Ill. 2015).
[21] Ex. 4.
[22] Ex. 4, at 20–21.
[23] Ex. 7.
[24] Ex. 13, at 34–35.

not argue the warrant authorized the *unlimited* search of "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the "Kakao Talk" application,"[25] and the *limited* search of "any deleted messages, content, & application data between PFC Song & PFC Kim *related to the alleged offense* described in the affidavit submitted on 25 Jan. 18."[26] Instead, appellate counsel argued the warrant was overly broad because:

> [i]n the instant case, the data seized from Song's phone pursuant to the search warrant was not particularly described, lacked any temporal restriction, and it did not fall into the category of relevant evidence of the sexual assault allegation. The evidence was obtained based on an affidavit that was missing key facts and a search authorization that was overly broad.[27]

Based on appellate counsel's frail argument, the Fifth Circuit found the warrant was not overly broad because the authorization provided specific notice of the material SA J. Cunningham could search, specifically under the Fifth Circuit's opinion the warrant limited SA Cunningham to searching: "SMS, MMS, videos, images, calls, and application data *related to the sexual assault.*"[28] Yet the warrant authorized SA Cunningham to search: "PFC Song's personal cellular phone. As well as any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data including contents from the "Kakao Talk" application; as well as any deleted messages, content & application data between PFC Song & PFC Kim related to the alleged offense…."[29]

### REQUEST TO TAKE JUDICIAL NOTICE

Applicant asks this Court to take judicial notice of the contents of the Applicant's file.[30]

---

[25] Exs. 11, 11.2
[26] Exs. 11, 11.2 (emphasis added).
[27] Ex. 13, at 35.
[28] Ex. 9, at 9 (emphasis original).
[29] Exs. 11, 11.2.
[30] FED. R. EVID. 201.

### STANDARD FOR CLAIMS OF INEFFECTIVE ASSISTANCE

The standard for ineffective assistance of counsel applies to two of Applicant's grounds for relief. Rather than repeat the standard, counsel includes the standard here and incorporates the standard into grounds one and two.

The Sixth Amendment secures the right to effective assistance of counsel. Under *Strickland*, a defendant must show that (1) his counsel's representation was objectively deficient and (2), that he suffered prejudice as a result.[31] An attorney's performance is deficient where the proffered "representation fell below an objective standard of reasonableness" as assessed "under prevailing professional norms."[32] A defendant suffers prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[33] This same *Strickland* standard applies for ineffective assistance of appellate counsel.[34]

### EXHIBITS

| | |
|---|---|
| **Exhibit 1** | Indictment[35] |
| **Exhibit 2** | Motion to Suppress Hearing 1 Transcript on November 26, 2019 |
| **Exhibit 3** | Motion to Suppress (SEALED) |
| **Exhibit 4** | Order Denying Song's Motion to Suppress (SEALED) |
| **Exhibit 5** | Verdict Form |
| **Exhibit 6** | Judgment in a Criminal Case |
| **Exhibit 7** | Notice of Appeal |

---

[31] *Strickland v. Washington*, 466 U.S. 668, 685–86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *See Garza v. Idaho*, —–U.S. ——, 139 S. Ct. 738, 744, 203 L. Ed. 2d 77 (2019).

[32] *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (internal quotation marks and citation omitted).

[33] *Id.*

[34] *Blanton v. Quarterman*, 489 F. Supp. 2d 621, 699 (W.D. Tex. 2007), *aff'd,* 543 F.3d 230 (5th Cir. 2008); *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

[35] The indictment was unsealed on February 8, 2019. *See* Ex. 17.

| | |
|---|---|
| **Exhibit 8** | United States Court of Appeals for the Fifth Circuit's Judgment on August 1, 2023 |
| **Exhibit 9** | United States Court of Appeals for the Fifth Circuit's Memorandum Opinion on August 1, 2023 |
| **Exhibit 10** | United States Court of Appeals for the Fifth Circuit's Mandate on December 14, 2023 |
| **Exhibit 11** | Motion to Suppress Exhibits Filed by Trial Counsel Including:<br>• January 25, 2018 Affidavit and Warrant (SEALED)<br>• June 8, 2018 Affidavit and Warrant (SEALED) |
| **Exhibit 11.1** | More Readable January 25, 2018 Affidavit (SEALED) |
| **Exhibit 11.2** | More Readable January 25, 2018 Warrant (SEALED) |
| **Exhibit 11.3** | More Readable June 8, 2018 Affidavit (SEALED) |
| **Exhibit 11.4** | More Readable June 8, 2018 Warrant (SEALED) |
| **Exhibit 12** | Motion to Suppress Hearing 2 Transcript on February 19, 2020 |
| **Exhibit 13** | Original Appellant Brief on Behalf of Hae Yeong Song |
| **Exhibit 14** | Military Memorandum on Acknowledgment of Receipt of Separation Notice |
| **Exhibit 15** | Chapter Information on Military Separation Under AR-635-200 |
| **Exhibit 16** | Unsworn Declaration Under the Penalty of Perjury of Hae Yeong Song |
| **Exhibit 17** | Docket Sheet for Case No.: 5:19–cr–00063 |

### BURDEN OF PROOF/PERSUASION

"In a section 2255 motion, a petitioner has the burden of sustaining his contentions by a preponderance of the evidence."[36]

---

[36] *United States v. Clay*, 921 F.3d 550, 559 (5th Cir. 2019), *as revised* (Apr. 25, 2019) (quoting *Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980)).

I.    **Underline{First Ground}**: Trial counsel was constitutionally ineffective for failing to argue the first warrant was overly broad because it authorized the unlimited search of Song's personal cellphone including "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application."

### A. Introduction

On January 25, 20118, a magistrate signed a "search and seizure authorization" stating "that the property to be seized is located *(on the person) (or the place)* to be searches, you are hereby ordered to search the *(person) (place)* known as PFC Hae Yeong Song…*for the property described as PFC Song's personal cellular phone*."[37] The search and seizure authorization "made [the affidavit] a part of th[e] authorization."[38]

The signed search and seizure authorization allowed to search Song for the property described as "PFC Song's personal cell phone":

> *As well as any* contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the "Kakao Talk" application**;** *as well as any deleted* messages, content, & application data between PFC Song & PFC Kim *related to the alleged offense* described in the affidavit submitted on 25 Jan. 18.[39]

Specifically, the search warrant authorized the *unlimited* search of all "contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application,"[40] "as well as" a *limited* search of "*any deleted* messages, content, & application data between PFC Song & PFC Kim *related to the alleged offense* described in the affidavit submitted on 25 Jan. 18."[41] The restriction in the second clause of the warrant did not apply to the first clause.

---

[37] Exs. 11, 11.2 (emphasis added).
[38] Exs. 11, 11.2; *See* Exs. 11, 11.1.
[39] Exs. 11, 11.2 (emphasis added).
[40] Exs. 11, 11.2.
[41] Exs. 11, 11.2 (emphasis added).

The affidavit SA Cerean drafted that was made part of the authorization was only one page.[42] The affidavit stated, "PFC Kim was sexually assaulted by PFC Song while on Holiday Block Leave (HBL)."[43] Yet the affidavit did not provide a date limitation based on when the HBL allegedly occurred. Further, in the last paragraph the affidavit, SA Cerean stated:

> Based on the fact that PFC Kim reported she was sexually assaulted, and a video was recorded during the commission of the act, it is paramount to the resolution of this allegation that PFC Song's cellular be collected as evidence and forensically examined by USACIDC to determine what;[*sic*] videos and images were taken of PFC Kim, and *what conversations took place on the[sic] through the "Kakao Talk" application*.[44]

After the magistrate signed the warrant,[45] SA Cunningham conducted a digital forensic examination of Song's entire phone.[46] This examination produced a "carved"[47] image the Government alleged was child pornography[48] on information and belief that it did not come from "*deleted* messages, content, & application data between PFC Song & PFC Kim *related to the alleged offense* described in the affidavit submitted on 25 Jan. 18."[49] After finding the image, SA Cunningham drafted an affidavit for a second search warrant.[50] This second search warrant was appropriately narrow as it allowed for a:

> Digital forensic examination for but not limited to text, documents, pictures, graphics/images, electronic mail messages, news groups, chat room databases, software, video/movie files, file sharing, computerized logs, account names, passwords, and other data including deleted files containing material *related to Child Pornography*.[51]

---

[42] *Compare* Exs. 11, 11.2 *with* Exs. 11, 11.4.
[43] Exs. 11, 11.1.
[44] Exs. 11, 11.1 (emphasis added).
[45] Ex. 11, 11.2
[46] Exs. 11, 11.1.
[47] Warlock, *File carving*, INFO. SEC. INST. (Feb. 4, 2018), https://www.infosecinstitute.com/resources/digital-forensics/file-carving/ ("File carving is a process used in computer forensics to extract data from a disk drive or other storage device without the assistance of the file system that originality created the file. It is a method that recovers files at unallocated space without any file information and is used to recover data and execute a digital forensic investigation.").
[48] Exs. 11, 11.1.
[49] Exs. 11, 11.2 (emphasis added).
[50] Exs. 11, 11.4.
[51] Exs. 11, 11.4 (emphasis added).

The second warrant demonstrates the CID agents knew how to draft an appropriate warrant. Yet the first warrant, authorized the *unlimited* search of "contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application,"[52] while the second warrant allowed a *limited* search related to the alleged child pornography offense.[53]

The first warrant was overly general because it allowed an *unlimited* search of "contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application."[54] The second warrant was sufficiently narrow because it limited the search to material "related to Child Pornography."[55] The first search warrant limited the search of "*any deleted* messages, content, & application data between PFC Song & PFC Kim *related to the alleged offense* described in the affidavit submitted on 25 Jan. 18."[56] But the limitation on the search in the first warrant did not apply to the search of "contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application."[57]

Trial counsel filed a motion to suppress "to (1): suppress the image of a minor found during Special Agent J[]. A. Cunningham's digital forensic examination of [Song]'s cell phone on June 7, 2019…and (2) in the alternative, order a hearing on this Motion to Suppress."[58] In the motion, trial counsel argued the search warrant was overbroad because "the data seized from Defendant's

---

[52] Exs. 11, 11.2 (emphasis added).
[53] *Compare* Exs. 11, 11.2 *with* Exs. 11, 11.4. The Second Search and Seizure Authorization shows that the Magistrate issued the Authorization on July 8, 2018. However, the date in the second warrant should have read 'June 8' as opposed to 'July 8.'" *See* Ex. 4.
[54] Exs. 11, 11.2.
[55] Exs. 11, 11.4.
[56] Exs. 11, 11.2 (emphasis added).
[57] Exs. 11, 11.2.
[58] Ex. 3, at 1.

phone, pursuant to the search warrant was not particularly described nor did it fall into the category of those relevant to the sexual assault allegations."[59] Trial counsel's motion was deficient because it did not explain why "the search warrant was not particular described."[60] The motion should have explained the relationship between the first and second clauses in the warrant and explained that the limitation applied only to the second clause.[61]

This Court held hearing on the motion to suppress: the first on November 26, 2019, and the second on February 19, 2020.[62]

After the second hearing,[63] the Court denied Song's motion.[64] The Court explained that Applicant's argument left the Court "unpersuaded" that the:

> [w]arrant was overly broad because "the first Warrant was intended to be narrowed to (1) information between Defendant and Complainant and (2) regarding the alleged sexual assault. In addition to the affidavit attached to the back of the first Warrant, the Court finds that there were safeguards in place to provide Agent Cunningham with specific parameters of his search so that it was not overly broad.[65]

### B. Law

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and *the persons or things to be seized*."[66] That an application adequately described "things to be seized" does not save the warrant from being facially invalid.[67] The Fourth Amendment's particularity requirement "makes general searched under [search warrants] impossible and prevents the seizure

---

[59] Ex. 3, at 11.
[60] *See* Ex. 3, at 11.
[61] *See* Exs. 11, 11.2; Ex. 3, at Issue II.C.
[62] Exs. 2, 12.
[63] Ex. 12.
[64] Ex. 4.
[65] Ex. 4, at 20–21.
[66] *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (emphasis original).
[67] *Id.*

of one thing under a warrant describing another."[68] The Fourth Amendment requires particularity in the warrant, not in the supporting documents.[69] Even so, a warrant may be construed with reference to a supporting affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant.[70]

Here the search authorization issued under military law. Military law, however, is substantively similar to civilian law concerning the particularity requirement of the Fourth Amendment.[71]

The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fouth Amendment is unconstitutional.[72] "No reasonable officer could claim to be unaware of the basic rule…."[73] Additionally, "[t]he test for determining the adequacy of the description of the location to be searched is whether the description is sufficient 'to enable the executing officer to locate and identify the premises with

---

[68] *Marron v United States*, 275 U.S. 192, 196 (1927).

[69] *Groh*, 540 U.S. at 557.

[70] *Id.* at 557–58.

[71] *See United States v. Richards*, 76 M.J. 365, 369 (C.A.A.F. 2017) ("A search authorization, whether for a physical location or for an electronic device, must adhere to the standards of the Fourth Amendment of the Constitution. The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This insistence on particularity is a defining aspect of search and seizure law. The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit. *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). "The Fourth Amendment requires that a search warrant describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings." *United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir. 1999)."); *United States v. Betancourt*, No. 201500400, 2017 WL 2438544, at *5 (N-M. Ct. Crim. App. June 6, 2017) )"[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. CONST. amend. IV. Evidence obtained in violation of the Fourth Amendment is generally inadmissible. MIL. R. EVID. 311.").

[72] *Groh*, 540 U.S. at 564–65.

[73] *Id.* at 564.

reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched.'"[74]

Chief Justice Roberts explained the unique problems with a search of a cellular phone in *Riley v. California*,

> . . . a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is.[75]

Most individuals who own a cell phone keep a digital record of every part of their lives ranging "from the mundane to the intimate."[76] As Chief Justice Roberts explained:

> Although the data stored on a cell phone is distinguished from physical records by quantity alone, certain types of data are also qualitatively different. An Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD. Data on a cell phone can also reveal where a person has been. Historic location information is a standard feature on many smart phones and can reconstruct someone's specific movements down to the minute, not only around town but also within a particular building. See *United States v. Jones,* 565 U.S. ——, ——, 132 S.Ct. 945, 955, 181 L.Ed.2d 911 (2012) (SOTOMAYOR, J., concurring) ("GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.").

> *Mobile application software on a cell phone, or "apps," offer a range of tools for managing detailed information about all aspects of a person's life.* There are apps for Democratic Party news and Republican Party news; apps for alcohol, drug, and gambling addictions; apps for sharing prayer requests; apps for tracking pregnancy symptoms; apps for planning your budget; apps for every conceivable hobby or pastime; apps for improving your romantic life. There are popular apps for buying or selling just about anything, and the records of such transactions may be accessible on the phone indefinitely. There are over a million apps available in each

---

[74] *United States v. Morales*, 77 M.J. 567, 574 (A. Ct. Crim. App. 2017) (citing *United States v. Lora-Solano*, 330 F.3d 1288, 1293 (10th Cir. 2003)).

[75] *Riley v. California*, 573 U.S. 373, 396–97 (2014). (emphasis original).

[76] *Id.* at 395.

of the two major app stores; the phrase "there's an app for that" is now part of the popular lexicon. *The average smart phone user has installed 33 apps, which together can form a revealing montage of the user's life.*[77]

### 1. *United States v. Winn*

In *United States v. Winn*, an Illinois district court held because the search warrant authorized the seizure of "any and all files" that constituted evidence of disorderly conduct, the search warrant invited the police to conduct an illegal general search of the defendant's phone.[78] In *Winn*, while warrant particularly described the place of the search as, "the white Samsung Galaxy III cell phone," the warrant authorized:

> [T]he seizure of "any or all files" contained on the cell phone and its memory card that "constitute[d] evidence of the offense of [Public Indecency 720 ILCS 5/11–30]," including, but not limited to, the calendar, phonebook, contacts, SMS messages, MMS messages, emails, pictures, videos, images, ringtones, audio files, all call logs, installed application data, GPS information, WIFI information, internet history and usage, any system files, and any deleted data.[79]

The *Winn* court found that the overriding problem with the description of the object of the search (i.e., "any or all files") is that officers did not have probable cause to believe that everything on the defendant's phone was evidence of public indecency.[80] The *Winn* court explained there was probable cause to believe data of photos and videos could reveal evidence of a crime, but there was no basis "to believe that the *calendar, phonebook, contacts, SMS messages, MMS messages, emails, ringtones, audio files, all call logs, installed application data, GPS information, WIFI information, internet history and usage, or system files were connected with [the] act* of public indecency."[81] The warrant described the category of data rather than specific items, which then

---

[77] *Id.* at 395–96 (emphasis added).
[78] *Winn*, 79 F. Supp. 3d. at 918.
[79] *Id.*
[80] *Id.*
[81] *Id.* at 919–20 (emphasis added).

allowed officers to seize *all* photos and videos on the defendant's phone instead of specific photos and videos.[82] The *Winn* court, citing to *Riley*, noted that a smartphone like the defendant's could hold thousands of pictures and hundreds of videos that could predate the purchase of the phone.[83]

The *Winn* Court also explained the ". . . warrant should have specified the relevant time frame," since "[f]ailure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad."[84] In *Winn*, the alleged offense took place on June 18, 2014 so officers only needed to search for photos or videos taken on that date, and no evidence suggested that any data in the defendant's phone created before June 14, 2018 was connected to the suspected offense.[85] Yet the warrant allowed officers to do a complete "phone dump" to extract *all* of the data from the defendant's phone.[86]

In sum, the *Winn* court determined the officers had probable cause to seize and search a subset of data on the defendant's phone, but the warrant did not limit the scope of the seizure or search to only that subset of data and therefore did not describe the data with particularity.[87] Instead, the warrant authorized officers to *search* the entire phone and rummage through all of the data, essentially telling "the police to take everything, and they did."[88] Accordingly, the *Winn* court concluded the warrant was overly broad.[89]

The *Winn* Court then examined the good-faith exception and found it did not apply.[90] The court found the detective was reckless regarding the list of items to be seized, and the warrant was

---

[82] *Id.* at 920.
[83] *Id.* (citing *Riley*, 572 U.S. at 394).
[84] *Id.* at 921 (citing *United States v. Lazar*, 604 F.3d 230, 238 (6th Cir. 2010)).
[85] *Id.*
[86] *Id.* at 921–22.
[87] *Id.* at 922.
[88] *Id.*
[89] *Id.*
[90] *Id.* at 923.

facially and grossly overbroad in its description.[91] Specifically, because of the officers' involved combined fifteen years of experience, "it was not objectively reasonable for [the officers] to think that a warrant was valid when it gave them unbridled discretion to search for and seize whatever they wished."[92] "Simple common sense dictates that [the] Detective [] did not need to look at every bit of data in the cell phone to find the pictures of young girls in swimsuits taken at the Mascoutah Public Pool on June 18, 2014."[93] Therefore, the court in *Winn* determined that the good-faith exception did not apply.[94]

Because the *Winn* Court found the warrant was overly broad and lacked sufficient particularity in violation of the Fourth Amendment, the good-faith exception did not apply, and the warrant was a general warrant because "[e]very portion [wa]s impossibly overbroad encompassing every conceivable bit of data generated by the use of the cell phone," the only remedy was to suppress all the evidence.[95]

> **C.  Trial counsel was constitutionally ineffective because failing to argue the first warrant was overly broad since it authorized the unlimited search of "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application" was deficient. Had trial counsel made that argument the evidence would likely have been suppressed.**

>> **1.  Trial counsel's failure to argue the warrant was overly broad because it authorized the unlimited search of categories of data was deficient.**

While trial counsel filed a motion to suppress and argued the "warrant and affidavit at issue in this case are excessively overbroad,"[96] counsel failed to argue first clause of the warrant

---

[91] *Id.*

[92] *Id.* at 924.

[93] *Id.*; *see also Platteville Area Apartment Ass'n v. City of Platteville*, 179 F.3d 574, 579 (7th Cir. 1999) (:If you are looking for an adult elephant, searching for it in a chest of drawers is not reasonable.").

[94] *Id.*; *see also Morales*, 77 M.J. at 576 (citing *United States v. Angelos*, 433 F.3d 738, 744–46 (10th Cir. 2006)) (reasoning "when officers do not rely on another's mistake, but instead, commit the mistake themselves by exceeding the scope of an explicit and valid warrant, the good faith exception does not apply").

[95] *Id.* at 926–27.

[96] Ex. 3, at 11.

authorized the *unlimited* search of "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application,"[97] while the second clause had a restriction *limiting* the search to "*any deleted* messages, content, & application data between PFC Song & PFC Kim *related to the alleged offense* described in the affidavit submitted on 25 Jan. 18."[98] Instead, trial counsel argued "the data sized from Defendant's phone, pursuant to the search warrant was not particularly described nor did it fall into the category of those relevant to the sexual assault allegations."[99] Trial counsel made no other argument to support the claim the warrant was overly broad.[100] Had trial counsel argued the restriction in the second clause of the warrant did not apply to the first clause because it authorized the *unlimited* search of "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application,"[101] there is a reasonable likelihood the result of the proceeding would have been different because the evidence would have been suppressed since there was no reason to suspect all of the data on the phone related to the alleged sexual assault.[102]

*Winn* is instructive. As in *Winn*, where the search warrant particularly described the place of the search as, "the white Samsung Galaxy III cell phone," and authorized the seizure of "any or all files" contained on the defendant's cell phone,[103] here, the search warrant described the property to be seized as "PFC Song's personal cellular phone,"[104] and authorized the *unlimited* search of "any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application,"[105] and for *limited* search of "any deleted messages,

---

[97] Exs. 11, 11.2.
[98] Exs. 11, 11.2 (emphasis added).
[99] Ex. 3, at 11.
[100] *See* Ex. 3, at 11.
[101] Exs. 11, 11.2.
[102] *Wiggins*, 539 U.S. at 521; *Winn*, 79 F. Supp. 3d. at 926–27.
[103] *Winn*, 79 F. Supp. 3d. at 918.
[104] Exs. 11, 11.2.
[105] Exs. 11, 11.2.

content, & application data between PFC Song and PFC Kim related to the alleged offense described in the affidavit submitted on 25 Jan 18."[106]

In *Winn*, the court found the overriding problem with "any and all files" is that officers did not have probable cause to believe that everything on the defendant's phone was evidence of the crime of public indecency.[107] Here, the overriding problem with authorizing the *unlimited* search of "any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application," is that CID officers did not have probable cause to believe everything on Song's phone was evidence of the alleged sexual assault.[108]

The search warrant in Song's case described the category of data rather than specific items, which then allowed officers to conduct an *unlimited* search of all "contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the "Kakao Talk" Application," instead of specific photos, videos, or application data from "Kakao Talk."[109] A smartphone like Song's can hold thousands of pictures and hundreds of videos that can and likely predated the purchase of the phone.[110] Further, "the average smart phone user has installed 33 apps, which together can form a revealing montage of the user's life."[111] Here, SA Cerean knew the precise identity and context of the photos/videos/"Kakao Talk" application data sought in Song's phone,[112] yet received authorization to seize/search "any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application."[113]

---

[106] Exs. 11, 11.2.
[107] *Winn*, 79 F. Supp. 3d. at 918.
[108] *See id.*; Exs. 11, 11.2.
[109] *See Winn*, 79 F. Supp. 3d. at 920.
[110] *See id.* (citing *Riley*, 572 U.S. at 394–96).
[111] *See id.* (citing *Riley*, 572 U.S. at 394–96).
[112] *See id.*
[113] Exs. 11, 11.2.

Additionally, as in *Winn*, where the alleged offense took place on a specific date, here the warrant did not "limit the broad descriptive terms by relevant date,"[114] because the warrant authorized an *unlimited* search of "any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application."[115] While the warrant also authorized the limited search of "any deleted messages, content, & application data between PFC Song and PFC Kim *related to the alleged offense described in the affidavit submitted on 25 Jan 18*,"[116] the January 25, 2018 affidavit stated, "PFC Kim was sexually assaulted by PFC Song while on Holiday Block Leave (HBL)," but, no date(s) were provided in the affidavit or search and seizure authorization for the dates of HBL.[117] As in *Winn* where the officers then did a complete dump using Cellbrite to extract every data from the defendant's phone the machine could detect,[118] here, when SA Cunningham connected Song's phone Cellebrite, "everything out of databases" in Song's phone was extracted.[119]

As the *Winn* court determined, there was probable cause to search and seize a small and specific subset of data on the defendant's phone but the warrant did not limit the scope of the search and seizure to only that specific data or describe that data with particularity.[120] Here, while there might have been probable cause to search and to seize a specific subset of data on Song's phone, the warrant authorized CID agents to search and seize the entirety of Song's "contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the

---

[114] *See id.* at 921 (citing *Lazar*, 604 F.3d at 238).
[115] Exs. 11, 11.2.
[116] Exs. 11, 11.2 (emphasis added).
[117] Exs. 11, 11.1.
[118] *Winn*, 79 F. Supp. 3d. at 921.
[119] *See id.*; Ex. 12, at 42.
[120] *Winn*, 79 F. Supp. 3d. at 922.

'Kakao Talk' Application." SA Cunningham seized and searched all the data on Song's phone when he connected Song's phone to Cellebrite.[121]

Accordingly, as the *Winn* court concluded, here, the warrant in Song's case was overly broad in every aspect and violated the Fourth Amendment.[122] Therefore, by failing to adequately argue the warrant in Song's case was overly broad because it authorized the *unlimited* search of "contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application,"[123] trial counsel was deficient.[124]

> **2. Trial counsel's deficient performance prejudiced Applicant because had trial counsel argued the warrant was overly broad because it authorized the unlimited search "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application," the evidence likely would have been suppressed.**

In the motion to suppress, trial counsel argued the "issuance and execution of [the] search warrant was improper because the warrant was excessively overbroad," because "the data seized from Defendant's phone, pursuant to the search warrant was not particularly described nor did it fall into the category of those relevant to the sexual assault allegations."[125] At the second motion hearing, while whether the search warrant was overly broad was discussed, the Government mainly argued the warrant was *not* overly broad.[126] Trial counsel did not rebut the Government's argument that the warrant *was* overly broad.[127] Trial counsel did not argue that the restriction on the search of the "deleted messages, content, & application data between PFC Song and PFC Kim related to the alleged offense described in the affidavit submitted on 25 Jan 18"[128] did not apply to the search

---

[121] Ex. 12, at 41–42.
[122] *Winn*, 79 F. Supp. 3d. at 922.
[123] Exs. 11, 11.2.
[124] *See Strickland*, 466 U.S. at 685–86.
[125] Ex. 3, at 11.
[126] Ex. 12, at 59–60.
[127] Ex. 12, at 59–60.
[128] Exs. 11, 11.2.

of the "any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application."[129]

The argument trial counsel made in the motion was inadequate to argue the warrant was overly broad. Trial counsel should have recognized that the January 25, 2018 search warrant, which resulted in SA Cunningham finding child pornography, authorized two searches: (1) an *unlimited* and unrestricted search and (2) a *limited* and restricted search.[130] The restriction in the second clause of the warrant limiting CID's search to "any deleted messages, content, & application data between PFC Song and PFC Kim related to the alleged offense described in the affidavit submitted on 25 Jan 18," did not apply to the first clause which was unrestricted and allowed for the *unlimited* search of "any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application."[131]

In Song's case, it was the first search and seizure authorization that mattered. Had trial counsel recognized and argued the first warrant authorized the *unlimited* search of "any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application," and the *limited* search of "deleted messages, content, & application data" related to the alleged offense, there is a reasonable probability that instead of this Court being "unpersuaded" that the warrant was overly broad, the result of the motion would have been different.[132]

In *Winn*, court concluded the good-faith exception did not apply.[133] In *Winn* the court explained because of the officer's experience it was objectively unreasonable for the officers to

---

[129] Exs. 11, 11.2.
[130] Exs. 11, 11.2.
[131] Exs. 11, 11.2.
[132] *See Wiggins*, 539 U.S. at 521; Ex. 4, at 20–21.
[133] *Winn*, 79 F. Supp. 3d. at 922, 924.

think a warrant was valid when it authorized the search and seizure of everything in the defendant's phone, and here, SA Cerean had seven years of experience[134] and SA Cunningham had approximately eighteen years of experience[135] for a combined total of twenty-five years of experience so "it was not objectively reasonable for [SA Cerean] to think that a warrant was valid when it gave [him and SA Cunningham] unbridled discretion to search for and seize whatever they wished."[136] The *Winn* court reasoned that "[s]imple common sense dictates that [the] Detective [] did not need to look at every bit of data in the cell phone to find the pictures of young girls in swimsuits taken at the Mascoutah Public Pool on June 18, 2014,"[137] and therefore, the good-faith exception did not apply.[138] Applying the *Winn* court's reasoning here, common sense would dictate SA Cerean and SA Cunningham had no legal basis to search all of the data in Song's cell phone to find evidence of the alleged sexual assault during HBL, therefore, the good-faith exception does not apply in Song's case.[139]

Accordingly, as the court in *Winn* determined, because the warrant in Song's case was overly broad and lacked sufficient particularity violating the Fourth Amendment, the good-faith exception did not apply.[140]

Had this argument been made by trial counsel since the warrant was a general warrant because "[e]very portion [wa]s impossibly overbroad encompassing every conceivable bit of data generated by the use of [Song's] cell phone," as the court concluded in *Winn*, the only remedy

---

[134] Ex. 2, at 7.
[135] SA Cunningham became a special agent with CID in 1999, started computer crimes investigations in 2001, and began digital forensics in 2003 until he retired in 2015. In 2017, he was hired as a "special agent with Army CID as a civilian doing digital forensics as [his] main position." Ex. 12, at 14–15.
[136] *See Winn*, 79 F. Supp. 3d. at 924.
[137] *Id.*
[138] *Id.*
[139] *See id.*
[140] *See id.*

would be to suppress all the evidence.[141] Because trial counsel in *Winn* presented the proper argument on the defendant's behalf, all evidence was suppressed.[142]

Accordingly, Song suffered prejudice because there is a reasonable probability had trial counsel correctly presented this argument, all evidence yielded from the first warrant would have been suppressed.[143]

### D. Conclusion

Trial counsel was thus constitutionally ineffective while representing Song.[144]

**II.    <u>Second Ground</u>: Appellate counsel was constitutionally ineffective for failing to argue the first warrant was overly broad because it authorized the unlimited search of "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application."**

### A. Introduction

This Court denied Song's motion to suppress because it found the warrant was not overly broad.[145] On appeal, appellate counsel argued "the search authorization and affidavit were excessively overbroad"[146] because:

> . . .the data seized from Song's phone pursuant to the search warrant was not particularly described, lacked any temporal restriction, and it did not fall into the category of relevant evidence of the sexual assault allegation. The evidence was obtained based on an affidavit that was missing key facts and a search authorization that was overly broad. It was the government's burden to show that law enforcement were lawfully in the spot where the evidence was in plain view. The government failed in satisfying this burden for the above reason, and for the reasons previously stated herein. The government failed to meet its burden of proof as to exceeding the search authorization and find the pornographic photos in plain view.[147]

---

[141] *See id.* at 926–27.
[142] *See id.* at 927.
[143] *See id.*; *See Wiggins*, 539 U.S. at 521.
[144] *See Strickland*, 466 U.S. at 685–86.
[145] Ex. 4.
[146] Ex. 13, at 33.
[147] Ex. 13, at 34–35

That was the entirety of appellate counsel's argument that the warrant was overly broad.[148] Based on appellate counsel's argument, the Fifth Circuit "conclude[d] the authorization was not overly broad, and suppression was not warranted."[149] The Fifth Circuit reasoned that first, even if the authorization was somewhat generic, the authorization provided notice of the type of data SA Cunningham could search: "SMS, MMS, videos, images, calls, and application data *related to the sexual assault*."[150] Second, the Fifth Circuit reasoned agents had probable cause to believe Song's phone had videos, images, and conversations related to the alleged sexual assault and the authorization authorized the "search to only content related to the incident."[151] Based on Song's brief, the Fifth Circuit did not have to address whether the limitation on the search of the "deleted messages, content, & application data between PFC Song and PFC Kim related to the alleged offense described in the affidavit submitted on 25 Jan 18" applied to the unlimited search of "any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application."[152] Consequently, the Fifth Circuit affirmed.[153]

### B.  Law

The same two-pronged standard for evaluating ineffective assistance of counsel claims against trial counsel in *Strickland* applies to appellate counsel.[154] Accordingly, the standard for evaluating appellate counsel's performance requires inquiring into "(1) whether appellate counsel's performance was deficient, i.e., whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and (2) whether appellate counsel's allegedly deficient performance "prejudiced" petitioner, i.e., whether there is a reasonable probability that, but for

---

[148] Ex. 13, at 33–35.
[149] Ex. 9, at 10.
[150] Ex. 9, at 9.
[151] Ex. 9, at 10.
[152] Exs. 11, 11.2.
[153] Ex. 9, at 10.
[154] *Blanton*, 489 F. Supp. 2d at 699; *Robbins*, 528 U.S. at 285.

appellate counsel's deficient performance, the outcome of petitioner's appeal would have been different."[155]

Filtering out the weaker arguments on appeal and focusing on arguments more likely to prevail is the hallmark of effective appellate advocacy.[156]

> **C. Appellate counsel was constitutionally ineffective because failing to argue the first warrant was overly broad since it authorized the unlimited search of "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application," was deficient. Had appellate counsel made that argument the evidence would likely have been suppressed.**

>> **1. Appellate counsel's failure to argue the warrant was overly broad because it authorized the unlimited search of categories of data was deficient.**

Here, while appellate counsel did argue the warrant in Song's case was overly broad, appellate counsel did not adequately argue that the limitation on the search of the "deleted messages, content, & application data between PFC Song and PFC Kim related to the alleged offense described in the affidavit submitted on 25 Jan 18," did not apply to the unlimited search of "any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application."[157]

As discussed above, *Winn* is instructive,[158] and appellate counsel should have presented an argument that illustrated the deficiencies in the warrant. In *Winn*, counsel argued the search warrant was invalid because it did not state with particularity the items to be seized and instead authorized the seizure of "any and all files" and it authorized officers to conduct an illegal general warrant of his phone.[159] Here, without citing the warrant or providing a legal explanation, appellate counsel

---

[155] *Blanton*, 489 F. Supp. 2d at 699.
[156] *Id.*; *Smith v. Murray*, 477 U.S. 527, 536 (1986).
[157] *See Blanton*, 489 F. Supp. 2d at 699; *See* Ex. # - Warrant.
[158] *See supra* First Ground for Relief (discussing *Winn*, 79 F. Supp. 3d. 904).
[159] *Winn*, 79 F. Supp. 3d at 918.

merely argued "the search warrant was not particularly described, lacked any temporal restriction, and it did not fall into the category of relevant evidence of the sexual assault allegation."[160] Appellate counsel should have recognized the warrant authorized two seizures of Song's phone: The first authorized the *unlimited* search of "any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application,"[161] and the second authorized the *limited* search "any deleted messages, content, & application data between PFC Song and PFC Kim *related to the alleged offense* described in the affidavit submitted on 25 Jan 18."[162] Appellate counsel should have argued the warrant authorized the *unlimited* search of "any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application,"[163] because the restriction in the second clause did not apply to the first clause and thus the warrant was an impermissible general warrant.

Instead of simply stating "the evidence was obtained based on an affidavit that was missing key facts" but not explaining what the "missing key facts" were,[164] appellate counsel should have argued the affidavit incorporated into the warrant alleged the offense occurred while on Holiday Block Leave (HBL),"[165] but the affidavit did not include the dates when HBL was. Additionally, the authorized seizure about HBL was *limited* to "*any deleted* messages, content, & application data between PFC Song and PFC Kim *related to the alleged offense described in the affidavit submitted on 25 Jan 18*."[166] Then, as in *Winn*, appellate counsel could have argued "that the warrant [in Song's case] should have specified the relevant time frame," since "[f]ailure to limit

---

[160] Ex. 13, at 34.
[161] Exs. 11, 11.2.
[162] Exs. 11, 11.2 (emphasis added).
[163] Exs. 11, 11.2.
[164] Ex. 13, at 35.
[165] Exs. 11, 11.1.
[166] Exs. 11, 11.2 (emphasis added).

broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad."[167]

That said, because appellate counsel did not adequately argue the warrant was overly broad by authorizing the *unlimited* search of "any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application,"[168] the Fifth Circuit embraced a misinterpretation of the plain language of the warrant.[169] Therefore, appellate counsel, by failing to adequately argue the warrant in Song's case was overly broad, provided deficient performance.[170]

> **2. Appellate counsel's deficient performance prejudiced Applicant because had appellate counsel argued the warrant was overly broad because it authorized the unlimited search of "any contacts; call logs; texts; SMS; MMS; videos; images; call and Application data, including contents from the 'Kakao Talk' application," the evidence likely would have been suppressed.**

By merely stating "that the data seized from Song's phone pursuant to the search warrant was not particularly described, lacked any temporal restriction, and [] did not fall into the category of relevant evidence of the sexual assault allegation," appellate counsel did not adequately argue that the warrant was overly broad.[171] Appellate counsel failed to recognize the first warrant from January 25, 2018 authorized the *unlimited* search of categories of data (i.e., "any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the 'Kakao Talk' Application") and the *limited* search of "deleted messages, content, & application data" related to the alleged offense.[172]

---

[167] *See Winn*, 79 F. Supp. 3d at 921.
[168] Exs. 11, 11.2.
[169] Ex. 9, at 9–10.
[170] *See Blanton*, 489 F. Supp. 2d at 699.
[171] Ex. 13, at 34.
[172] Exs. 11, 11.2.

Had appellate counsel argued the warrant was a general warrant since "[e]very portion [wa]s impossibly overbroad encompassing every conceivable bit of data generated by the use of [Song's] cell phone," the only remedy would have been to suppress all the evidence.[173] Because counsel in *Winn* presented the proper argument, all evidence against the defendant was suppressed.[174]

Because appellate counsel did not adequately argue the warrant was overly broad and lacked sufficient particularity, the Fifth Circuit affirmed based on the argument appellate counsel presented.[175] Even so, there is a reasonable probability that but for appellate counsel's failure to adequately argue the warrant was overly broad because it allowed for the *unlimited* search of categories of data and the *limited* search of other data related to the alleged offense,[176] the outcome of Song's appeal would have been different because the evidence yielded from the first warrant would have been suppressed.[177] Therefore, Song suffered prejudice.[178]

### D. Conclusion

Thus, appellate counsel was constitutionally ineffective while representing Song on appeal.[179]

### III. Request, in the Alternative, for a Certificate of Appealability or Opportunity to Brief Merits of a Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings for the United States District Courts, as amended effective on December 1, 2019, reads:

> Certificate of Appealability. The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Before entering the final order, the court may direct the parties to submit arguments on whether a

---

[173] *See Winn*, 79 F. Supp. 3d at 926–27.
[174] *See id.* at 927.
[175] Ex. 9, at 10.
[176] Exs. 11, 11.2.
[177] *See Blanton*, 489 F. Supp. 2d at 699.
[178] *Id.*
[179] *Id.*

certificate should issue. If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2). If the court denies a certificate, a party may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22. A motion to reconsider a denial does not extend the time to appeal.[180]

Applicant, of course, does not know how the Court will rule on this motion and thus the request for a certificate of appealability can only be general. Applicant prefers, should this Court deny relief, for this Court to request briefing on the merits of a certificate of appealability. But out of prudence, counsel for Appellant now requests a certificate of appealability—in the case this Court denies this motion and denies the request for briefing on the certificate of appealability—because the case presents specific and unusual facts that go directly to the effectiveness of counsel during sentencing.

## IV.    Conclusion

For these reasons, Applicant respectfully asks this Court to under grounds one and two to set aside Applicant's sentence and remand for resentencing.

Respectfully submitted,

*/s/ NILES S. ILLICH*
NILES S. ILLICH
SBOT No. 24069969

*/s/ MIKAYLA J. LEWISON*
MIKAYLA J. LEWISON
SBOT No. 24137889

PALMER PERLSTEIN
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Direct: (972) 987–4100
Fax: (214) 922–9900
Email: niles@palmerperlstein.com

---

[180] ADMIN. OFF. OF THE U.S. CT., RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS AND RULES GOVERNING SECTION 2255 PROCEEDINGS FOR THE UNITED STATES DISTRICT COURTS, https://www.uscourts.gov/sites/default/files/rules_governing_section_2254_and_2255_cases_in_the_u.s._district_courts_-_dec_1_2019.pdf.

Email: mikayla@palmerperlstein.com

### CERTIFICATE OF SERVICE

I certify that on October 28, 2024, that I delivered a true and correct copy of this brief via electronic commercial delivery to all parties of record using the CM/ECF system.

*/S/ NILES S. ILLICH*
NILES S. ILLICH

# Exhibit 1

**SEALED**

**FILED**

FEB – 6 2019

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | CRIMINAL NO. |
| Plaintiff, | § | **SA19CR0063DAE** |
| | § | I N D I C T M E N T |
| v. | § | |
| | § | [In violation of: |
| HAE YEONG SONG, | § | 18 U.S.C. § 2252A(a)(2) |
| | § | Receipt of Child Pornography; and |
| Defendant. | § | 18 U.S.C. § 2252A(a)(5)(B) |
| | § | Possession of Child Pornography] |
| | § | |

**THE GRAND JURY CHARGES:**

**<u>COUNT ONE</u>**
[18 U.S.C. § 2252A(a)(2)]

Beginning on or about January 14, 2018, and continuing through on or about January 20, 2018, within the Western District of Texas, and elsewhere, the Defendant,

**HAE YEONG SONG,**

did knowingly receive, or attempt to receive, any child pornography, as defined in Title 18, United States Code, Section 2256(8)(A), that has been shipped or transported using any means or facility of interstate and foreign commerce, including by computer,

All in violation of Title 18, United States Code, Section 2252A(a)(2) and (b).

**<u>COUNT TWO</u>**
[18 U.S.C. § 2252A(a)(5)(B)]

On or about January 22, 2018, within the Western District of Texas, the Defendant,

**HAE YEONG SONG,**

did knowingly possess material, specifically a Samsung Galaxy S7 smartphone, Model SM-G930V, bearing serial number RF8J11TQ7FP, 32 GB, with a Samsung Micro SD card, EVO

1

Select, 64 GB, which contains an image of child pornography, as defined in Title 18, United States Code, Section 2256(8)(A), which involved a prepubescent minor, which had been shipped and transported using any means and facility of interstate and foreign commerce, and was produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce, including by computer,

All in violation of Title 18, United States Code, Section 2252A(a)(5)(B).

## FORFEITURE COUNT

Pursuant to Federal Rule of Criminal Procedure 32.2 and Title 18 United States Code, Section 2253(a), as a result of the foregoing criminal violations set forth in the Indictment, specifically Title 18, United States Code Sections 2252A(a)(2), and 2252A(a)(5)(B), the defendant HAE YEONG SONG shall forfeit to the United States any and all right, title and interest in any and all matter which contains visual depictions of minors engaged in sexually explicit conduct in violation of the charged offenses; any property constituting or derived from any proceeds the defendant obtained directly or indirectly as a result of the said violations; and any and all property used or intended to be used in any manner or part to commit and to promote the commission of the aforementioned violations, including, but not limited to a Samsung Galaxy S7 smartphone, Model SM-G930V, bearing serial number RF8J11TQ7FP, 32 GB, with a Samsung Micro SD card, EVO Select, 64 GB.

A TRUE BILL.



_____
FOREPERSON OF THE GRAND JURY

2

JOHN F. BASH
UNITED STATES ATTORNEY

BY: _____
BETTINA J. RICHARDSON
Assistant United States Attorney

# Exhibit 2

```
 1                    UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF TEXAS
 2                        SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA,        :
     Plaintiff,                       :
 4                                     :
     vs.                              : No. SA:19-CR-00063
 5                                     : San Antonio, Texas
     HAE YEONG SONG(1),               : November 26, 2019
 6   Defendant.                       :
     ********************************************************

 7                   TRANSCRIPT OF MOTION TO SUPPRESS
 8              BEFORE THE HONORABLE DAVID A. EZRA
                 SENIOR UNITED STATES DISTRICT JUDGE
 9
     APPEARANCES:
10   FOR THE GOVERNMENT:
       Bettina Richardson, Esquire
11     United States Attorney's Office
       601 N.W. Loop 410, Suite 600
12     San Antonio, Texas  78216
       (210)384-7152
13

14   FOR THE DEFENDANT:
       John A. Convery, Esquire
15     Julie Hasdorff, Esquire
       Jonathan Chavez, Esquire
16     Hasdorff & Convery, P.C.
       1005 South Alamo Street
17     San Antonio, Texas  78210
       (210)738-9060
18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     655 East Cesar E. Chavez Blvd., Third Floor
22   San Antonio, Texas  78206
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

2

**I N D E X**

**GOVERNMENT WITNESS:**                    **PAGE**

**SPECIAL AGENT ANDREW SYRIAN**

By Ms. Richardson                          6

By Mr. Convery                            20

```
 1  (Tuesday, November 26, 2019, 9:08 a.m.  Open court.)

 2                        *   *   *

 3          COURT SECURITY OFFICER:  All rise.

 4          THE COURT:  Can I have appearances?

 5          MS. RICHARDSON:  Good morning, Bettina Richardson on

 6  behalf of the United States and at counsel table is Special

 7  Agent Brice Walford(ph) with Army CID.

 8          THE COURT:  Good morning.

 9          MR. CONVERY:  Good morning, Your Honor, John Convery

10  for Hae Song and Julie Hasdorff.

11          MS. HASDORFF:  Good morning.

12          MR. CONVERY:  Jonathan Chavez also at counsel table.

13          THE COURT:  Good morning.  Are you ready to proceed?

14          MS. RICHARDSON:  The government is ready, Your Honor.

15          THE COURT:  And you're ready to proceed, Mr. Convery?

16          MR. CONVERY:  Yes.

17          THE COURT:  You may proceed.

18          MR. CONVERY:  Your Honor, may I take up one thing

19  beforehand?

20          THE COURT:  Sure.

21          MR. CONVERY:  Just very briefly.  Just before court,

22  the government notified me that they had received a file from

23  law enforcement that purports to be the child pornography file

24  for this case.  Government said, "Well, I have it with me and

25  you can look at it, I don't believe there's anything new or
```

1   additional in it."

2        The problem is it's the morning of the motion to

3   suppress hearing and I have no way to know that.  I don't want

4   to take up the Court's time and inconvenience everybody, but

5   I'm sure it's not counsel's fault, but it puts me in a

6   horrible, terrible situation.  I bring it to the Court's

7   attention because I'm perfectly willing to look at it in a

8   deliberate way at some time after this and bring to the Court's

9   attention anything that I think I need to add or that I need to

10  do.

11       THE COURT:  Well, my understanding of this motion is

12  that the gravamen of the motion is really the suppression or

13  the attempt to suppress the material on the cell phone.  The

14  cell phone.  Am I right?

15       MR. CONVERY:  Correct.

16       THE COURT:  Okay.  So it wouldn't appear that --

17  regardless of the content of the material on the cell phone,

18  the question is whether the cell phone and whatever contents

19  there are suppressed.  So I don't know what it is.  Is this a

20  different source?  Or is this just the same material from the

21  cell phone?

22       MS. RICHARDSON:  It contains the forensic report.  I

23  was notifying defense counsel that I have acquired a full set

24  of the child porn investigation file from CID and that I have

25  not yet turned that over, but I will provide them a complete

1    copy.  I believe it is duplicative of what they already have.
2    They clearly already have everything that is discoverable.
3    Everything else that is within this file will be additional
4    information if there is any additional information.
5              THE COURT:  Well, the way to deal with this since what
6    I'm really looking at here today is whether the cell phone
7    itself and any material that's on the cell phone should be
8    suppressed predicated on a number of alleged constitutional
9    errors, okay.  So if I deny the motion to suppress, it may be
10   that there are materials or reasons, Mr. Convery, that the
11   specific materials on the cell phone need to be suppressed for
12   some reason or another.  And that can be raised at a later
13   time.  But this is an overarching motion having to do with
14   whether the material -- the cell phone itself was illegally
15   seized and/or retained without the benefit of a Warrant.  So it
16   doesn't seem to me like you're in that terrible a position for
17   this motion as long as I allow you to file a subsequent motion,
18   which I would do.
19             MR. CONVERY:  Thank you, Your Honor.  That's my
20   purpose for putting it on the record.  If I don't say anything,
21   then it's why didn't I say something.
22             THE COURT:  I'm not chastising you for saying
23   something.  It's just like a situation where agents go in and
24   they search and seal off a home.  And defense counsel says that
25   the agents had no probable cause to do that and they want every

1    aspect of whatever was discovered in the home to be suppressed.
2    And then the government comes up with some material that they
3    found in the home.  Now, if the Court grants a motion to
4    suppress whatever was found in the home because there was no
5    probable cause, under those -- because we're assuming there was
6    no Warrant and then there's probable cause -- no probable
7    cause, they just went in without justification, then it doesn't
8    matter what was in there because everything is suppressed.
9           On the other hand, if the Court granted the motion and
10   there were items that should not have been searched for or
11   seized, then that can be taken care of later.  Okay.
12          MR. CONVERY:  Yes, Your Honor.  Thank you, sir.
13          MS. RICHARDSON:  The government is ready to proceed.
14          THE COURT:  Then proceed.
15          MS. RICHARDSON:  The government calls Special Agent
16   Andrew Syrian.
17          COURTROOM DEPUTY CLERK:  Please raise your right hand.
18                        *   *   *
19          (ANDREW SYRIAN, Government Witness, Sworn.)
20                        *   *   *
21          THE WITNESS:  I swear.
22          COURTROOM DEPUTY CLERK:  Thank you.  You may have a
23   seat.
24                        DIRECT EXAMINATION
25   BY MS. RICHARDSON:

1   Q.  Special Agent Syrian, can you introduce yourself to the

2   judge and give him the benefit of your background, your

3   education, your training and your experience?

4   A.  Yes, ma'am.  In 2011 I became a CID agent for the U.S.

5   Army.  I worked as an agent up until last May.  I have a

6   Bachelor's degree in criminal justice.  Since I've gotten out I

7   am currently a criminal intelligence analyst and I contract for

8   the U.S. Army.

9   Q.  And what rank were you when you separated?

10  A.  I was a staff sergeant.

11  Q.  And in your role in January of 2018, where were you

12  assigned?

13  A.  I was assigned on Fort Sam Houston, Texas.

14  Q.  Serving as a special agent?

15  A.  Yes, ma'am.

16  Q.  And what type of cases did you investigate?

17  A.  General crimes, essentially anything, any felony-related

18  crime.

19  Q.  And do you recall whether or not there was a case opened in

20  January of 2018, specifically on the 18th by the Joint Base San

21  Antonio that had been referred from Fort Sill, Oklahoma?

22  A.  I do.

23  Q.  And do you recall who the defendant in that case was, who

24  the target was?

25  A.  It was Mr. Song.

1    Q.  And do you recognize him in the courtroom today?

2    A.  I do.

3    Q.  And where is he seated?

4    A.  He is seated right there.

5    Q.  And can you describe what he's wearing?

6    A.  He's wearing eyeglasses and a gray sweatshirt.

7          MS. RICHARDSON:  Your Honor, may the record reflect

8    he's identified the defendant?

9          THE COURT:  Yes.

10   BY MS. RICHARDSON:

11   Q.  And did you ever have an opportunity to meet the defendant?

12   A.  Not prior to January 22nd, no, ma'am.

13   Q.  But on that day you did?

14   A.  Yes, ma'am, I did.

15   Q.  So how did this case come to you?

16   A.  The case was -- since he was located on Fort Sam Houston,

17   Texas, the case was eventually going to be transferred to Fort

18   Sam Houston.

19   Q.  Let's back up.  When you say he was located on Fort Sam

20   Houston, was he active duty?

21   A.  Yes, ma'am, he was.

22   Q.  In what capacity?

23   A.  I believe he was in a training environment.

24   Q.  And so since he was at Fort Sam, was there an individual --

25   another individual involved in the allegations for this case

1   that brought it to your attention?

2   A.  Yes, ma'am.

3   Q.  And where was that individual located?

4   A.  I believe she was stationed at Fort Sill, Oklahoma.

5   Q.  And did someone in Fort Sill interview her?

6   A.  Yes.

7   Q.  And who was that?

8   A.  That was Agent Bloomdall *(ph)*.

9   Q.  Did you receive documentation from Agent Bloomdall that

10  memorialized that interview?

11  A.  Yes.

12  Q.  And did you review that documentation?

13  A.  I did.

14  Q.  And what was the gist of that documentation?

15  A.  The documentation covered offenses related to an Article

16  120 offense under the UCMJ.

17  Q.  And what is that?

18  A.  Sexual assault.

19  Q.  And what were the allegations with regards to the date and

20  time and what had occurred?

21  A.  The allegations were that -- did you want me to cover what

22  occurred based on --

23  Q.  Yes.

24  A.  The allegation was while the complainant was visiting

25  Mr. Song at his residence, they were playing video games and

1   every time he would lose, I believe she had to -- they had to

2   do something and --

3   Q.  What do you mean "do something"?

4   A.  I believe it was something sexual in nature, either like

5   she had to kiss him or something to that effect every time she

6   had to help him or if he had to help her play the video game or

7   win at a video game.

8   Q.  You said at his residence, would that have been at Fort

9   Sam?

10  A.  No, ma'am.  They were on holiday block leave at his

11  personal residence.

12  Q.  And where was that, if you recall?

13  A.  I do not recall, ma'am.

14  Q.  And when you reviewed the report that memorialized the

15  interview of the complainant for what happened during holiday

16  block leave, did you note what the date -- what was the timing

17  of that?  When did this happen?

18  A.  I believe it happened towards the end of December.

19  Q.  And when you read the reports, did you see the elements of

20  sexual assault based upon UCMJ Article 120?

21  A.  I did.

22  Q.  Was there anything in addition to the complainant's

23  statement that corroborated her allegations of what had

24  occurred during the block leave of December 2017?

25  A.  Yes, there was a video.

1    Q.  A video of what?

2    A.  A video of the offense that was committed of the Article

3    120 offense.

4    Q.  The sexual assault?

5    A.  Yes, ma'am.

6    Q.  And how did the Army acquire that video?

7    A.  The original -- or the video was given to the Army by the

8    complainant.

9    Q.  And from where?

10   A.  Fort Sill, Oklahoma -- oh, from cellular phone.

11   Q.  From her cellular phone?

12   A.  That's correct.

13   Q.  Was her cellular phone -- was the data extracted from her

14   cellular phone?

15   A.  Yes.

16   Q.  Based upon that extraction, was the investigation -- were

17   the agents involved able to determine where that video came

18   from, where it originated?

19   A.  Yes.

20   Q.  And where was that?

21   A.  From Mr. Song's cellular device.

22   Q.  So when you received the case, you had the opportunity to

23   review a report that memorialized her interview?

24   A.  That is correct.

25   Q.  And you were able to review a report that documented the

1   video that was extracted?

2          MR. CONVERY:  Your Honor, I'm going to object.  This

3   is leading.

4          THE COURT:  Sustained.

5   BY MS. RICHARDSON:

6   Q.  In addition to reviewing the documentation that

7   memorialized her interview, did you also review the

8   documentation that memorialized the video?

9   A.  Yes.

10  Q.  And was what was in the video -- did you also have an

11  opportunity at some point to see the video?

12  A.  Yes.

13  Q.  And with your own eyes, were you able to determine whether

14  or not what was memorialized in the report was consistent with

15  what you saw in the video?

16  A.  Yes, it was consistent.

17  Q.  And so based upon Article UCMJ 120, what manner of actions

18  occurred based upon your review of the report that stated there

19  was a sexual assault?

20  A.  Fear and bodily harm.

21  Q.  And what did she say with regards to the bodily harm?

22  A.  She stated that she was choked a couple times prior to the

23  sexual act.

24  Q.  And did she indicate whether or not there was a point in

25  time where she felt pain?

1    A.  Yes.

2    Q.  And did she indicate whether or not she told the defendant

3    she felt pain?

4    A.  Yes.

5    Q.  And did she tell the defendant she felt pain?

6    A.  Based on her interview and what I read in the report, she

7    detailed that he had hurt her.

8    Q.  And what gave you the indication that she was in fear?

9    A.  Because based on her interview and the report I read, she

10   was already choked a couple times by the defendant and that put

11   her in fear to -- she didn't want to be hurt any further,

12   choked any further is what it was interpreted as during the

13   interview.

14   Q.  Based upon your review of the Special Agent Bloomdall's

15   reports that memorialized her interview as well as the video

16   and your review of UCMJ Article 120, what did you do next?

17   A.  After conducting review of those videos, we scheduled an

18   interview for Mr. Song.

19   Q.  And how did you do that?

20   A.  We contacted his chain of command and had him escorted to

21   the CID office.

22   Q.  When he arrived at the office, did you determine whether or

23   not he was in possession of his personal cell phone?

24   A.  Yes, everyone that we bring to the office we have their

25   possessions placed in a wall locker.

1    Q.  Did you do that in this case?

2    A.  Yes.

3    Q.  His cell phone?

4    A.  Yes.

5    Q.  Anything else?

6    A.  Any -- like any personal belongings, if he had any pens or

7    notepads, I can't describe exactly what he may have had on his

8    person, but anything that he would have had on his person would

9    have been placed in that wall locker.

10   Q.  So that's standard?

11   A.  Yes.

12   Q.  After you talked to the defendant, had an opportunity to

13   meet with him, did you return his cell phone?

14   A.  I did not.

15   Q.  And why is that?

16   A.  Because we had probable cause to believe that he had

17   committed sexual assault on the Article 120 and also had

18   probable cause to believe that that evidence was on his phone.

19   Q.  And so what did you do?

20   A.  At that point I collected his phone and we -- I secured the

21   phone in our evidence room.  We have wall lockers in the

22   evidence room.

23        MS. RICHARDSON:  Your Honor, may I approach the

24   witness?

25        THE COURT:  Yes.

1    BY MS. RICHARDSON:

2    Q.  So I'm going to show you --

3              THE COURT:  Now, Ms. Richardson.

4              MS. RICHARDSON:  Yes, sir.

5              THE COURT:  I would like to refocus this hearing, if

6    we can.  Now, my understanding is that this -- is he under

7    indictment somewhere?

8              MS. RICHARDSON:  He is under indictment.

9              THE COURT:  I know he's under indictment, but is he

10   under indictment for the sexual assault?

11             MS. RICHARDSON:  He is not.

12             THE COURT:  So the government chose not to indict him

13   for that?

14             MS. RICHARDSON:  The sexual assault did not occur on

15   federal territory.

16             THE COURT:  All right.  So is he under indictment

17   anywhere for that?

18             MS. RICHARDSON:  He is not.

19             THE COURT:  All right.  This is only for the child

20   porn.

21             MS. RICHARDSON:  This is only for the child porn.

22             THE COURT:  So I'm not really all that interested in

23   the sexual assault allegations beyond where we are.  There is

24   no dispute that he was under investigation for sexual assault.

25   There is no dispute that the government took into possession

 1   his cell phone, okay.  Unless there is some evidence that

 2   contradicts what has been submitted by both the government and

 3   the defendant, I find little to be concerned about in the

 4   initial seizure.

 5         I will tell you, however, that I am very concerned

 6   about the fact that that cell phone was held for three days

 7   without a Warrant being obtained.  Every case that I have

 8   reviewed, every single case, including Supreme Court precedent

 9   talks in terms of hours, so that's what you better focus on

10   instead of telling me all about the sexual assault.

11         MS. RICHARDSON:  In the interest of candor, Your

12   Honor, I do want to let you know that the Army did ultimately

13   close the sexual assault case as unfounded and did not go

14   forward.  I want the Court to know that.

15         THE COURT:  I thought he said he saw a video of sexual

16   assault.

17         MS. RICHARDSON:  He did see a video.  And based upon

18   the complainant's statement, it was determined at the time that

19   it provided probable cause of a sexual assault.

20         THE COURT:  All right, but later on it turned out not

21   to be the case.

22         MS. RICHARDSON:  Later on the Army made that

23   determination, yes.

24         THE COURT:  All right.  That's fine.  So let's not

25   spend all of our time on sexual assault, okay.  Because you're

1   not prosecuting sexual assault.  What you're prosecuting here

2   is a child pornography case.  And the issue before the Court

3   that is staring me straight in the face is -- and that's their

4   main complaint.  I understand about the second Warrant and all

5   of that, but if the first Warrant is bad, everything else after

6   it is bad.  So they didn't get the Warrant, they took the cell

7   phone into custody.  In a situation like this where they're

8   investigating sexual assault and cell phones are very much like

9   any other electronic device, they can be wiped.  I don't know

10  what brand, it's a Samsung, I assume it's no different than an

11  Apple cell phone.  You can plug it in and wipe it and it's very

12  difficult to retrieve material from it and it takes 30 seconds

13  to do it.  So I don't have a problem, unless something changes

14  in the testimony here, with the government seizing the cell

15  phone immediately.  That's in concert with Supreme Court

16  precedent.

17          Where we have a problem is that somebody held this

18  cell phone for three days before obtaining a Warrant.  So

19  that's where you better find the evidence.  That's where I need

20  both the defense and the government to go.

21          MS. RICHARDSON:  That's where we're headed.

22          THE COURT:  Well, let's get there quickly.

23          MS. RICHARDSON:  So at this point then based upon the

24  Court's position, the government would offer Exhibit 1 and 1A

25  which is the cell phone.

1          THE COURT:  Okay.

2          MS. RICHARDSON:  As having been seized.

3          MR. CONVERY:  For the purposes of this hearing, no

4     objection.

5          THE COURT:  It will be received.

6     BY MS. RICHARDSON:

7     Q.  So Special Agent Syrian, after you seized the defendant's

8     cell phone, what did you do with it?

9     A.  The phone was packaged and it was turned into the evidence

10    custodian.

11    Q.  And so that was on what day?

12    A.  It was on 22 January, 2018.

13    Q.  So on January 22nd, 2018, you seized the phone.  Do you

14    know approximately what time in the day that took place?

15    A.  Around noon.

16    Q.  What did you do next?

17    A.  We released Mr. Song.

18    Q.  Was there anything that happened on January 23rd that

19    prevented you from getting a Search Warrant on the 23rd?

20    A.  There was a prior investigation into a rape of a child

21    case, ma'am.

22    Q.  And so were you instructed by command to not work on

23    anything except for the aggravated sexual assault of a child?

24    A.  That is correct.

25    Q.  And was there anything that occurred on January the 24th

1   that prevented you from getting the Warrant on January the

2   24th?

3   A.  It was a continuation of that investigation, ma'am.

4   Q.  And on January 25th, what did you do?

5   A.  On January 25th I contacted the Magistrate and obtained an

6   authorization to search his cellular phone.

7   Q.  Did you submit an Affidavit and an application?

8   A.  Yes, ma'am.

9   Q.  And did the Magistrate on duty provide authorization to

10  search that phone in regards to the sexual assault allegations?

11  A.  Yes.

12          MS. RICHARDSON:  Your Honor, at this time the

13  government offers Government's Exhibit 3 and 3a which the Court

14  has a copy.  Defense counsel has a copy.

15          MR. CONVERY:  No objection --

16          THE COURT:  It will be received.

17          MR. CONVERY:  -- for purposes of this hearing.

18  BY MS. RICHARDSON:

19  Q.  When you look back at -- did you look at Government's

20  Exhibit 3 and 3a, which are the Affidavit and the Warrant in

21  preparation of today?

22  A.  Yes, ma'am.

23  Q.  And your statement within the Affidavit, is it still

24  consistent with what you reviewed in Special Agent Bloomdall's

25  report as well as the video that you saw later?

1  A.  Yes, ma'am, that information was all based off of the

2  initial preliminary investigation by Agent Bloomdall.

3  Q.  Once that Warrant was obtained, what did y'all do next?

4  A.  Once the Warrant was obtained, the evidence custodian

5  attempted to extract or conduct a UFED extraction of the

6  cellular phone and he was unable to do it, it was unsuccessful.

7  Q.  So then what happened?

8  A.  It was submitted to Fort Hood at the DFE cell for

9  extraction.

10 Q.  To have somebody with additional applications and software

11 to do the extraction of that phone?

12 A.  Yes, ma'am.

13         MS. RICHARDSON:  I pass the witness.

14         THE COURT:  That was after he got the Warrant.

15         MS. RICHARDSON:  After he got the Warrant.

16         THE COURT:  Do you have any cross-examination?

17         MR. CONVERY:  Yes.

18                    CROSS-EXAMINATION

19 BY MR. CONVERY:

20 Q.  Mr. Syrian, I'm John Convery.  And I'm going to try not to

21 duplicate the questions that have been asked, but I want to

22 focus on a few things with you.  First off, you had the

23 preliminary reports with respect to a sexual assault, correct?

24 A.  That's correct.

25 Q.  And what you put in the Affidavit is exactly the

1   information from that preliminary report, correct?

2   A.  It was pulled from the information, yes, sir.

3   Q.  You didn't learn anything different through meeting with

4   Song and seizing his phone on the 22nd of January, is that a

5   fair statement?

6   A.  That's a fair statement.

7   Q.  So within the military and with your training and

8   experience, you have the ability to get a pre-authorization to

9   seize the phone, is that correct?

10  A.  Yes.

11  Q.  You did not do that?

12  A.  I contacted the Magistrate prior --

13  Q.  Did you do that or not?

14  A.  I was unable to.

15  Q.  So you tried to get a pre-authorization?

16  A.  Yes, sir.

17  Q.  Is that in your reports anywhere?

18  A.  It's documented as an agent's investigative activity.

19  Q.  Well, let's go back over that because it might surprise you

20  to learn I've never seen that.  So this document as an agent's

21  activity, have those been provided to the government?

22  A.  I'm not sure if that was the cast entries, I'm not sure if

23  that was provided.

24  Q.  Well, it's your report, right?  It's your conduct of the

25  investigation, correct?

1  A.  Yes, sir.

2  Q.  In terms of this cross-examination, I'm not sure how I'm

3  going to be able to determine whether I have what you're

4  talking about.  Explain it to me better exactly what that's

5  contained in.

6  A.  Sure.  Every bit of activity that we do for any case is

7  documented.  Meaningful investigative activity that pulls

8  testimonial evidence or actual evidence would be provided in

9  the report.  Since the coordination with the Magistrate was

10  unsuccessful, I contacted two different Magistrates and neither

11  one of them responded.  It wasn't identified as meaningful

12  investigative activity.  It was an attempt, but if we had

13  evidence, if we had something that continued onto the report,

14  then at that point it would have --

15          THE COURT:  This is before you seized the phone.

16          THE WITNESS:  That is correct.  Before the phone was

17  collected, I attempted to contact the Magistrate twice prior to

18  Song coming to the office.

19          THE COURT:  When was the first time you attempted to

20  contact a Magistrate to get a Warrant after the phone was

21  seized?

22          THE WITNESS:  It was on the 25th.

23          THE COURT:  And then you were able to get that?

24          THE WITNESS:  Yes, sir.

25  BY MR. CONVERY:

1    Q.  I want to go back to the -- I've been handed these case

2    activity summaries.  And on the morning of the 22nd, the day

3    that you coordinated to bring in then Specialist Song, you made

4    a note that you had contacted -- attempted to contact Captain

5    Cadman Kiker, K-I-K-E-R, a military Magistrate at Fort Hood,

6    who was then deployed and unable to provide a search

7    authorization?

8    A.  That's correct.

9    Q.  And then that also on that morning you attempted to

10   coordinate with Captain Dana Newman, military Magistrate who

11   did not respond, okay.  And then Specialist --

12   A.  That is correct.

13   Q.  Specialist Song comes in, but you've set this up, correct?

14   A.  That is correct.

15   Q.  You've coordinated this whole meeting?

16   A.  That is correct.

17   Q.  Over a period of hours or days, correct?

18   A.  Yes.

19   Q.  You contacted his platoon sergeant, correct?

20   A.  Yes.

21   Q.  You contacted his commander, you arranged for him to come.

22   The characterization of this is as a noncustodial, I guess one

23   might question, voluntary appearance at CID.  That's not the

24   way it happens on active duty in the U.S. military, is it?

25   A.  No.

1  Q.  Okay.  What happens is the platoon sergeant tells Song you

2  are going to CID, correct?

3  A.  That's correct.

4  Q.  He's not -- it's not an opinion, it's not a request.  It's

5  an order, correct?

6  A.  That's correct.  He's a service member, yes, sir.

7  Q.  So to cut that short, the state of the law or at least your

8  understanding within the military is you can be ordered to go

9  to CID, you just can't be ordered to speak?

10  A.  That's correct.

11  Q.  So Song appears because he's driven there in the company

12  van or whatever, he's ordered to come and see you at CID,

13  correct?

14  A.  That's correct.

15  Q.  And then you have every intention of taking his cell phone,

16  don't you?

17  A.  Yes.

18  Q.  So in terms of your prior planning, it's that morning when

19  you're now telling the judge that you attempted to contact a

20  military Magistrate.  How many military Magistrates are there?

21  A.  It depends on -- there's always one on call and that's the

22  one I tried to contact.  And obviously I contacted one from

23  Fort Hood as well, but typically somebody on Fort Sam Houston

24  should be made available, but I'd say one or two.

25  Q.  So the timing did not -- obviously did not work out?

1  A.  That's -- the timing didn't work, I didn't have any reason

2  to believe they would respond because they do have duty cell

3  phones.

4  Q.  So you then proceeded with your interview of Specialist

5  Song?

6  A.  That is correct.

7  Q.  And it's a rather lengthy videotaped interview, correct?

8  A.  I wouldn't say the interview process was long.  I mean

9  there was a lot of -- we spoke prior during the Investigative

10  44 Worksheet, background worksheet, but other than that --

11  Q.  I'm just going to have it marked so that when we're

12  finished talking about it, I can deal with it.  But for my

13  purposes first, you spend, geez, 45 minutes of what we'll call

14  chitchat?

15  A.  That's correct.

16  Q.  Chitchat being that you're trying I guess from your

17  standpoint or is it your opinion that you're not interrogating

18  him at that time, you're just engaging in back and forth?

19  A.  That is correct.  I spoke to him for a period of time prior

20  to advising him of his legal rights.

21  Q.  So you have the legal rights paperwork there, you videotape

22  the conversation.  You learned in that exchange that he had

23  gone home to his parents for the holiday, correct?

24  A.  That's correct.

25  Q.  That his parents lived in Maryland, correct?

1    A.  That's correct.

2    Q.  That PFC Kim and a woman named Ni-jom(ph), I think, another

3    active duty soldier, that they had made plans to get together

4    and do some physical training or run during the holidays,

5    correct?

6    A.  That's correct, sir.

7    Q.  After this whatever time period is, I think it's 45 or more

8    minutes, you get to the point where you begin to focus the

9    interview on the reason that he's there and you go over the

10   rights warning with him, correct?

11   A.  Yes, sir.

12   Q.  When you do that, you then begin to ask questions about PFC

13   Kim and the video game and whether they were betting on things,

14   that kind of stuff, correct?

15   A.  Yes.

16   Q.  Now, you knew at the time from your review of this

17   evidence, and I won't belabor the point, that there were --

18   that when you watched that video of what you're calling a

19   sexual assault, that Kim is laughing in the video.  She's doing

20   oral sex on Kim and she's laughing.  Is that a fair statement?

21   A.  I don't think it's a fair statement.

22   Q.  Is she giggling?

23   A.  I'd say it's somewhat of a giggle, yes, but not laughing.

24   Q.  Okay.  And that there were also numerous conversations that

25   were extracted from her phone that were in the language Korean,

1  correct?

2  A.  That's correct.

3  Q.  And at the time you're doing this, that's still being

4  translated, correct?

5  A.  That's correct -- we wouldn't even start on that at that

6  point.

7  Q.  So let's go back.  You seize the phone.  The reports, again

8  I've reviewed numerous reports, this is the first time I've

9  heard about your priority activity.  Do you have some kind of

10 reports that relate to that priority activity?

11 A.  They're documented in the cast entry, sir.  The commander

12 of the office, he limits investigative activity during those

13 points or during those time frames.

14 Q.  Okay.  Now, but what is documented is that after this

15 interview, after your seizure of the phone, you contacted and

16 coordinated with his platoon sergeant -- no, his commander?

17 A.  Yes, sir.

18 Q.  So you took time from that priority duty to coordinate with

19 the commander of Song's unit before you were able to get a

20 hold --

21 A.  That happened prior to this -- to the investigation that

22 you're talking about.

23 Q.  No, no, I mean after he left.  After he left on the 22nd.

24 I thought I made that clear.  But before you got the search

25 authorization, you coordinated with his commanding officer.

1  You gave them information I guess on the seizure of the phone,

2  correct?

3  A.  We briefed him because whenever a soldier leaves their

4  office they're provided a high risk memorandum because there is

5  some great concern that being under investigation they may --

6  sometimes they injure themselves, so it is our due diligence to

7  make sure that the commander is aware of what was going on so

8  he can properly monitor his soldier.

9  Q.  Okay.  So the point being that after your interview with

10  Song, you brief the commander?

11  A.  That should have happened on the same day.

12  Q.  And after your -- and when I say your interview with Song,

13  I mean after your seizure of the phone, you briefed his

14  commander?

15  A.  Yes, sir, on that day.

16  Q.  And then you briefed the trial counsel?

17  A.  Yes, sir.

18  Q.  Trial counsel is the prosecutor within the military system,

19  correct?

20  A.  Yes, sir.

21  Q.  Now, going back to your interview, you're on the video tape

22  telling Song that you're going to take his phone, correct?

23  A.  That's correct.

24  Q.  He does not -- he expressly says he doesn't want you to

25  take his phone?

1   A.   That is correct.

2   Q.   He expressly does not give any consent to take his phone,

3   correct?

4   A.   That is correct.

5   Q.   He has invoked his right to counsel at that point, is that

6   correct?

7   A.   That is correct.

8   Q.   And the tape will reveal whether you're still talking to

9   him and what you're talking to him about, but this happens

10  after he's invoked his rights to counsel, correct?

11  A.   That is correct.

12  Q.   And you tell him that you're going to get a hold of the

13  Magistrate on the tape regarding the phone, that this is

14  basically -- the impression is this is not going to take very

15  long, I'm going to put you in another room and I'm going to get

16  a hold of the Magistrate with respect to your phone.  Don't you

17  tell him that?

18  A.   I told him that we are going to get an authorization to

19  search his phone, not collect it.  Collecting the phone or

20  under the notion that we are collecting it because there is

21  evidence of a sexual assault based on what I read from

22  preliminary reports to initiate the onset investigation, the

23  reason why he's at the office in the first place.

24  Q.   I asked you --

25  A.   So I told him that a search authorization to search his

1  phone.

2  Q.  Yes, on the tape.  My question to you was you clearly

3  convey to him that you're going to do that, you're going to put

4  him in another room and do that right away, is that a fair

5  statement?

6  A.  I don't think it's a fair statement.

7  Q.  Well, the tape will show what it shows.

8  A.  Okay.

9  Q.  After you talk to Song, you put the phone in a locker or

10  you leave -- do you leave it in the locker?  Do you immediately

11  take it that day?

12  A.  It is placed -- we have an evidence room and there are wall

13  lockers along the evidence room and there is a key that goes to

14  the wall locker and we hold on to that.  It's placed in a wall

15  locker until it's submitted into the evidence vault.

16  Q.  So do the documents show that you gave it to an evidence

17  custodian some two or three days later?

18  A.  I believe so.

19  Q.  Okay.  So wherever you put it, that's where it sat?

20  A.  It's in a locked vault, locked door.  Like, so our evidence

21  room, there is a locked room, there is an evidence processing

22  room and then there is a vault.  There are wall lockers, not in

23  the vault room, but inside the evidence processing room where

24  we process evidence and there are wall lockers.  It's a

25  temporary storage locker.  Whenever the evidence custodian is

1    not available to submit evidence we have to have it locked.

2    Q.  So it's a given that for the reasons that you're telling

3    the Court your priority assignment, it's a given though that it

4    sat there without anyone from your office contacting for

5    authorization to seize the cell phone until the 25th, correct?

6    A.  That's correct.

7    Q.  And you make that authorization, you do that yourself,

8    correct?

9    A.  That's correct.

10   Q.  And the form and the exhibit that's been provided to the

11   Court gives the clear impression that the cell phone is on the

12   person of Specialist Song, isn't that correct?

13   A.  No, that's not correct, sir.  It was collected from a wall

14   locker, not from him.

15   Q.  Okay.  So if the form then gives the impression that the

16   phone is going to be, in other words, it's going to be seized

17   from Song, then that would be incorrect, is that what you're

18   saying?

19   A.  That is -- the form should show that it's collected from a

20   wall locker.

21   Q.  I don't want it to be about semantics.  The point being

22   that in your opinion the Magistrate -- it's clearly indicated

23   to the Magistrate that the phone is being retrieved or seized

24   from a wall locker, correct?

25   A.  That's correct.

 1   Q.  And not from the person of Specialist Song, correct?

 2   A.  That's correct.

 3   Q.  Was the Magistrate informed in any other way other than

 4   that, because these are telephone authorizations, correct?

 5   A.  The conversation is submitted on cell phone and then a

 6   search and seizure authorization is sent to them, a request and

 7   then they authorize it.

 8   Q.  Okay.

 9   A.  And then they sign it and it's returned.

10   Q.  And they keep a log of that activity also, correct?

11   A.  They should.

12   Q.  Is there a tape recording of the actual telephone call?

13   A.  No, sir.

14   Q.  When you talked to the Magistrate, do you tell the

15   Magistrate that, oh, I took this phone from Specialist Song and

16   I've had it for a few days.  Is it that kind of conversation or

17   is it I'm seeking authorization based on this allegation and I

18   need to search the cell phone?

19   A.  I would tell -- I mean I told him that he was already

20   interviewed, the phone was collected and retained as

21   preservation of evidence, at which point we obtained an

22   authorization to conduct the search of the cellular phone.

23          MR. CONVERY:  May I have one moment, Your Honor?

24          THE COURT:  Of course.

25          (Pause.)

1          MR. CONVERY:  Do you have Government's Exhibit 3?

2          (Pause.)

3     BY MR. CONVERY:

4     Q.  Let me just try to do this this way.  In your Affidavit

5     requesting this authorization, this is the search and seizure

6     authorization form, okay.  You've got this here, it doesn't say

7     anywhere on it that it's already in your possession, is that

8     correct?

9     A.  That is correct.

10    Q.  And then in the affidavit for Government's Exhibit Number

11    3, you see down here in the last paragraph that it says, "Based

12    on the fact that Kim reported the sexual assault and a video

13    was recorded, it is paramount to the resolution of this

14    allegation that PFC Song's cellular phone be collected --"

15    A.  That's correct.

16    Q.  "-- and forensically examined to determine --"

17    blah-blah-blah.

18         That's what you wrote, that's what you signed off on,

19    correct?

20    A.  Yes, sir.

21    Q.  And were you in control of the investigation at the time?

22    A.  During that point in the investigation, yes.

23    Q.  So this procedure for pre-authorization is -- and I don't

24    mean on the morning of the event.  I mean you could get

25    pre-authorization let's say at any time after you reviewed PFC

1    Kim's allegations or reports and up to your scheduling of the

2    meeting with Song, correct?

3    A.   That is correct.

4    Q.   And so these efforts to get a pre-authorization occur on

5    the morning that you have scheduled the meeting with Specialist

6    Song?

7    A.   Yes, sir.

8    Q.   Now, in terms of -- it's out there, if you will, or may be

9    common knowledge with these devices in terms of one's ability

10   to delete them and that kind of thing, that's kind of what that

11   pre-authorization is there for, correct?

12   A.   That's correct.

13   Q.   So that you can take the phone.  But in terms of your

14   control of things, prior to January the 22nd, there weren't any

15   exigent circumstances, wasn't any immediate need or you didn't

16   perceive any or take any action, correct?

17   A.   That is correct.

18   Q.   And then the only difference with respect to 22 January and

19   the seizure of the phone was you setting up the meeting,

20   correct?

21   A.   That's correct.

22   Q.   And you taking the phone?

23   A.   That is correct.

24            MR. CONVERY:  Nothing further.

25            MS. RICHARDSON:  I have nothing further from this

1   agent.

2          MR. CONVERY:  I would like to -- I've marked as

3   Defendant's Exhibit Number One the interview.  I don't want to

4   belabor the point by doing that, but the Court -- it's

5   discovery, the government provided it to me.

6          THE COURT:  It will be received.

7          MS. RICHARDSON:  Is it the defendant's interview?

8          MR. CONVERY:  The defendant's interview.

9          THE COURT:  It will be received.

10         MR. CONVERY:  There's one other item.  Judge, could I

11  just ask one question with respect to this?

12         THE COURT:  Yes.

13  BY MR. CONVERY:

14  Q.  For the Court's edification or when the Court looks at

15  this, he's going to see a video tape that purports to start

16  sometime off in the future, January -- the date is incorrect,

17  is that right?

18  A.  Yes, the system that records on it, there's a timing --

19  Q.  Whatever you needed to do wasn't done.  The date is

20  incorrect?

21  A.  That's correct.

22  Q.  The time is incorrect?

23  A.  That's going to be displayed due to the machine, yes.

24  Q.  But it's all on this, so it does not -- your representation

25  is this is, in fact, the interview of January the 22nd?

 1   A.  Yes, sir.

 2   Q.  But it's not -- if one looks at the date, that's not

 3   correct?

 4   A.  I don't know if that issue was resolved.  I didn't pay

 5   attention to the actual timestamps on the video, but that was

 6   conducted on 22, January, 2018.

 7   Q.  Also at that time Specialist Song was processed, meaning

 8   DNA, fingerprints, the things booking, if you will, the things

 9   commonly in the civilian world associated with arrest, is that

10   correct?

11   A.  He was processed, like the fingerprints --

12   Q.  Fingerprints, mugshot, photograph?

13   A.  Yes, sir.

14   Q.  DNA, that kind of thing?

15   A.  Yes, sir.

16   Q.  And with respect to the locker that he was directed to put

17   his cell phone in prior to the interview --

18   A.  Yes, sir.

19   Q.  -- that's not a locked locker.  He's not given any key to

20   that locker?

21   A.  No, sir.

22   Q.  He can't have any access to it.  For the processing for

23   that location, are there video tapes of either the processing

24   or that location?

25   A.  I do not know, sir.  I don't believe so.

1   Q.  Okay.

2   A.  I do not recall, sir.

3   Q.  When you were arranging for this meeting, did you indicate

4   to the platoon sergeant or to any other personnel that when

5   they brought Song, they were to bring him with his cell phone?

6   A.  I do not recall if I specifically requested that.  If I

7   did, it would have been documented, but I'm not sure if I

8   specifically requested that, sir.

9   Q.  But it wouldn't be out of the ordinary for you to request

10  that.  I mean that's the purpose --

11          THE COURT:  Counsel, he says he doesn't remember.

12  What would have been out of the ordinary or not out of the

13  ordinary is not helpful.

14          MR. CONVERY:  Yes, Your Honor, I understand.  Thank

15  you for the additional questions.

16          THE COURT:  You can step down, sir.

17          THE WITNESS:  Thank you.

18          MR. CONVERY:  I offer --

19          THE COURT:  I've already received it.

20          MS. RICHARDSON:  No objection.  So Your Honor, based

21  upon -- the government's perception of defense counsel's motion

22  that's before the Court is about the seizure of the phone

23  without a Warrant.

24          THE COURT:  That's it.

25          MS. RICHARDSON:  The three-day delay and then the

1  issues with regards to the typographical error and the scope.

2  I'm completely prepared to go into all of that, but if the

3  Court is solely focused on that one issue, I don't want to take

4  up the Court's time if those other issues are not --

5         THE COURT:  When you say you're prepared to go into

6  that, what other evidence do you have in relationship to the

7  seizure of the phone and the delay between the seizure and the

8  ultimate receipt of the Warrant?  I mean he's testified pretty

9  clearly and I think quite credibly as to exactly what happened.

10 Now, is somebody going to get up on the stand and contradict

11 that?

12        MS. RICHARDSON:  No, Your Honor.  The government --

13 that is all with regards to the seizure of the phone and the

14 securing of the Warrant.  The government's next witness would

15 be with regards to the execution of that Warrant, the forensic

16 analysis of the phone.

17        THE COURT:  No.  That's not necessary for our purposes

18 today.

19        MS. RICHARDSON:  Then the government rests with

20 regards to that issue.

21        THE COURT:  Do you have any evidence?  I assume not.

22        MS. HASDORFF:  Your Honor, may we have a moment?

23        THE COURT:  Yes.

24         (Pause.)

25        MR. CONVERY:  First I would like to understand, Judge,

1   so in terms of the issue of the seizure of the phone, that's

2   the sufficient evidence.

3        THE COURT:  It doesn't seem to me that there is any

4   dispute at all between the parties as to what went on, period.

5   We're not talking about what conversations or whether he was

6   properly Mirandized and all of that.  I'm going to let you get

7   into that later if you need to, but what we're talking here now

8   about is just the phone.

9        MR. CONVERY:  Okay.  With respect to the defendant's

10  motion to suppress, we have the seizure of the phone, then we

11  have the Cellebrite, you know, the review of the materials in

12  the phone.

13       THE COURT:  But if the phone was improperly seized,

14  then you don't -- if the phone was improperly searched because

15  the Warrant wasn't timely obtained, then what was on the phone

16  is irrelevant.

17       MR. CONVERY:  I understand that, Your Honor, and

18  that's certainly the defense's position.

19       THE COURT:  It's the law.  I mean if something is

20  suppressed, it's suppressed and what's on it is suppressed.

21       MR. CONVERY:  If the phone was properly seized, then

22  the issues with respect to the Warrant, I think that what the

23  government is talking about is they have the person here who

24  did the Cellebrite, the technician who did the --

25       THE COURT:  That was much later.

1          MR. CONVERY:  I understand that.

2          THE COURT:  I think we're talking past each other

3    here.  I think your co-counsel understands what I'm saying

4    here.  I think what you need to do is to sit down.

5          MR. CONVERY:  I understand.  I will do that.

6          THE COURT:  Now, do we have any argument?

7          MS. RICHARDSON:  Your Honor, the government's position

8    is that --

9          MR. CONVERY:  Hold on.  I do -- I have evidence on

10   this point.  Sorry, Judge, I was trying to seek clarification.

11         THE COURT:  What evidence do you have to offer on what

12   point?

13         MR. CONVERY:  Well, at the time that with respect to

14   the seizure of the phone that Specialist Song's platoon

15   sergeant came and tried to retrieve the phone and his military

16   lawyer went to CID and tried to retrieve the phone and was told

17   that they had Magistrate's authorization, when in fact they did

18   not.

19         THE COURT:  Is that true?

20         MS. RICHARDSON:  That I've never heard, Your Honor.

21         THE COURT:  Do you want to take a minute and talk with

22   your agent and find out if you disagree with that?

23         MS. RICHARDSON:  I do.

24         THE COURT:  All right.

25         MS. RICHARDSON:  I'll step out.

1              (10:00 a.m.)

2              (Pause.)

3              (10:02 a.m.)

4         MS. RICHARDSON:  Your Honor, the agents maintain a

5    record that has to do with the entries of significant events

6    that take place.  That is a significant event that they would

7    have documented and that is not documented.  And they do not

8    recall anything between the seizure on January 22nd and the

9    securing of the Warrant on January 25th that involved the

10   defendant's counsel.

11        THE COURT:  I don't think he was saying the

12   defendant's counsel.  What he said was that some platoon

13   sergeant, I assume some SFC or somebody, I don't know, maybe a

14   staff sergeant, depends upon how they're constituted, went to

15   the agent and -- are you suggesting this happened during the

16   interview or was this sometime after?

17        MR. CONVERY:  After the interview.

18        THE COURT:  But while the phone was still locked up.

19        MR. CONVERY:  One moment.

20        (Pause.)

21        Yeah, while the phone was still locked up.

22        THE COURT:  So that's what they're saying.  They're

23   not saying some lawyer went to him.  They're saying some

24   platoon sergeant went.  I'm sure he complained to the platoon

25   sergeant that they had his phone and he wanted his phone back

1  and the platoon sergeant went over there.  Little bizarre, but

2  the platoon sergeant went over there, allegedly, and demanded

3  they return the phone.  And apparently they didn't accede to

4  that demand.  And allegedly the platoon sergeant was told

5  that -- allegedly the platoon sergeant was told something.

6  Then it says they have in their papers here -- my law clerk

7  just refreshed my recollection -- says Mr. Song's military

8  attorney requested the cell phone be returned at some point

9  also.

10         MS. RICHARDSON:  I do recall that being in their

11 motion, but there's nothing documented --

12         THE COURT:  Where is his military counsel?

13         MR. CONVERY:  Present, Your Honor.  That's our

14 witness.

15         THE COURT:  That's your witness.

16         MR. CONVERY:  Yes.  She has left the service since

17 this, but has remained in San Antonio.

18         THE COURT:  But she asked that the phone be returned.

19         MR. CONVERY:  That's correct.  It's just that simple.

20         THE COURT:  That's fine.  Even if that occurred, it

21 doesn't change my analysis.  What would have changed my

22 analysis would be if Mr. Song had voluntarily turned the phone

23 over and said you can hold my phone, but the agent testified

24 unequivocally that Mr. Song said no, you can't have my phone

25 and they took it anyway.  So that's the key here.

1              MR. CONVERY:  I understand.

2              THE COURT:  That's the key.

3              MR. CONVERY:  Then defense would rest.

4              MS. RICHARDSON:  Your Honor, the government's position

5    is that the analysis on the timing between the seizure of an

6    item because of probable cause and the securing of the Warrant

7    is based upon reasonableness without unnecessary delay.

8              THE COURT:  Right.

9              MS. RICHARDSON:  And while there's not a Fifth Circuit

10   case where the Fifth Circuit has looked at it, the Ninth

11   Circuit and the 11th Circuit have both looked at it with

12   regards to an analysis on whether or not it's unreasonable.

13             THE COURT:  Do you have any cases that even

14   approximate three days?

15             MS. RICHARDSON:  Actually I have an unpublished

16   Eleventh Circuit that says 45 days is not unreasonable.

17             THE COURT:  What?  In what context?

18             MS. RICHARDSON:  That is the United States versus

19   Vallimont.

20             THE COURT:  I don't have that case in front of me, but

21   I see that.  I'd like to read that case.  I will read it.

22   Where is it?

23             MS. RICHARDSON:  May I approach?

24             THE COURT:  Sure.  This sounds to me like an outlier,

25   there's got to be something very strange going on here.

1              MS. RICHARDSON:  I also have United States versus

2      Burgard, which is a Seventh Circuit case that looks at --

3      actually looks at a Ninth Circuit opinion of United States

4      versus Song Ja Cha, looking at whether or not the exclusionary

5      rule should be applied when there's been a delay and that it

6      is -- while it's applicable, it goes to whether or not that

7      delay is unreasonable.

8              THE COURT:  There's no question about the law.  I

9      understand what the law is.  I'm just looking to see what

10     this --

11             MS. RICHARDSON:  And, Your Honor, in this instance --

12             THE COURT:  Counsel, let me read and then I'll give

13     you an opportunity, I promise.  You can be seated.  Thank you.

14             *(Pause.)*

15             There's apparently another subsequent case which

16     distinguishes this case.  They talk about a case that was

17     decided by this Court, the Eleventh Circuit, in which a 21-day

18     delay was deemed under those circumstances unreasonable.

19             *(Pause.)*

20             And I think what distinguishes this case was the

21     situation where -- and they say here, "This case is

22     distinguishable --" Mitchell was the case where the 21 days was

23     deemed unreasonable.  Here they said, "First the delay was

24     reasonable due to overriding circumstances."

25             And they did talk about the officer's diversion to

1   other cases, but it says, "This case is also distinguishable

2   from Mitchell --" and this is a key factor "-- based upon

3   Kirsch's *(ph)* efforts during the 45-day delay to prepare the

4   Warrant and continue -- moreover, Vallimont had a diminished

5   privacy interest in his computer compared to the defendant in

6   Mitchell so that the delay in obtaining the Warrant was less

7   intrusive."

8            First of all, the search of the computer was deemed by

9   the Court in the Eleventh Circuit not to be unconstitutional

10  because third parties who had control over the computer gave

11  permission to search the computer.  In other words, the

12  information on that computer wasn't private to begin with.  He

13  apparently had taken photographs or had child pornography of a

14  girl who was living in the home.  She was the child victim.

15  The child victim -- he had shared the contents of that computer

16  with the child victim and the child victim had some control

17  over the computer and gave access to the computer.  I'm sure

18  you read the case.  That's not the situation here.

19            The situation here is that they were investigating

20  something entirely different.  They were investigating a sexual

21  assault.  And he did not give permission to have his phone,

22  which in effect is a computer in a way, searched.  He said no.

23  And there was no third party who had access to it.  So the

24  facts in this case are distinguishable from the facts in our

25  case, significantly.  Because in our case there was no

1    understanding that there would be child pornography on that

2    phone.  What they were looking for was evidence of the sexual

3    assault, and reasonably so, by the way, because the young woman

4    said that she had videotaped the event on her phone and that

5    would -- I believe, is that right?

6            MS. RICHARDSON:  He videotaped it on his phone and

7    messaged it to her phone.

8            THE COURT:  Well, that's even more significant.  So I

9    agree in this respect with the government that the initial

10   seizure, it appears to me the initial seizure of the phone

11   under the circumstances here was warranted and certainly was

12   not unconstitutional.  However, I disagree with the government

13   in -- you can be seated, counsel.  You're not on trial here.

14   You're not getting sentenced.

15           MS. RICHARDSON:  Thankfully.

16           THE COURT:  The Court is -- this case, first of all,

17   is an outlier, it's been distinguished by the Eleventh Circuit

18   and I am not convinced that the circumstances here, even given

19   the fact which I am quite sympathetic, as I think counsel is

20   quite aware, I am not unfamiliar with the military justice

21   system.  I was a commissioned officer in the United States

22   Army's Military Police Corps and I am quite familiar with

23   military investigations, the way they're conducted, how they're

24   conducted.  I am -- and by the way so because of his military

25   experience is defense counsel, both defense counsel actually.

1          So I am quite aware of the pressure that's put on

2     these investigators and I have great sympathy for that.  I

3     don't think that the investigator here himself -- he was put in

4     a very trying situation.  I mean certainly where the government

5     had evidence of -- and what appeared at least to be compelling

6     evidence of a sexual assault in the form of what they believed

7     to be a video tape.  It's pretty hard to refute a video tape of

8     sexual assault, you know, and they had a cooperating witness

9     who was the victim who was willing to move forward at that

10    point.  Now, obviously at some point in time, they

11    reinterviewed her and she either changed her story or something

12    was found to lack credibility and they could not go forward,

13    okay.  But I can understand where under the circumstances he

14    made a priority judgment.  They had a very strong case in his

15    view against Specialist Song at that point due to the material

16    that they had collected at Fort Sill.  The place, by the way,

17    where I was stationed at one time.  So then they get a call to

18    do an immediate investigation on a baby who allegedly had been

19    raped.  Now, that is obviously a significant priority.

20         Now, had this case been a child pornography case, had

21    this case been of some great urgency to them, had the case

22    against Specialist Song not been as strong as it was, they

23    might have made a different assessment.  He's not the only

24    person in the office, I would assume.  They have other people

25    that can get a Warrant.  This was on a Monday.  The Court

1    checked the calendar.  We're not talking about this all
2    happening on a Friday and then everybody is gone over the
3    weekend and the first available day was three days later.  This
4    was Monday, Tuesday and Wednesday.  Someone else in the office
5    could easily have obtained a Warrant during any of those
6    periods of time if he was pulled off the case.  But I can
7    understand why for, you know, reasons that had to do with the
8    strength of the case against what they thought was the strength
9    of the case against Specialist Song, they just simply didn't do
10   that.

11           Now, it's easy for somebody in my position to
12   second-guess that decision, but I'm not going to second-guess
13   it because I understand the pressure that they're under.  But
14   they're not the only people in the office.  I mean they have
15   JAG officers there, anybody could have obtained this Warrant
16   predicated on the evidence that they had.  I mean they had a
17   woman who claimed to have been sexually assaulted, she provided
18   them with a video which had been reviewed and appeared at least
19   to them to show sexual assault.  I cannot imagine under those
20   circumstances a military Magistrate denying a Search Warrant of
21   the telephone, especially where her testimony was that -- or
22   her statement was, I should say, to the agents, that he had
23   made this recording on his phone and sent it to her.  So they
24   had direct evidence that he had that on his phone.  I cannot
25   imagine any Magistrate Judge or any District Judge or any

1   military Magistrate Judge turning down a Warrant under those
2   circumstances.  It was not a difficult Warrant to obtain.  They
3   just set it aside.  And they set it aside because they thought
4   they had a priority and they had a very strong case.

5        The Constitution doesn't get put on hold because of
6   the exigencies, generally, absent something else.  Now, in this
7   case that you've given to me, the Eleventh Circuit case, it was
8   put on hold for them because they had other strong evidence of
9   the very crime they were committing, the access to the computer
10  had been given by a third party, so the 45-day delay in getting
11  the Warrant meant almost nothing because they had the right to
12  look at the computer at the time and they saw the pornography
13  at the time because the third party gave consent.  But we don't
14  have that here.

15       And the other cases that have been cited, the Supreme
16  Court case involved two-hour delay.  Two hours they said was
17  not too long.  I would have said in this case even I think it
18  would have been reasonable for them under the circumstances for
19  him to have gotten the new assignment and then had he known
20  there was child pornography on there, this would have happened.
21  There is no doubt in my mind that what he would have done if he
22  had had an inkling that there was child pornography on there in
23  addition to what was on there, what he would have done is the
24  next day he would have said, Look, I think we've got a
25  potential child porn here, we need to get a Warrant ASAP.  But

1   there was no way for him to know that.  So who can criticize

2   him?  I'm not criticizing him.  I understand.

3          But it's no different than the Speedy Trial Act which

4   is a constitutional right.  If I have a defendant in my court

5   and the Speedy Trial Act is going to expire and I'm in the

6   middle of a trial, is that an excuse for letting the Speedy

7   Trial Act expire?  I can tell you the Supreme Court has said

8   no.  The prosecution's delay because they're busy is no excuse.

9   The Court's delay because the Court is busy is no excuse.  The

10  defendant's delay is an excuse, but if it's the Court or if it

11  is the government, Speedy Trial Act expires, the defendant may

12  not be tried.  So what we do in those circumstances is we stop

13  whatever we're doing and we select a jury, swear the jury in

14  and then within a very short period of time get to that case,

15  but if we -- but it's also been ruled by several Circuit courts

16  that a judge stopping another trial, selecting a jury and

17  setting that jury aside for a month and then coming back to it

18  is a sham.  And they have held, you know, you're looking at the

19  Ninth Circuit, I can tell you they've held the Speedy Trial Act

20  expired because that was not a reasonable effort by the Court

21  to get to that matter quickly.

22          So I am going to take another hard look at this, but

23  I'm inclined to suppress the telephone because I believe that

24  under all the circumstances the three days was just simply too

25  long.  And it could have and should have -- it was not a

1  reasonable amount of time on a Monday, Tuesday and Wednesday,

2  they could easily have obtained a military Magistrate's Warrant

3  to look at that phone, they close not to do it because they

4  were busy.  I don't know what the circumstances were with this

5  particular officer, but I know as a matter of fact and I don't

6  think you're going to deny this, there were other people in his

7  office.  You and I have had plenty of these cases, right?  And

8  I know how many agents are there.  There's plenty of them.  Not

9  as many as they need, I'm sure, but there's others and I

10 understand why he didn't do it.  He didn't do it because he

11 didn't think there would be child pornography on there or any

12 other crime.  And he had a very strong case otherwise, the Army

13 did, so they didn't need to.  We don't need to even talk about

14 whether the Army officer who was his counsel demanded the phone

15 back because he didn't give consent to take it away from him in

16 the first place.  So all she was doing was something that was I

17 think a good thing to do, but it was redundant, assuming that

18 that happened.  Because he had already asked that his phone not

19 be taken away.  So you have the right to appeal, of course.

20         MS. RICHARDSON:  Well, since you're still thinking

21 about it, would the Court not consider that even if there was a

22 delay and --

23         THE COURT:  Well, we know there was a delay.  There

24 was a three-day delay, from Monday when he talked to him all

25 the way through Tuesday, Wednesday and I think, I can't

1    remember -- it was a full three days.

2            MS. RICHARDSON:  Even if that delay was considered

3    unreasonable, would the Court consider that a Leon good faith,

4    good faith would come into play because nothing would have

5    changed, none of that evidence changed.  Had they have gotten a

6    Warrant on the very first day --

7            THE COURT:  What you're talking about is an inevitable

8    discovery exception.

9            MS. RICHARDSON:  If he would have gotten the phone

10   back, he wouldn't have been -- he wasn't deprived any more than

11   he would have been --

12           THE COURT:  He was deprived of his property and even

13   in this case they talk about a seizure of a computer because

14   people use their computer, that is a significant deprivation of

15   property.  And I don't think anybody around here would suggest

16   that being deprived of your cell phone is not a significant

17   deprivation of your property.  I doubt there are many people in

18   this audience or anybody here who has a cell phone who doesn't

19   have it with them and carry it with them all the time.  So I

20   don't think anybody is going to seriously consider whether that

21   is -- I will look at the inevitable discovery doctrine.  As I

22   told you, I don't think there's any question they would have

23   had the right to examine the phone and we can litigate those

24   issues, you know, if I agree with you then I'll give counsel an

25   opportunity to address those issues later.  As to whether they

1    would have found the child porn, I don't know, then we can hear

2    from the forensics person.  That's when that becomes, but on

3    this issue here, three days is too long.  They had easy access

4    on the military base to a Magistrate.  And I understand that

5    one was not available, but there was another one.  I think

6    there's more than one Magistrate on Fort Sam, military

7    Magistrate I would hope.  So they could get access to that.

8            Now, I don't suppress evidence lightly, as you well

9    know.  I mean we've got a bunch of Fifth Circuit child porn

10   cases up on appeal where I've denied motions to suppress and

11   these were your cases, I think, are they?

12           MS. RICHARDSON:  Yes, Your Honor.

13           THE COURT:  But in this case, three days is just too

14   long.  And from a legal constitutional standpoint, from a

15   practical standpoint, I can understand what the problem was,

16   but people make choices.  And choices were made and I'm not

17   criticizing the agent for making the choice he made.  I want to

18   make that very clear.  I'm not suggesting that he intentionally

19   committed an unconstitutional act.  That's not the question.

20   He made a choice.  Now, had he known, of course, that there was

21   child porn on there, he would have gotten somebody else right

22   away.  He seems bright, he seems articulate, he seems

23   committed, he seems like a good agent to me.  And I've heard a

24   lot of agents testify in 31 years on this bench and I've worked

25   with a lot of agents, civilian and military when I was on

 1  active duty.  I know what a good agent is and he seems like a

 2  good agent, but he had no idea there was porn on there.  He

 3  wasn't looking for porn.  He was looking for evidence of sexual

 4  assault, which is a serious matter obviously, very serious and

 5  he got diverted.  And while that could be an excuse I think for

 6  a day, maybe two days even, but three full days?  The

 7  Constitution can't tolerate that kind of delay under these

 8  circumstances, it isn't reasonable.  So I will look at the

 9  inevitable discovery exception and I may deny the motion

10  tentatively on the inevitable discovery exception pending

11  further testimony, but on this issue, just on the issue of

12  delay, if that's where we are, the government has -- does not

13  have a position to stand on here.  So I would suppress if

14  that's where we are.  I'll look at the inevitable discovery.

15  You haven't even had a chance to brief that, have you?

16          MR. CONVERY:  No, Your Honor.

17          THE COURT:  And I assume you want a chance to brief

18  that.

19          MR. CONVERY:  If necessary, yes, sir.

20          THE COURT:  Well, I think it's necessary.

21          MR. CONVERY:  Okay.  We will do that.

22          THE COURT:  So what I'm going to do is I'm not going

23  to issue a flat out ruling yet.  I'm going to give the

24  government -- I mean don't brief this again, okay.  I don't

25  need to have any more briefing on this issue.  We've had

1    testimony on it, the agent was absolutely truthful, he did what

2    he was supposed to do, get up here and tell the truth.  And so

3    we don't need any more briefing there.  That isn't going to

4    change the circumstances here and the law is the law.  Whatever

5    it is, it is.  And you've cited me your best cases.  And I can

6    see that this case says 45 days was okay because this agent was

7    otherwise busy.  You're going to look real hard and long before

8    you're going to find another federal judge who isn't just so

9    ideologically swung in one way or the other to suggest that

10   because an agent is busy, a week delay or even a three-day

11   delay is okay.  The Supreme Court has said, well, you know,

12   yeah, the guy was deprived from the occupancy of his mobile

13   home, but it was only two hours, so it's okay.

14            Now, do you think the Supreme Court would have reached

15   the same decision for three days?  I don't think so.  I think

16   the Supreme Court would have said no dice, they needed a

17   Warrant at that point.  I mean he had the phone.  I don't have

18   any problem at all with him seizing the phone.  He did exactly

19   what he needed to do in seizing that phone for the purposes in

20   which he seized it.  That I think the defense loses on.  He had

21   the right to seize the phone.  But then he needed to get a

22   Warrant.  And the next day trying to get the guy, I mean

23   there's no evidence at all that he could not have gotten a

24   Warrant that day or even the next morning or the next afternoon

25   or the next day or the morning of the afternoon.  There's no

1   evidence of that.  Now, he was busy doing a really critical

2   case, but there are lots of people involved.  I mean I can't

3   believe that somebody can't call a JAG officer, a prosecutor

4   and say, geez, we're in a real bind over here, we need a

5   Warrant.  I mean I've seen that before.  I've had it done

6   before.  And they're all working for the same agency, the

7   United States Army.  I don't think the Magistrate is going to

8   say, oh, geez, you mean you called an agent, you called some

9   captain over at the JAG office and they're getting the Warrant?

10  With his affidavit which takes two minutes to do on this case,

11  I could do that Warrant sitting on the bench from right now, it

12  would take me three minutes to do that Warrant.  I promise, it

13  would be a good one.  But he didn't see the exigency of it, he

14  just didn't.  And one can understand why, but that's not an

15  excuse any more than my being tied up in a multiple murder

16  trial is an excuse for some defendant over here with a drug

17  case being denied their right to a speedy trial.  You got to

18  get another judge.  Which, by the way, is why I had 14 jury

19  trials and four non-jury trials last year.  I'm the other

20  judge.  I had to step in several times, so that's the way it

21  is.  So I'm going to hold this open.  How long do you need to

22  brief this inevitable discovery.  That's what you were arguing

23  basically, isn't it?

24          MS. RICHARDSON:  Yes, Your Honor, that nothing else

25  would have changed if they had gotten the Warrant on that same

1   day, he wouldn't have gotten his phone back, the evidence would

2   have stayed the same and that ultimately the agent that

3   executed the Warrant relied on good faith, that it was valid --

4           THE COURT:  So there's two different things here

5   you're arguing.

6           MS. RICHARDSON:  Inevitable discovery and good faith.

7           THE COURT:  They're not the same.  I want you to

8   prepare your memo within, let's see -- well, we've got

9   Thanksgiving, don't we?  He's on bond, isn't he?

10          MR. CONVERY:  Yes.

11          THE COURT:  Nothing else is going to change.  When

12  would you like to have your memorandum in?

13          MS. RICHARDSON:  December 15th.

14          THE COURT:  December 15th?  Yikes.  Do you have a

15  problem with that?

16          MR. CONVERY:  No.

17          THE COURT:  All right.  Okay, Bettina, you get

18  December 15th.

19          MS. RICHARDSON:  Thank you, Judge.

20          THE COURT:  And I'm going to give you seven days after

21  that to file your reply.

22          MR. CONVERY:  Thank you.

23          THE COURT:  Because you can start your legal research

24  right now.  You know what the issues are.

25          MR. CONVERY:  Sure.  And I didn't -- obviously in your

1  head you know when to sit down and I don't mean to violate

2  that, but I do want to point out because I don't want to agree

3  with the issues, the defense doesn't exactly -- we don't

4  exactly see it the same way.  I don't know that he operated

5  intentionally and it may apply to this inevitable discovery,

6  but the evidence is clear --

7          THE COURT:  Counsel, in my many years as a federal

8  judge you would not be the first lawyer to tell me that you

9  have not and do not see the evidence the same way I do.  That's

10 not unusual.

11         MR. CONVERY:  Well, I do see the same result.  My

12 simple point is that one of the chief distinctions here with

13 respect to all of this, because Bettina has gotten to discuss

14 with the Court a couple times, my only point is that in this

15 situation especially with the military system of telephonic

16 Warrants and follow-up affidavits, they are in complete control

17 of the timing of this.  From the time of the sexual assault

18 allegation up until January 22nd and until January 25th, these

19 time periods, any exigency is created by them.  And any

20 pre-authorization --

21         THE COURT:  I'm having a very difficult time

22 understanding why what you're saying is different than what I

23 said.  I said that they had plenty of opportunity and could

24 have if they would have seen the need to do so.

25         MR. CONVERY:  I agree.

1          THE COURT:  Now, what that plays into, however, it may

2     be it plays into her good faith exception, I don't know.  So

3     then we're going to have to look at that.

4          MR. CONVERY:  Yes, sir.

5          THE COURT:  So you know what the issues are.  You know

6     what the issues are.  I'm not going to issue a ruling on the

7     motion to suppress.  Now, if I rule that there is a potential

8     here for a good faith exception and, therefore, uphold the

9     seizure, then we'll have another hearing and I'm going to give

10    counsel an opportunity to raise the other issues that they wish

11    to raise.

12         MR. CONVERY:  Yes, sir.

13         THE COURT:  But we need to get over this hump first,

14    okay?

15         MR. CONVERY:  Yes, sir.

16         THE COURT:  Anything else?

17         MR. CONVERY:  No, sir.

18         THE COURT:  Do we all know where we are?

19         MR. CONVERY:  Yes, sir.

20         MS. RICHARDSON:  Thank you, Your Honor.

21         THE COURT:  All right.  I hope you all, by the way, in

22    spite of all this have a very happy Thanksgiving.

23         COURT SECURITY OFFICER:  All rise.

24         (10:42 a.m.)

25                         *   *   *

1                    *   *   *   *   *

2

3    UNITED STATES DISTRICT COURT

4    WESTERN DISTRICT OF TEXAS

5

6        I certify that the foregoing is a correct transcript from

7    the record of proceedings in the above-entitled matter.  I

8    further certify that the transcript fees and format comply with

9    those prescribed by the Court and the Judicial Conference of

10   the United States.

11

12   Date signed:  February 20, 2020

13

14   /s/ Angela M. Hailey

15   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
16   655 East Cesar E. Chavez Blvd., Third Floor
     San Antonio, Texas  78206
17   (210)244-5048

18

19

20

21

22

23

24

25

# Exhibit 3
# (Sealed Motion to Suppress)

# Exhibit 4
# (Sealed Order Denying Motion to Suppress)

# Exhibit 5

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

# FILED

JUL 21 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | CAUSE NO. SA-19-CR-63-DAE-1 |
| | § | |
| HAE YEONG SONG, | § | |
| DEFENDANT. | § | |

## VERDICT FORM

## DEFENDANT HAE YEONG SONG

**COUNT ONE - (Receipt of Child Pornography)**

GUILTY __X__                              NOT GUILTY _____

**COUNT TWO - (Possession of Child Pornography)**

GUILTY __X__                              NOT GUILTY _____

**Date** _July 21, 2021_

_____
**DAVID A. EZRA**
**U.S. DISTRICT COURT JUDGE**

# Exhibit 6

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

UNITED STATES OF AMERICA

v.

Case Number: 5:19-CR-00063-DAE(1)
USM Number: 25596-480

HAE YEONG SONG
*aka Hae Song*
    Defendant.

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

The defendant, HAE YEONG SONG, was represented by John A. Convery, Esq.

The defendant was found guilty to Counts One (1) and Two (2) of the Indictment by a Court verdict on July 21, 2021 after a plea of not guilty. Accordingly, the defendant is adjudged guilty of such Counts involving the following offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2252A(a)(2), 18 U.S.C. § 2252A(b)(1) | Receipt of Child Pornography | 01/20/2018 | One (1) |
| 18 U.S.C. § 2252A(a)(5)(B), 18 U.S.C. § 2252A(b)(2) | Possession of Child Pornography | 01/22/2018 | Two (2) |

As pronounced on December 8, 2021, the defendant is sentenced as provided in pages 2 through 7 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is further ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the Court and United States Attorney of material changes in economic circumstances.

Signed this 21st day of December, 2021.

                    DAVID A. EZRA
            Senior United States District Judge

DEFENDANT: HAE YEONG SONG
CASE NUMBER: 5:19-CR-00063-DAE(1)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of **one hundred seventy (170) months.** This term consists of one hundred seventy (170) months as to count one (1) and sixty (60) months as to count two (2) with credit for time served while in custody for this federal offense pursuant to 18 U.S.C. § 3585(b). Terms are to run concurrently.

The court makes the following recommendation to the Bureau of Prisons:
1) That the defendant be placed at the Butner (low security) facility or the Fort Dix (low security) facility
2) That the defendant participate in mental health treatment while in custody
3) That the defendant participate in educational/vocational programs while in custody

The defendant shall remain in custody pending service of sentence.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

_____

By
DEPUTY UNITED STATES MARSHAL

DEFENDANT: HAE YEONG SONG
CASE NUMBER: 5:19-CR-00063-DAE(1)

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release a total term of **ten (10) years.** This term consists of ten (10) years as to count one (1) and ten (10) years as to count two (2)**.** Terms are to run concurrently.

While on supervised release the defendant shall comply with the mandatory, standard and if applicable, the special conditions that have been adopted by this Court, and shall comply with the following additional conditions:

1.  The defendant shall participate in a sex offense-specific treatment program and submit to periodic polygraph testing at the discretion of the probation officer as a means to ensure compliance with the requirements of supervision or the treatment program. The defendant shall follow the rules and regulations of the program. The probation officer will supervise the defendant's participation in the program (provider, location, modality, duration, intensity, etc). The defendant shall pay the costs of the program if financially able.

2.  The defendant shall not reside within 1,000 feet of the real property comprising a public or private elementary, vocational, or secondary school or a public or private college, junior college, university or playground or a housing authority owned by a public housing authority or within 100 feet of a public or private youth center, public swimming pool or video arcade facility, without prior approval of the Court.

3.  The defendant shall allow the probation officer to install computer monitoring software on any computer (as defined in 18 U.S.C. § 1030(e)(1)) the defendant uses.

4.  To ensure compliance with the computer monitoring condition, the defendant shall allow the probation officer to conduct initial and periodic unannounced searches of any computers (as defined in 18 U.S.C. § 1030(e)(1)) subject to computer monitoring. These searches shall be conducted for the purposes of determining whether the computer contains any prohibited data prior to installation of the monitoring software; to determine whether the monitoring software is functioning effectively after its installation; and to determine whether there have been attempts to circumvent the monitoring software after its installation. The defendant shall warn any other people who use these computers that the computers may be subject to searches pursuant to this condition.

5.  The defendant shall not associate with any child or children under the age of 18 except in the presence and supervision of an adult specifically designated in writing by the probation officer. The probation officer will notify the designated adult of risks occasioned by the defendant's criminal record or personal history or characteristics. The defendant shall permit the probation officer to make such notifications.

6.  Sex Offender Search and Seizure Condition: The defendant shall submit his or her person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only when reasonable suspicion exists that the defendant has violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search shall be conducted at a reasonable time and in a reasonable manner.

AO 245B (Rev. TXW 10/12) Judgment in a Criminal Case                                      Judgment -- Page 4 of 7

DEFENDANT:          HAE YEONG SONG
CASE NUMBER:        5:19-CR-00063-DAE(1)

# CONDITIONS OF SUPERVISION

**Mandatory Conditions:**

1. The defendant shall not commit another federal, state, or local crime during the term of supervision.

2. The defendant shall not unlawfully possess a controlled substance.

3. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release on probation or supervised release and at least two periodic drug tests thereafter (as determined by the court), but the condition stated in this paragraph may be ameliorated or suspended by the court if the defendant's presentence report or other reliable sentencing information indicates low risk of future substance abuse by the defendant.

4. The defendant shall cooperate in the collection of DNA as instructed by the probation officer, if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 (42 U.S.C. § 14135a).

5. If applicable, the defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et. seq.*) as instructed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which the defendant resides, works, is a student, or was convicted of a qualifying offense.

6. If convicted of a domestic violence crime as defined in 18 U.S.C. § 3561(b), the defendant shall participate in an approved program for domestic violence.

7. If the judgment imposes restitution, the defendant shall pay the ordered restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664. *(if applicable)*

8. The defendant shall pay the assessment imposed in accordance with 18 U.S.C. § 3013.

9. If the judgment imposes a fine, it is a condition of supervision that the defendant pay in accordance with the Schedule of Payments sheet of the judgment.

10. The defendant shall notify the court of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution, fines or special assessments.

**Standard Conditions:**

1) The defendant shall report to the probation office in the federal judicial district where he or she is authorized to reside within seventy-two (72) hours of release from imprisonment, unless the probation officer instructs the defendant to report to a different probation office or within a different time frame.

2) After initially report to the probation office, the defendant will receive instructions from the court or the probation officer about how and when to report to the probation officer, and the defendant shall report to the probation officer as instructed.

3) The defendant shall not knowingly leave the federal judicial district where he or she is authorized to reside without first getting permission from the court or the probation officer.

4) The defendant shall answer truthfully the questions asked by the probation officer.

5) The defendant shall live at a place approved by the probation officer. If the defendant plans to change where he or she lives or anything about his or her living arrangements (such as the people the defendant lives with), the defendant shall notify the probation officer at least ten (10) days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within seventy-two (72) hours of becoming aware of a change or expected change.

6) The defendant shall allow the probation officer to visit the defendant at any time at his or her home or elsewhere, and the defendant shall permit the probation officer to take any items prohibited by the conditions of the defendant's supervision that are observed in plain view..

7) The defendant shall work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses the defendant from doing so. If the defendant does not have full-time employment, he or she shall try to find full-time employment, unless the probation officer excuses the defendant from doing so. If the defendant plans to change where the defendant works or anything about his or her work (such as the position or job responsibilities), the defendant shall notify the probation officer at least ten (10) days before the change. If notifying the probation officer at least ten (10) days in advance is

AO 245B (Rev. TXW 10/12) Judgment in a Criminal Case                                          Judgment -- Page 5 of 7

DEFENDANT:              HAE YEONG SONG
CASE NUMBER:            5:19-CR-00063-DAE(1)

not possible due to unanticipated circumstances, the defendant shall notify the probation officer within seventy-two (72) hours of becoming aware of a change or expected change.

8) The defendant shall not communicate or interact with someone the defendant knows is engaged in criminal activity. If the defendant knows someone has been convicted of a felony, the defendant shall not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9) If the defendant is arrested or questioned by a law enforcement officer, the defendant shall notify the probation officer within seventy-two (72) hours.

10) The defendant shall not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified, for the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11) The defendant shall not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12) If the probation officer determines that the defendant poses a risk to another person (including an organization), the probation officer may require the defendant to notify the person about the risk and the defendant shall comply with that instruction. The probation officer may contact the person and confirm that the defendant has notified the person about the risk.

13) The defendant shall follow the instructions of the probation officer related to the conditions of supervision.

14) If the judgment imposes other criminal monetary penalties, it is a condition of supervision that the defendant pays such penalties in accordance with the Schedule of Payments sheet of the judgment.

15) If the judgment imposes a fine, special assessment, restitution, or other criminal monetary penalties, it is a condition of supervision that the defendant shall provide the probation officer access to any requested financial information.

16) If the judgment imposes a fine, special assessment, restitution, or other criminal monetary penalties, it is a condition of supervision that the defendant shall not incur any new credit charges or open additional lines of credit without the approval of the probation officer, unless the defendant is in compliance with the payment schedule.

17) If the defendant is excluded, deported, or removed upon release on probation or supervised release, the term of supervision shall be a non-reporting term of probation or supervised release. The defendant shall not illegally re-enter the United States. If the defendant is released from confinement or not deported, or lawfully re-enters the United States during the term of probation or supervised release, the defendant shall immediately report to the nearest U.S. Probation Officer.

DEFENDANT:   HAE YEONG SONG
CASE NUMBER:  5:19-CR-00063-DAE(1)

## CRIMINAL MONETARY PENALTIES/SCHEDULE

  The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth. Unless the Court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. Criminal Monetary Penalties, except those payments made through Federal Bureau of Prisons' Inmate Financial Responsibility Program shall be paid through the Clerk, United States District Court, 655 E. Cesar E. Chavez Blvd, Room G65, San Antonio, TX 78206 or online by Debit (credit cards not accepted) or ACH payment (direct from Checking or Savings Account) through pay.gov (link accessible on the landing page of the U.S. District Court's Website). **Your mail-in or online payment must include your case number in the exact format of DTXW19CR00063-005 to ensure proper application to our criminal monetary penalty.** The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $200.00 | $.00 | $22,500.00 |

### SPECIAL ASSESSMENT

  It is ordered that the defendant shall pay to the United States a total special assessment of $200.00. This total consists of $100.00 as to each count- one (1) and two (2). Payment of this sum shall begin immediately.

### FINE

  The fine is waived because of the defendant's inability to pay.

### RESTITUTION

  The defendant shall pay restitution in the amount of $22,500.00 through the Clerk, U.S. District Court, for distribution to the payees. Payment of this sum shall begin immediately.

  The Court directs the United States Probation Office to provide personal identifier information of victims by submitting a "reference list" under seal Pursuant to E-Government Act of 2002" to the District Clerk within ten (10) days after the criminal Judgment has been entered.

| Name of Payee | Amount of Restitution |
|---|---|
| The victim of the "At School" series, "Violet." | $4,500.00 |
| The victim of the "Vicky" series, "Lily." | $4,500.00 |
| The victim of the "Sweet Sugar" series (Pia). | $4,500.00 |
| The victim of the "Jenny" series. | $4,500.00 |
| The victim of the "Tara" series. | $4,500.00 |

  If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column above. However, pursuant to 18 U.S.C. § 3664(i), all non-federal victims must be paid before the United States is paid.

  If the fine is not paid, the court may sentence the defendant to any sentence which might have been originally imposed. See 18 U.S.C. §3614.

  The defendant shall pay interest on any fine or restitution of more than $2,500.00, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. §3612(f). All payment options may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. §3612(g).

  Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.

  Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. TXW 10/12) Judgment in a Criminal Case                                      Judgment -- Page 7 of 7

DEFENDANT:            HAE YEONG SONG
CASE NUMBER:          5:19-CR-00063-DAE(1)

## FORFEITURE

The defendant is ordered to forfeit the following property to the United States:

1) Samsung Galaxy S7 cell phone; sn: RF8J11TQ7FP;
2) Samsung Micro SD card; and
3) EVO Select 64 GB.

# Exhibit 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

UNITED STATES OF AMERICA      §

VS.                    §   CAUSE NO. SA-19-CR-0063(1)DAE

HAE YEONG SONG          §

### NOTICE OF APPEAL

COMES NOW HAE YEONG SONG, Defendant in the above styled number cause, and pursuant to Rule 4 FRAP gives this written Notice of Appeal to the United States Court of Appeals for the Fifth Circuit. It is Defendant's desire to appeal the trial, final judgment, and sentence entered in this action on the 8th day of December 2021. Defendant is indigent and requests separate counsel be appointed to represent him for this direct appeal.

Respectfully Submitted,

/s/ John A. Convery
John A. Convery
SBN: 04715100

Hasdorff & Convery, P.C.
2313 N Flores St.
San Antonio, Texas 78212
(210) 738-9060
(210) 738-9426 fax
hasconpc@aol.com

Requested and Approved By:

Hae Yeong Song

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Notice of Appeal was electronically filed with the U.S. District Clerk's Office via the CM/ECF filing system and has been Delivered to the Assistant U.S. Attorney Bettina Richardson, for the Western District of Texas, San Antonio Division.

Respectfully Submitted.

/s/ John A. Convery
John A. Convery

# Exhibit 8

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 1, 2023

Lyle W. Cayce
Clerk

_____

No. 21-51229
_____

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

HAE YEONG SONG,

*Defendant—Appellant.*

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:19-CR-63-1

_____

Before JONES, CLEMENT, and HAYNES, *Circuit Judges*.

J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.

# Exhibit 9

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 1, 2023

Lyle W. Cayce
Clerk

No. 21-51229

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

HAE YEONG SONG,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:19-CR-63-1

Before JONES, CLEMENT, and HAYNES, *Circuit Judges*.

PER CURIAM:[*]

The Government charged Hae Yeong Song with receipt and possession of child pornography after investigative agents found an illicit image on Song's cellphone during an investigation into an unrelated incident. Song subsequently moved to suppress the child pornography evidence, asserting that the agents violated his Fourth Amendment rights when they seized and searched his cellphone. The district court denied Song's motion

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

and found him guilty after a bench trial. Song appealed. For the reasons set forth below, we AFFIRM.

## I.    Factual Background

When he was a soldier in the United States Army, Song was accused of sexually assaulting another soldier, "PFC Kim," and recording videos of the assault on his cellphone. PFC Kim reported the incident to Army investigative agents. She also stated that, days after the alleged assault, Song messaged her on the "Kakao Talk" app, sent her one of the video recordings, and told her he would use it as blackmail if she refused to have sex with him again. PFC Kim permitted the agents to review her cellphone, where they found a video associated with the incident.

After receiving PFC Kim's report and the video, Special Agent Andrew Cerean began an investigation. He first arranged a standard interview with Song at an Army field office. Before the interview, Agent Cerean attempted to contact the on-duty military magistrate judge and a second military magistrate judge to obtain a search and seizure authorization for Song's cellphone.[1] Despite several attempts to reach them, however, Agent Cerean did not receive a response. Song later arrived at the office for the interview, where he was instructed to follow the standard practice of placing his belongings in a locker, which he did.

The interview began casually, and Song was generally responsive. He confirmed that he knew PFC Kim and that she had visited him. However, when Agent Cerean began questioning Song about his visit with PFC Kim, Song ceased responding and requested a lawyer. Based on PFC Kim's report, the video from her phone, and his conversation with Song, Agent

---

[1] A "search and seizure authorization" is another term for a "warrant" in the military context. *See* MIL. R. EVID. 315(a), (d)

No. 21-51229

Cerean determined he had probable cause that (1) Song had sexually assaulted PFC Kim and (2) evidence of that assault would be on Song's cellphone. Accordingly, when the interview ended, Agent Cerean declined to return Song's cellphone.

Before Agent Cerean was able to seek a search and seizure authorization, his commanding officer ordered him to give his attention to a different matter. Three days later, Agent Cerean submitted an affidavit detailing the results of his investigation, and a magistrate judge issued a search and seizure authorization for Song's cellphone. The authorization permitted a search of "any contacts; call logs; texts; SMS; MMS: videos; images; call & Application Data, including contents from the 'Kakao Talk' application; as well as any deleted messages, content & application data between" Song and PFC Kim related to the sexual assault investigation.

A different agent, Agent Jeffrey Cunningham, conducted the search. In his initial review, he was unable to find a particular video related to the sexual assault. So, he broadened his review. During this search, he stumbled upon an image of child pornography. He immediately ceased his review and obtained a second search authorization. During the search conducted pursuant to that second authorization, Agent Cunningham discovered extensive images and videos of child pornography.

The Government subsequently charged Song with receipt and possession of child pornography involving a prepubescent minor, in violation of 18 U.S.C. § 2252A(a)(2) and § 2252A(a)(5)(B), respectively. Song moved to suppress the initial image, and all evidence stemming from that image, as fruit of the poisonous tree. He urged that Agent Cerean's initial seizure of his cellphone and Agent Cunningham's subsequent search violated his Fourth Amendment rights. After two evidentiary hearings, the district court

denied Song's suppression motion. Song proceeded to a bench trial, in which the district court found him guilty. After sentencing, Song timely appealed.

## II.    Standard of Review

Our review of a district court's denial of a suppression motion is two-fold: we review conclusions of law de novo and factual findings for clear error. *United States v. Robinson*, 741 F.3d 588, 594 (5th Cir. 2014). "[T]he clearly erroneous standard is particularly strong" where, as here, the district court heard oral testimony and "had the opportunity to observe the demeanor of the witnesses." *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (quotation omitted). Accordingly, under that standard, we defer to the district court's factual findings unless we are left with "a definite and firm conviction that a mistake has been committed." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010). Importantly, we view the evidence "in the light most favorable to the prevailing party," here, the Government. *Gibbs*, 421 F.3d at 357.

## III.    Discussion

The district court concluded that neither the seizure nor the subsequent search violated Song's Fourth Amendment rights. Therefore, suppression of the child pornography evidence was not warranted. As discussed below, we agree.

### A. Seizure

We begin with Agent Cerean's seizure of Song's cellphone. Song makes two main challenges. First, he urges that Agent Cerean violated the Fourth Amendment's protection against unreasonable seizures when he confiscated Song's cellphone without a warrant. While seizures generally must be conducted pursuant to a warrant, *see United States v. Place*, 462 U.S. 696, 701 (1983), there are exceptions. For instance, "the exigencies of the

situation [may] make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (second alteration in original) (internal quotation marks and citation omitted). Accordingly, under this "exigent circumstances exception," an agent does not need a warrant to seize property if he has (1) probable cause to believe that a suspect might destroy evidence, and (2) exigent circumstances demand it. *See Illinois v. McArthur*, 531 U.S. 326, 330–31 (2001); *Place*, 462 U.S. at 701.

Here, the Government urges that its warrantless seizure of Song's cellphone was justified by exigent circumstances. We agree. First, there is no real debate that Agent Cerean had probable cause that Song's cellphone contained evidence of a sexual assault. PFC Kim's report, the video on her cellphone, and Song's interview provided ample basis for that conclusion, and Song's counsel agreed as much at oral argument. That requirement is easily satisfied.

Second, we are also satisfied with the district court's determination that exigent circumstances existed. At the conclusion of the interview, Song was aware that he was under investigation for sexual assault. *See United States v. Mata*, 517 F.3d 279, 287 (5th Cir. 2008). Therefore, it was reasonable for Agent Cerean to believe that Song would remove evidence from his phone, which could be readily deleted. *See id; see also United States v. Diaz*, 435 F. App'x 329, 332 (5th Cir. 2011) (per curiam) (concluding that the warrantless seizure of a computer was justified under the exigent circumstances exception because the "digital images" it contained were "easily destructible"). That observation is bolstered here by the fact that Agent Cerean did not place Song under arrest at the conclusion of the interview. So, it was reasonable for Agent Cerean to assume that Song would have had the opportunity to delete incriminating evidence, had Agent Cerean

not kept the cellphone. All of these factors weigh in favor of exigency. *See Mata*, 517 F.3d at 287.

Song challenges the application of the exception because he says that, if any "exigency" existed, it was "manufactured" by Agent Cerean. We disagree. It's true that an agent who deliberately "creates" exigent circumstances cannot later claim the benefit of the exception. *King*, 563 U.S. at 462, 471–72. But, under guiding Supreme Court precedent, an agent "creates" an exigency only when he "engag[es] or threaten[s] to engage in conduct that violates the Fourth Amendment." *Id.* at 462, 469.

Here, Agent Cerean's pre-warrant conduct plainly did not violate, or threaten to violate, the Fourth Amendment. Song fails to cite to anything about the lead-up to the interview or the interview itself that would cause us to pause.[2] There's no indication, for example, that Agent Cerean unlawfully required him to appear for the interview; unconstitutionally coerced Song to bring his cellphone to the Army office; or violated Song's rights by requesting that Song place his belongings in a locker. Rather, Song concedes that such a request is "routinely done." Moreover, the Supreme Court has expressly rejected the notion that an agent "manufactures" exigency if he conducts an interview without a seizure authorization.[3] *See id.* at 458, 466–67 (rejecting lower court tests that considered whether an officer could have obtained a search warrant prior to the development of the exigent circumstances).

---

[2] In fact, his counsel conceded at oral argument that nothing about the interview violated the Fourth Amendment.

[3] The Court observed that "[f]aulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution." *Id.* at 467. It therefore concluded that those tests were "unsound" and would "unjustifiably interfere[] with legitimate law enforcement strategies." *Id.* at 464, 466.

No. 21-51229

Thus, for all these reasons, we conclude the exigent circumstances exception justified the warrantless seizure.

We now turn to Song's second challenge, which involves Agent Cerean's post-seizure conduct. Song asserts that it was constitutionally unreasonable for Agent Cerean to wait three days to obtain a warrant after seizing Song's cellphone. Therefore, suppression was warranted. While a delay could possibly become unreasonable, Song has no authority that the brief delay at issue here was unreasonable, particularly since Agent Cerean had a more pressing emergency in the few intervening days. *See United States v. Martinez*, 25 F.4th 303, 308–09 (5th Cir. 2022); *see also United States v. Mitchell*, 565 F.3d 1347, 1353 (11th Cir. 2009) (noting that delay may be reasonable where "some overriding circumstances arose, necessitating the diversion of law enforcement personnel to another case"); *accord United States v. Stabile*, 633 F.3d 219, 236 (3d Cir. 2011) ("[S]uch overriding circumstances were present because [the agent] was assigned to what was obviously important security work."). In any event, "police imperfection is not enough to warrant reversal," particularly when a delay is relatively brief. *United States v. Burgard*, 675 F.3d 1029, 1034 (7th Cir. 2012).

We therefore conclude that Agent Cerean did not unreasonably interfere with Song's possessory interests, and the three-day delay did not amount to a Fourth Amendment violation.[4]

---

[4] We recognize that Song undoubtedly has a possessory interest in his cellphone, which likely holds personal and confidential information. *See Riley v. California*, 573 U.S. 373, 393–94 (2014). But Agent Cerean's overall diligence simply outweighs that possessory interest.

No. 21-51229

## B. Search

Song next asserts that suppression was warranted because Agent Cunningham violated the Fourth Amendment's protection against unreasonable searches. Song advances two challenges.

First, Song contends that Agent Cunningham impermissibly exceeded the scope of the search authorization. We disagree. As we have noted, "Fourth Amendment reasonableness is the bedrock principle that guides computer as well as physical searches." *United States v. Triplett*, 684 F.3d 500, 505 (5th Cir. 2012). With a physical search, an officer executing a search warrant may look anywhere evidence described in the warrant might conceivably be located. *United States v. Ross*, 456 U.S. 798, 820–21 (1982). Similarly, in the digital context, a "search may be as extensive as reasonably required to locate the items described in the warrant based on probable cause." *Triplett*, 684 F.3d at 505 (quotation omitted).

Here, the purpose of the search authorization was to locate conversations and media related to the alleged sexual assault;[5] and Agent Cunningham "followed a reasonable protocol toward that end," starting narrowly and expanding only as needed to find responsive data. *See id.*

There's no indication that Agent Cunningham freely roamed through all the contents of Song's cellphone, as Song protests. He did need to broaden his search at some point. But that was not unreasonable. Rather, as we have advised, agents "should limit [their] exposure to innocent files"; but "in the end, there may be no practical substitute for actually looking in many

---

[5] Recall that the search authorization permitted Agent Cunningham to examine Song's cellphone for "texts; SMS; MMS; videos; images; call [and] [a]pplication data" from the Kakao Talk App, "as well any deleted messages, content, and [a]pplication data between" Song and PFC Kim "related to the alleged" sexual assault.

No. 21-51229

(perhaps all) folders and sometimes at the documents contained within those folders." *Id.* at 506 (internal quotation marks and citation omitted). Because Agent Cunningham, "followed a reasonable protocol toward" locating the "items described in the warrant," we conclude that he did not "violate[] the Fourth Amendment in a way requiring suppression." [6]  *Id.* at 505–06.

We now turn to Song's second challenge, which asserts that the search authorization was impermissibly broad. We again disagree. It's true that an overly broad warrant may violate the Fourth Amendment, and therefore, warrant suppression. *See United States v. Sanjar*, 876 F.3d 725, 735 (5th Cir. 2017). But a warrant is sufficiently tailored—and therefore, not overbroad—when (1) it "provide[s] sufficient notice" of the particular areas an agent may search, and (2) "probable cause exist[s] to justify listing" those areas as being subject to search. *See id.* at 735–36. The search authorization here satisfied both requirements.

First, the authorization provided specific notice of the types of data (i.e., areas) Agent Cunningham could search: SMS, MMS, videos, images, calls, and application data *related to the sexual assault*. Even if that authorization was "somewhat generic," it nevertheless "provided sufficient notice of what items" Agent Cunningham could view. *See id.* at 736; *Triplett*, 684 F.3d at 504–05. Song concedes as much, recognizing that "the warrant restricted" Agent Cunningham "to discrete and limited categories of information on Song's phone."

---

[6] We also find unpersuasive Song's argument that Agent Cunningham should have ceased his investigation after locating *some* of the relevant videos. "[L]aw enforcement officers are under no constitutional duty to call a halt to criminal investigation the moment they have the minimum evidence to establish probable cause." *King*, 563 U.S. at 467 (quotation omitted).

No. 21-51229

Second, as discussed above, there's no debate that the agents had probable cause to believe that Song's cellphone contained videos, images, and conversation related to the alleged sexual assault. The authorization here constrained Agent Cunningham's search to only content related to the incident. Accordingly, we conclude the authorization was not overly broad, and suppression was not warranted.

## IV.    Conclusion

For all these reasons, we AFFIRM.

# Exhibit 10

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 1, 2023

Lyle W. Cayce
Clerk

No. 21-51229

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

HAE YEONG SONG,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:19-CR-63-1

Before JONES, CLEMENT, and HAYNES, *Circuit Judges.*

JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.

Certified as a true copy and issued
as the mandate on Dec 14, 2023

Attest: *Lyle W. Cayce*

Clerk, U.S. Court of Appeals, Fifth Circuit

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 1, 2023

Lyle W. Cayce
Clerk

No. 21-51229

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

HAE YEONG SONG,

*Defendant—Appellant.*

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:19-CR-63-1

_____

Before JONES, CLEMENT, and HAYNES, *Circuit Judges.*

PER CURIAM:[*]

The Government charged Hae Yeong Song with receipt and possession of child pornography after investigative agents found an illicit image on Song's cellphone during an investigation into an unrelated incident. Song subsequently moved to suppress the child pornography evidence, asserting that the agents violated his Fourth Amendment rights when they seized and searched his cellphone. The district court denied Song's motion

_____

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

and found him guilty after a bench trial. Song appealed. For the reasons set forth below, we AFFIRM.

## I. Factual Background

When he was a soldier in the United States Army, Song was accused of sexually assaulting another soldier, "PFC Kim," and recording videos of the assault on his cellphone. PFC Kim reported the incident to Army investigative agents. She also stated that, days after the alleged assault, Song messaged her on the "Kakao Talk" app, sent her one of the video recordings, and told her he would use it as blackmail if she refused to have sex with him again. PFC Kim permitted the agents to review her cellphone, where they found a video associated with the incident.

After receiving PFC Kim's report and the video, Special Agent Andrew Cerean began an investigation. He first arranged a standard interview with Song at an Army field office. Before the interview, Agent Cerean attempted to contact the on-duty military magistrate judge and a second military magistrate judge to obtain a search and seizure authorization for Song's cellphone.[1] Despite several attempts to reach them, however, Agent Cerean did not receive a response. Song later arrived at the office for the interview, where he was instructed to follow the standard practice of placing his belongings in a locker, which he did.

The interview began casually, and Song was generally responsive. He confirmed that he knew PFC Kim and that she had visited him. However, when Agent Cerean began questioning Song about his visit with PFC Kim, Song ceased responding and requested a lawyer. Based on PFC Kim's report, the video from her phone, and his conversation with Song, Agent

---

[1] A "search and seizure authorization" is another term for a "warrant" in the military context. *See* MIL. R. EVID. 315(a), (d)

No. 21-51229

Cerean determined he had probable cause that (1) Song had sexually assaulted PFC Kim and (2) evidence of that assault would be on Song's cellphone. Accordingly, when the interview ended, Agent Cerean declined to return Song's cellphone.

Before Agent Cerean was able to seek a search and seizure authorization, his commanding officer ordered him to give his attention to a different matter. Three days later, Agent Cerean submitted an affidavit detailing the results of his investigation, and a magistrate judge issued a search and seizure authorization for Song's cellphone. The authorization permitted a search of "any contacts; call logs; texts; SMS; MMS: videos; images; call & Application Data, including contents from the 'Kakao Talk' application; as well as any deleted messages, content & application data between" Song and PFC Kim related to the sexual assault investigation.

A different agent, Agent Jeffrey Cunningham, conducted the search. In his initial review, he was unable to find a particular video related to the sexual assault. So, he broadened his review. During this search, he stumbled upon an image of child pornography. He immediately ceased his review and obtained a second search authorization. During the search conducted pursuant to that second authorization, Agent Cunningham discovered extensive images and videos of child pornography.

The Government subsequently charged Song with receipt and possession of child pornography involving a prepubescent minor, in violation of 18 U.S.C. § 2252A(a)(2) and § 2252A(a)(5)(B), respectively. Song moved to suppress the initial image, and all evidence stemming from that image, as fruit of the poisonous tree. He urged that Agent Cerean's initial seizure of his cellphone and Agent Cunningham's subsequent search violated his Fourth Amendment rights. After two evidentiary hearings, the district court

denied Song's suppression motion. Song proceeded to a bench trial, in which the district court found him guilty. After sentencing, Song timely appealed.

## II.    Standard of Review

Our review of a district court's denial of a suppression motion is two-fold: we review conclusions of law de novo and factual findings for clear error. *United States v. Robinson*, 741 F.3d 588, 594 (5th Cir. 2014). "[T]he clearly erroneous standard is particularly strong" where, as here, the district court heard oral testimony and "had the opportunity to observe the demeanor of the witnesses." *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (quotation omitted). Accordingly, under that standard, we defer to the district court's factual findings unless we are left with "a definite and firm conviction that a mistake has been committed." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010). Importantly, we view the evidence "in the light most favorable to the prevailing party," here, the Government. *Gibbs*, 421 F.3d at 357.

## III.    Discussion

The district court concluded that neither the seizure nor the subsequent search violated Song's Fourth Amendment rights. Therefore, suppression of the child pornography evidence was not warranted. As discussed below, we agree.

### A. Seizure

We begin with Agent Cerean's seizure of Song's cellphone. Song makes two main challenges. First, he urges that Agent Cerean violated the Fourth Amendment's protection against unreasonable seizures when he confiscated Song's cellphone without a warrant. While seizures generally must be conducted pursuant to a warrant, *see United States v. Place*, 462 U.S. 696, 701 (1983), there are exceptions. For instance, "the exigencies of the

situation [may] make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (second alteration in original) (internal quotation marks and citation omitted). Accordingly, under this "exigent circumstances exception," an agent does not need a warrant to seize property if he has (1) probable cause to believe that a suspect might destroy evidence, and (2) exigent circumstances demand it. *See Illinois v. McArthur*, 531 U.S. 326, 330–31 (2001); *Place*, 462 U.S. at 701.

Here, the Government urges that its warrantless seizure of Song's cellphone was justified by exigent circumstances. We agree. First, there is no real debate that Agent Cerean had probable cause that Song's cellphone contained evidence of a sexual assault. PFC Kim's report, the video on her cellphone, and Song's interview provided ample basis for that conclusion, and Song's counsel agreed as much at oral argument. That requirement is easily satisfied.

Second, we are also satisfied with the district court's determination that exigent circumstances existed. At the conclusion of the interview, Song was aware that he was under investigation for sexual assault. *See United States v. Mata*, 517 F.3d 279, 287 (5th Cir. 2008). Therefore, it was reasonable for Agent Cerean to believe that Song would remove evidence from his phone, which could be readily deleted. *See id; see also United States v. Diaz*, 435 F. App'x 329, 332 (5th Cir. 2011) (per curiam) (concluding that the warrantless seizure of a computer was justified under the exigent circumstances exception because the "digital images" it contained were "easily destructible"). That observation is bolstered here by the fact that Agent Cerean did not place Song under arrest at the conclusion of the interview. So, it was reasonable for Agent Cerean to assume that Song would have had the opportunity to delete incriminating evidence, had Agent Cerean

not kept the cellphone. All of these factors weigh in favor of exigency. *See Mata*, 517 F.3d at 287.

Song challenges the application of the exception because he says that, if any "exigency" existed, it was "manufactured" by Agent Cerean. We disagree. It's true that an agent who deliberately "creates" exigent circumstances cannot later claim the benefit of the exception. *King*, 563 U.S. at 462, 471–72. But, under guiding Supreme Court precedent, an agent "creates" an exigency only when he "engag[es] or threaten[s] to engage in conduct that violates the Fourth Amendment." *Id.* at 462, 469.

Here, Agent Cerean's pre-warrant conduct plainly did not violate, or threaten to violate, the Fourth Amendment. Song fails to cite to anything about the lead-up to the interview or the interview itself that would cause us to pause.[2] There's no indication, for example, that Agent Cerean unlawfully required him to appear for the interview; unconstitutionally coerced Song to bring his cellphone to the Army office; or violated Song's rights by requesting that Song place his belongings in a locker. Rather, Song concedes that such a request is "routinely done." Moreover, the Supreme Court has expressly rejected the notion that an agent "manufactures" exigency if he conducts an interview without a seizure authorization.[3] *See id.* at 458, 466–67 (rejecting lower court tests that considered whether an officer could have obtained a search warrant prior to the development of the exigent circumstances).

---

[2] In fact, his counsel conceded at oral argument that nothing about the interview violated the Fourth Amendment.

[3] The Court observed that "[f]aulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution." *Id.* at 467. It therefore concluded that those tests were "unsound" and would "unjustifiably interfere[] with legitimate law enforcement strategies." *Id.* at 464, 466.

No. 21-51229

Thus, for all these reasons, we conclude the exigent circumstances exception justified the warrantless seizure.

We now turn to Song's second challenge, which involves Agent Cerean's post-seizure conduct. Song asserts that it was constitutionally unreasonable for Agent Cerean to wait three days to obtain a warrant after seizing Song's cellphone. Therefore, suppression was warranted. While a delay could possibly become unreasonable, Song has no authority that the brief delay at issue here was unreasonable, particularly since Agent Cerean had a more pressing emergency in the few intervening days. *See United States v. Martinez*, 25 F.4th 303, 308–09 (5th Cir. 2022); *see also United States v. Mitchell*, 565 F.3d 1347, 1353 (11th Cir. 2009) (noting that delay may be reasonable where "some overriding circumstances arose, necessitating the diversion of law enforcement personnel to another case"); *accord United States v. Stabile*, 633 F.3d 219, 236 (3d Cir. 2011) ("[S]uch overriding circumstances were present because [the agent] was assigned to what was obviously important security work."). In any event, "police imperfection is not enough to warrant reversal," particularly when a delay is relatively brief. *United States v. Burgard*, 675 F.3d 1029, 1034 (7th Cir. 2012).

We therefore conclude that Agent Cerean did not unreasonably interfere with Song's possessory interests, and the three-day delay did not amount to a Fourth Amendment violation.[4]

---

[4] We recognize that Song undoubtedly has a possessory interest in his cellphone, which likely holds personal and confidential information. *See Riley v. California*, 573 U.S. 373, 393–94 (2014). But Agent Cerean's overall diligence simply outweighs that possessory interest.

No. 21-51229

**B. Search**

Song next asserts that suppression was warranted because Agent Cunningham violated the Fourth Amendment's protection against unreasonable searches. Song advances two challenges.

First, Song contends that Agent Cunningham impermissibly exceeded the scope of the search authorization. We disagree. As we have noted, "Fourth Amendment reasonableness is the bedrock principle that guides computer as well as physical searches." *United States v. Triplett*, 684 F.3d 500, 505 (5th Cir. 2012). With a physical search, an officer executing a search warrant may look anywhere evidence described in the warrant might conceivably be located. *United States v. Ross*, 456 U.S. 798, 820–21 (1982). Similarly, in the digital context, a "search may be as extensive as reasonably required to locate the items described in the warrant based on probable cause." *Triplett*, 684 F.3d at 505 (quotation omitted).

Here, the purpose of the search authorization was to locate conversations and media related to the alleged sexual assault;[5] and Agent Cunningham "followed a reasonable protocol toward that end," starting narrowly and expanding only as needed to find responsive data. *See id.*

There's no indication that Agent Cunningham freely roamed through all the contents of Song's cellphone, as Song protests. He did need to broaden his search at some point. But that was not unreasonable. Rather, as we have advised, agents "should limit [their] exposure to innocent files"; but "in the end, there may be no practical substitute for actually looking in many

---

[5] Recall that the search authorization permitted Agent Cunningham to examine Song's cellphone for "texts; SMS; MMS; videos; images; call [and] [a]pplication data" from the Kakao Talk App, "as well any deleted messages, content, and [a]pplication data between" Song and PFC Kim "related to the alleged" sexual assault.

(perhaps all) folders and sometimes at the documents contained within those folders." *Id.* at 506 (internal quotation marks and citation omitted). Because Agent Cunningham, "followed a reasonable protocol toward" locating the "items described in the warrant," we conclude that he did not "violate[] the Fourth Amendment in a way requiring suppression." [6] *Id.* at 505–06.

We now turn to Song's second challenge, which asserts that the search authorization was impermissibly broad. We again disagree. It's true that an overly broad warrant may violate the Fourth Amendment, and therefore, warrant suppression. *See United States v. Sanjar*, 876 F.3d 725, 735 (5th Cir. 2017). But a warrant is sufficiently tailored—and therefore, not overbroad—when (1) it "provide[s] sufficient notice" of the particular areas an agent may search, and (2) "probable cause exist[s] to justify listing" those areas as being subject to search. *See id.* at 735–36. The search authorization here satisfied both requirements.

First, the authorization provided specific notice of the types of data (i.e., areas) Agent Cunningham could search: SMS, MMS, videos, images, calls, and application data *related to the sexual assault*. Even if that authorization was "somewhat generic," it nevertheless "provided sufficient notice of what items" Agent Cunningham could view. *See id.* at 736; *Triplett*, 684 F.3d at 504–05. Song concedes as much, recognizing that "the warrant restricted" Agent Cunningham "to discrete and limited categories of information on Song's phone."

---

[6] We also find unpersuasive Song's argument that Agent Cunningham should have ceased his investigation after locating *some* of the relevant videos. "[L]aw enforcement officers are under no constitutional duty to call a halt to criminal investigation the moment they have the minimum evidence to establish probable cause." *King*, 563 U.S. at 467 (quotation omitted).

Second, as discussed above, there's no debate that the agents had probable cause to believe that Song's cellphone contained videos, images, and conversation related to the alleged sexual assault. The authorization here constrained Agent Cunningham's search to only content related to the incident. Accordingly, we conclude the authorization was not overly broad, and suppression was not warranted.

### IV.  Conclusion

For all these reasons, we AFFIRM.

# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

December 14, 2023

Mr. Philip Devlin
Western District of Texas, San Antonio
United States District Court
655 E. Cesar E. Chavez Boulevard
Suite G65
San Antonio, TX 78206

     No. 21-51229   USA v. Song
                 USDC No. 5:19-CR-63-1

Dear Mr. Devlin,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                     Sincerely,

                     LYLE W. CAYCE, Clerk

                     *Lisa E. Ferrara*

                     By: _____
                     Lisa E. Ferrara, Deputy Clerk
                     504-310-7675

cc:
       Mr. Charles E. Fowler Jr.
       Mr. Joseph H. Gay Jr.
       Mr. Hae Yeong Song

# Exhibit 11
# (Sealed Motion to Suppress Exhibits Filed by Trial Counsel Including: January 25, 2018 Affidavit and Warrant and June 8, 2018 Affidavit and Warrant)

# Exhibit 11.1
# (Sealed More Readable January 25, 2018 Affidavit)

# Exhibit 11.2
# (Sealed More Readable January 25, 2018
# Warrant)

# Exhibit 11.3
# (Sealed More Readable June 8, 2018 Affidavit)

# Exhibit 11.4
# (Sealed More Readable June 8, 2018 Warrant)

# Exhibit 12

```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA,         :
     Plaintiff,                        :
 4                                     :
     vs.                               : No. SA:19-CR-00063
 5                                     : San Antonio, Texas
     HAE YEONG SONG(1),                : February 19, 2020
 6   Defendant.                        :
     *********************************************************
 7
                TRANSCRIPT OF MOTION TO SUPPRESS (Volume 2)
 8                BEFORE THE HONORABLE DAVID A. EZRA
                  SENIOR UNITED STATES DISTRICT JUDGE
 9
     APPEARANCES:
10   FOR THE GOVERNMENT:
       Bettina Richardson, Esquire
11     United States Attorney's Office
       601 N.W. Loop 410, Suite 600
12     San Antonio, Texas  78216
       (210)384-7152
13

14   FOR THE DEFENDANT:
       John A. Convery, Esquire
15     Julie Hasdorff, Esquire
       Jonathan Chavez, Esquire
16     Hasdorff & Convery, P.C.
       1005 South Alamo Street
17     San Antonio, Texas  78210
       (210)738-9060
18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     655 East Cesar E. Chavez Blvd., Third Floor
22   San Antonio, Texas  78206
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

I N D E X

**GOVERNMENT WITNESS:**                                    **PAGE**

**SPECIAL AGENT ANDREW SYRIAN**

By Mr. Convery                                              5

By Ms. Richardson                                          10


**JEFFREY CUNNINGHAM**

By Ms. Richardson                                         14

By Mr. Convery                                            35

```
 1   (Wednesday, February 20, 2020, 9:15 a.m.)

 2                          *   *   *

 3           COURT SECURITY OFFICER:  All rise.

 4           THE COURT:  Good morning.  Please be seated.

 5           COURTROOM DEPUTY CLERK:  SA:19-CR-00063, United States

 6   of America versions Hae Yeong Song.

 7           MS. RICHARDSON:  Bettina Richardson on behalf of the

 8   United States.

 9           MR. CONVERY:  John Convery, Julie Hasdorff, Jonathan

10   Chavez for Hae Song.

11           THE COURT:  So this is really a continuation of our

12   earlier motion to suppress hearing we had I believe in January.

13           MS. RICHARDSON:  November 26th.

14           THE COURT:  Oh, was it November?  November 26th we had

15   a hearing.  That's right.  I'll tell you, I've got so many

16   things going on here I don't remember which is which anymore.

17   There are a couple things that I wanted to clear up before we

18   get moving anywhere.  My recollection of the evidence, and I

19   can get a transcript to verify this, was that the agent

20   testified that he initially had sought a Magistrate's Warrant,

21   but that the Magistrate was unavailable initially for some --

22   whatever reason, vacation or just wasn't there, he couldn't

23   find another Magistrate.  Is that right initially?

24           MS. RICHARDSON:  Correct.  Prior to interviewing the

25   defendant, he reached out to the duty Magistrate at Fort Sam
```

1   and did not make contact.

2           THE COURT:  He couldn't find him.

3           MS. RICHARDSON:  He left a message and didn't get a

4   call back.  He called the duty phone and did not get a

5   response.  And went ahead and proceeded with the interview and

6   seized the phone pursuant to probable cause.

7           THE COURT:  Right.  And then he got called away on a

8   sexual assault of a child.

9           MS. RICHARDSON:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MS. RICHARDSON:  On the Tuesday and the Wednesday.

12          THE COURT:  I wanted to make sure my recollection was

13  correct.  All right.  You can proceed.

14          MS. RICHARDSON:  So just so that we're all moving in

15  the same direction, I believe the government concluded the

16  testimony from the government's perspective of the Agent

17  Syrian.  I believe I had passed.  I'm not sure the defense

18  finished with him, so he's available or we can start with the

19  next.

20          MR. CONVERY:  I just have a brief question or two of

21  him, if that's possible.

22          THE COURT:  All right.  Sure.

23          MS. RICHARDSON:  Special Agent Syrian.

24          THE COURT:  Just take the stand and you remain under

25  oath.  You're going to be cross-examined by Mr. Convery.

1        THE WITNESS:  I understand, sir.

2                    CROSS-EXAMINATION

3   BY MR. CONVERY:

4   Q.  Good morning.  I'm John Convery.  I just have a couple of

5   follow-up, couple of questions that I want to ask you.

6   A.  Yes, sir.

7   Q.  I tried to carefully review the discovery that was provided

8   in this case and I couldn't find anything about this other case

9   that you were called away on.  Does that surprise you?

10  A.  I'm not sure whether they were able to provide that

11  information to you, sir.

12  Q.  It exists, however, is your position?

13  A.  It exists that there was another ongoing investigation,

14  yes, sir.

15       THE COURT:  Do you know what happened in that

16  investigation?  Do you have any idea?

17       THE WITNESS:  The sexual assault of the child, sir, am

18  I at liberty to disclose --

19       THE COURT:  Don't give us any names.  I'm just

20  interested in trying to figure out what happened.

21       THE WITNESS:  From my recollection a female was

22  sexually assaulted in a bathroom near a school campus and we

23  were actively looking for surveillance footage, processing

24  crime scenes, conducting campus interviews of that entire area.

25       THE COURT:  Was there a charge ultimately laid against

1  somebody?

2         THE WITNESS:  I left shortly after --

3         THE COURT:  So you don't know.

4         THE WITNESS:  No, sir, not on that, sir.

5         THE COURT:  Okay.  Well, I don't know that it matters,

6  but okay.

7  BY MR. CONVERY:

8  Q.  You had the ability to do an advanced authorization to

9  seize the cell phone with the military Magistrate prior to then

10  Specialist Song even coming to your office, correct?

11  A.  That is correct, sir.

12  Q.  You didn't do that, correct?

13  A.  I contacted two different Magistrates the morning of prior

14  to his interview.

15  Q.  You didn't do that, correct?

16  A.  I contacted two Magistrates prior to his interview, but

17  unable to successfully make contact with two Magistrates prior

18  to his interview.

19  Q.  So you didn't do that, correct?

20  A.  Do you mean obtain the authorization?

21  Q.  Same question over and over again.

22         THE COURT:  Well, he's trying to answer it,

23  Mr. Convery.  He said that he tried to contact two Magistrates,

24  he wasn't able to get in contact with them and I assume he went

25  forward, so I think the answer is pretty obvious, he didn't get

Case 5:19-cr-00063-DAE Document 161-59 Filed 03/28/24 Page 7 of 32
Case 5:19-cr-00063-DAE Document 161-59 Filed 03/28/24 Page 153 of 288
Special Agent Syrian - Examination          7

1  a Warrant.

2       MR. CONVERY:  Well, thank you, Your Honor.

3  BY MR. CONVERY:

4  Q.  If you don't understand the question, just stop me.

5  A.  Yes, sir.

6  Q.  Because I want to be as clear as possible.  Do you have a

7  duty roster of Magistrates at the office that you work?

8  A.  Yes, sir.

9  Q.  I am told by colleagues that at the time there were at

10  least eleven military Magistrates on that list, is that

11  correct?

12  A.  There are -- I know there's several.  Like, I can't attest

13  to the exact number, but that's -- I mean there are more than

14  one Magistrate on a call list, yes, sir.

15  Q.  Significantly more than one, at least five or seven or ten

16  times more than one?

17  A.  I can't -- like, I don't know what type of rotational basis

18  they do that, sir, so I cannot definitively say that.  I just

19  know that every day is covered by a Magistrate.  I'm not sure

20  on how often or how frequently they rotate it through, sir, so

21  I can't attest to that.

22  Q.  Because of the military environment, you also had the

23  ability to hold personnel for a certain period of time before

24  you seeked out authorization, correct?

25  A.  Just to clarify, do you mean just to hold him in place

1  until we continue our efforts to obtain an authorization, sir?

2  Q.  Yeah, kind of a detention while you're doing that,

3  investigatory detention of a military man, we're not talking

4  about civilian.

5  A.  To a degree, we don't hold people overnight, but we do have

6  the ability to feed them in case they are at our office for

7  long periods of time.

8  Q.  And you elected as case agent not to do that, correct?

9  A.  That is correct.

10  Q.  In the Song case?

11  A.  That is correct.

12  Q.  And of course because it's the military environment and the

13  nature of the environment is why you have this ability to seek

14  telephone authorization, correct?

15  A.  Can you repeat the question, sir?

16  Q.  The telephone authorization, the ability to contact

17  military Magistrates to seek telephone authorization is

18  something that's significant -- it's different than what the

19  civilian community does?

20  A.  Yes, sir, we can contact the Magistrates, obtain a

21  telephonic authorization and follow up in writing, yes, sir.

22          MR. CONVERY:  Thank you.

23          MS. RICHARDSON:  Just briefly, Your Honor, if I may.

24  May I approach the witness?

25          THE COURT:  With what?

 1          MS. RICHARDSON:  His case activity summary to provide

 2   the information Mr. Convery was seeking with regards to the --

 3          THE COURT:  To refresh his recollection?

 4          MS. RICHARDSON:  Well, I can do it without going

 5   through the document.

 6          MR. CONVERY:  I've never received it, Your Honor, I

 7   object to any use of any -- in fact, after the hearing in

 8   November, I asked for these things and then I sent a letter --

 9   I need to admit something in evidence, but I object at this

10   point.  This hasn't been provided to me at all.

11          THE COURT:  Well, let me let her respond.

12          MS. RICHARDSON:  Actually, Mr. Chavez picked up two

13   complete duplicates of the case files, so you have the exact

14   duplicate of the sexual assault investigation and the exact

15   duplicate of the child porn investigation and it is in that

16   file.

17          THE COURT:  Okay.  So you do have it apparently, okay.

18          MR. CONVERY:  That's the government's position.  I

19   stand corrected.

20          THE COURT:  Apparently it is the government's

21   position.  You want me to put your associate on the stand and

22   find out?

23          MR. CONVERY:  Not necessary.

24          THE COURT:  All right.

25                      REDIRECT EXAMINATION

1  BY MS. RICHARDSON:

2  Q.  Agent, the two entries in your case activity summary that

3  Mr. Convery were referring to specifically point out on the

4  23rd and the 24th your attention and everybody else's attention

5  was redirected, is that correct?

6  A.  That's correct, ma'am.

7        MS. RICHARDSON:  I have nothing further.

8        THE COURT:  Mr. Convery raised an interesting point

9  that I'd like to follow up on.  Mr. Convery suggested that

10  there were like a lot of different -- I don't know how many,

11  you didn't know how many, Mr. Convery apparently doesn't know

12  exactly how many, but there were more than two people on a

13  list.  Were you permitted to just kind of get this laundry list

14  and go down or was it a rotating thing where certain people

15  were available and other people were not and then other people

16  were available and other people were not?

17        THE WITNESS:  The duty roster itself it has the

18  date -- like a day of the month and then it has the Magistrate

19  that is on call or on duty at that point.

20        THE COURT:  I see.

21        THE WITNESS:  And they know that they are on duty and

22  I attempted to contact that particular Magistrate and after

23  that was exhausted.  I also contacted a different Magistrate

24  who was not even on the roster, it was another Magistrate I

25  knew was from Fort Sam Houston and also was Captain Newman and

1    I checked if she was available as well and that met with

2    negative results.

3              THE COURT:  So you actually tried three different --

4              THE WITNESS:  Two Magistrates, sir.

5              THE COURT:  But you don't have a big laundry list of

6    people you can call.

7              THE WITNESS:  It's just a duty roster.

8              THE COURT:  I understand.  I'm not asking you about a

9    list of Magistrates who might be somewhere.  I'm asking you

10   what you had available to you.

11             THE WITNESS:  I would say that we do have knowledge of

12   the Magistrates that are available to us, sir, but I knew that

13   at the time I referenced the duty roster, but there is a -- we

14   are aware that there are numerous Magistrates and their contact

15   information is provided, but I also believe and Agent Wulford

16   might be able to state whether or not they actually have a duty

17   phone and then they rotate a duty phone.  I am not sure how --

18             THE COURT:  One of them was on duty, you couldn't get

19   that person.

20             THE WITNESS:  That's correct.

21             THE COURT:  But you knew that another person had been

22   on duty at some point, so you were aware of them and you tried

23   to call that person.

24             THE WITNESS:  That's correct.  I contacted a

25   Magistrate that I already knew was a Magistrate on the

1   installation because I believe the one that I contacted was a

2   duty -- it was a Magistrate on duty from Fort Hood.

3            THE COURT:  Oh, near Waco.

4            THE WITNESS:  Yes, sir, and that was POC for that

5   particular day.

6            THE COURT:  So all these people aren't, like,

7   available right there and then.

8            THE WITNESS:  I'm not sure because I didn't go -- I

9   didn't contact every single one of them, but I attempted to

10  contact two of them and at which point I had him scheduled for

11  an interview and I just --

12           THE COURT:  You ran out of time.

13           THE WITNESS:  Yes, sir.  Essentially, sir.  I had him

14  coming to the office and prior to him coming in, I felt that we

15  had a duty phone, I felt that they'd respond to it at least

16  promptly or at least respond to the message or --

17           THE COURT:  Refresh my recollection on something else.

18  How did the issue of Mr. Song's alleged sexual assault of this

19  girl that was videotaped, how did that come to the Army's

20  attention, to your attention?

21           THE WITNESS:  I believe the case originated in Fort

22  Sill, Oklahoma, sir.  And when they found out -- the way the

23  Army functions whenever it comes to cases, wherever the subject

24  is located, that is the office that eventually assumes

25  investigative responsibility.

1          THE COURT:  Do you know how it came to Fort Sill's

2    attention or you don't?

3          THE WITNESS:  From my recollection, I believe she

4    reported the incident --

5          THE COURT:  She reported.

6          THE WITNESS:  Yes.

7          THE COURT:  That was my recollection, but I wanted to

8    be sure.  But that incident allegedly -- well, we know that

9    they had an encounter.  That encounter occurred at --

10          THE WITNESS:  I believe it was a holiday block leave

11    at a private residence, sir.

12          THE COURT:  But that was up in Lawton, Oklahoma or

13    Fort Sill.

14          THE WITNESS:  I want to say it was a completely

15    different state.  It was while they were on leave.

16          THE COURT:  She was also in the service, right?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  She was also in the Army.

19          THE WITNESS:  That's correct.  They were both service

20    members and I believe they knew each other from training.

21          THE COURT:  All right.  I just wanted to refresh my

22    recollection because I couldn't remember that exactly.  All

23    right.  You can step down, sir.  Your next witness.

24          MS. RICHARDSON:  Your Honor, the government calls

25    Jeffrey Cunningham.

1              COURTROOM DEPUTY CLERK:  Please raise your right hand.

2                          *   *   *

3          *(JEFFREY CUNNINGHAM, Government Witness, Sworn.)*

4                          *   *   *

5          THE WITNESS:  Yes, I do.

6          COURTROOM DEPUTY CLERK:  Have a seat.

7          THE COURT:  I think we know how to spell Jeffrey.

8   Could you spell Cunningham?

9          THE WITNESS:  Jeffrey can actually be misspelled, sir.

10         THE COURT:  Spell both.

11         THE WITNESS:  Jeffrey, J-E-F-F-R-E-Y.

12         THE COURT:  That's the way I would have spelled it.  I

13  have a female former law clerk very close to me whose name is

14  Jeffrey, but she does not spell it the way you do.  All right,

15  you may proceed.

16                      DIRECT EXAMINATION

17  BY MS. RICHARDSON:

18  Q.  Can you give us the benefit of your background and where

19  you're employed?

20  A.  I did over 20 years in the military and I became a special

21  agent with CID in 1999.  2001 I started computer crimes

22  investigations.  2003 I started doing the digital forensics,

23  which I did until 2015 when I retired.  When I retired from the

24  military I became a defense consultant --

25         THE COURT:  When did you retire, sir?

1          THE WITNESS:  2015.

2          THE COURT:  So you were CID with the Army while you

3     were on active duty?

4          THE WITNESS:  Yes.

5          THE COURT:  And then you retired in 2015 from the

6     Army?

7          THE WITNESS:  Yes.

8          THE COURT:  What was your rank when you retired?

9          THE WITNESS:  Chief Warrant Officer 3.

10          THE COURT:  Okay.  CW3.  And you then did what?

11          THE WITNESS:  Consulting for Cyber Agents, Inc. out of

12     Lexington, Kentucky.

13          THE COURT:  Are you still with them?

14          THE WITNESS:  No, sir, in 2017 I got hired on my

15     current position which is a special agent with Army CID as a

16     civilian doing digital forensics as my main position.

17          THE COURT:  So you're back with the Army.

18          THE WITNESS:  Yes, sir.

19          THE COURT:  In a civilian capacity.

20     BY MS. RICHARDSON:

21     Q.  Agent Cunningham, where do you actually sit and perform

22     your duties?

23     A.  At Fort Hood, Texas.

24     Q.  And what do those duties encompass?

25     A.  Digital forensics is my main game.

Case 5:19-cr-00630-DAE Document 68-9 Filed 03/28/24 Page 16 of 27
Case 5:19-cr-00630-DAE Document 159 Filed 03/28/24 Page 162 of 288
Jeffrey Cunningham - Examination                    16

1   Q.  And have you testified in the past and been qualified as an
2   expert?
3   A.  Yes, in military, state and federal courts.
4   Q.  And have you testified on behalf of both the government and
5   defense?
6   A.  Yes.
7   Q.  In May of 2018, how were you employed?
8   A.  Digital forensics special agent with Army CID at Fort Hood,
9   Texas.
10  Q.  Tell us how you actually get a case that you start working
11  on?
12  A.  Okay.  When I actually -- the case comes into our forensics
13  cell.  They send their lab request, the evidence custody
14  document or voucher and any authorizations that we need and any
15  read-aheads, statements, agent's investigative reports, things
16  like that.  And the supervisor, which is Mr. Anderson this
17  time, reviews the lab request and reviews the authorizations to
18  make sure that we can operate within the parameters or that
19  we're even authorized to do the exam.  When he accepts it, it
20  will be given our case number for our office and then he'll
21  send that to them and they will send the evidence to the Fort
22  Hood evidence custodian and then when I get assigned the case I
23  review all the documents in it and make sure it's just a
24  double-check, that I'm still good to go on what my parameters
25  are for the examination and then I will sign for the evidence

1   and conduct the examination.

2          MS. RICHARDSON:  Your Honor, may I approach the

3   witness?

4          THE COURT:  Yes.

5   BY MS. RICHARDSON:

6   Q.  I'm going to show you what's already been admitted into

7   evidence as Government's Exhibits 1 and 3 and ask you if you

8   can identify -- if you recognize what these are, 3 and 3a?

9   A.  It's going to be 3a and 3 is the Affidavit and

10  authorization to search the phone.

11  Q.  And Government's Exhibit 1?

12  A.  That is the cell phone that I examined.

13  Q.  And how do you link Government's Exhibit 1 to Government's

14  Exhibit 3?

15  A.  That I'm going to need the voucher, the evidence custody

16  document.

17  Q.  Going to show you what's been premarked for identification

18  purposes as Government's Exhibit 2 and ask you if that's the

19  document you are referring to?

20  A.  Yes, it is.

21          MS. RICHARDSON:  Your Honor, at this time I would

22  tender to defense counsel and offer into evidence Government's

23  Exhibit 2.

24          MR. CONVERY:  No objection for this hearing, Your

25  Honor.

```
 1          THE COURT:  All right.  It will be received.
 2   BY MS. RICHARDSON:
 3   Q.  Government's Exhibit 2 is oftentimes referred to as the
 4   chain of custody document?
 5   A.  Yes.
 6   Q.  And it links the phone in Government's 1 to the search
 7   authorization in Government's 3 and 3a?
 8   A.  Yes.
 9   Q.  So tell us when you received this phone and the search
10   authorization as detailed in Government's Exhibit 3, you told
11   us kind of quickly a minute ago how you proceed, but what did
12   you do first?  What was the first thing you did when you were
13   assigned the digital forensics on -- to do the digital
14   forensics on Government's Exhibit 1?
15   A.  Review the authorizations and the lab request.
16   Q.  And when you say the authorization, you're referring to
17   Government's Exhibit 3 and 3a?
18   A.  Yes.
19   Q.  And what are you looking for when you review 3 and 3a?
20   A.  I'm looking -- well, one, we try to make sure that what
21   they've said in the Affidavit matches what they're authorized,
22   so it really can't be very far apart and then the authorization
23   gives me left and right limits of what I'm looking for.
24   Q.  Expound on that when you say left and right limits.
25   A.  My scope.  If my scope is limited, then I have to follow
```

1    what the limitations are.

2    Q.  So for this case -- and let me know if you need your notes

3    because I'm going to ask you for specific dates.  Do you recall

4    what date you received Government's Exhibit 1 and began the

5    process of the forensic analysis?

6    A.  I want to say that March -- not March.  If I can look at

7    the voucher in my notes, I could tell you exactly when I signed

8    for it.

9           THE COURT:  You believe that will refresh your

10   recollection?

11          THE WITNESS:  Yes.

12   BY MS. RICHARDSON:

13   Q.  I'm showing you Government's Exhibit 2 and would your notes

14   also assist?

15   A.  To show when I actually started, because sometimes I will

16   sign it out in preparation to begin the exam.  Can I go and

17   answer the other part of the question?

18   Q.  Yes, please.

19   A.  I signed for it from the evidence custodian on May 29, 2018

20   and it was maintained within my custody until 21 June when I

21   felt that it could be returned back to the evidence room, I

22   didn't need it anymore.

23   Q.  So what did you do -- did you work directly off the phone

24   or did you make a copy of the data contained within the phone?

25   A.  I made a copy of the data on the phone.

1    Q.  And you began your analysis you said on 5/29/2018?

2    A.  This is when I signed for it.  I actually started working

3    with the phone on 30th of May.

4    Q.  May 30th?

5    A.  Yes.

6    Q.  And tell us based upon the parameters that you set, what

7    were you looking for within the digital device, Government's

8    Exhibit 1?

9    A.  I was looking for videos, images and conversations.  One

10   conversation particular with Kakao conversation.

11   Q.  What is Kakao?

12   A.  It's just a messaging application, you have the native

13   messaging applications on iPhones and Androids, then you have

14   things like Snap Chat, Kakao, Telegram and a lot of other

15   applications.  They're just third party applications for

16   texting and sending multi media back and forth.

17   Q.  And why were you looking for a particular conversation on

18   the Kakao application?

19   A.  Because that's what she had reported, that he had sent her

20   a video that apparently by the conversation she was surprised

21   that he had sent it or took it or not really sure where that

22   went.

23   Q.  And --

24           THE COURT:  When you say "she", who is she?

25           THE WITNESS:  Kim.  The victim in the first case.

1          THE COURT:  In your understanding, is this the woman

2    who had complained about --

3          THE WITNESS:  The sex assault.

4          THE COURT:  -- the alleged sexual assault?

5          THE WITNESS:  Yes, sir.

6    BY MS. RICHARDSON:

7    Q.  In your role as special agent, do you have access to the

8    whole case file for facts and relevant information with regards

9    to help set parameters and help you look for what you're

10   looking for?

11   A.  Yes, I have from a remote access I can access the digital

12   case agent summaries and whatever data that they put in there I

13   can review things and get more information if I need it.

14   Q.  So did you have an opportunity to review the summary of the

15   interview of the complainant in the sexual assault case?

16   A.  I reviewed the entire -- whatever was in the case

17   currently, I reviewed it, and that's where I obtained my --

18   because I narrowed my scope down because it was for the

19   incident, I found two dates that I narrowed things down to.

20   Q.  And what two dates did you narrow it down to?  So you were

21   looking for responsive evidence between what date and what

22   date?

23   A.  21 December '17 and 2 January '18.

24          THE COURT:  So as I understand it, you were looking

25   specifically for any conversations or evidence relating to the

1   alleged sexual assault by the defendant of the fellow female

2   service member as she complained it.

3          THE WITNESS:  Yes, sir.

4          THE COURT:  You weren't out there searching around

5   generally for child pornography.

6          THE WITNESS:  No, sir, I don't have time to search

7   everything.  As a matter of fact, I appreciate limited scope

8   because it really keeps me from having to look at hundreds of

9   thousands of images that don't need to be looked at.

10         THE COURT:  Okay.

11  BY MS. RICHARDSON:

12  Q.  So you have limited your scope by date, 12/21/2017 to

13  January 2, 2018?

14  A.  Yes, ma'am.

15  Q.  You are looking for conversations between the defendant and

16  the complainant?

17  A.  Correct.

18  Q.  On one particular application or on all applications?

19  A.  Particularly in Kakao because that's where she reported it

20  came from.

21  Q.  And you are looking for videos and still shots that would

22  also be within that time period that would be responsive or

23  evidence of the sexual assault between 12/21/2017 and

24  January 2nd, 2018?

25  A.  Correct.

1  Q.  So as you move forward in your investigation, what do you

2  discover first, what do you isolate first in your process?

3  A.  The first thing I found were three videos.

4  Q.  Okay.  And where did you find those three videos?

5  A.  Looks like two of them were in the DCIM folder which is the

6  common folder where actual videos and pictures you take with

7  your phone, that's where those get stored.  And then I found

8  another one in what I would expect to hold all the Kakao data

9  on the android phone.

10 Q.  So let's talk about as you are doing your forensic

11 analysis, are you having to actually go into each of these

12 applications or does the forensic tool pull all the images into

13 a particular location?

14 A.  The way most of the forensic suites work, particularly the

15 one that I use.

16 Q.  Which is what?

17 A.  Magnet Axiom.  It consolidates all pictures, it doesn't

18 care where they come from, where they're at, so I don't have to

19 keep going down folder by folder and looking at things, so it

20 will consolidate them and display them in a gallery view which

21 I can filter by dates and look at it that way.  It will do the

22 same thing with videos, it doesn't care whether the picture

23 when it processed it, it came out of a database or if it came

24 out of a cache file, it knows it's a picture and it will

25 display it for me.

1  Q.  So all of the photos, the images, the videos and the still

2  shots are put into a gallery and then you limit them by date?

3  A.  Yes.

4  Q.  And then you begin looking at them, looking for responsive

5  videos and images?

6  A.  Yes.

7  Q.  You said you found two of them that were in the original

8  video file and you found another one.  And how do you know

9  where they originally came from?

10  A.  Oh, that's where they're found.  The ones that are in the

11  DCIM, they could have been moved there, but by the naming

12  convention, which is the way the phone names the photos and

13  images and where it was located, those were taken with the

14  phone.

15  Q.  Right.  So because you just told us that they're all put

16  into a gallery?

17  A.  Yes.

18  Q.  So when you click on it and you see it and you say this is

19  a responsive video, how do you then know where within the

20  device that video was?

21  A.  The forensic suite gives me the breadcrumbs of where it was

22  actually located.

23  Q.  The metadata?

24  A.  Where it's located, but then the metadata is to the files

25  itself.

1  Q.  So two of them you locate -- you're able to determine that

2  those two were actually created with the phone?

3  A.  Yes.

4  Q.  And the third one, what did you learn about it?

5  A.  At this time, just basically that it was in the Kakao

6  folder where all the database and other files reside.

7  Q.  And what does that tell you, if there's a video in the

8  Kakao folder?

9  A.  Well, at this point it's confirming that she said it was a

10 video sent to her via Kakao.  I just don't know what message

11 this particular video was sent in.

12 Q.  Okay.  So were you able to click on the link to see the

13 video?

14 A.  I believe you're talking about where I found the link in

15 the Kakao conversation.

16 Q.  That's right.  So you link it back to the Kakao

17 conversation.  When you click on it, do you see the video?

18 A.  Not on the link in the conversation on his phone, no.

19 Q.  Explain why that is.

20 A.  The link that's provided, it actually is a web link to the

21 Kakao website, but the way most of these work when you send a

22 video or an image, it kind of goes in like a Post Office on

23 their server and then when the person checks it out on the

24 other end, then it's no longer accessible or it may have had a

25 time out and I can no longer access it or I didn't have the

Case 5:19-cr-00690-DAE Document 159   Filed 03/22/24   Page 261 of 272
Case 5:19-cr-00690-DAE Document 159   Filed 03/28/24   Page 172 of 288
Jeffrey Cunningham - Examination                    26

1  right keys because it is supposed to be between two people that

2  know each other.

3  Q.  And so what did you do next?

4  A.  Well, considering I didn't have any other information in

5  the conversation or the video that I found in the Kakao, then

6  now I need to try to look further and find out how I can

7  associate that video with the one sent to Kakao because they

8  didn't share a name or have a hash value.

9  Q.  So what did you do then?

10  A.  Filtered videos down and search for them as much as I

11  could.  And then for videos that don't have metadata I had to

12  look at individually and then I did the same thing with images.

13  I filtered down within the limits of my scope until I couldn't

14  filter anymore where there was no metadata and then I had to

15  look at those and those would be items from cache files and

16  databases that were carved out so they don't have individual

17  created dates or times, things like that.

18  Q.  So you are looking for the image or video associated with

19  the link in the Kakao message?

20  A.  Correct.

21  Q.  And you go through the images in the gallery that are

22  within your parameter and you don't find them?

23  A.  Correct.

24  Q.  And then you go through the videos, then you go through all

25  the images and you don't find it?

Jeffrey Cunningham - Examination          27

1    A.  No.  I haven't linked -- I can only go based on the date

2    and time it was created in the Kakao folder and the

3    conversation at this point.  That's how I would say that that's

4    the same video and that's when I would put my expert opinion at

5    that time, but when I'm doing the exam I'm trying to pull every

6    artifact I can to positively identify and link that this is the

7    video that was sent in that conversation.

8    Q.  So at some point do you end up looking at a gallery that is

9    images that have been pulled from other locations, from the

10   cache location?

11   A.  Yes, after I've already exhausted looking through

12   everything that had -- that I could limit in scope, I had to go

13   and then look at everything that had no metadata which are

14   images that it's identified from, cache files, embedded images

15   and other files and databases, things like that, so those are

16   all dumped in one entire gallery, yes.

17   Q.  And why are you in that gallery?

18   A.  Because if it can point me to a database and I can

19   recognize that video, then I can possibly go to that database

20   and find out if this was the video that was linked to that

21   conversation.

22            THE COURT:  This was an iPhone, as I understand?

23            THE WITNESS:  Android.

24            THE COURT:  Android.

25            THE WITNESS:  Yes, sir.

1   BY MS. RICHARDSON:

2   Q.  And in your process of going through the videos, clicking

3   on the images in an effort to identify the image that connects

4   with that link that's in the Kakao message that was sent from

5   the defendant to the complainant, at some point do you click on

6   an image that forces you to stop your search?

7   A.  Yes.  I then have to click it.  It's in the gallery,

8   they're thumbnailed, they're displayed and I make sure they're

9   a good size so I don't need glasses to see them, but yes, I did

10  identify an image that caused me to have to stop my

11  examination.

12  Q.  And why is that?

13  A.  Because it was suspected child pornography.

14          MS. RICHARDSON:  Your Honor, at this time, may I

15  approach the witness?

16          THE COURT:  But you weren't looking for child porn, it

17  just popped up?

18          THE WITNESS:  Yes, sir, I mean there's probably 10 by

19  10 rows of images.

20  BY MS. RICHARDSON:

21  Q.  At this time, I'm going to show you what's premarked as

22  Government's Exhibit Number 4 and ask you if you recognize this

23  series of documents as well as the image on page four?

24  A.  Yes, this is the document I created back in November

25  specifically for that image.

1      MS. RICHARDSON:  And Your Honor, at this time, I have

2  tendered to defense counsel --

3      THE COURT:  Are these the images?

4      MS. RICHARDSON:  It is one of the images -- it is the

5  image that stopped his search and resulted in the next Search

6  Warrant.

7      THE COURT:  I see.  Okay.  I've seen this one before.

8  That's a fairly common image.

9      THE WITNESS:  Yes, sir.

10      MS. RICHARDSON:  The government offers Exhibit 4 into

11  evidence.

12      THE COURT:  It will be received.

13  BY MS. RICHARDSON:

14  Q.  So Agent Cunningham, when you saw the image --

15      THE COURT:  I'm going to put that under seal, by the

16  way.

17      MS. RICHARDSON:  Yes, Your Honor.

18  BY MS. RICHARDSON:

19  Q.  Agent Cunningham, when you saw the image depicted in

20  Government's Exhibit 4, based on your training and experience

21  did you know immediately that that thumbnail within that

22  gallery that you were in looking for the image related to the

23  sexual assault investigation was, in fact, child pornography?

24  A.  Yes.

25  Q.  And so what did you do?

1   A.  I stopped the exam, which I always do.  If I find something

2   of a new crime, then I got to go get a new Warrant just to even

3   continue what I'm doing to be on the safe side.  But I briefed

4   my supervisor and we decided we would go and get the Warrant

5   because I could walk across the street to the Magistrate.  I

6   filled out my Affidavit I believe on the 7th and went over and

7   briefed the Magistrate in person and then he sent it back to me

8   on the 8th of June.

9           MS. RICHARDSON:  May I approach the witness?

10          THE COURT:  Yes.

11  BY MS. RICHARDSON:

12  Q.  I'm going to show you what's been premarked as Government's

13  Exhibit 5 and 5a and ask you if you recognize these documents?

14  A.  5a is my Affidavit.  And five is the Magistrate's

15  authorization.

16  Q.  Related to the investigation on the child porn?

17  A.  Yes.

18  Q.  Your Honor, at this time, the government has tendered to

19  defense counsel and we'd offer into evidence for purposes of

20  this hearing Government's Exhibits 5 and 5a?

21          MR. CONVERY:  No objection.

22          THE COURT:  It will be received.  Those are the

23  Affidavits.

24          MS. RICHARDSON:  Yes.

25  BY MS. RICHARDSON:

1  Q.  So Government's Exhibit Number -- let's look at 5a first.

2  So Government's Exhibit 5a, if we go down to under item number

3  two where you are describing a minor female approximately three

4  years old and then you list located that the file is in

5  micro.0?

6  A.  It's a cache file.

7  Q.  And then you list out -- it's in the gallery for the cache

8  file and then you have the hash value on that and that there

9  was no date and time.

10     Are you explaining to the Magistrate that you're in that

11 gallery that you were just telling us about that doesn't have

12 metadata attached to it, that doesn't have date and time?

13 A.  I don't think that was discussed with the Magistrate.

14 Q.  So explain that paragraph, starting with about 14:45.

15 Explain that paragraph to us.

16 A.  I can't read it.

17 Q.  Here you go?

18 A.  It's basically --

19         THE COURT:  Mr. Convery, have you seen this before?

20 You've had this before?

21         MR. CONVERY:  Yes, Your Honor.  Thank you, sir.

22         THE COURT:  Did you also get a copy of it and have a

23 chance to review the photograph that was just put into

24 evidence, the copy?

25         MR. CONVERY:  I did and I have no objections for the

1    purpose of this hearing.  Thank you, Your Honor.

2         THE COURT:  All right.

3    A.  I think I'm just explaining what I found, where I found it

4    and everything that I can to him.

5    Q.  And when we go further down on page two of your Affidavit,

6    it says that it's July 8, 2018?

7    A.  Yes.

8    Q.  That's not the date you testified to just a minute ago?

9    A.  No, because I went off the digital signature which is more

10   accurate than the clerical error on the typed in.  If you look

11   on there, it should say 8 June.

12   Q.  So July 8, 2018, which is right here, is incorrect?

13   A.  The July is incorrect, correct.

14        THE COURT:  That's a clerical error?

15        THE WITNESS:  Yes.

16   BY MS. RICHARDSON:

17   Q.  So the digital date, the date that this was digitally

18   signed by Magistrate Casey Jones is June 8, 2018?

19   A.  Yes.

20   Q.  So you get that, you see the child porn on June 6th, you

21   get a Warrant to do a look within the digital device for child

22   porn on June 8th, did you immediately go back to your office

23   and start looking for child pornography?

24   A.  No, I finished the original request because I opened the

25   child pornography under a separate investigation.

Case 5:19-cr-00630-DAE Document 165-9 Filed 03/28/24 Page 31 of 72
Case 1:19-cr-00630-DAE Document 165-9 Filed 03/28/24 Page 3 of 72
Jeffrey Cunningham - Examination 33

1  Q.  So when you got back to your office after having seen the
2  Magistrate, you go back and you finish the sexual assault
3  investigation with regards to the digital --
4  A.  When I physically saw the Magistrate, he hadn't signed it
5  yet.  I waited until he sent it to me, he signed in the e-mail
6  on the 8th, so on the 7th when I came back I didn't do anything
7  else with that case.  I probably went and did some research on
8  something else.
9  Q.  So on June 8th you do not pick up with the child
10  pornography investigation?
11  A.  No, on June 8th when I get my Warrant signed by the
12  Magistrate, I continue the sex assault investigation.
13  Q.  And you don't look for any more child porn at that time?
14  A.  No, I ignored at that time because I know there's going to
15  be a separate investigation for it.
16  Q.  When do you complete the sexual assault investigation of
17  Government's Exhibit 1, the digital device?
18  A.  That would be on page 24 that I don't have here.  But it
19  would have been around 14 June, because that's when I signed my
20  report to distribute to the office, which would be the date on
21  my report.  I would have signed it on the 14th of June.
22  Q.  You're correct.  Page 25 it is 14th of June.  So what day
23  did you begin -- do you recall what day you began the forensic
24  investigation for under the child pornography case?
25  A.  I would have to look at my notes for that separate case.

1    And again we put them through the process of doing a lab

2    request.  And of course I already had the authorization, so I

3    didn't need that from them, but they needed to submit a lab

4    request.  We got that on 29 June and I started the exam for

5    that on 29 June.

6    Q.  And when did you finish that?

7    A.  That one was -- whatever date I signed the report I would

8    have sent it out, it would have been in July or something,

9    because this one, page 52 is not stapled on it.

10   Q.  I'm going to show you your report, your forensic report for

11   the child pornography case and ask you the date that you

12   finished that investigation?

13   A.  Yeah, 15 August I would have finished, but by the time it

14   goes through quality assurance and quality checks by another

15   examiner, I sent the report out on 14 September.

16   Q.  Okay.  As a part of your investigation, you don't have to

17   give me any details, but did you, in fact, find child

18   pornography within the digital device in addition to the one

19   thumbnail?

20   A.  Yes.

21         MS. RICHARDSON:  I pass the witness.

22         THE COURT:  Were they all still images or videos, the

23   child pornography that you testified that you found, were they

24   still images or were they videos?

25         THE WITNESS:  Both.

Case 5:19-cv-00630-DAE Document 68-159 Filed 03/28/24 Page 516 of 288
Case 5:19-cr-00630-DAE Document 159 Filed 03/28/24 Page 516 of 172
Jeffrey Cunningham - Examination                    35

1          THE COURT:  Both.

2          THE WITNESS:  Yes, sir.

3          THE COURT:  You can proceed, Mr. Convery, any time.

4          MR. CONVERY:  Thank you, Your Honor.

5                    CROSS-EXAMINATION

6    BY MR. CONVERY:

7    Q.  Mr. Cunningham, I want to go back for a second because you

8    a number of times talked about how you limited the parameters,

9    limited the parameters, limited the dates, you wanted to

10   understand the scope of what you're supposed to do, is that

11   correct?

12   A.  Correct.

13   Q.  The scope of what you're supposed to do is contained on the

14   Search Warrant, is it not?

15   A.  Yes.

16   Q.  Personal cellular phone as well as any contents, call logs,

17   SMS, video images, call and application data including contents

18   from the Kakao talk application as well as any deleted

19   messages, content and application data between PFC Song and PFC

20   Kim related to the alleged offense described in the Affidavit

21   submitted on 25 January, 18.  That is exactly the scope of your

22   search, correct?

23   A.  Correct.

24   Q.  And as a seasoned professional, isn't it fair to say that

25   that would give you access and the ability to search the entire

1   cell phone?

2   A.  For whatever was on there, images, videos, databases.

3   Q.  As a seasoned forensic examiner, when you're talking about

4   contents and data application, isn't it correct that that would

5   give you the ability both with Cellebrite and by looking at

6   carved images and galleries the ability to search the entire

7   cell phone?

8   A.  Yeah, with regards in this case to the related incident,

9   yes.

10  Q.  But in order to determine whether it relates to the

11  incident, this authorization gives you the ability to search

12  the entire cell phone, correct?

13  A.  You had specific things limited on there, but it's almost

14  all the cell phone, yes.

15  Q.  You'll say now almost all the cell phone?

16  A.  Whatever is on the Warrant is what I was allowed to.

17  Q.  Did I just -- that includes everything I just read to you,

18  correct?

19  A.  Correct.

20  Q.  And you said that you went then had access to the agent in

21  the field's file, correct?

22  A.  I had digital access to their case activity summary.

23  Q.  Okay.  That's not part of the Warrant, is it?

24  A.  I have authorization to review that though.

25  Q.  That's not part of the Warrant, is it?

 1   A.  No, sir, it's not.

 2   Q.  And besides that, you talked with the judge about these

 3   dates of the offenses, two dates that you went through with the

 4   federal prosecutor, 21 December, '17 to 2 January '18, correct?

 5   A.  Correct.

 6   Q.  And you did that with the purpose of showing the judge

 7   through the government that what the limited parameters of your

 8   scope of your search were, correct?

 9   A.  I did that in my exam because that's what the scope was.

10   Q.  It's not included anywhere in the Warrant, is that correct?

11   A.  It is included by saying pertaining to the offense, there's

12   no specific dates on the Warrant.

13   Q.  So I'm correct that it doesn't anywhere on the Warrant

14   mention 21 December or 2 January '18?

15   A.  That is correct.  I had to do a little investigating to

16   determine what date range I needed to narrow it down to.

17   Q.  So you made that decision, correct?

18   A.  Yes, sir.

19   Q.  And in doing that, now you're in charge or you're in

20   control of the methodology that you used to search the cell

21   phone.  That's what a forensic examination is, correct?

22   A.  I'm in charge of all the exams I do.  I don't understand

23   what you're saying.

24   Q.  You know what Cellebrite is, correct?

25   A.  Yes.

Jeffrey Cunningham - Examination                    38

1   Q.  And Cellebrite is a machine with some software included

2   that has certain capabilities for searching digital electronic

3   media, correct?

4   A.  Correct.  All the forensic suites have the ability to limit

5   scope.

6   Q.  But it also has limitations as to what it can perform and

7   what it can't perform on different kinds of phones or different

8   kinds of phone systems, isn't that a fair statement?

9   A.  That is correct.  That's why I used several tools.

10  Q.  So did you use several tools in this case?

11  A.  I believe I used FTK Imager, Magnet Axiom, Cellebrite Touch

12  -- not Touch, but Cellebrite UFED and Physical Analyzer.

13  Q.  What did you use when you searched the phone and in your

14  initial testimony you were talking about the search of the

15  phone yielded the videos that from your personal investigation

16  you believed you were looking for, what system did you use?

17  A.  Well, for most of that I used Physical Analyzer and Axiom

18  because Axiom parses things differently.

19  Q.  Can you be specific or it's just one or the other?

20  A.  It really depends on which it is.  I usually use both of

21  those tools for phones.

22  Q.  Can you recall which of those tools you used in this case?

23  A.  I used both in this case.

24  Q.  For the initial -- what I'll call the initial search of the

25  cell phone that yielded the three videos?

1  A.  Started in Physical Analyzer.

2  Q.  In Physical Analyzer, can you tell Physical Analyzer that

3  you're looking for videos and that you're looking for the Kakao

4  messaging system?  Can you give it direction?

5  A.  I can filter, which is how I limit the scope.

6  Q.  That's how you limit the scope?

7  A.  Yes.

8  Q.  And so within that you found the three videos?

9  A.  Yes.

10  Q.  One in Kakao and one in the file folder that indicates

11  those videos were taken by the phone, correct?

12  A.  Yes.

13  Q.  And you also knew from reviewing the agent's investigative

14  summaries or what we'll call the investigative file that the

15  videos and the content of the videos and the information had

16  been taken from PFC Kim's cell phone also, correct?

17  A.  Correct.

18  Q.  And in terms of what communications were made.

19      You did not believe, based on the scope of this Warrant

20  that I provided to you, that that was -- you were finished or

21  that was sufficient, correct?

22  A.  Correct.

23  Q.  So then you go into what let's call a deeper doc.?

24  A.  Yes.

25  Q.  Into these caches and application data that could have

1  deleted materials, that's not actually the Kakao program,

2  correct?

3  A.  Not all of it, no.

4  Q.  In this case, you didn't even find -- the child pornography

5  image wasn't in the Kakao program, was it?

6  A.  No, it wasn't.

7  Q.  And so you're down there in the body -- in the depths of

8  the cell phone and you are doing this gallery print or this

9  gallery image of what you're looking at as you go through that

10  phone.  And it's not -- the scope of that is not dates, is it?

11  A.  Can you repeat the question?

12  Q.  Once you get -- after you find those three videos, when you

13  go down into the data of that phone, then within your earlier

14  testimony was lost the idea of dates, now there's no dates,

15  correct?

16  A.  Yes.

17  Q.  So now you're looking at everything that's there, correct?

18  A.  I'm looking at what's left over.

19  Q.  And it's not even in -- it's not -- so that for

20  organizational purposes it's there would be one column of what

21  came from Kakao and one column that came from e-mails and one

22  column that came from other applications.  This cache that

23  you're talking about of data is not -- it's not linear like

24  that, it's not by date, correct?

25  A.  Correct.

Jeffrey Cunningham - Examination                41

1  Q.  It's by when the phone or when another application either

2  sends it there or it's placed there -- it's history?

3  A.  And that was --

4  Q.  It's not in the active Kakao file, it's in the cache,

5  correct?

6  A.  Correct.  I think what you're asking is why was I not

7  looking specifically in the Kakao folder?

8  Q.  No, that's not what I'm asking, because you already did

9  that and you found one of the videos, correct?

10 A.  Yes.

11 Q.  And then you found the other two videos that -- in the

12 simple operating file that shows they were taken by the phone,

13 correct?

14 A.  Yes.

15 Q.  Now, I'm just suggesting that in terms of your scope when

16 you look at what the Magistrate authorized, it's a search of

17 the entire cell phone, correct?

18 A.  His authorization, yes.

19 Q.  And Cellebrite and these other operating systems do not

20 allow you to or do not provide the limitation where you can say

21 I only want information from the data cache that's from Kakao.

22 You can't do that, correct?

23 A.  Not the methodology I was using, I haven't tried to.

24 Q.  So that's why you're using the carving process?

25 A.  Yes, because it carves everything out of databases, cashes

1  which might lead me to other information to positively identify

2  that that video was the one sent in the Kakao conversation.

3  Q.  The point being that it's everything.  Everything means

4  everything, correct?

5  A.  Everything means everything, yes.

6  Q.  And with the second search, the same thing applies, you

7  still have access to materials, you still have access to the

8  agent's investigative summary?

9  A.  The second search?  Are we talking about the one --

10 Q.  The child pornography search after you stopped and got the

11 thumbnail.  Because you got the thumbnail through this search

12 that we've been talking about, right?

13 A.  Yes.

14 Q.  And then you got the authorization for the second search or

15 the child pornography search?

16 A.  Yes.

17 Q.  Were you aware through your -- did you look at the agent's

18 investigative summaries there in June of 2018?

19 A.  For which case?

20 Q.  For the sexual assault case?

21 A.  Did I look -- I didn't look at it any further when I

22 already started.

23 Q.  Because at some point in time before you start your search,

24 isn't it true that that case is seriously called into question

25 at all?

1  A.  I had no knowledge of that.

2  Q.  You didn't happen to check?

3  A.  No, I don't make it a habit to check up on cases once I've

4  started and get going.

5  Q.  And you conduct your search based on the Search Warrant

6  authorization, right?

7  A.  For the sex assault case, yes.

8  Q.  That you supplement or you limit via the report, the

9  agent's investigative summary and the other information that

10 you have available to you?

11 A.  Correct.

12         MR. CONVERY:  Nothing further.

13         MS. RICHARDSON:  I have nothing further.

14         THE COURT:  Let me ask you this because there's an

15 exigency issue here.  I'm going to start with -- because I

16 think I know the answer to this, I'm going to start with an

17 iPhone and then I'm going to ask you if this applies to an

18 Android phone.  So let's say somebody either intentionally

19 wants to wipe their phone or they're going to sell their phone

20 or whatever, an iPhone, and they hook it up to their Mac or

21 whatever and they press Restore and it ostensibly wipes the

22 phone out and puts it in its original condition with just an

23 operating system.

24         THE WITNESS:  Yes.

25         THE COURT:  Am I correct?

1          THE WITNESS:  Yes.

2          THE COURT:  Is that data that was on the phone prior

3  to it being wiped, so to speak, can you recover that data?

4          THE WITNESS:  On iPhones, based on the way it does

5  encryption, no, after it's been reset, no, sir.

6          THE COURT:  How about on Android?

7          THE WITNESS:  Androids it will depend because there

8  are so many companies out there and they all make their own

9  versions of Android.  Samsung has a version, HTC has a version.

10         THE COURT:  So some it is and some it isn't.

11         THE WITNESS:  It will all be based on what version of

12  Android they're using and what type of encryption it's using.

13  In essence, you possibly could get recovered stuff off of an

14  Android if you're able to get a physical, which I did in this

15  case.

16         THE COURT:  But sometimes not.

17         THE WITNESS:  Sometimes not.

18         THE COURT:  Okay.  All right.  Thank you very much.

19  You can step down.

20         THE WITNESS:  Yes, sir.

21         THE COURT:  You want to take our morning recess now?

22  Do you have another witness?

23         MS. RICHARDSON:  I don't, Your Honor.  With regards to

24  the pending motions before the Court, the government doesn't

25  have anything further at this time.

1          THE COURT:  All right.  Mr. Convery, do you know

2   whether you're going to be calling any witnesses or presenting

3   any evidence?

4          MR. CONVERY:  I'm not going to call any witnesses.

5          THE COURT:  All right.  Then why don't we take a very

6   short recess and then I'll hear any argument you wish to

7   propose to the Court.  Okay.

8          COURT SECURITY OFFICER:  All rise.

9          *(10:15 a.m.)*

10         THE COURT:  Can I see all counsel at sidebar?

11         *(Sidebar off the record.)*

12                        *   *   *

13         *(10:42 a.m.)*

14         COURT SECURITY OFFICER:  All rise.

15         THE COURT:  Please be seated.  It's generally my

16   practice in these motions to suppress to have the defense go

17   first since they're the ones that are actually trying to

18   suppress the material, but I'm happy to have the government go

19   first if you would prefer that, Mr. Convery.

20         MR. CONVERY:  No, it's my motion.  I'm happy to do

21   that.

22         THE COURT:  All right.

23         MR. CONVERY:  Thank you, Your Honor.  In November when

24   we had the first part of the motion to suppress, the Court

25   commented that how deeply troubled the Court was by this three

Case 5:19-cr-00630-DAE Document 68-9 Filed 03/22/24 Page 61 of 72
Case 5:19-cr-00630-DAE Document 18-159 Filed 03/28/24 Page 46 of 288

MOTION HEARING                                          46

1   days of failing to secure --

2          THE COURT:  I was.  And I am.  But that doesn't mean

3   it's going to be suppressed, so I don't know why they -- well,

4   I do know why they waited three days.  I have to look again.  I

5   haven't made up my mind finally on this yet.

6          MR. CONVERY:  And I understand that and I appreciate

7   that.

8          THE COURT:  I mean I believe you were a JAG officer,

9   weren't you?

10         MR. CONVERY:  No, sir.

11         THE COURT:  But you were in military.

12         MR. CONVERY:  My partner was.

13         THE COURT:  I know she was.

14         MR. CONVERY:  I was active duty Navy.

15         THE COURT:  Oh, that's right, you were in the Navy.

16  You were in the Air Force, right?

17         MS. HASDORFF:  Army.

18         THE COURT:  Well, she certainly outranked me.  Weren't

19  you a colonel?

20         MS. HASDORFF:  I retired as a colonel, sir.

21         THE COURT:  See.  I was just a company grade officer.

22         MS. HASDORFF:  I've always outranked him at home.

23         THE COURT:  Let me tell you something.  I can assure

24  you without any question at all that my wife, Judith, who has

25  never served a day in the military has outranked me since the

 1  day we got married.  As soon as I walk in the door, it's,

 2  "David, take out the trash.  David, go do this.  David, you're

 3  going to change that."  Hopeless.  Go ahead, Mr. Convery.

 4           MR. CONVERY:  Thank you, sir.

 5           THE COURT:  Yeah, you're right.  Let me say this on

 6  the record.  I was a bit troubled by the fact that they kept

 7  his phone for three days, it doesn't mean it's going to be

 8  suppressed, but you know --

 9           MR. CONVERY:  When the Court is considering that, let

10  me just try to articulate the defense's position in this case.

11  First off, the agent -- there was no exigent circumstances with

12  respect to the seizure of the cell phone.  I think it's

13  important to start from that standpoint.  There is no exigent

14  circumstances.  Any exigency was created by the agent in

15  setting the appointment to have then Specialist Song come in

16  and see him.  Nothing else was of any urgency at that time.

17  The military procedures that are less to start with than the

18  civilian procedures allow the agency the ability to get

19  advanced authorization from one of any number of military

20  Magistrates where they indicate what their probable cause is,

21  the military Magistrate then gives them the ability to seize

22  the cell phone and the paperwork follows.  Number one.

23           Number two, when the individual comes in from the

24  previous testimony, the agent tells him, I'm going to get

25  authorization.  The individual does not want to give up his

1  cell phone, tells him, tries to get it back, enlists his

2  platoon sergeant to try and get it back.  So there's no

3  indication of any kind of a lack of awareness.

4          The investigator again, less than the normal course of

5  the Fourth Amendment, has the ability to keep Specialist Song

6  there while he gets that authorization.  They elect to let him

7  go.  They elect to just keep the cell phone and let him go.

8  The testimony before the Court is that something else came up

9  of urgency that may have been exigent circumstances in another

10  case and for that reason he couldn't get a hold of the

11  Magistrate by phone in the three days.

12          THE COURT:  Apparently he tried to, he couldn't get

13  them, but yeah.

14          MR. CONVERY:  He tried once --

15          THE COURT:  He tried one, but he did testify that he

16  did try to get a hold of another Magistrate who he was aware

17  of, but couldn't apparently reach her either.

18          MR. CONVERY:  Well, but he did agree with me that

19  there are a number of Magistrates.  And in the discussion that

20  the duty Magistrate having a military background, doesn't mean

21  you can't call other people, that's the person that day that

22  has the duty phone.  And if it's during business hours --

23          THE COURT:  Well, I think he acknowledged, counsel,

24  that -- and this is also something I have to look at.  He

25  acknowledged that he was pulled away because of this

1    investigation of a girl that was allegedly sexually assaulted
2    in -- apparently this was a school on post, I'm not sure, but
3    otherwise they wouldn't have any jurisdiction at all and -- you
4    know, and then he got kind of pulled away.
5            In the meantime, he's waiting, I assume, for one of
6    these Magistrates that he called to call him back which
7    apparently never did happen and he's all bollixed up in this
8    other thing.  Now, whether that under these circumstances is
9    enough, I've got to think long and hard and look at it
10   carefully.
11           MR. CONVERY:  When the Court does that --
12           THE COURT:  Cases all over the place.
13           MR. CONVERY:  When the Court does that, I think from a
14   systemic in a policy consideration that we would ask the Court
15   to consider the fact that, as I repeated a couple times, it's
16   less anyway to begin with, given the military environment and
17   the vagaries of the military kind of way of life, a system has
18   been set up to do this by phone, to do this in a very
19   expeditious manner.  If you dilute that further, then the
20   danger becomes to the Fourth Amendment that it becomes somewhat
21   nonexistent.  I would respectfully object to good faith even
22   applying in such a circumstance where whether or not to do it
23   is under your control, number one.  Two, scheduling is under
24   your control.  Three, it's not like in San Antonio where you
25   have three Magistrates and you have a duty Magistrate, you have

1    all of this ability to do that.  And then to, if you will,

2    further dilute the Fourth Amendment by allowing them to say,

3    well, because I ultimately got one I'm in good faith is a

4    really I think dangerous thing from a systemic standpoint.

5         With respect to the Warrant itself, I can really give

6    the Court our argument in very succinct manner.  If you have to

7    look at the agent investigative summaries or you have to

8    consult a report or reports to provide the parameters and to,

9    as a law enforcement agent, limit, what he says, limit the

10   forensic analysis, the Warrant is bad, period.  Warrants in

11   this country, as the Court well knows are within the four

12   corners of the Warrant.  Either says what you can do or it

13   doesn't say what you can do.  This Warrant, number one, doesn't

14   say -- it tells him what he's looking for.  The real argument

15   here is he would say or the government will say when I sit

16   down, well, he found these videos that are in question.  But he

17   wanted to look and see if there was any conversations.  He

18   wanted to see this, he wanted to see that, so this is --

19        THE COURT:  Well, that was clearly within the scope of

20   what he was entitled to do.  I mean they were looking for any

21   information directly related to the allegation of sexual

22   assault.  And that would include, you know, the videos for

23   sure, which ultimately kind of -- and the other information

24   which kind of ultimately somewhat exonerated him, so it was

25   good that they found that information because having done so,

1    they were able to determine that this was a consensual --
2    appeared to be at least or they couldn't prove it was other
3    than a consensual encounter is probably the right way to put
4    it.
5                MR. CONVERY:  Well, as a matter of fact, that
6    determination was being made before the second Search Warrant
7    even takes place.
8                THE COURT:  Well, but he didn't know about that.
9                MR. CONVERY:  When in our jurisprudence -- I didn't
10   raise it in the motion, but it's certainly raised by the cases,
11   when is there a necessity to go back and tell the Magistrate
12   that things have changed.
13               THE COURT:  Well, he doesn't know that.
14               MR. CONVERY:  Well, if I'm the agent and I make a
15   probable cause Affidavit talking about sexual assault and my
16   investigation of sexual assault and then before the person gets
17   to make the search, the sexual assault itself is called into
18   question.
19               THE COURT:  Let me ask you a hypothetical.  I know
20   what you're talking about.  Let me ask you a hypothetical.
21   What happens if in good faith they go get a Search Warrant to
22   search a particular house and there's nothing wrong with the
23   Search Warrant.  Let's assume for a moment the Search Warrant
24   is perfectly good, to search a particular house for drugs.
25   Nothing more, just drugs.  And while they're on their way to

1  this house, some prosecutor realizes that in obtaining the

2  Search Warrant, he had, in fact, identified the wrong residence

3  entirely.  It was another street over.  In the meantime, for

4  whatever reason, the prosecutor -- let's just assume the

5  prosecutor doesn't realize they're already on their way to

6  execute the Search Warrant.  They go in there, they have the

7  Search Warrant, as far as they know the Search Warrant is

8  perfectly valid.  They give the homeowner the Search Warrant.

9  Knock on the door, homeowner says, oh, I don't know what this

10 is all about.  Okay.  You can come in.  Reluctantly.  And they

11 open the door and there's somebody producing child porn.  What

12 happens, under those circumstances?  Clearly an invalid Search

13 Warrant, but I think the good faith exception would probably

14 apply.  And that that' kind of the problem we have here maybe,

15 I don't know, why don't you address it.  I'm giving you that

16 scenario so that you can kind of address it.

17         MR. CONVERY:  Thank you.  And I think that that

18 scenario raises similar -- there's two distinct issues I think

19 that are inter-related within there.  One is do you have the

20 right to be where you're at at the time.

21         THE COURT:  Well, they don't because it was a bad

22 Warrant, but they don't know that.

23         MR. CONVERY:  But then that answer to me --

24         THE COURT:  That answers the question.

25         MR. CONVERY:  That answers the question.

1        THE COURT:  There's no good faith.

2        MR. CONVERY:  Because there's no plain view.  What's

3   inter-related is both plain view and good faith.

4        THE COURT:  You might be right.  You might be right,

5   but you know --

6        MR. CONVERY:  To have plain view, you have to be in a

7   place where you have a right to be and then it has to be

8   somewhat immediately apparent to you that something is wrong is

9   my recollection of the two prongs of plain view.

10       THE COURT:  So your view is they just at that point,

11  they just back out of the house.  Let's say they get a call at

12  some point that says, well, look, we screwed up.  And so in the

13  meantime, they're watching somebody producing child porn, they

14  just kind of back out of the house and say okay.  Then they

15  have to go make a call to get another Warrant?

16       MR. CONVERY:  I think they absolutely have to do that.

17       THE COURT:  I think they would, but the question is

18  what's the basis for the second Warrant?  The basis would be

19  the fruit of the poisonous tree?  I don't know.  I mean this is

20  a very tough issue.  Sounds like a silly issue, a silly

21  hypothetical, but it isn't that silly.

22       MR. CONVERY:  It's not because if you wanted to have

23  good faith, though, I think you have to drop back and try to

24  get authorization in order to do that.  I mean you can tell the

25  Magistrate -- what if in that same hypothetical you go to the

 1    Magistrate and say, oh, my goodness, we have the wrong address,
 2    we didn't know it.  We went to execute the Search Warrant that
 3    you authorized.  And in doing that, we discovered the
 4    production of child pornography and now this is the Affidavit
 5    for our view of the production of the child pornography.  One,
 6    the hypothetical assumes that the Magistrate won't say denied.
 7    Cold reality, denied, can't do it.  The Magistrate says no, I
 8    think you're doing the right thing, I'm going to grant the
 9    Search Warrant.  The issue before the judge would be good
10    faith.  Is that okay?  Or is the part of the Affidavit that
11    contains the fruit of the poisonous tree and the illegality
12    sufficient that it's just not a good search.
13            THE COURT:  See, my understanding, if we can go back
14    to the facts of this case, my understanding is that these
15    programs are designed -- because of the way that -- you know,
16    these cell phones and iPads and, you know, Tab As or whatever
17    the darn Samsung version of the iPad is, they are really, in
18    effect, computers, you know, they are computers to a degree.  I
19    mean look, an iWatch is a computer, so they're computers.  And
20    within the indescribable number of layers within these devices
21    is all kinds of data.  Some of it intentionally deleted, others
22    of it just kind of residing there.  Some of it residing in
23    areas where you don't know where it is and so in order to --
24    let's say he's got a Warrant that allows him to search for
25    evidence of the videos, conversations, evidence of the alleged

Case 5:19-cr-00630-DAE Document 68-15   Filed 03/28/24   Page 52 of 172
Case 5:19-cr-00630-DAE Document 145   Filed 03/28/24   Page 201 of 288

MOTION HEARING                              55

1    sexual assault by the defendant, the only way to do that, I
2    mean he can't -- he doesn't know ahead of time, nor could you,
3    where on the computer, i.e., the cell phone, this particular
4    material is located because it gets scattered throughout the
5    cell phone's memory bank.

6              MR. CONVERY:  Right.

7              THE COURT:  So he plugs the program in, and the
8    program essentially scans in multiple different ways the entire
9    cell phone searching for this material, but it can only be so
10   discrete.  I mean I don't think they've got it down to the
11   point where it can be so precise that it's going to just find
12   that.  It just doesn't exist, they can only be so discrete to
13   get it narrowed down and then he pulls up these pictures or
14   videos or data and he has to manually look to see if there's
15   anything there which comports with his Warrant.  And he did
16   find some things that did.  And so then he's looking, he
17   continues to look to see if there's anything else.  And bing,
18   there goes the child porn.

19             He wasn't looking for child porn.  He had no idea
20   there was any child porn there.  He had no Warrant for child
21   porn.  The government agents who were investigating the sexual
22   assault were not looking for child porn, they had no idea that
23   he had -- allegedly had child porn on his phone and so nobody
24   is looking for child porn, but boom, there it is.  And then he
25   stops, he goes, Woops.  And then he runs across and gets that

1   second Warrant you were talking about which then gives him the

2   authority to pull the child porn videos and still pictures out

3   of the phone.  He didn't do that previously because he didn't

4   have the Warrant for it.

5           MR. CONVERY:  I go back to the first part of my

6   argument in terms of when you look at this Warrant it's so

7   broad --

8           THE COURT:  Well, but doesn't it have to be?

9           MR. CONVERY:  Well, and I won't repeat what's in our

10  motion, but I would call the Court's attention --

11          THE COURT:  I'm going to look back at both motions.

12          MR. CONVERY:  I always hate to draw the comparison

13  between the Ninth Circuit and Fifth Circuit.

14          THE COURT:  Well, listen, I sit on the Ninth Circuit

15  three times a year and I have for 30 years.  There's a lot of

16  good judges on the Ninth Circuit.

17          MR. CONVERY:  That's not why I don't like to draw the

18  comparison.  I don't like to draw the comparison because of the

19  opposite Circuit.

20          THE COURT:  There's very conservative judges on the

21  Ninth Circuit.  My friend Diarmuid O'Scannlain is there.

22          MR. CONVERY:  I really ask the Court to look at what

23  we've presented in terms of the Ninth Circuit because they

24  really grapple with this.  They look at it and say some of the

25  same things we're talking about.  They say, Wait a minute here,

MOTION HEARING 57

1    that in order to look for what you want to look for and given
2    the depth and the breadth of that cell phone, it's not like a
3    filing cabinet, it's so exponential to a filing cabinet that
4    you can't make that analogy.  So what's going to happen, the
5    danger to the Fourth Amendment is it will always be in plain
6    view.  Whatever you found that you weren't looking for, that
7    you weren't supposed to look for, that just popped up is always
8    going to be in plain view.

9          THE COURT:  Well, you know, it's interesting that you
10   make that argument because I just had a suppression hearing
11   yesterday with Ms. Richardson in a very tough, very tough case
12   where the Supreme Court dissent in a particular -- laying down
13   a particular argument the dissent, the whole argument was,
14   look, with this ruling, the Supreme Court is essentially
15   eviscerated the Fourth Amendment.

16         MR. CONVERY:  Well, I tend to agree with the dissent
17   in that case without even knowing what it is.

18         THE COURT:  That's a true defense lawyer for you.
19   There you go.

20         MR. CONVERY:  They've been eviscerating the Fourth
21   Amendment since I became a lawyer in 1983, but here we still
22   are.

23         THE COURT:  Then the late Chief Justice Burger wanted
24   to do away with it completely.

25         MR. CONVERY:  Mr. Cunningham was one of my professors

1    at Catholic University of America --

2         THE COURT:  Not this Cunningham.

3         MR. CONVERY:  No, no.  And Professor Cunningham

4    actually wrote one of the first books that was -- it's called

5    Exclusionary Injustice.  That initially made the new -- then

6    new argument in the late 70s that the Supreme Court should

7    throw out the exclusionary rule.  Hasn't seen fit to do that

8    for a number of different reasons as recognizing the danger and

9    then again here in terms of the four corners of this Warrant,

10   the page doesn't have any of these dates.  The reason I bring

11   that up to you again is when he gets what I'll call below the

12   line.  Above the line is the Kakao program operating system.

13   This big catch that you're talking about, I'm calling below the

14   line.  It's not in any order, it's everything that's been

15   discarded or saved and stuff.  And what may have gotten lost in

16   the testimony is that gallery he pulls up is not restrained by

17   these dates, it's not restrained by these dates.  It's

18   everything.

19        THE COURT:  Well, I said that.  I said what happens is

20   these programs are only so sophisticated and they can narrow

21   things down to a degree, but they can't narrow them down so

22   finitely that they require no human intervention.  If it

23   required no human intervention, we wouldn't need forensic

24   experts.  We could just have robots, you know, do it or we

25   could have some person, some E2 in the Army and just teach him,

1    here, take this and plug it in and then bring me the

2    spreadsheet that they print out.  That's just not the way it

3    works.

4            MR. CONVERY:  If you take a sledgehammer and a

5    surgical type operation, this Warrant doesn't attempt in any

6    way to be surgical.  This Warrant attempts to be as broad as

7    possible and the boiler plate language of what you can do just

8    simply allows you to do whether it's by a program, a Cellebrite

9    machine, Axiom, different things, you can then do all those

10   things which yielded the videos.

11           THE COURT:  Well, I want to get some answers from

12   Ms. Richardson, so here is what I'll do.  Why don't you sit

13   down for a moment.  I'm going to let her address it, then I'm

14   going to give you opportunity for rebuttal.

15           MR. CONVERY:  Thank you.

16           THE COURT:  Now, Mr. Convery's argument has a certain

17   attractiveness to it.  You know, generally speaking overbroad

18   Warrants aren't good, you know.  If you issue -- let's say

19   they're looking for business records of a certain business, a

20   company and the Warrant says you may search anything and

21   everything you wish at this house in order to locate their

22   business records.  I mean you can go in the bathroom, look

23   under the towels, go in people's drawers, look under their

24   underwear, wherever you want to go you can go and then they

25   happen to go into the bedroom and they look under the bed and

1  they find a gun, but they're looking for business records.  The

2  chances are that gun is going to get suppressed because that's

3  an overbroad Warrant.  So why isn't this Warrant overbroad.

4          MS. RICHARDSON:  This Warrant particularly is not

5  overbroad because of that language that was tagged on to the

6  end that said consistent with the Affidavit attached.  So when

7  you look at the Affidavit --

8          THE COURT:  So your point is that the Affidavit

9  becomes part of the -- becomes part of the Warrant essentially,

10  incorporated.

11          MS. RICHARDSON:  It's incorporated, it's referenced

12  and so that does limit it.  I totally agree that if the Warrant

13  said that they could look at all pictures, all conversations,

14  all Kakao messages, all videos without any regard to date or

15  without any regard to limiting who those conversations was with

16  or what they were about, absolutely that would be overbroad.

17          THE COURT:  So if he comes across videos of adult

18  pornography, adult pornography, that's none of his business.

19          MS. RICHARDSON:  Unless it involved the complainant.

20          THE COURT:  Of course.

21          MS. RICHARDSON:  Right.

22          THE COURT:  I'm talking about general adult

23  pornography which I'm sure he comes across a lot when he's

24  searching, adult pornography, but when he comes across child

25  pornography or what he reasonably believes to be child

1  pornography, that then becomes -- because that's a federal --

2  MS. RICHARDSON: That is in plain view. So what

3  happens, he limits -- even though the Warrant itself did not

4  put the specific parameters, Special Agent Cunningham limits

5  those parameters in order to be efficient and to be in

6  compliance with the incident referenced in the Affidavit.

7  There's evidence that the ongoing relationship between the

8  complainant and this defendant with regards to the sexual

9  assault extended considerably beyond the dates that he was

10  looking at, but he was only looking at the dates and what was

11  referenced in the Affidavit with regards to the fact that there

12  was ongoing chat communications.

13  THE COURT: Well, I think that we have a complainant,

14  she alleges that he sexually assaulted her, right?

15  MS. RICHARDSON: That's correct.

16  THE COURT: And she makes that complaint at Fort Sill.

17  MS. RICHARDSON: Yes.

18  THE COURT: And then the investigation becomes active

19  at Fort Sam because that's where he's serving.

20  MS. RICHARDSON: Right.

21  THE COURT: And at that point in time, they're still

22  investigating the validity of the complaint.

23  MS. RICHARDSON: Correct.

24  THE COURT: And so they're looking for these alleged

25  videos which are supposedly going to show her being sexually

1   assaulted.

2           MS. RICHARDSON:  Right, as well as communications

3   between him and her.

4           THE COURT:  Him and her, right.  And as a result of

5   that investigation, ultimately they determine that they don't

6   have enough evidence to go forward, that the video is not a

7   clear exposition of any kind of a sexual assault.

8           MS. RICHARDSON:  I'm not sure that they rely solely on

9   the video, the communications themselves.

10          THE COURT:  The communications themselves did not

11  support it.

12          MS. RICHARDSON:  That's correct.  I would like to

13  address the three-day issue.  So --

14          THE COURT:  Which is, you know, as a prominent jurist

15  once said, When somebody is accused of a sexually abusive crime

16  you're guilty until you're proven guilty.

17          So I commend the Army for at least, you know, looking

18  to do justice and not ignoring the evidence and prosecuting the

19  man for something which apparently he didn't do.

20          MS. RICHARDSON:  And to point out as the Court has

21  already taken notice of, this Search Warrant that seems to be

22  at issue is actually the tool that rendered -- ultimately

23  rendered the finding or promoted the finding that the sexual

24  assault was not going to go forward.  It was because Special

25  Agent Cunningham meticulously gathered those communications.

MOTION HEARING                    63

1   It's because Special Agent Cunningham pursued that video in an

2   effort to link it up to those communications to see exactly not

3   only what he was saying, but what she was saying about what had

4   gone on.

5         So on January 22nd when Special Agent Syrian brought

6   the defendant in to interview him, they take his phone based on

7   probable cause and there isn't exigency, the Courts have found

8   all across the board in all Circuits that phones themselves

9   have an exigency about them.  The very nature, once you've

10  interviewed somebody and you've asked them a specific series of

11  questions and they know what you're investigating, if you give

12  them that phone back, they're going to walk out and reset it or

13  delete everything that's related.  So the nature of the phone

14  is in and of itself the exigency.  Once you need the evidence

15  on that phone -- and granted the Supreme Court has now said we

16  need a Warrant, we can't just start thumbing through it.  So

17  they seize that phone on the 22nd.

18        THE COURT:  And I think that's the right decision

19  because people carry so much --

20        MS. RICHARDSON:  It's a cornerstone of our life.

21        THE COURT:  That's correct.  And there's a lot of

22  personal information, you know, we all have involving our

23  families and medical situations and diagnoses and, you know,

24  personal issues involving health and wellbeing that are on the

25  phone.

1          MS. RICHARDSON:  They take his phone with probable

2     cause and exigency on the 22nd.  Ideally we would have liked

3     for them to have gotten a Warrant on the 23rd, but on the 23rd

4     they are delayed because of the work that they're doing.  So

5     it's actually just the 24th that they do not get the Warrant

6     when they should have gotten the Warrant after that delay

7     because they get it on the 25th.

8          THE COURT:  Well, he's waiting for somebody to call

9     him back and nobody called him back.

10         MS. RICHARDSON:  To call him back, to respond.

11         THE COURT:  Now, there is an argument, and I think

12    Mr. Convery will make it, that he should have been proactive,

13    more proactive than he was.

14         MS. RICHARDSON:  I suspect that this process has

15    actually done exactly what this process is intended to do, that

16    he will be more proactive in the future just to remedy any

17    question --

18         THE COURT:  Well, he's not in the service anymore.

19         MS. RICHARDSON:  As a law enforcement officer.

20         THE COURT:  Right.  He still is that.  I think that

21    the Court also has to look at a question of whether there was

22    good faith here, even though Mr. Convery thinks that good faith

23    doesn't play a role, I think it does.  And also I think the

24    Court has to look and see if there was undue delay.  I mean

25    some of these cases I read they're -- my God, they're waiting

 1  21 days and 40 days and a month and a half and -- I mean what
 2  in the world?
 3          MS. RICHARDSON:  And good faith actually applies for
 4  Special Agent Cunningham.  When he received the Warrant and he
 5  had the phone, he had no reason to anticipate that there was
 6  anything wrong with what he was about to do.
 7          THE COURT:  I think Mr. Convery is correct.  I think
 8  at some point during that investigation by Mr. Cunningham,
 9  there was some doubt being cast upon the veracity of the
10  original complaint, but I don't think any final decision had
11  been made as to whether prosecution was going forward or not.
12  They were still investigating it.
13          MS. RICHARDSON:  Correct.  And his report was not done
14  at that point.
15          THE COURT:  No, so that's why they couldn't come to a
16  conclusion, they didn't have the materials.
17          MS. RICHARDSON:  That's correct.
18          THE COURT:  Although they were concerned I think about
19  her -- some of her statements and so forth.  All right.
20          MS. RICHARDSON:  Thank you, Your Honor.
21          THE COURT:  I understand your position,
22  Ms. Richardson.  Mr. Convery.
23          MR. CONVERY:  I think we've really narrowed the issues
24  down, Your Honor.  I think that the issue becomes whether or
25  not a person who is in control of the situation can create

1    exigency.  The defense's position is Supreme Court said no, law

2    enforcement can't create their own exigency, especially in this

3    limited or lesser situation where he could have put the

4    interview off three days.  He could have -- he did not need to

5    bring Specialist Song in to take his cell phone.  He made that

6    decision.  He made the decision whether to even talk about

7    whatever he did with Specialist Song that then, oh, my gosh,

8    the government would say we can't let him leave now with the

9    cell phone --

10           THE COURT:  Well, it is a serious allegation.  And one

11   would hope that law enforcement would take an allegation of

12   sexual assault by a young -- one soldier upon another seriously

13   and not kind of put it on the side of their desk and just let

14   it lay there.  And I don't think there was any reason for him

15   to know, he couldn't have known, that whoever the duty

16   Magistrate was wasn't going to bother to call him back.  I mean

17   I think he assumed and I think we would all assume that when

18   you place a call to somebody, particularly if you get an agent

19   calling a Magistrate, I mean what are they calling them for, to

20   ask them out to lunch?  There's some need for the Magistrate to

21   call him back, so he calls the guy in.

22           MR. CONVERY:  Forgive the defense's scepticism, but

23   I'm sceptical and I'll look into that because that's a very

24   interesting concept.

25           THE COURT:  It's an interesting concept?

1      MR. CONVERY:  Yeah, well, it's not what the defense

2  gets, so you know, the defense gets a report that says I called

3  the duty Magistrate and they never called me back.

4      THE COURT:  Right.

5      MR. CONVERY:  So --

6      THE COURT:  Well, he called two.

7      MR. CONVERY:  I get that now from the hearing, but my

8  point is still that he has the ability to do advanced

9  authorization.  I understand the serious nature of the offense,

10 but when you're in control of the day and the time and the

11 place, it's not -- is it negligence?  Sure, in my opinion.  Is

12 it gross negligence?  Quite possibly given the serious nature

13 of the offense.  Why don't you take more care and concern to

14 follow the policies and procedures that are set out because

15 then the government is going to say, well, he's operating in

16 good faith and is excusable.  I just don't believe that from

17 the defense perspective this is excusable neglect.  So that's

18 on the one hand.

19      The other hand from policy perspective is the real

20 thorny sticky wicket of if the Affidavit -- if now in what can

21 be searched and how it can be searched we're incorporating

22 whole Affidavits, which is what the military does, that form

23 paperwork says exactly what the Assistant U.S. Attorney talked

24 about.  I think that's extremely problematic, that when the

25 person conducting the search and they have all these tools that

1    you talked about, different formats, they're not the ones I

2    want to limit the search.  I want the Magistrate to limit the

3    search.

4              THE COURT:  I fully understand your argument.

5              MR. CONVERY:  That is the core issue that until -- and

6    it's difficult at the trial level given the different

7    relationships, it's easier when you read the case from the

8    Ninth Circuit, the Ninth Circuit case that we cite in our

9    brief, the Ninth Circuit basically gave some advice to

10   Magistrates that if the government wants to do all of this and

11   go from stem to stern within the boundaries of this computer or

12   computer-type device, then they need to waive good faith.

13   That's the suggestion.  Because to do otherwise just so dilutes

14   the Fourth Amendment.  Again I repeat it will -- if you can

15   search everything on the cell phone, it will always be good

16   faith.  Thank you, sir.

17             THE COURT:  Okay.  Thank you very much.  I fully

18   understand, I think, all of the arguments here, but I also

19   intend to go back and reread your submissions to the Court

20   because I want to make sure that I have all of that freshly in

21   my mind, particularly since we have had two hearings and

22   they've been separated by a bit of time, not a huge amount of

23   time, but a bit of time.

24             Let me switch -- so I'm going to take the matter under

25   submission.  Let me switch gears here.  My understanding is

1  that you want to continue the trial date, is that right, Mr.

2  Convery?

3          MR. CONVERY:  That's why I was standing up.  I would

4  make a motion to continue the trial date.  We checked with this

5  Court's schedule and apparently August 17th is available.  The

6  defendant is on release.

7          THE COURT:  Yeah, he's not in custody.

8          MR. CONVERY:  It's a very restrictive release, but he

9  lives with his family -- his mother is present here in the

10 courtroom -- in Baltimore.  And so that gives us time to make

11 arrangements.

12         THE COURT:  Sure.

13         MR. CONVERY:  And I would represent to the Court

14 because I know how busy, terribly busy your schedule is, that

15 if anything changes between now and August 17, of course we'll

16 advise the Court.

17         THE COURT:  I'm going to grant the motion.  I think

18 it's a reasonable and responsible motion in light of all the

19 circumstances as I understand them.  And I understand from your

20 shaking your head up and down yes, that you have no --

21         MS. RICHARDSON:  The government has no objection and

22 we actually participated in the discussion.

23         THE COURT:  All right.  So my understanding is this

24 will also give you more opportunity to get yourself fully

25 prepared in light of all these motions.  So the Court is going

1    to grant the defendant's motion to continue the trial date

2    until August 17th at 9:00 a.m. for selection, jury selection.

3    The Court finds that the need of the defendant to be fully

4    prepared for trial outweighs both the defendant and the

5    public's interest in a speedy trial and, therefore, the Court

6    excludes from computation under the Speedy Trial Act the period

7    of time from today until the August 17th's trial date, without

8    objection.  Any objection to the Magistrate judge selecting the

9    jury?  They usually do it.

10         MS. RICHARDSON:  Not from me.

11         MR. CONVERY:  I have no objection.

12         THE COURT:  Who would that be?  Do we know?

13         COURTROOM DEPUTY CLERK:  Whoever is on duty.

14         THE COURT:  Okay.  Could be Judge Bemporad, I don't

15   know.  We'll see.  Okay.  Well, thank you all very much.  I

16   appreciate your arguments, I appreciate your time and I will do

17   the best job I can to get this out.  As you know, I don't just

18   do one of these, The Court, having carefully considered all of

19   the arguments, hereby grants or hereby denies.  Signed David

20   Ezra.

21         I saw one of those the other day in a big motion to

22   suppress and I thought to myself, if I was a Circuit judge, I

23   would be furious.  I always try to put a reasoned order out, as

24   counsel knows.  And the reason for that is -- well, a lot of

25   judges, district judges think that if you put a reasoned order

```
 1   out, it gives much more opportunity for the Circuit Court to
 2   pick your reasoning apart.  My view is that's okay.  My job is
 3   to try to make the best decision I can to put my thinking on
 4   paper for both the parties to review and to give the Court of
 5   Appeals a clear and precise understanding of why I ruled the
 6   way I ruled.  And if they disagree with me, that's okay, that's
 7   the process.  But this business of playing hide the ball behind
 8   some kind of a general order that doesn't mean anything, to me
 9   just doesn't stand the test of fairness and I just don't do it.
10   So it takes me just a little while longer than it would be if I
11   was just going to put a one-page thing out, but I think it's
12   worth it.  And nobody is entitled to win in any particular
13   case.  They don't have an entitlement just because of who they
14   are, but they certainly are entitled to and absolutely entitled
15   to have the Court carefully consider their arguments and make a
16   reasoned ruling.  And if the Court disagrees with their
17   reasoning or their argument, to tell them why.  You're entitled
18   to that, so they can file a motion for reconsideration if they
19   wish or seek an appeal at the appropriate time.  Okay.
20           Court stands in recess and I'll get to you as quickly
21   as I can with this.
22           MS. RICHARDSON:  Thank you, Your Honor.
23           MR. CONVERY:  Thank you, Your Honor.
24           COURT SECURITY OFFICER:  All rise.
25           (11:26 a.m.)
```

1                    *   *   *   *   *

2  UNITED STATES DISTRICT COURT

3  WESTERN DISTRICT OF TEXAS

4

5       I certify that the foregoing is a correct transcript from

6  the record of proceedings in the above-entitled matter.  I

7  further certify that the transcript fees and format comply with

8  those prescribed by the Court and the Judicial Conference of

9  the United States.

10

11 Date signed:  February 20, 2020

12

13 /s/ Angela M. Hailey

14 Angela M. Hailey, CSR, CRR, RPR, RMR
   Official Court Reporter
15 655 East Cesar E. Chavez Blvd., Third Floor
   San Antonio, Texas  78206
16 (210)244-5048

17

18

19

20

21

22

23

24

25

# Exhibit 13

No. 21- 51229

_____

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

UNITED STATES OF AMERICA
Plaintiff – Appellee

v.

HAE YEONG SONG,
Defendant – Appellant

_____

Appeal from the United States District Court
for the Western District of Texas – San Antonio Division
Criminal No. 5:19-cr-00063

_____

# ORIGINAL APPELLANT BRIEF
# ON BEHALF OF HAE YEONG SONG

_____

Stephen H. Shapiro (#21076)
Attorney at Law
A Limited Liability Company
700 Camp Street
New Orleans, Louisiana 70130
Telephone:  (504) 309-8442
E-Mail:   steve@shapirolaw-nola.com

**Counsel for Appellant,
Hae Yeong Song**

# I.   CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Appellant:**  Hae Yeong Song

**Counsel for Appellant:**   Stephen H. Shapiro, Attorney at Law, 700 Camp Street, New Orleans, LA 70130; Angela Moore, Attorney at Law, Law Office of Angela Moore 316 Martinez Street San Antonio, TX 78205

**Counsel for Hae Yeong Song in District Court:**   John A. Convery Hasdorff & Convery, P.C., 1005 South Alamo Street, San Antonio, TX 78210; Duty Pub. Defender, San Antonio Federal Public Defender's Office, San Antonio Division, 727 E. Cesar E. Chavez Blvd. - Suite B-207, San Antonio, TX 78206; Kurt Gene May-FPD (RETIRED), Federal Public Defender's Office, San Antonio Division, 727 E. Cesar E. Chavez Blvd. - Suite B-207 San Antonio, TX 78206

**Appellee:**  The United States of America

**Counsel for Appellee:**   Joseph Gay, Jr., Karina O'Daniel, Ray Gattinella Assistant United States Attorneys, 601 N.W. Loop 410, Suite 600, San Antonio, TX 78216

**Counsel for Government in District Court:**   Bettina J. Richardson, Eric Yuen, Antonio Franco , Jr., Assistant United States Attorneys, 601 N.W. Loop 410, Suite 600, San Antonio, TX 78216

*s/ Stephen H. Shapiro*

Stephen H. Shapiro

## II.   STATEMENT REGARDING ORAL ARGUMENT

This appeal presents issues concerning the legality of search and seizure of a cell phone by law enforcement either without a military search authorization or with a search authorization when the exclusionary rule applies and several of the exceptions to the authorization requirement are not applicable under the facts of a particular case.   The issues are apparently *res nova* in this Court.   Given the complexity and significance of these issues given the modern-day trend of the critical importance of a cell phone to nearly all individuals, counsel submits that oral argument will assist this Court in rendering its decision.

### III.   TABLE OF CONTENTS

I.   CERTIFICATE OF INTERESTED PERSONS  ...........................2

II.   STATEMENT REGARDING ORAL ARGUMENT  .................................3

III.   TABLE OF CONTENTS ...........................................4

IV.   TABLE OF AUTHORITIES  .................................................5. 6

V.   STATEMENT OF JURISDICTION ...........................................7

VI.   STATEMENT OF ISSUES ........................................7

VII.   STATEMENT OF THE CASE  ........................................7

VIII. SUMMARY OF ARGUMENT ................................................14

IX.   LAW AND ARGUMENT .................................................15

X.   CONCLUSION  ..................................................28

XI.   CERTIFICATE OF SERVICE .................................................29

XII.   CERTIFICATE OF COMPLIANCE ........................................30

## IV.    TABLE OF AUTHORITIES

**A.    Cases**

*Anderson v. City of Bessemer,* 470 U.S. 564 (1985)                15

*Carpenter v. United States*, — U.S. — , 138 S. Ct. 2206 (2018)    17

*Davis v. United States,* 564 U.S. 229 (2011)                      16

*Freeman v. City of Dallas*, 186 F.3d 601 (5th Cir. 1999)          20

*Illinois v. Gates*, 462 U.S. 213 (1983)                           17

*Ker v. California*, 374 U.S. 23 (1963)                            17

*Mapp v. Ohio*, 367 U.S. 643 (1961)                                16

*Maryland v. Macon*, 427 U.S. 463 (1985)                           16

*Michigan v. Tyler*, 436 U.S. 499 (1978)                           17

*Riley v. California* , 573 U.S. 373 (2014)                        19, 25

*Segura v. United States*, 468 U.S. 796 (1984)                     16, 20

*Terry v. Ohio*, 392 U.S. 1 (1968)                                 17

*United States v. Calandra,* 414 U.S. 338 (1974)                   16

*United States v. Comprehensive Drug Testing, Inc.*,               23
621 F.3d 1162 (9th Cir. 2010)

*United States v. Flores*, 802 F.3d 1028 (9th Cir. 2015)           25, 26

*United States v. Ganias*, 824 F.3d 199 (2nd Cir. 2016)            23

*United States v. Hernandez,* 670 F.3d 616 (5th Cir.2012)          16

*United States v. Kelley*, 981 F.2d 1464 (5th Cir. 1993)           21

*United States v. Kow*, 58 F.3d 423 (9th Cir. 1995)                27

*United States v. Lopez-Moreno,* 420 F.3d 420 (5th Cir. 2005)      15

*United States v. Loe*, 248 F.3d 449 (5th Cir. 2001)               21

*United States v. Mata,* 517 F.3d 279 (5th Cir. 2008)              15

*United States v. Mitchell*, 565 F.3d 134 (11th Cir. 2009)         20

*United States v. Place*, 462 U.S. 696 (1983)                      17

*United States v. Pratt,* 915 F.3d 266 (4th Cir. 2020)  20

*United States v. Riley*, 906 F.2d 841 (2nd Cir. 1990)  21

*United States v. Runyan*, 275 F.3d 449 (5th Cir. 2001)  21

*United States v. Waldrop,* 404 F.3d 365 (5th Cir. 2005)  15

*Voss v. Bergsgaard*, 774 F.2d 402 (10th Cir. 1985)  27

*Warden v. Hayden*, 387 U.S. 294 (1967)  17

*Williams v. Kunze*, 806 F.2d 594 (5th Cir. 1986)  27

**B. Statutes**

18 U.S.C. § 2252A(a)(2)  12

18 U.S.C. § 2252A(a)(5)(B)  12

**C. Constitution**

The Fourth Amendment to the United States, 13, 14, 16, 17. 20, 21, 23, 24, 25, 26
  U.S. Const. Amend. IV

## V.   STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## VI.   STATEMENT OF ISSUES

A.   The district court clearly erred in denying Song's Motion to Suppress evidence of child pornographic images that were found in his phone because:

1.   Song's Constitutional Rights to Be Free from Unlawful Searches and Seizures Were Violated When SA Cerean Seized Song's Cell Phone Without a Warrant or Authorization and Without Exigent Circumstances, and there was a Three-Lapse Between the When Song's Phone was Unlawfully Seized Until the Day the Search Authorization was Issued;

2.   The Search Exceeded the Scope of the Search authorization,  and the Good Faith Exception to the Authorization Requirement did not Apply in this Case Because the Army's Delay was, at a Minimum, Grossly Negligent;

3.   The Initial Search of Song's Phone Exceeded the Scope of the First Search Authorization, and the "Plain View" Exception did not Apply, and the search authorization was overly broad.

## VII.   STATEMENT OF THE CASE

**A.   Facts**

On January 8, 2018, Hae Yeong Song, Private First Class ("PFC") in the United States Army was accused of sexually assaulting PFC Kim (the "complainant") while she was on leave in Maryland.  Song was also on leave in Maryland.  Song allegedly recorded a sexual encounter with the complainant and sent a video recording of the sexual encounter to her using a smart phone (hereinafter the "phone").  At the time of the investigation, Song was stationed at Joint Army

Base-San Antonio.**1**

The complainant reported this incident to the Army, claiming Song sexually assaulted her on December 22, 2017.  During that alleged conduct, the complainant stated as follows:  (1) Song repeatedly requested to take a photo of her with his phone while they had sex; (2) she repeatedly told Song to refrain from doing so; (3) Song asked numerous times, and eventually the complainant allowed Song to take one photo of her as long as it did not show her face; (4)  she noticed Song hold and move his phone in such a way she believed he took video of the assault, and not just a picture.  The complainant stated she and Song had communicated through "Kakao Talk Messenger," a social media and communications application, before and after the assault.  The complainant further stated that while she and Song were still on leave in Maryland, Song contacted her via KakaoTalk and requested that she visit him again for sex.  The complainant stated that she declined Song's request.  The complainant stated that Song sent her a video via KakaoTalk which showed her perform oral sex on Song.  She allegedly did not know Song recorded her performing oral sex on Song.  Song allegedly told the complainant that the the video was to allegedly coax, in her words "blackmailed," the complainant into visiting him and having sex with him again.  The complainant stated she laughed at the end of the video.  The complainant saved the video on her phone and took screenshots of their KakaoTalk conversations to ensure they were saved.  The complainant provided written consent for the collection of her phone as evidence.

The Army, through Special Agent Andrew Cerean ("SA Cerean"), began to investigate the alleged sexual assault and recording.  SA Cerean wanted to seize Song's phone.  SA Cerean called the duty magistrate on two occasions to obtain pre-

---

**1**      The Joint Army Base-San Antonio is comprised of: Fort Sam Houston, Randolph Air Force Base and Lackland Air Force Base. https://www.arsouth.army.mil/Community/-Joint-Base-San-Antonio/#:~:text=Joint%20Base%20San%20Antonio%20(JBSA,Force%2C%20502nd%20Air%20Base%20Wing. It is also well known that Fort Hood is the central hub for judicial activity, especially the higher command officers and magistrates.

8

authorization to search Song's phone in an effort to find evidence of the complainant's sexual assault claim against Song. However, according to SA Cerean, the magistrate never returned his call. SA Cerean subsequently contacted another magistrate that he knew would be on the base to secure the pre-authorization. According to SA Cerean, that magistrate failed to return SA Cerean's call. There was absolutely no evidence that SA Cerean attempted to call any other magistrate on the Joint Base, even it was well known that there are numerous magistrates at the base on Ft. Hood.

On January 22, 2018, SA Cerean interviewed Song at the Fort Sam Houston CID Office. Prior to entering the interview room, SA Cerean, acting without search seizure warrant ("hereinafter "authorization" or "search authorization" as that is known in Army parlance), instructed Song to remove his phone and place it in a storage locker located outside of the room. The locker did not belong to Song, and he would have no access to it at any point during his time in the CID Office or thereafter. SA Cerean indicated that he needed the phone as part of his investigation of the alleged sexual assault on the complainant and advised Song that the there was a video of Song's sexual encounter with the complainant which SA Cerean had to view the video as part of his investigation. Song declined to turn over his phone to SA Cerean. However, Song offered to show the video to SA Cerean. SA Cerean declined Song's offer and seized Song's phone from him.

Subsequently, SA Cerean released the phone to Special Agent Strong ("SA Strong") who was the evidence custodian. Song's military counsel requested that the phone be returned to him. Another supervisor at Song's military unit also requested return of Song's phone. These requests were categorically denied.

SA Cerean prepared an Affidavit Supporting a Request for Authorization to Search and Seize or Apprehend Song's phone, which had remained inside the storage locker. ROA.1317. The affidavit in support of the authorization, in pertinent

part, stated:

> Based on the fact that PFC Kim reported she was sexually assaulted, and a video was recorded during the commission of the act, it is paramount to the resolution of this allegation that PFC Song's cellular phone be collected as evidence and be forensically examined by USACIDC to determine what videos and images were taken of PFC Kim and what conversations took place on [the through] (sic) the "KakaoTalk" application.

ROA.1317. After making this application, SA Cerean was told by his commanding officer to divert all of his attention to another case involving sexual abuse of a child. Regardless of this order, SA Cerean continued to work on the case against Song by briefing his upper command and discussing the case with the Army's prosecuting attorneys. He also sought and ultimately obtained a search authorization from a magistrate.

On January 25, 2022, **three days** after Song's phone was unlawfully seized by SA Cerean, a magistrate finally authorized the search authorization. The search authorization described the property to be seized as the following:

> PFC Song's personal cellular phone, as well as any contacts; call logs; texts; SMS; MMS; videos; images; call & Application Data, including contents from the Kakao Talk application; as well as any deleted messages, content & application data between PFC Song & PFC Kim related to the alleged offense described in the affidavit submitted on 5 Jan 18.

ROA.1319.

As a result of that search authorization, Special Agent Jeffrey Cunningham ("SA Cunningham"), who was located at the Army Base at Fort Hood, received a request to extract messages between Song and the complainant from the submitted media pertaining to the sexual assault investigation. ROA.1321. This request, which was sent to the Digital Forensic Examiner at Fort Hood was dated February 5, 2018. *Id*. The request stated:

> EXAMINATION(S) REQUESTS Digital Forensic Examiner:
> Request that an examination be conducted to recover any messages to include deleted messages between Song and the Complainant (See Search and Seizure Authorizations). Please conduct any other

examination deemed necessary within the parameters of the search authorization.

*Id.*

SA Cunningham conducted a digital forensic examination of the phone four months later on June 7, 2018. ROA.1323-1324.   During the examination of the phone's contents, SA Cunningham identified a one "carved" image that depicted child pornography. *Id.*2   As a result of this discovery, SA Cunningham put the

---

2      File carving is a process used in computer forensics to extract data from a disk drive or other storage device without the assistance of the file system that originality created the file. It is a method that recovers files at unallocated space without any file information and is used to recover data and execute a digital forensic investigation. It also called "carving," which is a general term for extracting structured data out of raw data, based on format specific characteristics present in the structured data.   https://resources.infosecinstitute.com/topic/file-carving/.

Stated another way, when you delete something off your computer, it's not really gone. It's still there. The best analogy is to view your hard drive like a filing cabinet. The filing cabinet has a bunch of papers in it, and there's a tag on the front of the door describing what's inside. When you delete a file from a Windows computer, all you're really doing is tearing the tag off the front of the filing cabinet. All of the papers are still there.

When you delete a file, Windows removes the label from the front of the filing cabinet and makes that hard drive space available for other data, but the raw data of the image is still on the hard drive until it's written over with something else. Often, citizens use programs like Eraser and CC Cleaner to make sure everything is erased that should be erased. This hard drive space is called "unallocated space"–and law enforcement may "carve" out raw image files from this part of the hard drive to retrieve evidence (they did this to Bin Laden's computers, all sorts of investigations utilize carving techniques). The only way to retrieve carved images is to use very expensive programs like Forensic Tool Kit (FTK) to scan the raw data in the unallocated space of the hard drive.

There are several problems with any government attempt to prosecute a Possession of Child Pornography case based upon carved images. First of all, the user cannot view carved images without special software (and, most law enforcement experts conveniently fail to look for such software on the computer, so that they "can't say" whether or not the defendant was able to view the images).

Second, it is virtually impossible to prove that a computer user has knowledge of a carved file's existence on the computer (absent a confession, of course!). To make matters worse for the State, carved files typically have no names, and no dates. If that's not bad enough for the State's case, there is nothing about a carved file which indicates that it has ever been opened or viewed.

Basically, you can't tell the name of a carved file, don't know where it came from, don't know when it got there, and you don't know if it was ever opened or viewed. Not much of a case, right? Typically, you won't see a prosecutor charge a defendant on carved files if they find actual, existing files on a computer.

Carved Images | Orlando Criminal Defense Lawyer The Law Office of John Guidry (jgcrimlaw.com)

sexual assault investigation on hold and initiated a new case number for a child pornography investigation. However, interestingly, the search authorization in the instant case does not indicate that a forensic investigator has the authority to search for carved images.

SA Cunningham applied for a search and seizure authorization from a military magistrate to search the phone for child pornography. *Id*. The authorization called for a search of Song's phone, SIM card, and micro-SD card contained in the phone. *Id*. The Search and Seizure Authorization specifically stated:

> Digital forensic examination for but not limited to texts, document, pictures, graphics/images, electronic mail messages, news groups, chat room databases, software, video/movie files, file sharing, computerized logs, account names, passwords, and any other data including deleted files containing material relating to Child Pornography.

ROA.1326.

After SA Cunningham discovered the single image, and obtained a second authorization as set forth above, he conducted an examination of the evidence on Song's phone which disclosed the evidence in the child porn case. His findings were memorialized in a forensic report. ROA.1328-1335.

## B.    Proceedings Below and Disposition

On February 6, 2019, a two count Indictment was filed in the Western District of Texas, San Antonio Division, charging Hae Yeong Song, with Count One-Receipt of Child Pornography, which allegedly occurred between January 14, 2018, and January 20, 2018, in violation of 18 U.S.C. § 2252A(a)(2) and Count Two-Possession of Child Pornography, which allegedly occurred on or about January 22, 2018, in violation of 18 U.S.C. § 2252A(a)(5)(B). ROA.20-22.

On August 7, 2019, Song filed a Motion to Suppress the Evidence. ROA.1293-1335. Song specifically sought to suppress his phone which was unlawfully seized by SA Cerean and subsequently searched by Special Agent

Cunningham. Song contended, *inter alia*, that military law enforcement violated his constitutionally guaranteed Fourth Amendment right to be free from unlawful searches and seizures. Song further argued that the pornographic photos and videos ultimately found by military law enforcement on his phone were the fruit of the poisonous tree and therefore were subject to suppression.

The district court conducted an evidentiary hearing on Song's Motion to Suppress on November 26, 2019 and February 19, 2020. ROA.304-363 and ROA.364-435. At the conclusion of the hearing, the district court took the matter under advisement.

On February 25, 2020, the district court issued its Order denying Song's Motion to Suppress. ROA.1337-1358. The district court ruled as follows. First, the court held that the initial seizure of Song's phone was based on probable cause and exigent circumstances, and that the three-day delay in obtaining an authorization to search the phone was not unreasonable. Second, even if the seizure of Song's phone was unlawful, the good faith exception applied to the situation at hand and the military's delay was, at most, due to its negligence. Third, the initial search of Song's phone exceeded the scope of the first search authorization warrant and the search warrant was overly broad, and the plain view exception did not apply.

Song ultimately went to trial on the charges against him. Song opted to waive a jury trial and to proceed with bench trial. ROA.436-448. This was done because Song wanted to preserve the denial of the Motion to Suppress for appeal, rather than waive his right to appeal the suppression issue, or any other issues that might arise during the bench trial. Further, the government declined to offer Song a Conditional Plea, which would have preserved his right to appeal the denial of the Motion to Suppress.

At trial, several witnesses were called, and a host of exhibits were entered into the record. ROA.449-544; ROA.545-585. At the conclusion of the trial, the district

court found Song guilty of both counts in the Indictment. ROA.573-578.

The United States Probation Office ("USPO") conducted a presentence investigation and prepared a presentence report ("PSR"). According to the PSR, based on a total offense level of 40 and a criminal history category of I, Song faced a sentencing guideline imprisonment range of 292 months to 365 months. The statutory maximum term of imprisonment for each count was 240 months. ROA.1243.

On December 11, 2021, the district court conducted a sentencing hearing. ROA.586-637. The district court sentenced Song to 170 months of imprisonment. ROA.629-630. The district court entered a written Judgment reflecting its sentence and other special conditions imposed on Song. ROA.285-291. On December 13, Song filed a timely Notice of Appeal. ROA.283-284.

## XIII.   SUMMARY OF ARGUMENT

The district court clearly erred in denying Song's Motion to Suppress the evidence. Appellent Hae Yeong Song's constitutional right to be free from unlawful searches and seizures under the Fourth Amendment of the United States Constitution were violated when Special Agent Cerean, a CID officer with the United States Army, seized Song's phone without a search authorization and without exigent circumstances. This seizure of the phone was aggravated by SA Cerean's failure to request a search warrant for Song's phone three-day after the phone was unlawfully seized. On this basis, alone, all evidence derived from the unlawful seizure of Song's phone should have been suppressed by the district court.

The search conducted by SA Cunningham, a computer forensic specialist exceeded the scope of the search authorization, and the good faith exception to the search authorization requirement did not apply in this case. SA Cunningham, during the search, went outside the parameters of the search authorization. Further, the good faith exception did not apply to SA Cunningham because the carved

pornographic image found by SA Cunningham on Song's computer. The image further could not be in plain view because he needed to take additional steps to carve out the photo.

Finally, the issuance and execution of the search authorization was improper because the warrant was excessively overbroad because it sought evidence on Song's phone that was outside the scope of the original investigation of Song for sexual assault. Further, the plain view exception to the warrant authorization requirement did not apply.

## IX.    LAW AND ARGUMENT

### A.    The District Court Clearly Erred in Denying Song' Motion to Suppress

**1.    Song's Constitutional Right to be Free from Unlawful Searches and Seizures were Violated when SA Cerean Seized Song's Phone Without a Search Authorization and Without Exigent circumstances, and there was a Three-day Lapse Between the Unlawful Seizure of the Phone Until the Date the Search Authorization was Issued**

#### a.    Standard of Review

In connection with a motion to suppress evidence obtained by a warrantless search, the burden is on the government to prove that the search was valid. *United States v. Waldrop,* 404 F.3d 365, 368 (5th Cir. 2005). In evaluating a refusal to suppress evidence, this Court reviews the district court's factual findings for clear error and questions of law on a *de novo* basis. *United States v. Mata,* 517 F.3d 279, 284 (5th Cir. 2008). A district court's findings are clearly erroneous if this Court has a "definite and firm conviction that a mistake has been committed." *United States v. Lopez-Moreno,* 420 F.3d 420, 429-430 (5th Cir. 2005) (internal citations to quotations omitted). A clearly erroneous finding is a judicial finding that is not plausible in light of the record viewed in its entirety. *Anderson v. City of Bessemer,* 470 U.S. 564, 573-576 (1985).

### b.    The Fourth Amendment and the Exclusionary Rule

The Fourth Amendment to the United States Constitution protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . U.S. Const. Amend. IV.  The Fourth Amendment itself, however, offers no remedy for unconstitutional searches and seizures.  *Davis v. United States,* 564 U.S. 229, 237 (2011).  The enforcement mechanism is the judicially created exclusionary rule.  *Id.*  A seizure occurs when "'there is some meaningful interference with an individual's possessory interests' in the property seized." *Maryland v. Macon*, 427 U.S. 463, 469 (1985) (quoting *U.S. v. Jacobsen*, 466 U.S. 109 (1984)).  If there is a Fourth Amendment violation, a court may suppress the evidence in question. *Mapp v. Ohio*, 367 U.S. 643, 648-649 (1961); see also *Davis v. United States*, 564 U.S. 229, 236-237 (2011).

The exclusionary rule prohibits the introduction of evidence at trial that is derivative of an unconstitutional search or seizure. *United States v. Hernandez,* 670 F.3d 616, 620 (5th Cir.2012) (citing *United States v. Singh,* 261 F.3d 530, 535 (5th Cir.2001)).  "[The exclusionary rule] is a 'prudential doctrine' . . . created by this Court 'to compel respect for the constitutional guaranty.'" *Davis v. United States*, 564 U.S. at 236 (internal citations and quotations omitted).  The purpose of the exclusionary rule is to safeguard Fourth Amendment rights . . . through its deterrent effect.  *United States v. Calandra,* 414 U.S. 338, 348 (1974).  "The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citations omitted).

### c.    Search Warrant Requirement and Exigent Circumstances

It is well settled that prior to seizing an individual's personal property, law enforcement typically must obtain a warrant based on probable cause. See *United*

*States v. Place*, 462 U.S. 696, 701 (1983); *Carpenter v. United States*, — U.S. — , 138 S. Ct. 2206, 2213 (2018) ("When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause.").  Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

However, in certain limited circumstances, courts allow law enforcement to seize property "pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States v. Place*, 462 at 701.

The exigent circumstances doctrine is an exception to the Fourth Amendment's protection against searches conducted without prior approval by a judge or magistrate. The doctrine recognizes that "warrantless entry by criminal law enforcement officials may be legal when there is a compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978). In applying this doctrine, an objective standard governs the reasonableness of law enforcement officials' belief that exigent circumstances have arisen.  *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968).  The doctrine has been applied primarily when law enforcement agents fear imminent destruction of evidence.  *Ker v. California*, 374 U.S. 23, 39-40 (1963).  Other reasons for exigent circumstances include the escape of a suspect, *Warden v. Hayden*, 387 U.S. 294, 298-300 (1967), and grave danger to their lives or the lives of others. *Id*.

### d.    SA Cerean Unlawfully Seized Song's Phone Without Search Warrant and Without Exigent Circumstances

On January 22, 2018, SA Cerean interviewed Song about the alleged sexual assault on the complainant.  It is undisputed that SA Cerean did not have an

authorization or a warrant permitting him to seize and search Song's phone. SA Cerean attempted to obtain a warrant to seize Song's phone prior to the interview with Song but could not because there allegedly no magistrates available. SA Cerean, acting on his own without search authorization or a warrant, instructed Song to turn his phone over to SA Cerean and it would be placed it in a locked storage locker outside of the interview room. Song clearly had an extremely strong and powerful possessory interest in his phone and the contents therein. Song refused to comply with SA Cerean's instruction.

**There were absolutely no exigent circumstances that permitted SA Cerean to seize Song's phone based on the feared destruction of the contents of Song's phone or for any other reason.** Song invoked his right to counsel when questioned about the phone. He did not consent to the seizure of his phone. However, Song offered to show SA Cerean the alleged assault video, and presumably all other data and communications to and from the complainant to SA Cerean which resided on Song's phone, regardless of his invocation of his right to counsel. While SA Cerean allegedly (and conveniently) feared that the contents of Song's phone would be destroyed or deleted by Song, the Army already had the contents of the complainant's phone from the complainant, including the videos of the alleged sexual assault at issue, corresponding messages, and all other applicable data on the complainant's phone. Further, and again very importantly, Army law enforcement could have easily subpoenaed all data on Song's phone from his either his cell phone service provider and/or from "Kakao Talk" or "Kakao Messenger." In sum, there was absolutely no need to seize Song's phone because there were no exigent circumstances.

Additionally, the seizure of Song's phone was not a "minimally intrusive means," for seizing Song's phone. Our lives today are nearly totally dependent on the possession of a phone because such device contains a plethora of information,

including much personal information. *Riley v. California* , 573 U.S. 373, 385 (2014) (correctly observing that cell phones are "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy."). All of us are depended on our phones to access emails, text messages, and oral communication with family, co-workers, and friends, banking information, health information, and other highly personal information. This makes the possessory interest of a phone extremely strong, and this interest should not, without a warrant or exigent circumstances, have been subject to seizure even on a limited basis. Instead of the Army's so-called minimally intrusive seizure of Song's phone, the seizure of Song's phone was not minimally, but **extremely intrusive** of his possessory interest in his phone and the contents therein.

Based on the foregoing, SA Cerean did not have a search authorization and there were absolutely no exigent circumstances arising out of fear of Song destroying the sexual assault video and its corresponding messages and date. There was absolutely no evidence that Song was going to "escape" from the military by being away without leave ("AWOL") or that he would have harmed anyone or himself because of seizure of the phone and the contents therein. Therefore, SA Cerean unlawfully seized Song's phone, which ultimately led to the unlawful and improper search of the contents of his phone. Accordingly, Song's cell phone was unlawfully seized as a result of the phone being held in the storage locker against his will, and any data ultimately found on Song's phone as a result of the unlawful seizure should have been excluded from evidence at the trial of this case. All other evidence derived from this seizure, including the child pornographic images, should also have been suppressed as fruit of the poisonous tree.

   **e.**  **The Three-Day Lapse in Time Between the Seizure of Song's Phone Until a Search Authorization Was Secured Was Unreasonable and Constituted Gross Negligence**

Assuming, but not admitting, that the seizure of Song's phone was lawful

prior to obtaining a search authorization, the three-day lapse between the seizure and obtaining a search authorization was unreasonable.  "[A] seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration or for other reasons."  *Segura v. United States*, 468 U.S. 796, 812 (1984).  In making this assessment, the Court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment possessory interests against the importance of the government interests."  *Freeman v. City of Dallas*, 186 F.3d 601, 605 (5th Cir. 1999).

Two cases support Song's position.  In *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009), the court held that a 21-day delay in failing to obtain a search warrant was unreasonable for lack of diligence under the facts and circumstances.  In  *United States v. Pratt,* 915 F.3d 266 (2019) (4th Cir. 2020), the court found that the 31-day delay in obtaining a search warrant was for lack of diligence under the facts and circumstances.  In both cases, the number of days comprising the delays by law enforcement did not necessarily hinge solely on the unreasonable conduct of law enforcement.

Applying principles and precepts set forth in *Mitchell* and *Pratt*, Song did not diminish his possessory interest in the phone.  Indeed, for the reasons set forth herein, Song's possessory interest in his phone, an integral part of his life and livelihood, was very strong.  Song did not consent to seizure of his phone and his voluntarily request to share the phone's contents was denied by SA Cerean.  There was no evidence that Army bases were overwhelmed by anything, nor did they have lack of manpower. The Army law enforcement agents could have easily removed or copied incriminating files of the sexual assault, which was the issue at hand, and returned the phone to Song.  The Army did not.  Indeed, the Army attempts to excuse the three-day delay in obtaining a search warrant on SA Cerean's diversion from Song's case to another matter.  This was inexcusable, especially in a military context,

because the warrant could have been easily obtained telephonically or through other electronic means. This would have taken a matter of hours, at best. This clearly constituted gross negligence, rather than ordinary negligence, on the part of SA Cerean and the Army. Accordingly, the district court erred in ruling that the three-day delay from the date Song's phone was seized to the date the search authorization was obtained was reasonable. Clearly, it was not.

**2.     The Search Exceeded the Scope of the Search Authorization, and the Good Faith Exception to the Search Authorization Requirement did not Apply in this Case**

**a.     Standard of Review**

The standard of review for this issue is the same is set forth above in Section A(1)(a). However, the burden of proof is different. When a search and seizure was conducted pursuant to a search warrant, the party moving to suppress evidence has the burden of proving by a "preponderance of evidence" that the evidence was obtained in violation of his Fourth Amendment rights. *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993). The burden then shifts to the government to "demonstrate why the exclusionary rule should not apply to the fruits of the illegal search or seizure." *United States v. Runyan*, 275 F.3d 449, 456 (5th Cir. 2001) (citing *United States v. Houltin*, 566 F.2d 1027, 1031 (5th Cir. 1978)).

**b.     Law Enforcement Exceeded the Scope of the Search Authorization and the Pornographic Image Found Was Not in Plain View, nor did SA Cunningham did not Act in Good Faith**

This Court has held that evidence that falls outside of the scope of the warrant normally must be suppressed. *United States v. Loe*, 248 F.3d 449, 460 (5th Cir. 2001). When interpreting the intentions of a search warrant, "the language of a warrant is to be construed in light of an illustrative list of seizable items." *United States v. Riley*, 906 F.2d 841, 844 (2nd Cir. 1990) (citing to *United States v. Young*, 745 F.2d 733, 759-760 (2nd Cir. 1984)).

In the instant case, the search authorization utilized search of Song's phone makes it clear that any search conducted on the cell phone was to be done within the parameters of the sexual assault allegation. The affidavit submitted on January 25, 2018 focused solely on the sexual assault allegation, and not any allegation of child pornography. Significantly, the search warrant did not grant the examiner free range to examine every item of information contained in the cell phone. Rather, the search was to be limited to content and application data between Song and the complainant related to the alleged offense of sexual assault, which described in the affidavit submitted on January 25, 2018 as well as the search authorization. ROA.1317; ROA.1319.

In the case *sub judice*, SA Cunningham was in the process of examining the entire cell phone. SA Cunningham testified on day two of suppression hearing that he had found everything he needed in connection with the sexual assault allegation, but nevertheless continued to look through Song's phone and its data to determine anything that might have been deleted. ROA.377-405. SA Cunningham ultimately discovered a deleted file that appeared to be unresponsive to the warrant or unlocated that turned out to be child pornography. *Id.*

The photograph was absolutely not in plain view because it had been deleted, and, equally important is that it was unresponsive or unallocated, as those terms are known in computer parlance. This meant the SA Cunningham had to take another step, such as attempting to open the file or using other computer technology, which he did, in order to access the file. ROA.377-405. SA Cunningham did not limit his search to the search authorization, affidavit of in support of the search authorization, or even the memo advising him to keep within the parameters of the search authorization. *Id.* Accordingly, under no circumstances could the child pornography issue be in plain view, and further under no circumstances can it be said the SA Cunningham acted in good faith.

The United States Fifth Circuit case law appears to be underdeveloped regarding the reasonableness of executing search warrants for electronically stored information. However, other circuits have taken steps in mandating guidelines on how the search for electronically stored information must be conducted for it to be considered reasonable. These cases are highly persuasive.

The Second Circuit Court of Appeals in *United States v. Ganias*, 824 F.3d 199, 209 (2nd Cir. 2016) made observations regarding the reasonableness of the agents' actions in executing a search warrant for electronically stored information. The *Ganias* court commented on the " . . . complexity of the questions in this significant Fourth Amendment context." *Id*. And, it highlighted the "importance of careful consideration of the technological contours of digital search and seizure for future cases." *Id*. The *Ganias* court noted that the common analogy used when discussing data stored on a digital device is to a file cabinet filled with documents, some relevant, and some irrelevant. But, that court acknowledged that the vast amount of storage capacity of a digital device makes the issue even more complex to the dealing with file cabinets in white-collar cases. Specifically, the court stated the following: While physical searches for paper records or other evidence may require agents to rummage at least cursorily through much private material, the reasonableness of seizure and subsequent retention by the government of such vast quantities of irrelevant private material was rarely if ever presented in cases prior to the age of digital storage and has never before been considered justified or even practicable in such cases. The *Ganias* court noted that, even as courts recognize that search and seizure of digital media is, in some ways, distinct from what has come before, we must remain mindful of the privacy interests that necessarily inform our analysis. *Id*. at 218.

Another case provides excellent guidance with respect to a search similar to the one in the instant case. In *United States v. Comprehensive Drug Testing, Inc.*,

621 F.3d 1162, 1176 (9th Cir. 2010) ("*CDT*"), the Ninth Circuit expressed its concerns about the execution of search warrants for electronically stored information and offered guidance to magistrate judges. The pressing need of law enforcement for broad authorization to examine electronic record . . . creates a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant. The problem can be stated very simply: There is no way to be sure exactly what an electronic file contains without somehow examining its contents—either by opening it and looking, using specialized forensic software, keyword searching or some other such technique. But electronic files are generally found on media that also contain thousands or millions of other files among which the sought-after data may be stored or concealed. By necessity, government efforts to locate particular files will require examining a great many other files to exclude the possibility that the sought-after data are concealed there. *Id.* at 1176 (9th Cir. 2010). The *CDT* court feared that "[o]nce a file is examined . . . the government may claim . . . that its contents are in plain view and, if incriminating, the government can keep it." *Id.* There, the court, in a concurring opinion, offered the following guidance to magistrate judges when drafting search warrants for information stored on electronic devices: When the government wishes to obtain a warrant to examine a computer hard drive or electronic storage medium to search for certain incriminating files, or when a search for evidence could result in the seizure of a computer . . . magistrate judges should insist that the government **forswear** reliance on the plain view doctrine. They should also require the government to **forswear** reliance on any similar doctrine that would allow retention of data obtained only because the government was required to segregate seizable from non-seizable data . . . If the government does not consent to such a waiver, the magistrate judge should order that the seizable and non-seizable data be separated by an independent third party under the supervision of the court or deny the warrant

altogether. *Id*. at 1178 (Emphasis added).

Finally, The Warrant Clause of the Fourth Amendment, which states "no Warrants shall issue, but upon probable cause, ... and particularly describing the place to be searched, and the persons or things to be seized," presents unique interpretative difficulties in the context of electronically stored information, or "ESI." As the Supreme Court noted in *Riley v. California*, 573 U.S. at 393, "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." But despite the fact that many electronic devices contain our most personal and private information, courts have expressly acknowledged that "'[o]ver-seizing' is an accepted reality in electronic searching because '[t]here is no way to be sure exactly what an electronic file contains without somehow examining its contents.' " *United States v. Flores*, 802 F.3d 1028, 1044-45 (9th Cir. 2015) (quoting *CDT.*, 621 F.3d at 1176-1177).

However, courts have begun expressing concerns about over-searching ESI, especially because warrants often authorize the government to seize large quantities of personal information that it lacks probable cause to search. The Ninth Circuit has admonished courts "to exercise 'greater vigilance' in protecting against the danger that the process of identifying seizable electronic evidence could become a vehicle for the government to gain access to a larger pool of data that it has no probable cause to collect." *United States v. Schesso*, 730 F.3d 1040, 1042 (9th Cir. 2013) (quoting *CDT*, 621 F.3d at 1177). Ensuring appropriate limitations within the warrant is therefore crucial to prevent a search "from turning into a general dragnet." *United States v. Flores,* 802 F.3d 1028, 1045 (9th Cir. 2015) (listing certain recognized limitations, including the requirement that a warrant "specify the particular crime for which the evidence is sought," **rejecting retainment of "unresponsive data" under the plain view doctrine**, and **finding suspect the use of over-seized data for "broader investigative purposes"**) (Emphasis added).

In the instant case, SA Cunningham clearly exceeded the scope of the search warrant issued on January 25, 2018.  Once he completed his initial analysis of Song's phone, he continued to review the phone in search of deleted files and files that are easily characterized as "unresponsive data" or "unallocated data," most of which was housed in the phone's cache.  This deleted, unresponsive, or unallocated data, arguably required SA Cunningham to take an active step in opening these files such as opening the file or using a computer software system to do so inasmuch as image were not in plain view.  SA Cunningham did not limit his search to the search authorization, affidavit of in support of the search authorization, or even the memo advising him to keep within the parameters of the search authorization. Consequently, all of the evidence discovered as a result of the search that exceeded the authority given by the search authorization, and which was not in plain view, should have been suppressed because it was discovered through unlawful means in violation of the Fourth Amendment to the United States Constitution.  Under no circumstances could the child pornography issue be in plain view, and further under no circumstances can it be said the SA Cunningham acted in good faith. Accordingly, the pornographic image and every piece of evidence discovered as a result of the unlawful search should have been suppressed as it is the fruit of the poisonous tree.

### 3. The Issuance and Execution of the Search Authorization Was Improper Because the Warrant Was Excessively Overbroad, and the "Plain View" Exception to the Search Authorization Requirement Did Not Apply

#### a. Standard of Review

The standard of review and the burden of proof for this issue is the same is set forth above in Section A(2)(a).

#### b. The Search Authorization and Affidavit Were Excessively Overbroad and the Plain View Exception Did Not Apply

The warrant and affidavit at issue in this case were excessively overbroad.

The distinction between an overbroad warrant and a general warrant is critical. A general warrant denies the officer the ability to discern what particularly is to be seized. An overbroad warrant simply lacks the probable cause to support the breadth of seizure authorized. *Williams v. Kunze*, 806 F.2d 594, 598-599 (5th Cir. 1986) ("The description of the documents to be seized must not be broader than what was justified by the showing of probable cause."). This rule does not preclude law enforcement from seizing a wide range of documentary evidence, but in such situations, the law requires a showing that the place to be searched or entity under investigation is so permeated with criminality as to make any narrower construction of the items to be seized impossible. This is not to say that a search may never properly result in the seizure of all of an organization's records. Where a warrant authorizes the seizure of particularly described records relevant to a specific crime and all of an organization's records, in fact, fall into that category, they may lawfully be seized. *Voss v. Bergsgaard*, 774 F.2d 402, 406 (10th Cir. 1985; *cf. United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995) (finding that a warrant authorizing the seizure of virtually all business records failed to meet the particularity requirement because affidavit failed to allege that the government was unable to segregate documents reflecting criminal activity from legitimate business documents).

In the instant case, the data seized from Song's phone pursuant to the search warrant was not particularly described, lacked any temporal restriction, and it did not fall into the category of relevant evidence of the sexual assault allegation. The evidence was obtained based on an affidavit that was missing key facts and a search authorization that was overly broad. It was the government's burden to show that law enforcement were lawfully in the spot where the evidence was in plain view. The government failed in satisfying this burden for the above reason, and for the reasons previously stated herein. The government failed to meet its burden of proof as to exceeding the search authorization and find the pornographic photos in plain

view.

## X.    CONCLUSION

For the foregoing reasons, Hae Yeong Song's conviction should be reversed, and his sentence  should be vacated.

Respectfully Submitted;

*s/ Stephen H. Shapiro*
Stephen H. Shapiro (#21076)
Attorney at Law
A Limited Liability Company
700 Camp Street
New Orleans, Louisiana 70130
Telephone:  (504) 309-8442
E-Mail:   steve@shapirolaw-nola.com

**Counsel for Appellant,**
**   Hae Yeong Song**

## XI.    CERTIFICATE OF SERVICE

I hereby certify that this Original Brief on Behalf of Hae Yeong Song was filed utilizing this Court's ECF filing system and therefore has been electronically served on Joseph Gay, Assistant U.S. Attorney, Joseph Gay, Jr. (Lead Appellate Counsel, Assistant United States Attorney, 601 N.W. Loop 410, Suite 600, San Antonio, TX 78216, and a hard copy of the foregoing brief has been placed in the U.S. Mail to Hae Yeong Song, #25596-480, FCI-Fort Dix, Fort Dix, New Jersey, which is his present place of confinement, via United States mail with sufficient first-class postage affixed.

New Orleans, Louisiana, on this 20th day of July, 2022.

s/ *Stephen H. Shapiro*
STEPHEN H. SHAPIRO

## XII.    CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains **7105** words, excluding the parts of the brief exempted by Fed.. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word in 14 point (size) and Times New Roman (font).  If the Court so requests, the undersigned will provide an electronic version of the brief and/or a copy of the word or line printout.

The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in 5th Cir. R. 32.2.7, may result in the Court's striking the brief and imposing  sanctions against the person signing the brief.

I further certify the foregoing document meets with the required privacy redactions; that it is an exact copy of the paper document; and the document has been scanned with the most recent version of a commercial virus scanning program and is virus free.

July 20, 2022                                          s/ *Stephen H. Shapiro*
      Date                                          Stephen H. Shapiro
                            **Counsel for Appellant, Hae Yeong Song**

# Exhibit 14



**TRIAL DEFENSE SERVICE
FORT SAM HOUSTON TEXAS**

## CPT Lorelei E. Evans
## Defense Counsel

## Specialist
## Haeyeong Song

# Administrative Separation Board
# Attorney's Preparation Book
# Attorney's Work Product

 

**DEPARTMENT OF THE ARMY**
DELTA COMPANY, 232ND MEDICAL BATTALION
3820 WILLIAMS WAY
JBSA FORT SAM HOUSTON, TEXAS 78234-1250

MCCS-ACD

MEMORANDUM FOR Commander, D Company, 232nd Medical Battalion, 32nd Medical Brigade, JBSA Fort Sam Houston, Texas 78234-1250

SUBJECT: Acknowledgment of Receipt of Separation Notice, Chapter 14-12c, Commission of a Serious Offense, PFC Haeyeong Song, xxx-xx-7735, D Company, 232nd Medical Battalion, 32nd Medical Brigade, JBSA Fort Sam Houston, Texas 78234-1250

I acknowledge receipt of the foregoing notice from my commander that informs me of the basis for the contemplated action to separate me under AR 635-200, Chapter 14-12c, and of the rights available to me. I have been advised of my right to consult with counsel prior to submitting my Election of Rights. I understand that unless an extension is granted, failure to respond within 7 duty days will constitute a waiver of the rights in paragraphs 6, 7, 8 and 9 of the notice.

DATE SIGNED: 13 Dec 2018

HAEYEONG SONG
PFC, USA
Respondent



**DEPARTMENT OF THE ARMY**
DELTA COMPANY, 232ND MEDICAL BATTALION
3820 WILLIAMS WAY
JBSA FORT SAM HOUSTON, TEXAS 78234-1250

DEC 1 3 2018

MCCS-ACD

MEMORANDUM FOR PFC Haeyeong Song, xxx-xx-7735, D Company, 232nd Medical Battalion, 32nd Medical Brigade, JBSA Fort Sam Houston, Texas 78234-1250

SUBJECT: Separation Under AR 635-200, Chapter 14-12c, Commission of a Serious Offense, PFC Haeyeong Song, xxx-xx-7735, D Company, 232nd Medical Battalion, 32nd Medical Brigade, JBSA Fort Sam Houston, Texas 78234-1250

1. Under the provisions of AR 635-200, Chapter 14-12c, I am initiating action to separate you for Commission of a Serious Offense. The reasons for my proposed action are: Violation of Article 134, UCMJ, (Child Pornography).

2. I am recommending that your service be characterized as Under **Other Than Honorable** conditions.

3. My recommendation and your reply will be submitted to the Commander, U.S. Army Medical Department Center and School, Fort Sam Houston, Texas 78234-6100, who is the separation authority and will make the final decision in your case.

4. The intermediate commander(s) and the separation authority are not bound by my recommendation as to characterization of service. The separation authority may direct that your service be characterized as Honorable or General (under honorable conditions), under Other Than Honorable conditions, or you may receive an entry-level separation (uncharacterized) if in an entry-level status. However, the separation authority may not direct the issuance of a type of discharge or characterization of service less favorable than that recommended by the board should you request a hearing before an administrative board.

5. If my recommendation is approved, the proposed separation could result in discharge, release from active duty to a Reserve component, or release from custody and control of the Army.

6. You have the right to consult with consulting counsel and/or civilian counsel at no expense to the Government within a reasonable time (not less than 3 duty days).

7. You may obtain copies of documents that will be sent to the separation authority supporting the proposed separation. (Classified documents may be summarized.)

MCCS-ACD
SUBJECT:  Separation Under AR 635-200, Chapter 14-12c, Commission of a Serious Offense, PFC Haeyeong Song, xxx-xx-7735, D Company, 232nd Medical Battalion, 32nd Medical Brigade, JBSA Fort Sam Houston, Texas  78234-1250


8.  You may request a hearing before an administrative board, or you may present written statements instead of requesting board proceedings.

9.  You may request appointment of military counsel for representation.  You may also retain civilian counsel at no expense to the Government.

10.  You may waive the rights listed above in paragraphs 6, 7, 8, and 9 in writing, and you may withdraw any such waiver at any time prior to the date the separation authority orders, directs, or approves your separation.

11.  You may submit a conditional waiver of your right to have your case heard by an administrative separation board.

12.  You will receive counseling concerning earned education benefits as required by law (10 USC 1142(b)).

13.  If applicable, recoupment of the unearned portion of your enlistment or reenlistment bonus is required by law (37 USC 308).

14.  You may be required to undergo a complete medical examination, in accordance with AR 635-200, paragraph 1-32, and AR 40-501, table 8-2, if it has been more than one year since your last examination.  If an exam is required by the above authorities and it has been less than one year, but more than six months since your last examination, you will complete a DA Form 3081 (Periodic Medical Examination Statement of Exemption).

MCCS-ACD
SUBJECT:  Separation Under AR 635-200, Chapter 14-12c, Commission of a Serious
Offense, PFC Haeyeong Song, xxx-xx-7735, D Company, 232nd Medical Battalion,
32nd Medical Brigade, JBSA Fort Sam Houston, Texas  78234-1250

15.  In addition to the pre-separation medical examination requirements addressed in paragraph 14, above, you may be required to undergo a medical examination to assess the potential effects of Post-Traumatic Stress Disorder (PTSD) or Traumatic Brain Injury (TBI) on the circumstances of your separation.  This examination is required if you have been deployed overseas in support of a contingency operation in the past 24 months and have been diagnosed with PTSD or TBI.  If you have not been diagnosed with PTSD or TBI stemming from deployment, but believe such a condition exists, you must inform your chain of command immediately.

16. You are required to undergo a mental status evaluation in accordance with AR 40-501.

17.  Execute the attached acknowledgment and return it within 7 duty days from the date of your receipt of this memorandum. Any statement you desire to submit in your behalf must reach me within 7 duty days after you receive this letter, unless you request and receive an extension for good cause shown. Unless an extension is granted, failure to respond within 7 duty days will constitute a waiver of the rights in paragraphs 6, 7, 8, and 9.

7 Encls
1. DA form 4856 (2) 3
2. LER w/Exhibits
3. Mental Evaluation
4. Medical Examination
5. Flag
6. Orders
7. ERB

ANDREW J. KAAIHUE
CPT, MS
Commanding

3

# Exhibit 15

**\*IF YOU HAVE SPECIAL VICTIM COUNSEL OR HAVE FILED AN UNRESTRICTED REPORT OF SEXUAL ASSAULT WITHIN THE LAST 24 MONTHS; PLEASE NOTIFY A TDS PARALEGAL\***



### U.S. ARMY TRIAL DEFENSE SERVICE
### FORT SAM HOUSTON FIELD OFFICE
### CHAPTER INFORMATION

Your commander has recommended that you be administratively separated from the service under the provisions of AR 635-200. This handout will answer some general questions about your administrative separation (also called a chapter).

If separated, you could receive one of three types of discharges (depending on your type of chapter): Honorable, General (Under Honorable Conditions) also called a General discharge, or a discharge Under Other Than Honorable Conditions, also called an "OTH." An Honorable discharge is the best discharge you can receive form the service. A General discharge is the second best discharge that the Army gives, but it is also "good paper". An OTH discharge will deprive you of most of the benefits you would receive with an Honorable discharge and may cause you substantial prejudice in civilian life. Generally, an OTH discharge is only possible under chapters 14 and 15 and before you can be given an OTH, you have the right to have your case heard by an administrative separation board.

The benefits available to you under the different types of discharges are listed on the chart attached to this handout. Note that with a General discharge, you keep most of the pay entitlements or VA benefits that you might have accrued thus far. For example, you can still cash in your occurred leave. However, you do lose any GI Bill contributions and any civil service retirement credit (that is, credit toward federal civil service retirement for your active duty military time) to which you would otherwise be entitled. The biggest problem with a General discharge is that it is the second best type of discharge and not the best. As such, a future employer may inquire as to why you got the second best, instead of the best. Because it is under honorable conditions and is still considered good paper, however, most employers probably will not press the issue.

The Separation Authority (your Battalion or Brigade Commander, or the Commanding General, depending on your type of chapter) decides whether or not you should be separated and, if so, what type of discharge you should get. There are three ways you can have input into those decisions:

a) If you have less than six years of active and reserve military service, and you are not being considered for an OTH discharge, the only way you can fight this action (or at least have some input into what sort of discharge you receive) is to submit statements in your own behalf. These statements can be yours, or from people that you work for or work with. They should talk about your duty performance, potential, and retainability, as well as any significant past contributions you have made. They can ask that you either be retained in the service or given an Honorable discharge. These statements should be submitted to your Commander, who will forward them to the Separation Authority to aid him in his decision.

b) If you have six years or more of active and reserve military service, or you are being considered for an OTH discharge, you have the two additional options:

(1)  You have the right to have your case heard before an Administrative Separation Board (Board).  This Board would normally consist of three people; two officers and one senior enlisted soldier.  The Board's job is to decide whether you should be separated and if so, with what kind of discharge.  The Board then makes a recommendation to the Separation Authority.  The Separation Authority makes the final decision, but cannot do anything less favorable to you than the Board recommended.  At the Board you have certain rights.  You would have the right to be represented by a detailed military lawyer or another military lawyer you might request (if that lawyer is reasonably available), both at no cost to you.  You could also hire a civilian lawyer, at no cost to the Government.  If you are a minority member, you could request that a minority member be part of your Board.  You could make a statement to the Board, or chose to remain silent.

(2)  You also have the right to submit a Conditional Waiver.  A Conditional Waiver is a document you send to the Separation Authority telling him that you will agree to give up your right to a Board hearing if he promises to give you a better type of discharge (usually a General discharge).  If the Separation Authority agrees, you get that better type of discharge.  If he turns down your proposal, you still have the right to a Board.

In any case, you also have the right to consult with a military lawyer to decide what you option is best for you.  You can always obtain copies of all documents that will be forwarded to the Separation Authority.

If you are discharged, you will not be eligible to reenlist in the United States Army for a period of two years; however, if discharged with an Honorable Discharge, the Separation Authority may direct that you serve the rest of your obligated time in a Reserve status.  If discharged with a General Discharge (Under Honorable Conditions) once out of the service you may petition the Army Discharge Review Board and the Army Board for Corrections of Military Records to upgrade your discharge.  An upgrade is neither guaranteed nor automatic.  A memorandum on the procedures to try to upgrade your discharge is attached.

If you wish, you may now see an attorney who will answer questions that you may have about your rights.  The attorney will also thoroughly review your discharge packet to ensure the Commander has satisfied all of the regulatory obligations.  You and the Attorney will then fill out a form indicating what options you wish to exercise in this matter.  Good Luck!!!


## ADMINISTRATIVE EFFECTS AND ADMINISTRATIVE SEPARATION ISSUES

**Shipment of household goods** – JFTR, U5317, U5370; A soldier without dependents, separated incident to administrative discharge with an under other than honorable conditions discharge, is not authorized shipment of household goods at government expense.  A soldier with dependents, separated with an under other than honorable conditions discharge is authorized shipment of household goods to a designated place, but is not authorized non-temporary storage.  Separations with an honorable or general discharge are authorized both shipment and up to one year non-temporary storage.

**Transportation of Family Members** – JFTR, U5240, U5370; transportation of dependents is authorized back to the home of record or some destination closer if cheaper for the government.

**Dependents Eligibility to Remain in Quarters** – AR 210-50, Section IV; if the soldier is incarcerated or separated from the service the dependents must vacate government quarters immediately. However, most housing directors allow dependents to remain 30 days in order to get their affairs in order.

**Receipt of Discharge Certificate**

    1.  Chapters – receive discharge certificate upon clearing.

    2.  RE Codes

        a.  RE-1 – eligible to re-enlist

        b.  RE-3 – requires a waiver to re-enlist

        c.  RE-4 – ineligible to re-enlist

**What About All the Leave Days I Have Been Saving** – DOD Pay Manual, Paragraph 40401;

    Payment of up to <u>60 days</u> accrued leave is authorized for soldiers separated with a <u>fully honorable or general discharge.</u>  Soldiers separated with an under other than honorable conditions discharge are not paid for accrued leave, nor is the accrued leave credited to any outstanding debts owed to the government.

## APPLYING FOR AN UPGRADE OF YOUR DISCHARGE/DISMISSAL

This fact sheet contains detailed answers to common questions concerning applying to have a discharge upgraded.  Discharges are not automatically upgraded after six months.  A request for discharge upgrade must be submitted.

**Who may apply?**  Former members of the Regular Army, the Army Reserve, and the Army National Guard may submit an application (DD Form 293) to the Army Discharge Review Board (ADRB).  If the former member is deceased or incompetent, the surviving spouse, next of kin, or legal representative may apply.  However, the application must include supporting documentation such as a certified copy of marriage license, death certificate, or power of attorney as appropriate.

**What do I do first?**  If you need any of your personnel records for inclusion in your application, obtain them before you submit your request for review.  After your application for discharge review is submitted your records are sent to the ADRB where they cannot be reproduced.  To obtain copies of your military personnel records, submit a Standard Form 180 (Request Pertaining to Military Records) to:

        National Personnel Records Center (NPRC)
        Military Personnel Records
        9700 Page Boulevard
        St. Louis, MO 63132-1547

**How do I apply?**  After you have all your documents ready, submit an original, completed and signed Application for Review of Discharge or Dismissal (DD Form 293).  Blank forms and instructions are

available on the ADRB web site: http://arba.army.pentagon.mil/adrb.htm. Application forms can also be obtained by sending a request to:

> Army Review Boards Agency (ARBA)
> ATTN: Client Information and Quality Assurance
> Arlington, VA 22202-4508
> Phone number: (703) 607-1600

**How long do I have to apply?** Requests for review to the ADRB must be made within 15 years of discharge/dismissal. However, if it has been more than 15 years since the date of your discharge/dismissal, you may apply to the Army Board for Correction of Military Records (ABCMR) using DD Form 149 (Application for Correction of Military Records). We suggest that you wait at least a short time (6 months - 2 years) of discharge before applying to the ADRB in order to allow time for you to establish some references in the civilian community where you live.

**What characterization of discharge can I request?** You can apply to have your discharge upgraded to honorable the first time you apply, regardless of the characterization of discharge you were awarded. However, we suggest you be realistic in your request. Soldiers discharged under Other Than Honorable conditions after 1 October 1982 while in entry level status (less than 6 months service) may request upgrade to an uncharacterized discharge. To do this, write in block 3c "Change to Entry Level Separation".

**What reasons justify an upgrade of my discharge?** There are two grounds for upgrading a discharge and the burden of proof rests with the applicant.

 a. Propriety - requesting change in discharge due to an error in the application of a regulation, statute, constitutional provision or other source of law.

 b. Equity - requesting change in discharge due to (1) the policies and procedures under which you were discharged differing in material respects from those currently applicable on a service-wide basis. (2) the discharge being inconsistent with the standards of discipline in the military service of which you were a member at the time of issuance, (3) your exemplary service record and other evidence presented to the ADRB, or (4) your capability to serve (age, educational level and aptitude scores, family and personal problems, capricious actions, or discrimination).

**Can I appear personally before the review board?** Yes. There are three types of reviews. The first two involve personal appearance.

 a. Resident Panel Hearing - a review involving an appearance before the ADRB in Arlington, VA, by you and/or your representative. You must pay your own and your counsel's travel expenses.

 b. Traveling Panel Hearing - a review involving an appearance before the ADRB at the regional location you request by you and/or your counsel or representative. The Board will travel to one of the regional locations when there are a sufficient number of cases to warrant the expense of travel. Normally, the Board will not appear at a regional location more than once a year. You must pay your own and your counsel's travel expenses.

c. Record - a review of the application, available service record, and documents submitted by you or on your behalf. There is no personal appearance by you and/or your counsel or representative.

**Can I submit a brief or supporting cases, regulations, previous decisions, etc. with my application?** Yes, however, when a brief is submitted, we recommend that you list specific issues discussed in the brief separately at the beginning of your brief and that you separately identify each of these issues in the issues block of the DD Form 293. For clarification purposes, we recommend that you cite on the DD Form 293 the page and paragraph of the brief where the issue is raised. Also, to save time in the review process, you should attach copies of cited cases, excerpts from regulations, and copies of previous decisions.

**What if I want to apply for a change in my "Reason for Discharge"?** You must specifically note that as a reason for your application in Block 3c of the application and provide documents to support your issue(s). If you fail to do this, the ADRB will assume you are applying for an upgrade of the characterization of your discharge only.

**Can I apply to the ADRB for a change in my RE Code?** No, RE code change requests, along with supporting documentation should be sent to:

> Commander, PERSCOM
> ATTN: TAPC-EPR-P
> Alexandria, VA 22331

**Can I apply to the ADRB for a discharge I received at court-martial?** The ADRB can hear any discharge except a Bad Conduct Discharge (BCD) or a Dishonorable Discharge (DD) issued by a general court-martial. BCDs given as a result of a special court-martial may be upgraded only on the basis of clemency.

**If my discharge is upgraded, will I receive my Montgomery GI Bill or get the money I paid into it back?** Not necessarily. The ADRB does not make decisions on policies and procedures related to the Montgomery GI Bill. Your local Department of Veterans Affairs can assist you with such matters.

**How long does it take to process an application?** You should receive a letter from the Board within one month that acknowledges receipt of your application. In this letter the Board may also request additional information, so read it carefully. You should then have a decision within the following timelines.

a. Personal appearance (Arlington, VA) - within two to three months

b. Personal appearance (regional location) - within twelve months

c. Records reviews - within six months

**Can I ask for a reconsideration of my application?** Yes, you may apply for reconsideration as often as you wish. However, the primary reason for reconsideration is due to newly discovered evidence. When applying for this reason, you must show new, substantial and relevant evidence that was not available at the time of any previous review. A record of all ADRB reviews and findings are maintained. Therefore, if a comparison shows that the evidence you submit would have had a probable effect, the request for reconsideration should be granted. Other reasons for reconsideration include, but are not

limited to, representation by a counsel or representative on your behalf when your previous application did not involve such representation and retroactive changes in discharge policies that are announced after your earlier review. AR 15-180 outlines the complete eligibility criteria for reconsideration of a discharge review.

**Sources of Information:**
AR 15-180          DoD Directive 1332.28          10 United States Code §1553

For further information contact the Fort Sam Houston Trial Defense Service at (210) 297-9742.

**\*General Eligibility. The eligibility of benefits set forth are not the sole determining factors, but only list the various types of discharge. The states also provide various benefits that will be influenced by the type of discharge, but information on state benefits should be obtained from state agencies.**

**FOOTNOTES:**

**"1"** The veteran must have served "honestly and faithfully" for 20 years or been disabled and excludes convicted felons, deserters, mutineers, or habitual drunkards unless rehabilitated or soldier may become ineligible if that person following discharge is convicted of a felony, or is not free from drugs, alcohol, or psychiatric problems.

**"2"** Only if an immediate relative is buried in the cemetery.

**"3"** Only if no confinement is involved, or confinement is involved, parole or release is from a US military confinement facility or a confinement facility located outside the US.

**"4"** This discharge category includes the discharge of an officer under honorable conditions but under circumstances involving serious misconduct. See **AR 600-8-24.**

**"5"** An officer who resigns for the good of the service (usually to avoid court-martial charges) will be ineligible for benefits administered by the department of Veterans Affairs (DVA). 38 USC 3103.

**"6"** Including Commissioned and Warrant Officers who have been convicted and sentenced to dismissal as a result of General Court-Martial, see **AR 600-8-24, Chapter 5.**

**"7"** Additional references include Once a Veteran; Rights, Benefits and Obligations, DA Pam 360-526; and Federal benefits for Veterans and Dependants, (VA Fact sheet 1S-1).

**"8"** To be determined by the Secretary of the Army on a case-by-case basis.

**"9"** Only if the Bad Conduct Discharge was a result of conviction by General Court-Martial.

**"10"** Benefits from the Department of Veterans Affairs are not payable to (1) a person discharged as a conscientious objector who refused to perform military duty or refused to wear the uniform or otherwise comply with lawful orders of competent military authority, (2) by reason of a sentence of a General Court-Martial, (3) resignation by an officer for the good of the service, (4) as a deserter, and (5) as an alien during period of hostilities. 38 USC 3103. A discharge (1) by acceptance of an other than honorable discharge to avoid court-martial (2) for mutiny or spying, (3) for a felony offense involving moral turpitude, (4) for willful and persistent misconduct, or (for homosexual acts, involving aggravating circumstances or other factors will be considered to have been issued under dishonorable conditions and

thereby bar veterans benefits. 38 CFR 3.12. A discharge under dishonorable conditions from one period of service does not bar payment if there is another period of eligible service on which the claim may be predicated (Administrator's Decision, Veterans Admin. No. 655, 20 June 1945).

**VA Benefits Handbook – http://www.va.gov/pubaff/fedben/00fedben.pdf**

**"11"**  Any person guilty of mutiny, spying or desertion, or who because of conscientious objections, refuses to perform service in the Armed Forces or refuses to wear the uniform shall forfeit all rights to National Service Life Insurance and Servicemember's Group Life Insurance. 38 USC 711, 773.

**"12"**  Applies to Poast-1957 service only. Post-1957 service qualifies for Social Security benefits regardless of type of discharge. Pre-1957 service under conditions other than dishonorable qualifies a service member for a military wage credit for Social Security purposes.

**"13"**  Disabled and Vietnam-era veterans only. Post-Vietnam-era veterans are those who first entered on active duty as or first became members of the Armed Forces after May 7, 1975. To be eligible, they must have served for a period of more than 180 days active duty and have other than honorable discharge. The 180 day service requirement does not apply to (1) veterans separated from active duty because of a service connected disability, or (2) reserve and guard members who served on active duty (under 10 USC 672a, d, or g. 673, or 673b) during a period of war (such as the Persian Gulf War) or in a military operation for which a campaign or expeditionary medal is authorized.

**"14"**  Transitional benefits and services are available only to soldiers separated involuntarily, under other than adverse conditions.

# Exhibit 16

Cause No.:
Court of Appeals Cause No.: 21-51229
Related Criminal Case: 5:19-cr-00063

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS,
## SAN ANTONIO DIVISION

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

I, HAE YEONG SONG, declare from my personal knowledge that the following facts are true and correct:

① At the first visit to CID, I was ordered to place all my belongings in an unsecured locker in the middle of the hallway. I no longer had access to that locker for the remaining duration of my visit nor was any of my property under my control.

Then other two visits to the CID office, I was escorted to a room with secured lockers. I was ordered to place my belongings in those locker, lock it with a key and I had the possession of the key the remainder of my visit.

② During the first trip, After the interrogation, I was placed back in the holding room for about a hour. I was taken to two separate rooms after for processing of my fingerprints, picture, DNA swab. During the trips

to these two rooms, I inquired about my phone and demanded a warrant. I was put in waiting room while they "secure" a warrant. There were cameras in each room, facing me directly during the duration. The SA Cerean said "I don't need a warrant, I can just take your phone whenever I want" or to that effect. And "I don't need to give you a warrant. By law. I only need to give one to your lawyer" or to that effect. "You're not getting a warrant because I don't need to get one" or to that effect. Each time directly in front of the cameras in the corner of each room.

③ When I was incarcerated in county, Jonathan Chavez, an interning lawyer that worked for Mr John Convery, came to visit and took a packet of file from my Army separation packet. This file was "Case Agent Notes" or of "case agent activities" similar name that detailed more information of the daily activities and times of SA Cerean. In that, SA cerean reported working on my case debriefing my higher command And the JAG back to back on the day he claim he was pulled from my case and too busy to obtain a warrant in what appears to be approximately 2 hours (1hour each).

Unsworn Declaration of Hae Yeong Song

It also showed him debriefing another commander in my chain of command the following day. Again, a day he claims he was pulled from my case to divert all attention on a different case. This was my only copy of these files, I had told Mr Chavez I will mail them a copy once I ~~make~~ have the opportunity to make copies. He said he will make copies at the office and return the original back to me. Then later when I brought this up to Mr Convery upon my release on bond, he said he don't have these files, they've "lost". They were SA cerean's own words, his own reporting of his daily activities during the days in question that counters his words at the hearing.

④ When a member of my chain of command went to get my phone back, they told her that they already have authorization for my phone. At that time, they didn't have such authorization, they lied and misled ~~her~~ her whom would be one of the contacts to secure a command authorization for my phone in the stead of a magistrate authorization as they claimed they had failed to secure.

Unsworn Declaration of Hae Yeong Song

I declare under the penalty of perjury that the following is true and correct.

**Executed on:** _____19_____ day of ___August_____, 2024.
                     (Day)                     (Month)

**Signature:** ___Hae Yeong Song_____
                       Hae Yeong Song

# Exhibit 17

# U.S. District Court [LIVE]
## Western District of Texas (San Antonio)
## CRIMINAL DOCKET FOR CASE #: 5:19-cr-00063-DAE-1

Case title: USA v. Song                                      Date Filed: 02/06/2019

---

Assigned to: Judge David A. Ezra

Appeals court case number: 21-51229 (Doc.
118) 5CCA

**Defendant (1)**

**Hae Yeong Song**                represented by  **Angela J. Moore**
                                                  Law Office of Angela Moore
                                                  316 Martinez Street
                                                  San Antonio, TX 78205
                                                  210-364-0013
                                                  Email: amoorelaw2019@gmail.com
                                                  *TERMINATED: 03/31/2022*
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*
                                                  *Designation: CJA Appointment*

                                                  **John A. Convery**
                                                  Hasdorff & Convery, P.C.
                                                  100 NE Loop 410
                                                  Suite 650
                                                  San Antonio, TX 78216
                                                  210-738-9060
                                                  Email: hasconpc@aol.com
                                                  *TERMINATED: 01/05/2022*
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*
                                                  *Designation: Retained*

                                                  **Stephen H. Shapiro**
                                                  Stephen H. Shapiro, Attorney at Law
                                                  700 Camp Street
                                                  New Orleans, LA 70130
                                                  504-309-8442
                                                  Email: steve@shapirolaw-nola.com
                                                  *TERMINATED: 10/26/2023*
                                                  *LEAD ATTORNEY*
                                                  *PRO HAC VICE*
                                                  *ATTORNEY TO BE NOTICED*
                                                  *Designation: Retained*

                                                  **Duty Pub. Defender-San Antonio**
                                                  Federal Public Defender

San Antonio Division
300 Convent St.
Suite 2300
San Antonio, TX 78205
(210) 472-6700
Fax: 210/472-4454
Email: janie_craig@fd.org
*TERMINATED: 02/12/2019*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Kurt Gene May- FPD**
RETIRED Federal Public Defender
727 E. Cesar E. Chavez Blvd.
Room B-207
San Antonio, TX 78206
(210)472-6700
Fax: 210/472-4454
Email: anna_borjon@fd.org
*TERMINATED: 05/01/2019*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:2252A.F - ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO - Receipt of Child Pornography (1) | One-Hundred Seventy (170) months imprisonment to run concurrent; Ten years supervised release to run concurrent; No fine imposed; $100 special assessment; $22,500.00 in restitution. |
| 18:2252A.F - ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO - Possession of Child Pornography (2) | Sixty (60) months imprisonment to run concurrent; Ten years supervised release to run concurrent; No fine imposed; $100 special assessment. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

**<u>Plaintiff</u>**

**USA**                                    represented by    **Antonio Franco , Jr.**
Assistant U.S. Attorney
Asset Forfeiture Section
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216
210-384-7040
Fax: 210-384-7045
Email: antonio.franco@usdoj.gov
*TERMINATED: 03/12/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Bettina J. Richardson**
Assistant U.S. Attorney
601 NW Loop 410, Suite 600
San Antonio, TX 78206
(210) 384-7152
Fax: 210/384-7118
Email: bettina.richardson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Yuen**
U.S. Attorney's Office
601 NW Loop 410, Suite 600
San Antonio, TX 78216-5512
210-384-7150
Fax: 210-384-7118
Email: eric.yuen2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph H. Gay , Jr.**
Assistant U.S. Attorney
601 N.W. Loop 410
Suite 600
San Antonio, TX 78216
(210) 384-7030
Fax: 210 384-7031
Email: Joseph.Gay@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karina O'Daniel**
U.S. Attorney's Office
Western District of Texas
601 NW Loop 410, #600
San Antonio, TX 78216
210-970-5356
Email: karina.o'daniel@usdoj.gov

*TERMINATED: 05/10/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Ray Gattinella**
United States Attorney Office
601 N.W. Loop 410 - Suite 600
San Antonio, TX 78216
(210) 384-7040
Fax: (210) 384-7045
Email: ray.gattinella@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Steven E. Seward**
U.S. Attorney's Office
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216
210-384-7259
Fax: 210-384-7247
Email: steven.seward@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd R. Keagle**
United States Attorney's Office
601 N.W. Loop 410
Suite 600
San Antonio, TX 78216
(210) 384-7138
Fax: (210) 384-7247
Email: Todd.Keagle@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/06/2019 | 1 | MOTION to Seal Indictment by USA as to Hae Yeong Song. (aej) (Entered: 02/07/2019) |
| 02/06/2019 | 2 | ORDER GRANTING 1 Motion to Seal Indictment as to Hae Yeong Song (1). Signed by Judge Henry J. Bemporad. (aej) (Entered: 02/07/2019) |
| 02/06/2019 | 4 | SEALED INDICTMENT (Redacted Version) with Notice of Forfeiture included as to Hae Yeong Song. Unredacted document sealed pursuant to E-Government Act of 2002 as to Hae Yeong Song (1) count(s) 1, 2. (aej) (Entered: 02/07/2019) |
| 02/06/2019 | 5 | Personal Data Sheet (SEALED) as to Hae Yeong Song (aej) (Entered: 02/07/2019) |
| 02/06/2019 | 6 | ORDER FOR ISSUANCE OF Bench Warrant as to Hae Yeong Song. Signed by Judge Henry J. Bemporad. (aej) (Entered: 02/07/2019) |
| 02/06/2019 | 7 | Bench Warrant Issued by Judge Henry J. Bemporad as to Hae Yeong Song. (aej) (Entered: 02/07/2019) |

| 02/06/2019 | 8 | MOTION to Detain Defendant without Bond, MOTION to Continue by USA as to Hae Yeong Song. (aej) (Entered: 02/07/2019) |
|---|---|---|
| 02/08/2019 | | Arrest of Hae Yeong Song. (rg) (Entered: 02/11/2019) |
| 02/08/2019 | | INDICTMENT UNSEALED as to Hae Yeong Song. (rg) (Entered: 02/11/2019) |
| 02/08/2019 | 9 | Minute Entry for proceedings held before Judge Henry J. Bemporad:Initial Appearance as to Hae Yeong Song held on 2/8/2019. (Minute entry documents are not available electronically.) (Court Reporter ftr gold.) (rg) (Entered: 02/11/2019) |
| 02/08/2019 | 10 | CJA 23 Financial Affidavit by Hae Yeong Song. (SEALED pursuant to E-Government Act of 2002). (rg) (Entered: 02/11/2019) |
| 02/08/2019 | 11 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Hae Yeong Song Duty Pub. Defender-San Antonio for Hae Yeong Song appointed. Signed by Judge Henry J. Bemporad. (rg) (Entered: 02/11/2019) |
| 02/08/2019 | 12 | ORDER OF TEMPORARY DETENTION: Bond set to NO BOND as to Hae Yeong Song. District Court Arraignment and Detention Hearing set for 2/13/2019 10:30 AM before Judge Henry J. Bemporad. Signed by Judge Henry J. Bemporad. (rg) (Entered: 02/11/2019) |
| 02/12/2019 | 13 | NOTICE OF ATTORNEY APPEARANCE: Kurt Gene May appearing for Hae Yeong Song . Attorney Kurt Gene May added to party Hae Yeong Song(pty:dft) (May, Kurt) (Entered: 02/12/2019) |
| 02/12/2019 | | Attorney Duty Pub. Defender-San Antonio terminated as to Hae Yeong Song. (rg) (Entered: 02/12/2019) |
| 02/13/2019 | 14 | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Hae Yeong Song. (rg) (Entered: 02/14/2019) |
| 02/13/2019 | 15 | Order Accepting Waiver of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Hae Yeong Song. Signed by Judge Richard B. Farrer. (rg) (Entered: 02/14/2019) |
| 02/13/2019 | 16 | Minute Entry for proceedings held before Judge Richard B. Farrer:Bail Review Hearing as to Hae Yeong Song held on 2/13/2019. (Minute entry documents are not available electronically.) (Court Reporter ftr gold.) (rg) (Entered: 02/14/2019) |
| 02/13/2019 | 33 | ORDER SETTING CONDITIONS OF BOND - Bond set to $50,000 Unsecured with Myong Soon Song (mother) to sign as surety as to Hae Yeong Song. ***The Defendant shall remain in custody until all military orders and pending matters are resolved*** Signed by Judge Richard B. Farrer. (rg) (Entered: 09/06/2019) |
| 02/20/2019 | 17 | General Order Concerning Discovery & Pre-Trial Motions as to Hae Yeong Song. Signed by Judge David A. Ezra. (rg) (Entered: 02/20/2019) |
| 02/20/2019 | 18 | SCHEDULING ORDER as to Hae Yeong Song: Plea Agreement due by 3/29/2019, Jury Selection and Trial set for 4/15/2019 9:30 AM before Judge David A. Ezra. Signed by Judge David A. Ezra. (rg) (Entered: 02/20/2019) |
| 03/28/2019 | 19 | Unopposed MOTION to Continue by Hae Yeong Song. (May, Kurt) (Entered: 03/28/2019) |
| 04/01/2019 | 20 | ORDER GRANTING 19 Motion to Continue as to Hae Yeong Song (1) Jury Selection and Trial set for 5/20/2019 9:30 AM before Judge David A. Ezra, Plea Agreement due by 5/3/2019. Signed by Judge David A. Ezra. (rg) (Entered: 04/01/2019) |

| 04/30/2019 | 21 | MOTION to Substitute Attorney by Hae Yeong Song. (Convery, John) (Entered: 04/30/2019) |
|---|---|---|
| 04/30/2019 | | Attorney John A. Convery for Hae Yeong Song added (rg) (Entered: 04/30/2019) |
| 05/01/2019 | | Text Order GRANTING 21 Motion to Substitute Attorney as to Hae Yeong Song (1). It is hereby ORDERED that AFPD Kurt May is terminated from representing Defendant Song. John A Convery is substituted as attorney of record for this case. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ps) (Entered: 05/01/2019) |
| 05/01/2019 | | Attorney Kurt Gene May terminated as to Hae Yeong Song. (rg) (Entered: 05/01/2019) |
| 05/06/2019 | 22 | MOTION to Continue by Hae Yeong Song. (Convery, John) (Entered: 05/06/2019) |
| 05/09/2019 | 23 | ORDER GRANTING 22 Motion to Continue as to Hae Yeong Song (1). Jury Selection and Trial reset for 8/26/2019 9:30 AM before Judge David A. Ezra, Plea Agreement due by 8/9/2019. Signed by Judge David A. Ezra. (rg) (Entered: 05/09/2019) |
| 08/07/2019 | 24 | SEALED MOTION (Attachments: # 1 Sealed Document Sealed Exhibits) (Convery, John) Modified on 8/8/2019 (rg). (Entered: 08/07/2019) |
| 08/08/2019 | 25 | ORDER SETTING MOTION HEARING as to Hae Yeong Song, Set Motion Hearing in case as to Hae Yeong Song 24 SEALED MOTION filed. (Motion Hearing set for 8/16/2019 1:30 PM before Judge David A. Ezra) The Governments response to the pending motion is due to the Court no later than Tuesday, August 13, 2019 by the close of business day. Signed by Judge David A. Ezra. (rg) (Entered: 08/08/2019) |
| 08/13/2019 | 26 | MOTION to Continue by Hae Yeong Song. (Convery, John) (Entered: 08/13/2019) |
| 08/13/2019 | 27 | ORDER RESETTING MOTION HEARING as to Hae Yeong Song, 24 SEALED MOTION filed. (Motion Hearing Reset for 9/12/2019 1:30 PM before Judge David A. Ezra). Signed by Judge David A. Ezra. (rg) (Entered: 08/13/2019) |
| 08/14/2019 | 28 | MOTION to Continue by Hae Yeong Song. (Convery, John) (Entered: 08/14/2019) |
| 08/14/2019 | | Text Order MOOTING 26 Motion to Continue as to Hae Yeong Song (1) in light of Defendant's MOTION to Continue 28 . Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ps) (Entered: 08/14/2019) |
| 08/16/2019 | 29 | ORDER RESETTING MOTION HEARING as to Hae Yeong Song, 24 SEALED MOTION filed. (Motion Hearing reset for 9/9/2019 1:30 PM before Judge David A. Ezra). Signed by Judge David A. Ezra. (rg) (Entered: 08/16/2019) |
| 08/16/2019 | 30 | ORDER GRANTING 28 Motion to Continue as to Hae Yeong Song (1). Jury Selection and Trial set for 12/2/2019 9:30 AM before Judge David A. Ezra, Plea Agreement due by 11/15/2019. Signed by Judge David A. Ezra. (rg) (Entered: 08/16/2019) |
| 08/26/2019 | 31 | RESPONSE in Opposition by USA as to Hae Yeong Song re 24 SEALED MOTION filed filed by Defendant Hae Yeong Song (Richardson, Bettina) (Entered: 08/26/2019) |
| 08/27/2019 | 32 | ORDER RESETTING MOTION HEARING as to Hae Yeong Song, 24 SEALED MOTION filed.(Motion Hearing reset for 10/1/2019 9:00 AM before Judge David A. Ezra). Signed by Judge David A. Ezra. (rg) (Entered: 08/28/2019) |
| 09/19/2019 | 34 | RESPONSE TO MOTION by USA as to Hae Yeong Song re 24 SEALED MOTION filed filed by Defendant Hae Yeong Song (Richardson, Bettina) (Entered: 09/19/2019) |

| 09/20/2019 | 35 | Bench Warrant Returned Executed on 02/07/2019 as to Hae Yeong Song. (mgr) (Entered: 09/20/2019) |
|---|---|---|
| 09/24/2019 | 36 | Unsecured Bond Filed as to Hae Yeong Song in amount of $50,000.00. (rg) (Entered: 09/24/2019) |
| 09/25/2019 | 37 | ORDER RESETTING MOTION HEARING as to Hae Yeong Song, Reset Motion Hearing in case as to Hae Yeong Song 24 SEALED MOTION filed. (Motion Hearing reset for 11/26/2019 9:00 AM before Judge David A. Ezra). Signed by Judge David A. Ezra. (rg) (Entered: 09/25/2019) |
| 09/30/2019 | 38 | MOTION to Modify Conditions of Release by Hae Yeong Song. (Attachments: # 1 Exhibit)(Convery, John) (Entered: 09/30/2019) |
| 10/01/2019 | | Text Order REFERRING 38 Motion to Modify Conditions of Release as to Hae Yeong Song (1) to United States Magistrate Judge Farrer. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ps) (Entered: 10/01/2019) |
| 10/01/2019 | | MOTION as to Hae Yeong Song REFERRED to Magistrate Judge: 38 MOTION to Modify Conditions of Release. Referral Judge: Richard B. Farrer. (rg) (Entered: 10/01/2019) |
| 10/03/2019 | | Text Order GRANTING 38 Motion to Modify Conditions of Release as to Hae Yeong Song (1). Having been advised by Pretrial Services that they are unopposed in this specific case to the removal of condition (aa) Participate in Specialized Treatment Services, that condition of pretrial release shall be removed. All other conditions of Defendant's pretrial release remain in full force and effect. Entered by Judge Richard B. Farrer. (This is a text-only entry generated by the court. There is no document associated with this entry.) (RBF) (Entered: 10/03/2019) |
| 10/03/2019 | | MotionsNo Longer Referred as to Hae Yeong Song: 38 MOTION to Modify Conditions of Release (rg) (Entered: 10/04/2019) |
| 11/21/2019 | 39 | MOTION to Continue by Hae Yeong Song. (Convery, John) (Entered: 11/21/2019) |
| 11/22/2019 | 40 | ORDER GRANTING 39 Motion to Continue as to Hae Yeong Song (1) Jury Selection set for 3/16/2020 09:30AM before Judge David A. Ezra, Jury Trial set for 3/16/2020 09:30 AM before Judge David A. Ezra, Plea Agreement due by 2/28/2020,. Signed by Judge David A. Ezra. (rf) (Entered: 11/22/2019) |
| 11/26/2019 | 41 | Minute Entry for proceedings held before Judge David A. Ezra:Motion Hearing as to Hae Yeong Song held on 11/26/2019 re 24 SEALED MOTION filed filed by Hae Yeong Song. Court takes the motion under advisement. (Minute entry documents are not available electronically.) (Court Reporter Angela Hailey.) (rg) (Entered: 11/26/2019) |
| 11/26/2019 | | Motion Taken Under Advisement as to Hae Yeong Song re 24 SEALED MOTION filed. (rg) (Entered: 11/26/2019) |
| 11/26/2019 | 42 | WITNESS LIST (Suppression Hearing) by USA as to Hae Yeong Song. (rg) (Entered: 11/26/2019) |
| 11/26/2019 | 43 | EXHIBIT LIST (Suppression Hearing) by Hae Yeong Song. (rg) (Entered: 11/26/2019) |
| 11/26/2019 | 44 | EXHIBIT LIST (Suppression Hearing) by USA as to Hae Yeong Song. (rg) (Entered: 11/26/2019) |
| 12/13/2019 | 45 | RESPONSE TO MOTION by USA as to Hae Yeong Song re 24 SEALED MOTION filed filed by Defendant Hae Yeong Song (Richardson, Bettina) (Entered: 12/13/2019) |

| 12/18/2019 | 47 | ORDER set Motion Hearing in case as to Hae Yeong Song 24 SEALED MOTION filed.( Motion Hearing set for 2/19/2020 09:00 AM before Judge David A. Ezra,). Signed by Judge David A. Ezra. (rf) (Entered: 12/27/2019) |
|---|---|---|
| 12/20/2019 | 46 | REPLY TO RESPONSE to Motion by Hae Yeong Song re 24 SEALED MOTION filed filed by Defendant Hae Yeong Song (Convery, John) (Entered: 12/20/2019) |
| 02/10/2020 | 48 | NOTICE OF ATTORNEY APPEARANCE Antonio Franco, Jr appearing for USA. *Government's Notice of Appearance of Counsel.* Attorney Antonio Franco, Jr added to party USA(pty:pla) (Franco, Antonio) (Entered: 02/10/2020) |
| 02/10/2020 | 49 | NOTICE *United States of America's Bill of Particulars for Forfeiture of Property* by USA as to Hae Yeong Song (Franco, Antonio) (Entered: 02/10/2020) |
| 02/19/2020 | 53 | Minute Entry for proceedings held before Judge David A. Ezra:Motion Hearing as to Hae Yeong Song held on 2/19/2020 re 24 SEALED MOTION filed filed by Hae Yeong Song. (Minute entry documents are not available electronically.) (Court Reporter Angela Hailey.) (rg) (Entered: 02/25/2020) |
| 02/19/2020 | | "ORAL" MOTION to Continue Trial Settings by Hae Yeong Song. (rg) (Entered: 02/25/2020) |
| 02/19/2020 | | "ORAL" ORDER GRANTING ["ORAL"] Motion to Continue Trial Settings as to Hae Yeong Song (1). by Judge David A. Ezra. (rg) (Entered: 02/25/2020) |
| 02/19/2020 | 55 | EXHIBIT LIST (Motion Hearing) by USA as to Hae Yeong Song (rg) (Entered: 02/26/2020) |
| 02/19/2020 | 56 | WITNESS LIST (Motion Hearing) by USA as to Hae Yeong Song (rg) (Entered: 02/26/2020) |
| 02/25/2020 | 50 | Sealed Order. Signed by Judge David A. Ezra. (rg) (Entered: 02/25/2020) |
| 02/25/2020 | 51 | ORDER REFERRING MATTER TO MAGISTRATE JUDGE for the purpose of jury selection as to Hae Yeong Song. Signed by Judge David A. Ezra. (rg) (Entered: 02/25/2020) |
| 02/25/2020 | 52 | ORDER as to Hae Yeong Song, (Setting Pretrial Conference set for 8/14/2020 9:00 AM before Judge David A. Ezra). Signed by Judge David A. Ezra. (rg) (Entered: 02/25/2020) |
| 02/25/2020 | 54 | ORDER GRANTING MOTION FOR CONTINUANCE AND EXCLUDING TIME UNDER THE SPEEDY TRIAL ACT as to Hae Yeong Song: Jury Selection and Trial set for 8/17/2020 9:30 AM before Judge David A. Ezra, Plea Agreement due by 7/31/2020. Signed by Judge David A. Ezra. (rg) (Entered: 02/25/2020) |
| 02/26/2020 | 57 | ORDER as to Hae Yeong Song, (Setting Jury Selection for 8/17/2020 9:30AM before Judge Henry J. Bemporad). Signed by Judge Henry J. Bemporad. (rg) (Entered: 02/26/2020) |
| 03/02/2020 | 58 | TRANSCRIPT filed of Proceedings as to Hae Yeong Song held on 11/26/19 Proceedings Transcribed: Motion Hearing. Court Reporter/Transcriber Angela Hailey, Telephone number 210.244.5048. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. Redaction Request due 3/23/2020, Redacted Transcript Deadline set for 4/2/2020, Release of Transcript Restriction set for 6/1/2020, (Hailey, Angela) (Entered: 03/02/2020) |

| | | |
|---|---|---|
| 03/02/2020 | 59 | TRANSCRIPT filed of Proceedings as to Hae Yeong Song held on 2/19/20 Proceedings Transcribed: Motion Hearing. Court Reporter/Transcriber Angela Hailey, Telephone number 210.244.5048. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. Redaction Request due 3/23/2020, Redacted Transcript Deadline set for 4/2/2020, Release of Transcript Restriction set for 6/1/2020, (Hailey, Angela) (Entered: 03/02/2020) |
| 04/14/2020 | | Text Order MOOTING 60 Ex Parte Motion as to Hae Yeong Song (1) in light of the SEALED EX PARTE MOTION 61 . Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ps) (Entered: 04/14/2020) |
| 04/14/2020 | | Text Order REFERRING 61 Ex Parte Motion as to Hae Yeong Song (1) to the duty United States Magistrate Judge. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ps) (Entered: 04/14/2020) |
| 04/14/2020 | | MOTION as to Hae Yeong Song REFERRED to Magistrate Judge: 61 SEALED EX PARTE MOTION Filed. Referral Judge: Richard B. Farrer. (rg) (Entered: 04/14/2020) |
| 04/17/2020 | 63 | Sealed Order. Signed by Judge Richard B. Farrer. (rg) (Entered: 04/17/2020) |
| 04/17/2020 | | Text Order REFERRING 62 Ex Parte Motion as to Hae Yeong Song (1) to United States Magistrate Judge Farrer. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ps) (Entered: 04/17/2020) |
| 04/17/2020 | | MOTION as to Hae Yeong Song REFERRED to Magistrate Judge Farrer: 62 SEALED EX PARTE MOTION Filed. Referral Judge: Richard B. Farrer. (rg) (Entered: 04/17/2020) |
| 04/20/2020 | 64 | Sealed Order. Signed by Judge Richard B. Farrer. (aej) (Entered: 04/20/2020) |
| 04/20/2020 | | Motions No Longer Referred as to Hae Yeong Song: 62 SEALED EX PARTE MOTION Filed (ju) (Entered: 04/21/2020) |
| 07/08/2020 | 65 | MOTION to Continue by Hae Yeong Song. (Convery, John) (Entered: 07/08/2020) |
| 07/15/2020 | 66 | ORDER CONTINUING TRIAL DATE AND EXCLUDING TIME UNDER THE SPEEDY TRIAL ACT - GRANTING 65 Motion to Continue as to Hae Yeong Song (1). Jury Selection and Trial set for 1/4/2021 9:30 AM before Judge David A. Ezra, Plea Agreement due by 12/18/2020. Signed by Judge David A. Ezra. (rg) (Entered: 07/15/2020) |
| 07/22/2020 | 67 | NOTICE *United States of America's Second Bill of Particulars for Forfeiture of Property* by USA as to Hae Yeong Song (Franco, Antonio) (Entered: 07/22/2020) |
| 07/29/2020 | 68 | ORDER CANCELLING PRETRIAL CONFERENCE scheduled for Friday, August 14, 2020 @ 9:00 AM as to Hae Yeong Song. Signed by Judge David A. Ezra. (rg) (Entered: 07/30/2020) |
| 12/10/2020 | 69 | MOTION to Continue by Hae Yeong Song. (Convery, John) (Entered: 12/10/2020) |
| 12/11/2020 | 70 | ORDER TO CONTINUE - Ends of Justice as to Hae Yeong Song, ( Plea Agreement due by 2/19/2021,, Jury Selection and Trial reset for 3/8/2021 9:30AM before Judge David A. Ezra.. Signed by Judge David A. Ezra. (mgr) (Entered: 12/11/2020) |

| 03/04/2021 | 71 | MOTION to Continue by Hae Yeong Song. (Convery, John) (Entered: 03/04/2021) |
|---|---|---|
| 03/05/2021 | 72 | ORDER CONTINUING TRIAL DATE AND EXCLUDING TIME UNDER THE SPEEDY TRIAL ACT - GRANTING 71 Motion to Continue as to Hae Yeong Song (1): Jury Selection and Trial set for 5/24/2021 9:30 AM before Judge David A. Ezra, Plea Agreement due by 5/7/2021. Signed by Judge David A. Ezra. (rg) (Entered: 03/05/2021) |
| 03/12/2021 | 73 | NOTICE *GOVERNMENTS NOTICE OF SUBSTITUTION OF COUNSEL* by USA as to Hae Yeong Song (Gattinella, Ray) (Entered: 03/12/2021) |
| 03/12/2021 | | Attorney Antonio Franco, Jr terminated as to USA. (rg) (Entered: 03/15/2021) |
| 04/29/2021 | 74 | ORDER CONTINUING TRIAL DATE AND FINDINGS REGARDING EXCLUDABLE TIME PURSUANT TO SPEEDY TRIAL ACT as to Hae Yeong Song. Signed by Judge David A. Ezra. (bot1) (Entered: 04/30/2021) |
| 04/29/2021 | 75 | Order Regarding the Resumption of Criminal Jury Trials as to Hae Yeong Song. Signed by Chief Judge Orlando L. Garcia. (bot1) (Entered: 04/30/2021) |
| 05/04/2021 | 76 | MOTION to Continue by USA as to Hae Yeong Song. (Attachments: # 1 Proposed Order) (Richardson, Bettina) (Entered: 05/04/2021) |
| 05/05/2021 | 77 | ORDER CONTINUING TRIAL DATE AND EXCLUDING TIME UNDER THE SPEEDY TRIAL ACT as to Hae Yeong Song. Signed by Judge David A. Ezra. (cd) Modified on 5/12/2021 (rg). (Entered: 05/06/2021) |
| 05/05/2021 | | Set/Reset Deadlines/Hearings as to Hae Yeong Song: Jury Selection and Jury Trial set for 7/19/2021 9:30 AM before Judge David A. Ezra (rg) (Entered: 05/18/2021) |
| 05/07/2021 | 78 | Advisory to the Court by USA and Hae Yeong Song. (nm) (Entered: 05/07/2021) |
| 05/14/2021 | | Text Order MOOTING 76 Motion to Continue as to Hae Yeong Song (1) in light of the ORDER CONTINUING TRIAL DATE AND EXCLUDING TIME UNDER THE SPEEDY TRIAL ACT 77 . Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ps) (Entered: 05/14/2021) |
| 05/17/2021 | 79 | Order Regarding the Resumption of Criminal Jury Trials as to Hae Yeong Song. Signed by Chief Judge Orlando L. Garcia. (bot1) (Entered: 05/17/2021) |
| 06/23/2021 | 80 | MOTION *to Waive Jury Trial and Request for Bench Trial* by Hae Yeong Song. (Convery, John) (Entered: 06/23/2021) |
| 06/23/2021 | | Text Order REFERRING 80 Motion to Waive Jury Trial and Request for Bench Trial as to Hae Yeong Song (1) to an available United States Magistrate Judge to hold an expedited hearing. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ps) (Entered: 06/23/2021) |
| 06/23/2021 | | MOTIONS as to Hae Yeong Song REFERRED to DUTY Magistrate Judge: 80 MOTION *to Waive Jury Trial and Request for Bench Trial*. Referral Judge: Elizabeth S. Chestney. (bc) (Entered: 06/23/2021) |
| 06/23/2021 | 81 | ORDER SETTING VIDEO MOTIONS HEARING as to Hae Yeong Song, 80 MOTION to Waive Jury Trial and Request for Bench Trial. (Motion Hearing set for 6/25/2021 4:00 PM before Judge Elizabeth S. Chestney). Signed by Judge Elizabeth S. Chestney. (rg) (Entered: 06/23/2021) |
| 06/24/2021 | 82 | MOTION to Amend/Correct *Conditions of Bond* by Hae Yeong Song. (Convery, John) (Entered: 06/24/2021) |

| 06/25/2021 | 83 | Waiver of rights and consent to proceed by Video Conference by Hae Yeong Song (Convery, John) (Entered: 06/25/2021) |
|---|---|---|
| 06/25/2021 | | Text Order GRANTING 82 Motion to Amend/Correct as to Hae Yeong Song (1), which is unopposed by the Government, and the additional chaperone named in the motion is approved. This ruling is subject to confirmation that Pretrial has no objections. Entered by Judge Elizabeth S. Chestney. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ESC) (Entered: 06/25/2021) |
| 06/25/2021 | | Text Order GRANTING 80 the MOTION to Waive Jury Trial and Request for Bench Trial filed to Hae Yeong Song (1). The motion is granted after the undersigned (1) confirmed Defendant filed a written waiver (signed by Defendant, his attorney, and the Government); and (2) held a hearing on June 25, 2021 confirming Defendant is freely, knowingly, and voluntarily waiving his right to a trial by jury. The District Court will reset the case as a bench trial by separate order. Entered by Judge Elizabeth S. Chestney. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ESC) (Entered: 06/25/2021) |
| 06/25/2021 | | Motions No Longer Referred as to Hae Yeong Song: 80 MOTION *to Waive Jury Trial and Request for Bench Trial* (bc) (Entered: 06/25/2021) |
| 06/25/2021 | 84 | Minute Entry for proceedings held before Judge Elizabeth S. Chestney:Motion Hearing as to Hae Yeong Song held on 6/25/2021 re 80 MOTION to Waive Jury Trial and Request for Bench Trial filed by Hae Yeong Song, 82 MOTION to Amend/Correct Conditions of Bond filed by Hae Yeong Song. (Minute entry documents are not available electronically.) (Court Reporter ftr gold.) (rg) (Entered: 06/28/2021) |
| 06/29/2021 | 85 | ORDER SETTING BENCH TRIAL AND RELATED DEADLINES as to Hae Yeong Song: Plea Agreement due by 7/2/2021, Bench Trial set for 7/20/2021 9:00 AM before Judge David A. Ezra. Signed by Judge David A. Ezra. (rg) (Entered: 06/29/2021) |
| 07/09/2021 | 86 | NOTICE *of Intent to Offer Expert Witness Testimony* by USA as to Hae Yeong Song (Attachments: # 1 Exhibit A)(Yuen, Eric) (Entered: 07/09/2021) |
| 07/12/2021 | 87 | WITNESS LIST by USA as to Hae Yeong Song (Richardson, Bettina) (Entered: 07/12/2021) |
| 07/12/2021 | 88 | EXHIBIT LIST by USA as to Hae Yeong Song (Richardson, Bettina) (Entered: 07/12/2021) |
| 07/12/2021 | | Court received email from Pretrial indicating they are unopposed to Dkt.#82 MOTION to Amend/Correct Conditions of Bond filed by Hae Yeong Song. (vs1) (Entered: 07/20/2021) |
| 07/14/2021 | 89 | Advisory to the Court *Regarding the Forfeiture Phase of Trial* by USA as to Hae Yeong Song (Gattinella, Ray) (Entered: 07/14/2021) |
| 07/15/2021 | 90 | EXHIBIT LIST by USA as to Hae Yeong Song *Amended* (Richardson, Bettina) (Entered: 07/15/2021) |
| 07/15/2021 | 91 | Proposed findings of fact and conclusions of law filed by USA as to Hae Yeong Song (Richardson, Bettina) (Entered: 07/15/2021) |
| 07/16/2021 | 92 | Proposed findings of fact and conclusions of law filed by Hae Yeong Song (Convery, John) (Entered: 07/16/2021) |
| 07/19/2021 | 93 | EXHIBIT LIST by USA as to Hae Yeong Song *Second Amended* (Richardson, Bettina) (Entered: 07/19/2021) |

| 07/20/2021 | 94 | Minute Entry for proceedings held before Judge David A. Ezra:Bench Trial begun on 7/20/2021 as to Hae Yeong Song (1) Count 1,2. (Minute entry documents are not available electronically.) Bench Trial as to Hae Yeong Song held. Trial to resume on Wednesday, July 21, 2021 at 9:00 a.m. (Minute entry documents are not available electronically.) (Court Reporter Angela Hailey.) (rg) (Entered: 07/21/2021) |
|---|---|---|
| 07/20/2021 | 96 | WAIVER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO Hae Yeong Song. (rg) (Entered: 07/21/2021) |
| 07/21/2021 | 95 | Minute Entry for proceedings held before Judge David A. Ezra:Bench Trial as to Hae Yeong Song held. (Minute entry documents are not available electronically.) Bench Trial as to Hae Yeong Song completed on 7/21/2021. (Minute entry documents are not available electronically.), Referred to Probation for Pre-Sentence Report as to Hae Yeong Song. Court Verdict of Guilty on Count(s) 1 and 2. (Court Reporter Angela Hailey.) (rg) (Entered: 07/21/2021) |
| 07/21/2021 | | "ORAL" MOTIONS for Judgment of Acquittal and MOTION to Suppress by Hae Yeong Song. (rg) (Entered: 07/21/2021) |
| 07/21/2021 | | "ORAL" ORDER DENYING ["ORAL"] Motion for Judgment of Acquittal as to Hae Yeong Song (1); DENYING ["ORAL"] Motion to Suppress as to Hae Yeong Song (1). by Judge David A. Ezra. (rg) (Entered: 07/21/2021) |
| 07/21/2021 | 97 | COURT VERDICT as to Hae Yeong Song (1) Guilty on Count 1,2. Signed by Judge David A. Ezra. (rg) (Main Document 97 replaced on 7/22/2021) (rg). (Entered: 07/21/2021) |
| 07/21/2021 | 98 | WITNESS LIST (Bench Trial) by USA as to Hae Yeong Song (rg) (Entered: 07/21/2021) |
| 07/21/2021 | 99 | EXHIBIT LIST (Bench Trial) by USA as to Hae Yeong Song (rg) (Entered: 07/21/2021) |
| 07/21/2021 | 100 | EXHIBIT RECEIPT by USA as to Hae Yeong Song (rg) (Entered: 07/21/2021) |
| 07/21/2021 | 101 | ORDER Setting Sentencing as to Hae Yeong Song. Sentencing set for 11/1/2021 9:00 AM before Judge David A. Ezra. Signed by Judge David A. Ezra. (rg) (Entered: 07/21/2021) |
| 10/12/2021 | | MOTION as to Hae Yeong Song REFERRED to Magistrate Judge: 102 SEALED EX PARTE MOTION Filed. Referral Judge: Richard B. Farrer. (rg) (Entered: 10/13/2021) |
| 10/13/2021 | 103 | Sealed Report and Recommendation. Signed by Judge Richard B. Farrer. (rg) (Entered: 10/14/2021) |
| 10/13/2021 | | Motion No Longer Referred as to Hae Yeong Song: 102 SEALED EX PARTE MOTION Filed (rg) (Entered: 10/14/2021) |
| 10/25/2021 | 104 | SEALED PRESENTENCE INVESTIGATION REPORT Filed as to Hae Yeong Song by Officer Maria E. Holley. (Document available to court only) (Attachments: # (1-2) (Villarreal, Janet) (Entered: 10/25/2021) |
| 10/28/2021 | 105 | MOTION to Continue by Hae Yeong Song. (Convery, John) (Entered: 10/28/2021) |
| 10/28/2021 | 106 | MOTION for Forfeiture of Property *Motion for Preliminary Order of Forfeiture* by USA as to Hae Yeong Song. (Gattinella, Ray) (Entered: 10/28/2021) |
| 10/29/2021 | 108 | ORDER GRANTING DEFENDANT'S MOTION FOR CONTINUANCE AND ORDER RESETTING SENTENCING as to Hae Yeong Song( Sentencing reset for 12/8/2021 9:00 AM before Judge David A. Ezra,),.. Signed by Judge David A. Ezra. (mgr) (Entered: 10/29/2021) |

| 11/02/2021 | 109 | PRELIMINARY ORDER OF FORFEITURE - ORDER GRANTING 106 Motion for Forfeiture of Property as to Hae Yeong Song (1). Signed by Judge David A. Ezra. (rg) (Entered: 11/03/2021) |
|---|---|---|
| 12/01/2021 | 110 | SEALED SUPPLEMENTAL ATTACHMENT re 104 SEALED PRESENTENCE INVESTIGATION REPORT Filed as to Hae Yeong Song by Officer Maria E. Holley. (Document available to court only) (Attachments: # (1-2) (Villarreal, Janet) (Entered: 12/01/2021) |
| 12/01/2021 | 111 | ORDER as to Hae Yeong Song, (Resetting Sentencing for 12/6/2021 9:00 AM before Judge David A. Ezra). Signed by Judge David A. Ezra. (rg) (Entered: 12/03/2021) |
| 12/03/2021 | 112 | ORDER as to Hae Yeong Song, (Resetting Sentencing for 12/8/2021 9:00 AM before Judge David A. Ezra). Signed by Judge David A. Ezra. (rg) (Entered: 12/06/2021) |
| 12/03/2021 | 113 | Sealed Document filed. (rg) (Entered: 12/07/2021) |
| 12/03/2021 | 114 | Sealed Document filed. (rg) (Entered: 12/07/2021) |
| 12/03/2021 | 115 | Sealed Document filed. (rg) (Entered: 12/07/2021) |
| 12/08/2021 | 117 | Minute Entry for proceedings held before Judge David A. Ezra:Sentencing held on 12/8/2021 for Hae Yeong Song (1), Count(s) 1, One-Hundred Seventy (170) months imprisonment to run concurrent; Ten years supervised release to run concurrent; No fine imposed; $100 special assessment; $22,500.00 in restitution.; Count(s) 2, Sixty (60) months imprisonment to run concurrent; Ten years supervised release to run concurrent; No fine imposed; $100 special assessment. (Minute entry documents are not available electronically.) (Court Reporter Angela Hailey.) (rg) (Entered: 12/17/2021) |
| 12/13/2021 | 116 | Appeal of Final Judgment by Hae Yeong Song. No filing fee submitted (Convery, John) (Entered: 12/13/2021) |
| 12/13/2021 | 118 | NOTICE OF APPEAL following 116 Notice of Appeal (E-Filed) by Hae Yeong Song Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out a Transcript Order and follow the instructions set out on the form. If the appellant has a court appointed attorney under CJA, the CJA 24 vouchers must be completed in the E-voucher system. (rg) (Entered: 12/17/2021) |
| 12/13/2021 | | MOTION to Appoint Counsel by Hae Yeong Song.***MOTION FOR APPOINTMENT OF COUNSEL IS INCLUDED IN DOCKET ENTRY 118 .*** (dtg)***Modified FILING DATE FROM 12/21/2021 TO 12/13/2021 on 1/3/2022 (dtg).*** (Entered: 01/03/2022) |
| 12/21/2021 | 119 | JUDGMENT AND COMMITMENT as to Hae Yeong Song (1), Count(s) 1, One-Hundred Seventy (170) months imprisonment to run concurrent; Ten years supervised release to run concurrent; No fine imposed; $100 special assessment; $22,500.00 in restitution.; Count(s) 2, Sixty (60) months imprisonment to run concurrent; Ten years supervised release to run concurrent; No fine imposed; $100 special assessment.. Signed by Judge David A. Ezra. (bot2) (Entered: 12/21/2021) |
| 12/21/2021 | 120 | Sealed Statement of Reasons as to Hae Yeong Song (SOR documents are not available electronically.) (bot2) (Entered: 12/21/2021) |
| 12/21/2021 | 121 | Reference List filed under seal as to Hae Yeong Song. (rg) (Entered: 12/21/2021) |
| 12/27/2021 | 122 | MOTION to Withdraw as Attorney by Hae Yeong Song. (Convery, John) (Entered: 12/27/2021) |

| 01/03/2022 | | Text Order REFERRING 122 Motion to Withdraw as Attorney as to Hae Yeong Song (1) to the duty United States Magistrate Judge. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ps) (Entered: 01/03/2022) |
|---|---|---|
| 01/03/2022 | | MOTION as to Hae Yeong Song REFERRED to Magistrate Judge: 122 MOTION to Withdraw as Attorney. Referral Judge: Richard B. Farrer. (rg) (Entered: 01/04/2022) |
| 01/05/2022 | 123 | ORDER GRANTING 122 Motion for John Convery to Withdraw as Attorney as to Hae Yeong Song (1). Signed by Judge Richard B. Farrer. (rg) (Entered: 01/06/2022) |
| 01/05/2022 | | Attorney John A. Convery terminated as to Hae Yeong Song. (rg) (Entered: 01/06/2022) |
| 01/05/2022 | | Motions No Longer Referred as to Hae Yeong Song: 122 MOTION to Withdraw as Attorney (rg) (Entered: 01/06/2022) |
| 01/06/2022 | 124 | ORDER APPOINTING COUNSEL as to Hae Yeong Song Angela J. Moore for Hae Yeong Song appointed. MOTION to Appoint Counsel filed by Hae Yeong Song. Signed by Judge Richard B. Farrer. (rg) (Entered: 01/06/2022) |
| 01/11/2022 | 125 | DESIGNATION OF RECORD ON APPEAL by Hae Yeong Song re 118 Notice of Appeal - Final Judgment,, 116 Notice of Appeal (E-Filed) (Moore, Angela)***Modified TEXT on 1/14/2022 (dtg).***DKT-13 TRANSCRIPT ORDER FORM:***MOTION TO SUPPRESS HEARING OF 11/26/2019 BEFORE JUDGE EZRA. TRANSCRIPT IS ALREADY ON FILE IN THE CLERK'S OFFICE, SEE DOCKET ENTRY 58 .***MOTION HEARING OF 2/19/2020 BEFORE JUDGE EZRA. TRANSCRIPT IS ALREADY ON FILE IN THE CLERK'S OFFICE, SEE DOCKET ENTRY 59 .***BENCH TRIAL OF 7/20/2021 BEFORE JUDGE EZRA. COURT REPORTER: ANGELA HAILEY.***BENCH TRIAL OF 7/21/2021 BEFORE JUDGE EZRA. COURT REPORTER: ANGELA HAILEY.***SENTENCING HEARING OF 12/8/2021 BEFORE JUDGE EZRA. COURT REPORTER: ANGELA HAILEY.***FTR GOLD: VIDEO MOTIONS HEARING OF 6/25/2021 BEFORE MAGISTRATE JUDGE CHESTNEY. TRANSCRIBER ASSIGNED - ANGELA HAILEY.*** (Entered: 01/11/2022) |
| 02/02/2022 | 126 | TRANSCRIPT filed of Proceedings as to Hae Yeong Song held on 6/25/21 Proceedings Transcribed: Waiver of Jury Trial. Court Reporter/Transcriber Angela Hailey, Telephone number 210.244.5048. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. Redaction Request due 2/23/2022, Redacted Transcript Deadline set for 3/7/2022, Release of Transcript Restriction set for 5/3/2022, Appeal Record due by 2/17/2022, (Hailey, Angela) (Entered: 02/02/2022) |
| 02/02/2022 | 127 | TRANSCRIPT filed of Proceedings as to Hae Yeong Song held on 7/20/21 Proceedings Transcribed: NonJury Trial Proceedings. Court Reporter/Transcriber Angela Hailey, Telephone number 210.244.5048. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. Redaction Request due 2/23/2022, Redacted Transcript Deadline set for |

| | | 3/7/2022, Release of Transcript Restriction set for 5/3/2022, Appeal Record due by 2/17/2022, (Hailey, Angela) (Entered: 02/02/2022) |
|---|---|---|
| 02/02/2022 | 128 | TRANSCRIPT filed of Proceedings as to Hae Yeong Song held on 7/21/21 Proceedings Transcribed: NonJury Trial Proceedings. Court Reporter/Transcriber Angela Hailey, Telephone number 210.244.5048. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. Redaction Request due 2/23/2022, Redacted Transcript Deadline set for 3/7/2022, Release of Transcript Restriction set for 5/3/2022, Appeal Record due by 2/17/2022, (Hailey, Angela) (Entered: 02/02/2022) |
| 02/02/2022 | 129 | TRANSCRIPT filed of Proceedings as to Hae Yeong Song held on 12/8/21 Proceedings Transcribed: Sentencing. Court Reporter/Transcriber Angela Hailey, Telephone number 210.244.5048. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. Redaction Request due 2/23/2022, Redacted Transcript Deadline set for 3/7/2022, Release of Transcript Restriction set for 5/3/2022, Appeal Record due by 2/17/2022, (Hailey, Angela) (Entered: 02/02/2022) |
| 02/25/2022 | 131 | Letter of transmittal from USCA received as to Hae Yeong Song in for 118 Notice of Appeal - Final Judgment, filed by Hae Yeong Song.***The court has granted an extension of time to and including March 21, 2022 for filing the record on appeal in this case.*** (dtg) (Entered: 03/08/2022) |
| 02/28/2022 | 130 | NOTICE *DECLARATION OF PUBLICATION* by USA as to Hae Yeong Song (Gattinella, Ray) (Entered: 02/28/2022) |
| 03/21/2022 | 132 | EXHIBITS TO MOTION TO SUPPRESS HEARINGS OF 11/26/2019 AND 02/19/2020 by USA as to Hae Yeong Song. (Attachments: # 1 G-1, # 2 G-1a, # 3 G-2, # 4 G-3, # 5 G-3a, # 6 G-4, # 7 G-5, # 8 G-5a, # 9 G-6)(dtg) (Entered: 03/21/2022) |
| 03/21/2022 | 133 | TRIAL EXHIBITS by USA as to Hae Yeong Song. (Attachments: # 1 G-1, # 2 G-2, # 3 G-2A, # 4 G-3, # 5 G-3A)(dtg) (Entered: 03/21/2022) |
| 03/21/2022 | 134 | TRIAL EXHIBITS by USA as to Hae Yeong Song. (Attachments: # 1 G-4, # 2 G-4A, # 3 G-5, # 4 G-6, # 5 G-9)(dtg) (Entered: 03/21/2022) |
| 03/21/2022 | 135 | TRIAL EXHIBITS by USA as to Hae Yeong Song. (Attachments: # 1 G-10, # 2 G-10A, # 3 G-11, # 4 G-11A, # 5 G-12, # 6 G-12A, # 7 G-12B, # 8 G-12C)(dtg) (Entered: 03/21/2022) |
| 03/21/2022 | 136 | TRIAL EXHIBITS by USA as to Hae Yeong Song. (Attachments: # 1 G-13, # 2 G-13A, # 3 G-14, # 4 G-14A, # 5 G-15)(dtg) (Entered: 03/21/2022) |
| 03/21/2022 | 137 | TRIAL EXHIBITS by USA as to Hae Yeong Song. (Attachments: # 1 G-16, # 2 G-20, # 3 G-20A, # 4 G-21, # 5 G-21A)(dtg) (Entered: 03/21/2022) |
| 03/21/2022 | 138 | TRIAL EXHIBITS by USA as to Hae Yeong Song. (Attachments: # 1 G-22, # 2 G-22A, # 3 G-23, # 4 G-23A, # 5 G-24, # 6 G-24A)(dtg) (Entered: 03/21/2022) |

| 03/21/2022 | 139 | TRIAL EXHIBITS by USA as to Hae Yeong Song. (Attachments: # 1 G-25, # 2 G-25A, # 3 G-26, # 4 G-26A, # 5 G-27, # 6 G-27A)(dtg) (Entered: 03/21/2022) |
| 03/21/2022 | 140 | TRIAL EXHIBITS by USA as to Hae Yeong Song. (Attachments: # 1 G-28, # 2 G-28A, # 3 G-29, # 4 G-29A, # 5 G-30, # 6 G-30A)(dtg) (Entered: 03/21/2022) |
| 03/21/2022 | 141 | TRIAL EXHIBITS by USA as to Hae Yeong Song. (Attachments: # 1 G-31, # 2 G-31A, # 3 G-32, # 4 G-32A, # 5 G-33, # 6 G-33A)(dtg) (Entered: 03/21/2022) |
| 03/21/2022 | 142 | TRIAL EXHIBITS by USA as to Hae Yeong Song. (Attachments: # 1 G-34, # 2 G-34A, # 3 G-35, # 4 G-35A)(dtg) (Entered: 03/21/2022) |
| 03/22/2022 | 143 | MOTION for Forfeiture of Property *Motion for Final Judgment of Forfeiture* by USA as to Hae Yeong Song. (Gattinella, Ray) (Entered: 03/22/2022) |
| 03/23/2022 | 144 | FINAL JUDGMENT OF FORFEITURE ORDER GRANTING 143 Motion for Forfeiture of Property as to Hae Yeong Song (1). Signed by Judge David A. Ezra. (rg) (Entered: 03/23/2022) |
| 03/28/2022 | | Certification of the Electronic Record on Appeal in USCA #21-51229 has been accepted by the 5th Circuit as to Hae Yeong Song. re 118 Notice of Appeal - Final Judgment. Attorneys are advised that they may now download the EROA from the Fifth Circuit CM/ECF site. Please click this link to download the instructions here (dtg) (Entered: 03/28/2022) |
| 03/31/2022 | 151 | ORDER of USCA (certified copy) as to Hae Yeong Song. re 118 Notice of Appeal - Final Judgment.*** ORDER: Angela J. Moore, the attorney appointed under the Criminal Justice Act to represent Hae Yeong Song on appeal, moves to withdraw as counsel and to substitute Stephen H. Shapiro, whom Song has retained to represent him. Song consents to the substitution. No briefs have been filed in this appeal. Song has a right to be represented by qualified counsel of his choosing whom he is able to retain. See Luis v. United States, 578 U.S. 5, 11-12 (2016). Accordingly, the motion to withdraw and to substitute retained counsel is GRANTED, and Moore is relieved of all further responsibilities in this appeal.*** (Attachments: # 1 TRANSMITTAL LETTER FROM USCA5)(dtg) (Entered: 07/28/2022) |
| 07/11/2022 | 145 | Letter of transmittal from USCA received as to Hae Yeong Song in for 118 Notice of Appeal - Final Judgment, filed by Hae Yeong Song.***The court has considered the motion of Hae Yeong Song to view nonpublic and/or sealed material in the record on appeal. It is ordered that counsel for Hae Yeong Song may obtain access to sealed documents #24, #50, #63, and #64 ONLY. The non-public and/or sealed materials from the record are for your review ONLY. The integrity of the sealed documents is your responsibility, and if provided in original paper, return to the district court as soon as it has served your purpose.*** (Attachments: # 1 COPY OF APPELLANTS UNOPPOSED MOTION TO VIEW SEALED DOCUMENTS)(dtg) (Entered: 07/11/2022) |
| 07/11/2022 | | ELECTRONIC RECORD ON APPEAL containing requested Sealed Documents as to Hae Yeong Song were emailed to ATTORNEY, STEPHEN H. SHAPIRO, per 5th Circuit's instructions. See Docket Entry #145. (dtg) (Entered: 07/11/2022) |
| 07/18/2022 | 146 | SEALED MOTION filed (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit) (Keagle, Todd) (Entered: 07/18/2022) |
| 07/18/2022 | 147 | *AMENDED JUDGMENT (*amended to correct restitution page) as to Hae Yeong Song (1), Count(s) 1, One-Hundred Seventy (170) months imprisonment to run concurrent; Ten years supervised release to run concurrent; No fine imposed; $100 special assessment; $22,500.00 in restitution.; Count(s) 2, Sixty (60) months imprisonment to run concurrent; |

| | | |
|---|---|---|
| | | Ten years supervised release to run concurrent; No fine imposed; $100 special assessment. Signed by Judge David A. Ezra. (rg) (Entered: 07/18/2022) |
| 07/18/2022 | 148 | Sealed Statement of Reasons as to Hae Yeong Song (SOR documents are not available electronically.) (rg) (Entered: 07/18/2022) |
| 07/27/2022 | 149 | Letter of transmittal from USCA received as to Hae Yeong Song in for 118 Notice of Appeal - Final Judgment, filed by Hae Yeong Song.***The court has considered the motion of United States of America to view non-public and/or sealed material in the record on appeal. Unless the court granted access to one or more specific documents ONLY, it is ordered, counsel for United States of America may obtain all ex parte documents filed on behalf of United States of America, and all other non ex parte documents in the record. The non-public and/or sealed materials from the record are for your review ONLY. The integrity of the sealed documents is your responsibility, and if provided in original paper, return to the district court as soon as it has served your purpose.*** (Attachments: # 1 COPY OF APPELLEES UNOPPOSED MOTION TO VIEW SEALED DOCUMENTS FOR APPELLATE PURPOSES)(dtg) (Entered: 07/27/2022) |
| 07/27/2022 | | ELECTRONIC RECORD ON APPEAL containing requested Sealed Documents as to Hae Yeong Song were emailed to AUSAs, JOSEPH GAY AND CHARLES FOWLER, per 5th Circuit's instructions. See Docket Entry #149. (dtg) (Entered: 07/27/2022) |
| 07/27/2022 | 150 | SEALED ORDER. Signed by Judge David A. Ezra. (rg) (Entered: 07/28/2022) |
| 07/27/2022 | 152 | SEALED EX PARTE MOTION Filed. (rg) (Entered: 08/17/2022) |
| 07/27/2022 | 153 | Sealed Document filed. (rg) (Entered: 08/17/2022) |
| 08/30/2022 | 154 | Sealed Order. Signed by Judge David A. Ezra. (mgr) (Entered: 08/30/2022) |
| 08/30/2022 | 155 | SEALED DOCUMENT. (rg) Modified on 9/21/2022 (rg). (Entered: 09/21/2022) |
| 08/30/2022 | 156 | SEALED DOCUMENT. (rg) Modified on 9/21/2022 (rg). (Entered: 09/21/2022) |
| 12/07/2022 | 157 | Sealed Document filed (nm) (Entered: 01/04/2023) |
| 01/10/2023 | 158 | MOTION to Unseal Document *Motion to Unseal Garnishment Documents Re: Fidelity Investments, Inc., Garnishee* by USA as to Hae Yeong Song. (Attachments: # 1 Proposed Order Order Unsealing Documents)(Keagle, Todd) (Entered: 01/10/2023) |
| 01/10/2023 | 159 | Certificate of Service by USA as to Hae Yeong Song *Re: Fidelity Investments, Inc., Garnishee* (Keagle, Todd) (Entered: 01/10/2023) |
| 01/11/2023 | 160 | ORDER GRANTING 158 Motion to Unseal Document 158 MOTION to Unseal Document *Motion to Unseal Garnishment Documents Re: Fidelity Investments, Inc., Garnishee*, 157 Sealed Document, 155 Writ Issued, 150 Sealed Order, 152 SEALED EX PARTE MOTION Filed, 153 Sealed Document, 146 SEALED MOTION filed, 156 Notice, 154 Sealed Order as to Hae Yeong Song (1). Signed by Judge David A. Ezra. (mgr) (Entered: 01/12/2023) |
| 02/27/2023 | 161 | MOTION *for Final Order of Garnishment Re: Fidelity Investments, Inc., Garnishee* by USA as to Hae Yeong Song. (Attachments: # 1 Proposed Order Order, # 2 Proposed Order Final Order of Garnishment)(Keagle, Todd) (Entered: 02/27/2023) |
| 02/28/2023 | 162 | ORDER GRANTING 161 Motion Final Order of Garnishment as to Hae Yeong Song (1). Signed by Judge David A. Ezra. (mgr) (Entered: 03/01/2023) |
| 02/28/2023 | 163 | Final Order of Garnishment as to Hae Yeong Song. Signed by Judge David A. Ezra. (mgr) (Entered: 03/01/2023) |

| 03/14/2023 | 165 | MOTION to Appear Pro Hac Vice-Stephen H. Shapiro for Hae Yeong Song. (mgr) Modified on 3/23/2023 To edit text (bc). (Entered: 03/15/2023) |
|---|---|---|
| 03/14/2023 | 166 | MOTION MOTION AND INCORPORATED MEMORANDUM TO ENROLL AS COUNSEL OF RECORD FOR HAE YEONG SONG by Hae Yeong Song. (mgr) (Entered: 03/15/2023) |
| 03/14/2023 | 167 | MOTION for Leave to File Sealed Document (mgr) (Entered: 03/15/2023) |
| 03/20/2023 | 168 | Pro Hac Vice Fee Paid Filing fee $ 100, receipt number 2177. (mgr) (Entered: 03/20/2023) |
| 03/22/2023 | | Text Order GRANTING 167 Motion for Leave to File Sealed Document as to Hae Yeong Song (1). Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ps) (Entered: 03/22/2023) |
| 03/22/2023 | | Attorney Stephen H. Shapiro for Hae Yeong Song added (bc) (Entered: 03/23/2023) |
| 03/22/2023 | 169 | SEALED MOTION filed (mgr) (Entered: 03/23/2023) |
| 03/23/2023 | | Text Order GRANTING 165 Motion to Appear Pro Hac Vice. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing within 10 days of this order. Registration is managed by the PACER Service Center as to Hae Yeong Song (1) Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (btlc) (Entered: 03/23/2023) |
| 03/23/2023 | | Text Order MOOTING 166 Motion as to Hae Yeong Song in light of the Court's granting of the Motion to Appear Pro Hac Vice [Dkt. 165]. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (btlc) (Entered: 03/23/2023) |
| 03/30/2023 | 170 | MOTION for Extension of Time to File Response/Reply as to 169 SEALED MOTION filed by USA as to Hae Yeong Song. (Attachments: # 1 Proposed Order)(Richardson, Bettina) (Entered: 03/30/2023) |
| 03/31/2023 | | Text Order GRANTING 170 Motion for Extension of Time to File Response/Reply as to Hae Yeong Song (1). Therefore, the Government's response to due to the COurt on April 7, 2023 COB. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ps) (Entered: 03/31/2023) |
| 03/31/2023 | 171 | ORDER --IT IS HEREBY ORDERED that the Government is granted an extension of time, and the response to Defendants motion is due by Friday, April 7, 2023. as to Hae Yeong Song. Signed by Judge David A. Ezra. (mgr) (Entered: 03/31/2023) |
| 04/07/2023 | 172 | RESPONSE in Opposition by USA as to Hae Yeong Song re 169 SEALED MOTION filed by Defendant Hae Yeong Song (Attachments: # 1 Proposed Order, # 2 Exhibit 1)(Richardson, Bettina) (Entered: 04/07/2023) |
| 04/17/2023 | 173 | Sealed Order. Signed by Judge David A. Ezra. (mgr) (Entered: 04/17/2023) |
| 10/26/2023 | 174 | Certified and Transmitted Electronic Record on Appeal (1 CD) as to Hae Yeong Song to HAE YEONG SONG. re 118 Notice of Appeal - Final Judgment.***COVER LETTER AND CD WERE MAILED VIA USPS TO MR. SONG ON 10/26/2023.*** (dtg) (Entered: 10/26/2023) |
| 10/26/2023 | | Attorney Stephen H. Shapiro terminated as to Hae Yeong Song.***Motion to Withdraw as Attorney was filed with the 5th Circuit and Motion was Granted by the 5th Circuit.*** (dtg) (Entered: 10/26/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/03/2023 09:30:21 | | | |
| **PACER Login:** | Nilestefan | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:19-cr-00063-DAE |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |